FILED

AO 241
(Rev. 01/15)

Page 2

**PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF
HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

CASE: 6:18 CV-1915-ORL
18-KRS

| United States District Court | District: Middle | |
|---|---|---|
| Name (under which you were convicted): <br> James Edward Washington | | Docket or Case No.: <br> ~~5D18-0795~~ |
| Place of Confinement : <br> Madison Correctional Institution | Prisoner No.: <br> E-197574 | |
| Petitioner (include the name under which you were convicted) | Respondent (authorized person having custody of petitioner) | |
| James Edward Washington | v. | STATE OF FLORIDA |
| The Attorney General of the State of: FLORIDA | | |

**PETITION**

1. (a) Name and location of court that entered the judgment of conviction you are challenging:

   Orange County Courthouse
   425 North Orange Ave.
   Orlando, FLa 32801

   (b) Criminal docket or case number (if you know):   48-2014-CF-017252-0

2. (a) Date of the judgment of conviction (if you know):   September 14, 2016

   (b) Date of sentencing:   October 31, 2016

3. Length of sentence:   5 years

4. In this case, were you convicted on more than one count or of more than one crime?   ☑ Yes   ☐ No

5. Identify all crimes of which you were convicted and sentenced in this case:

   Burglary
   Possession of Burglary Tools
   Resisting Officer Without Violence
   Petit Theft

6. (a) What was your plea? (Check one)

   ☑ (1)   Not guilty        ☐ (3)   Nolo contendere (no contest)

   ☐ (2)   Guilty            ☐ (4)   Insanity plea

AO 241
(Rev. 01/15)

(b) If you entered a guilty plea to one count or charge and a not guilty plea to another count or charge, what did you plead guilty to and what did you plead not guilty to? *I plead not guilty to all charges*

_____

_____

_____

_____

(c) If you went to trial, what kind of trial did you have? (Check one)

☑ Jury    ☐ Judge only

7.  Did you testify at a pretrial hearing, trial, or a post-trial hearing?

☑ Yes    ☐ No

8.  Did you appeal from the judgment of conviction?

☑ Yes    ☐ No

9.  If you did appeal, answer the following:

(a) Name of court: *Fifth District Court of Appeal*

(b) Docket or case number (if you know): *5D16-3743*

(c) Result: *Denied*

(d) Date of result (if you know): *November 28, 2017*

(e) Citation to the case (if you know): *N/A*

(f) Grounds raised: *Point 1 - The trial court erred in denying Appellant's motions for judgment of acquittal on the charges, where the evidence was insufficient to support the convictions. Point 2 - The trial court erred in failing to control the improper closing comments of the prosecutor.*

_____

(g) Did you seek further review by a higher state court?    ☐ Yes    ☑ No

If yes, answer the following:

(1) Name of court: _____

(2) Docket or case number (if you know): _____

(3) Result: _____

_____

(4) Date of result (if you know): _____

AO 241
(Rev. 01/15)

(5) Citation to the case (if you know): _____

(6) Grounds raised: _____

_____

_____

_____

(h) Did you file a petition for certiorari in the United States Supreme Court?   ☐ Yes   ☑ No

If yes, answer the following:

(1) Docket or case number (if you know): _____

(2) Result: _____

_____

(3) Date of result (if you know): _____

(4) Citation to the case (if you know): _____

10. Other than the direct appeals listed above, have you previously filed any other petitions, applications, or motions concerning this judgment of conviction in any state court?   ☑ Yes   ☐ No

11. If your answer to Question 10 was "Yes," give the following information:

(a)  (1) Name of court: *Fifth District Court of Appeal*

(2) Docket or case number (if you know): *5D16-3743*

(3) Date of filing (if you know): *March 12, 2018*

(4) Nature of the proceeding: *PETITION FOR WRIT OF HABEAS CORPUS (Alleging Ineffective Assistance of Appellate Counsel)*

(5) Grounds raised: ① *A Due process violation occurred when the police eliminated body camera recorded video evidence that would have proved evidence tampering, police misconduct, and exonerated the Petitioner. The three essential components of a true Brady violation occurred which made the conviction unsustainable according to the Florida and United States constitutions.* ② *Four Public defenders had refused to compel the police to provide the body camera video. Their ineffectiveness led to the Petitioner's conviction. Despite being informed and noticing the Brady violation documented in the Petitioner's record on appeal, appellate counsel failed to argue the point in the appeal.*

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?   ☐ Yes   ☑ No

(7) Result: _____

(8) Date of result (if you know): _____

(b) If you filed any second petition, application, or motion, give the same information:

(1) Name of court: *Fifth District Court of Appeal*

(2) Docket or case number (if you know): *5D16-3743*

(3) Date of filing (if you know): *June 13, 2018*

(4) Nature of the proceeding: *REPLY TO RESPONDENT'S RESPONSE TO PETITIONER'S PETITION ALLEGING INEFFECTIVE ASSISTANCE OF COUNSEL*

(5) Grounds raised: *The Petitioner's lawyers were ineffective because they refused to compel the court to order the police to provide the body camera video. Due process was violated the moment the body camera video evidence was destroyed. The Petitioner received ineffective assistance of appellate counsel when the Brady violation was not made an issue in the grounds raised in the direct appeal.*

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

☐ Yes   ☑ No

(7) Result: *Denied*

(8) Date of result (if you know): *July 25, 2018*

(c) If you filed any third petition, application, or motion, give the same information:

(1) Name of court: *Fifth District Court of Appeal*

(2) Docket or case number (if you know): *5D16-3743*

(3) Date of filing (if you know): *August 13, 2018*

(4) Nature of the proceeding: *Motion for Rehearing*

(5) Grounds raised: *The Orlando Police Department's policy of destroying unsolicited body camera video in 30 days is a due process violation and a crime punishable by Section 918.13 Florida Statutes. The Petitioner wants the court to render their decision to deny the Ineffective Assistance of Appellate Counsel Habeas Corpus with an opinion. There is not a legally sustainable reason justifying the Petitioner's conviction and continued incarceration when the evidence that could have exonerated him was destroyed to protect the officers.*

AO 241
(Rev. 01/15)

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

☐ Yes  ☑ No

(7) Result: _Denied_

(8) Date of result (if you know): _August 14, 2017_

(d) Did you appeal to the highest state court having jurisdiction over the action taken on your petition, application, or motion?

(1) First petition:  ☑ Yes  ☐ No

(2) Second petition:  ☑ Yes  ☐ No

(3) Third petition:  ☑ Yes  ☐ No

(e) If you did not appeal to the highest state court having jurisdiction, explain why you did not:

_I need the Fifth District Court of Appeal to give an opinion in their denial so the complaint can go to next level._

12.  For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground.

**CAUTION: To proceed in the federal court, you must ordinarily first exhaust (use up) your available state-court remedies on each ground on which you request action by the federal court. Also, if you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.**

GROUND ONE:  _Due process prohibits the suppression of evidence favorable to the accused or discrediting its own case._

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

_The police tried to record an execution while detaining the Petitioner before arrest. Knife-like dentures were installed in the K-9's mouth before it was given the command to bite the leg in an area to sever the femoral artery. When the Petitioner survived, Evidence was redistributed to construct a crime to justify their actions. The body camera video recording that would have exposed their inappropriate conduct was destroyed._

(b) If you did not exhaust your state remedies on Ground One, explain why:  _I don't know if my state remedies are exhausted. I only know the Appellate Court denied my petition unjustifiably to stop me from going to the State Supreme Court to obtain relief. An opinion has to be included in the denial in order to go to a higher court. I requested an opinion in my motion for rehearing but was denied. I appeal to this court._

(c)      **Direct Appeal of Ground One:**

(1) If you appealed from the judgment of conviction, did you raise this issue?    ☐ Yes    ☑ No

(2) If you did not raise this issue in your direct appeal, explain why: *My appellate lawyer prepared and submitted the initial brief without raising the issue as I requested.*

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☑ Yes    ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: *Petition For Habeas Corpus (Alleging Ineffective Appellate Counsel)*

Name and location of the court where the motion or petition was filed: *Fifth District Court of Appeals; 300 S. Beach St; Daytona Beach, FLA 32114*

Docket or case number (if you know): *5D16-3743*

Date of the court's decision: *July 25, 2018*

Result (attach a copy of the court's opinion or order, if available): _____

(3) Did you receive a hearing on your motion or petition?    ☐ Yes    ☑ No

(4) Did you appeal from the denial of your motion or petition?    ☑ Yes    ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?    ☑ Yes    ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: *Fifth District Court of Appeals; 300 S. Beach St; Daytona Beach, FLA 32114*

Docket or case number (if you know): *5D16-3743*

Date of the court's decision: *August 13, 2018*

Result (attach a copy of the court's opinion or order, if available): _____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

AO 241
(Rev. 01/15)

Page 8

**(e) Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground One: _The aforementioned Petition for Habeas Corpus (Alleging Ineffective Assistance of Appellant Counsel)_

**GROUND TWO:** _I, the Petitioner, was denied the 6th Amendment right to reasonably effective assistance of counsel._

**(a)** Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

_The necessity of securing the police body camera video recording was explained to 4 public defenders. The services of the public defender's office was terminated because they chose to deny my request to protect those officers. The body camera video was destroyed within 30 days which is against the established law and a Brady violation. Despite being made aware of the necessity of arguing this dilemma on direct appeal, appellate counsel chose to defy the petitioner's request._

**(b)** If you did not exhaust your state remedies on Ground Two, explain why: _I don't know if my state remedies are exhausted. My Habeas Corpus was denied without an opinion to keep me from going to the State Supreme Court with the complaint._

**(c)     Direct Appeal of Ground Two:**

(1) If you appealed from the judgment of conviction, did you raise this issue?          ☑ Yes     ☑ No

(2) If you did <u>not</u> raise this issue in your direct appeal, explain why: _The due process violation was explained to appellate counsel and documented in the record on appeal. She chose to not honor my request._

**(d)     Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☑ Yes    ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: _Petition For Habeas Corpus (Alleging Ineffective Appellate Counsel)_

Name and location of the court where the motion or petition was filed: _Fifth District Court of Appeals; 300 S. Beach St.; Daytona Beach, FLA 32114_

Docket or case number (if you know): _5D16-3743_

Date of the court's decision: _July 25, 2018_

AO 241
(Rev. 01/15)

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(3) Did you receive a hearing on your motion or petition?          ☐ Yes   ☑ No

(4) Did you appeal from the denial of your motion or petition?     ☑ Yes   ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?   ☑ Yes   ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: *Fifth District Court of Appeals; 300 S. Beach St., Daytona Beach, FLA 32114*

Docket or case number (if you know): *5D16 - 3743*

Date of the court's decision: *August 13, 2018*

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

_____

_____

(e)   **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Two : *The aforementioned Petition for Habeas Corpus (Alleging Ineffective Assistance of Appellant Counsel)*

**GROUND THREE:** *N/A*

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

_____

_____

_____

_____

_____

_____

_____

(b) If you did not exhaust your state remedies on Ground Three, explain why: _____

_____

_____

_____

(c)  **Direct Appeal of Ground Three:**

(1) If you appealed from the judgment of conviction, did you raise this issue?  ☐ Yes   ☐ No

(2) If you did not raise this issue in your direct appeal, explain why: _____

_____

_____

(d)  **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☐ Yes   ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

(3) Did you receive a hearing on your motion or petition?   ☐ Yes   ☐ No

(4) Did you appeal from the denial of your motion or petition?   ☐ Yes   ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?   ☐ Yes   ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

_____

AO 241
(Rev. 01/15)

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

_____

(e)   **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Three: _____

_____

_____

**GROUND FOUR:**   *N/A* _____

_____

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

_____

_____

_____

_____

_____

_____

_____

(b) If you did not exhaust your state remedies on Ground Four, explain why: _____

_____

_____

_____

(c)   **Direct Appeal of Ground Four:**

(1) If you appealed from the judgment of conviction, did you raise this issue?   ☐  Yes   ☐  No

(2) If you did not raise this issue in your direct appeal, explain why: _____

_____

_____

(d)   **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☐  Yes   ☐  No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: _____

AO 241
(Rev. 01/15)

Name and location of the court where the motion or petition was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(3) Did you receive a hearing on your motion or petition?                    ☐ Yes    ☐ No

(4) Did you appeal from the denial of your motion or petition?               ☐ Yes    ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?    ☐ Yes    ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

_____

_____

_____

(e)   **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you

have used to exhaust your state remedies on Ground Four: _____

_____

_____

_____

_____

_____

_____

13.     Please answer these additional questions about the petition you are filing:

(a)      Have all grounds for relief that you have raised in this petition been presented to the highest state court

having jurisdiction?   ☑ Yes     ☐ No

If your answer is "No," state which grounds have not been so presented and give your reason(s) for not

presenting them:   _____

_____

_____

_____

(b)      Is there any ground in this petition that has not been presented in some state or federal court?  If so, which

ground or grounds have not been presented, and state your reasons for not presenting them:

① *False imprisonment; ② Malicious Prosecution; the Petitioner*
*receive ineffective assistance of counsel during prosecution which*
*must be challenged in the originating county courts.*

14.     Have you previously filed any type of petition, application, or motion in a federal court regarding the conviction

that you challenge in this petition?     ☐ Yes     ☑ No

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, the issues

raised, the date of the court's decision, and the result for each petition, application, or motion filed.  Attach a copy

of any court opinion or order, if available.    _____

_____

_____

_____

_____

_____

_____

15.     Do you have any petition or appeal now pending (filed and not decided yet) in any court, either state or federal, for

the judgment you are challenging?     ☐ Yes     ☑ No

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues

raised.    _____

_____

_____

_____

_____

_____

16.  Give the name and address, if you know, of each attorney who represented you in the following stages of the
judgment you are challenging:

(a) At preliminary hearing: ① _ZEA MCDONNOUGH, ②MOLINA ARENA-RANDALL,_
③ _JARED M. ADELMAN, JO ANNA SNOW OPATO._ 435 N. ORANGE AVE ORLANDO, FL 32801

(b) At arraignment and plea: ① _ZEA MCDONNOUGH_ ②_MOLINA ARENA-RANDALL,_
③ _JARED M. ADELMAN, JOANNA SNOW OPATO._ 435 N. ORANGE AVE ORLANDO, FL 32801

(c) At trial: _DONNA M. GOERNER; P.O. BOX 160266;_
_Altamonte Springs, FL 32716_

(d) At sentencing: _DONNA M. GOERNER_

(e) On appeal: _KATHRYN ROLLISON RADTKE; 444 Seabreeze_
_Blvd. Suite 210; Daytona Beach, FL 32118_

(f) In any post-conviction proceeding: _After the Direct Appeal, the_
_Petitioner has been Pro Se._

(g) On appeal from any ruling against you in a post-conviction proceeding: _After the_
_Ineffective Assistance of Appellant Counsel/Habeas_
_Corpus, the Petitioner has been Pro Se._

17.  Do you have any future sentence to serve after you complete the sentence for the judgment that you are
challenging?      ☐ Yes   ☑ No

(a) If so, give name and location of court that imposed the other sentence you will serve in the future:

_____

_____

(b) Give the date the other sentence was imposed: _N/A_

(c) Give the length of the other sentence: _N/A_

(d) Have you filed, or do you plan to file, any petition that challenges the judgment or sentence to be served in the
future?      ☐ Yes   ☐ No

18.  TIMELINESS OF PETITION: If your judgment of conviction became final over one year ago, you must explain
why the one-year statute of limitations as contained in 28 U.S.C. § 2244(d) does not bar your petition.*



* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2244(d) provides in

part that:

    (1)    A one-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of –

        (A)    the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

        (B)    the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such state action;

        (C)    the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

        (D)    the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

AO 241
(Rev. 01/15)

(2)     The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

Therefore, petitioner asks that the Court grant the following relief: *Petitioner respectfully request that the Court issue a Writ of Habeas Corpus requiring immediate release from the unjust convictions.*

or any other relief to which petitioner may be entitled.

_____
Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Petition for

Writ of Habeas Corpus was placed in the prison mailing system on _____ (month, date, year).

Executed (signed) on _____ (date).

*James E. Washington*
_____
Signature of Petitioner

If the person signing is not petitioner, state relationship to petitioner and explain why petitioner is not signing this petition.

_____

_____

_____

_____

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

James E. Washington,
                    Affiant,

v.                                          CASE NUMBER: _____
                                            (To be supplied by Clerk's Office)

   State of Florida
                    Defendant.

## PETITION UNDER 28 U.S.C. § 2254 FOR A WRIT OF HABEAS CORPUS

   COMES NOW, the Affiant, James E. Washington, per the instructions on the form for the Petition Under 28 U.S.C. § 2254 for a Writ of Habeas Corpus, list the following documents submitted to support arguments in a separate memorandum:

| DOCUMENT | APPENDIXES | NUMBER OF PAGES |
|---|---|---|
| Petition For Writ of Habeas Corpus Alleging Ineffective Assistance of Counsel | 1 - 33 | 225 |
| Reply to Respondent's Response to Petitioner's Petition Alleging Ineffective Assistance of Counsel | A - S | 369 |
| Order denying Petition for Ineffective Assistance of Appellant Counsel | NONE | 1 |
| Motion for Rehearing | A - C | 17 |
| Order denying Motion for Rehearing | NONE | 1 |
| Case Docket for Criminal Petition - Ineffective Assistance of Counsel from Orange County - Case Number 5D18-795 | NONE | 2 |

## CERTIFICATE OF SERVICE

   I HEREBY CERTIFY that a true and correct copy of the above has been sent by pre-paid first class United States mail on this 5th day of November 2018 to the Clerk of Court; United States District Court; United States Court-house; 401 West Central Boulevard, Suite 1200; Orlando, Florida 32801-0120.

                    James E. Washington
                    JAMES E. WASHINGTON
                    DOC# 187574; E2136S
                    Madison Correctional Institution
                    382 S.W. M.C.I. Way
                    Madison, FL 32340-6499

IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FIFTH DISTRICT

JAMES E. WASHINGTON,

        Petitioner,

v.                                CASE NO.  5D18-0795

STATE OF FLORIDA,

        Respondent.
_____/

DATE:  July 26, 2018

**BY ORDER OF THE COURT:**

        ORDERED that the Petition for Ineffective Assistance of Counsel, filed

March 12, 2018, is denied.

*I hereby certify that the foregoing is*
*(a true copy of) the original Court order.*

*Joanne P. Simmons*
JOANNE P SIMMONS CLERK

Panel: Judges Sawaya, Orfinger, and Edwards

cc:

Office of Attorney General    Allison  L. Morris        James E. Washington

IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FIFTH DISTRICT

JAMES E. WASHINGTON,

Petitioner,

v.                                                                CASE NO.  5D18-0795

STATE OF FLORIDA,

Respondent.

_____/

DATE:  August 14, 2018

## BY ORDER OF THE COURT:

ORDERED that Petitioner's Motion for Rehearing, filed August 13, 2018, is denied.

*I hereby certify that the foregoing is*
*(a true copy of) the original Court order.*

*Joanne P. Simmons*
JOANNE P SIMMONS CLERK

Panel: Judges Sawaya, Orfinger, and Edwards

cc:

Office of Attorney General    Allison  L. Morris              James E. Washington

Florida Fifth District Court of Appeal Docket

Case Docket

Case Number: 5D18-795

Criminal Petition - Ineffective Assistance of Counsel from Orange County

JAMES E. WASHINGTON vs. STATE OF FLORIDA

Lower Tribunal Case(s):48-2014-CF-017252-O

8/17/2018 11:55:56 AM

| Date Docketed | Description | Date Due | Filed By | Notes |
|---|---|---|---|---|
| 03/12/2018 | Petition Filed | | James E. Washington | |
| 03/12/2018 | Acknowledgement Letter 1 | | | |
| 03/13/2018 | ORD-Respondent to Respond | | | |
| 03/30/2018 | Motion for Extension of Time to File Response | | Allison L. Morris 931160 | |
| 04/02/2018 | Order Grant EOT to file Response to Ct. Order | | | |
| 05/14/2018 | Motion for Extension of Time to File Response | | Allison L. Morris 931160 | |
| 05/14/2018 | Order Grant EOT to file Response to Ct. Order | | | |
| 05/29/2018 | RESPONSE | | Allison L. Morris 931160 | |
| 05/29/2018 | Appendix to Response | | Allison L. Morris 931160 | |
| 06/04/2018 | Notice | | James E. Washington | |
| 06/13/2018 | REPLY | | James E. Washington | |
| 07/25/2018 | Order Denying Original Petition | | | |
| 07/25/2018 | Denied - Order by Judge | | | |
| 08/13/2018 | Disp. w/o Mandate | | | |
| 08/13/2018 | Returned Records | | | |
| 08/13/2018 | Motion For Rehearing | | James E. Washington | |
| 08/14/2018 | Order Deny Rehearing | | | |

**FIFTH DISTRICT COURT OF APPEAL**
300 South Beach Street
Daytona Beach, FL  32114
(386) 255-8600

DATE  **August 17, 2018**                                    **CASE NO:  5d18-0795**
vs.
**STATE**

**Mr. Washington,**

**In response to your recent correspondence, please see the paragraph(s) marked below,**

**X**       There is no case pending in this Court on your behalf.

Please contact the clerk of the <u>trial court</u> for additional information on your case.

This proceeding is still pending in this Court.  You or your attorney, if you are represented, will be notified by mail

Your appointed counsel is

Please direct your inquiry to your court appointed or retained counsel—

The           has not been filed as of this date.

The Clerk's office cannot provide legal services.  Please contact an attorney.

Every order signed by the Clerk is authorized by the Judges.  The Clerk's signature is merely certification that the order is the Judges' decision.

**X**       The above-numbered case was disposed of on – **7/25/18**

The motion for rehearing

The Court's mandate was issued on

A mandate is not issued when a case is disposed of by <u>order</u>.

Canon 3 of the Code of Judicial Conduct prohibits the judges from reading or considering your correspondence.

Copies are $1.00 per page §35.22, 28.24, Florida Statutes.  The documents requested must be clearly stated.  **<u>Please enclose a self-addressed stamp envelope for copies to be sent</u>**.

All parties, whether represented by counsel or not, must comply with the Florida Rules of Appellate Procedure.  The rules may be found in law libraries or accessed on line at <u>http://www.5dca.org.</u>  This Court cannot provide copies of rules or forms.

**X**       **Docket Sheet and Order Denying Motion are enclosed.**

Joanne P. Simmons, Clerk                    BY: _____    Deputy Clerk

IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FIFTH DISTRICT

JAMES E. WASHINGTON,
        Petitioner,

V.

                    CASE NO. 5D18-0795
STATE OF FLORIDA,
        Respondent,  /

Provided to Madison C.I. on
00/16/20 for mailing by
        Date
        Legal Mail

## MOTION FOR REHEARING

The Petitioner, James E. Washington, pursuant to rule 9.330, Florida Rules of Criminal Procedure, moves this Court for a rehearing in this case. The Court has overlooked or misapprehended points of law and facts in its decision. The Petitioner offers the following in support thereof:

1. The Court has overlooked or misapprehended points of law and facts in regard to the due process violation and Ineffective assistance of counsel when the Petitioner's petition for Ineffective Assistance of Appellate Counsel was denied. The Court's decision is not constitutionally sustainable under the laws of the State of Florida and the United States constitution. The Orlando police tried to record a ritualized execution of the Petitioner while detained before arrest. The Body camera video that recorded the assault and the police tampering with physical evidence to justify the incident was destroyed. (Appendix A, page 5 and 6) The Orlando Police Department policy is a due process violation and is a crime punishable by Section 918.13 Florida Statutes. Florida law requires law enforcement agencies to retain body camera footage for at least 90 days. Section 119.071 (L) (5) Florida Statutes. The evidence was destroyed in 30 days in violation of established Florida law. Since the Public defenders refused to request the Court to turn over the body camera footage with beneficial exculpatory evidence, the Petitioner terminated their services to be Pro Se in order to have the Court compel the police to provide the video evidence exonerating him while incriminating them. (Appendix B) The body camera video was no longer available (Appendix A, page 5 and 6). The Orlando Police department didn't have the authority to institute a policy that violates Florida law and the due process law of the United States constitution. Upon defendant request, the government must disclose all such information. Brady. v. Maryland, 373 U.S. 83 (1963). In Brady, the court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good or bad faith of the prosecution." 373 U.S. at 87, 83 S. Ct. 1194. The Petitioner was knowingly prosecuted and convicted in violation of due process. Appellate counsel was made aware of the due process violation but failed to address the issue as a part of her initial brief. (Appendix C) The Petitioner is being illegally detained in violation of the due process law of the constitution and warrants the relief requested in the initial Ineffective Assistance of Appellate Counsel Petition.

WHEREFORE, the Petitioner requests this Court for an order granting a rehearing and to withdraw the original decision. The Petitioner believes the Court is incapable of providing a judicially correct opinion justifying the denial of the Ineffective Assistance of Appellate Counsel Habeas Corpus. Consequently, the Petitioner is strongly soliciting a written opinion to provide a legitimate basis for Supreme Court review which will eventually terminate his incarceration. The Petitioner further prays this Honorable Court grant the relief initially sought.

IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FIFTH DISTRICT

Respectfully submitted,

*James E. Washington*
JAMES E. WASHINGTON
DOC# 197574; E2136S
Madison Correctional Institution
382 S.W. MCI Way
Madison, Florida 32340-6499

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the above has been sent by pre-paid First Class United States mail on this 10th day of August 2018 to Allison Leigh Morris, Assistant Attorney General, 444 Seabreeze Blvd., Fifth Floor, Daytona Beach, FL 32118; Fifth District Court of Appeals, 300 S. Beach St., Daytona Beach, FL 32114; Public Defender, 7th Judicial Circuit, Appellate Division, 444 Seabreeze Blvd., Ste. 210, Daytona Beach, FL 32118.

*James E. Washington*
JAMES E. WASHINGTON
DOC# 197574; E21368
Madison Correctional Institution
382 S.W. M.C.I. Way
Madison, FL 32340-6499

IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FIFTH DISTRICT

JAMES E. WASHINGTON,
    Petitioner,

V.                CASE NO. 5D18-0795

STATE OF FLORIDA,
    Respondent.   /

## NOTICE OF FILING APPENDIX OF MOTION FOR REHEARING

COMES NOW, the Petitioner, James E. Washington, filing this index to the appendixes of this Motion for Rehearing of Petition Alleging Ineffective Assistance of Appellate Counsel.

| Appendix | Pages | Subject Matter |
|----------|-------|----------------|
| A | 7 | State's response showing evidence destroyed. |
| B | 2 | E-mail response from Orlando Police Department. |
| C | 2 | Letter from Ms Kathryn Rollison Radtke |

Respectfully submitted,

James E. Washington
JAMES E. WASHINGTON
DOC#197574; E21365
Madison Correctional Institution
382 S.W. MCI Way
Madison, Florida 32340-6499

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the above has been sent by pre-paid First Class United States mail on this 10th day of August 2018 to Allison Leigh Morris, Assistant Attorney General, 444 Seabreeze Blvd, Fifth Floor, Daytona Beach, FL 32118; Fifth District Court of Appeals, 300 S. Beach St., Daytona Beach, FL 32114; Public Defender, 7th Judicial Circuit, Appellate Division, 444 Seabreeze Blvd., Ste. 210, Daytona Beach, FL 32118.

James E. Washington
JAMES E. WASHINGTON
DOC#197574; E21365
Madison Correctional Institution
382 S.W. MCI Way
Madison, FL 32340-6499



Filing # 46129856 E-Filed 09/07/2016 12:01:27 PM

IN THE CIRCUIT COURT OF THE NINTH
JUDICIAL CIRCUIT, IN AND FOR
ORANGE COUNTY, FLORIDA

STATE OF FLORIDA
       Plaintiff,

CASE NO:  48-2014-CF-017252-O

DIVISION:  19

vs.

JAMES EDWARD WASHINGTON
       Defendant.

_____/

## STATE'S RESPONSE TO DEFENDANT'S MOTION FOR DISCLOSURE OF IMPEACHING INFORMATION AND EVIDENCE FAVORABLE TO DEFENDANT

COMES NOW the State of Florida, by and through the undersigned Assistant State Attorney, and hereby responds to Defendant's Motion for Disclosure of Impeaching Information and Evidence Favorable to Defendant as follows:

1. Law Enforcement arrested Defendant for a multitude of charges on December 31, 2014.

2. Defendant has moved for a continuance on multiple occasions in this case.

3. Defendant has been represented by competent counsel from the Public Defender's Office and twice by Donna Goerner.

4. Defendant discharged Donna Goerner originally.

5. The Public Defender's Office was appointed, and Defendant discharged the Public Defender's Office.

6. Now, Donna Goerner is back on the case as the attorney of record.

7. During the pendency of the instant case, the State also requested Defendant be evaluated for competency.

8. Defendant was evaluated for competency and found to be competent.

9. On August 22, 2016, the defense filed the aforementioned motion requesting the State disclose a *myriad* of information relating to, *inter alia*, witnesses' criminal histories, body camera videos, and dash camera videos.

10. This case is currently set for trial on September 12, 2016 at 8:30 AM.

## I. Response to Section 1 of Defense's Motion (Criminal Records of Proposed Witnesses)

### 1. MEMORANDUM OF LAW

The Supreme Court of Florida has heard similar arguments levied by defense counsel in the instant case. In *Medina v. State*, 466 So.2d 1046 (Fla. 1985), the defense claimed the trial court erred when it failed to require the State to disclose the criminal records of several State witnesses. *See Medina*, 466 So.2d 1046, at 1049. The defense counsel's argument was that because the State had "access" to the criminal records, they should obtain them and disclose them. *See id.* However, the Court disagreed and held, "[that the trial] court granted the motion to the extent of information contained in the state's files, but properly held that the defense *has the initial burden of trying to discover such evidence and that the state is not required to prepare the defense's case." See id. See also State v. Counce*, 392 So.2d 1029 (FL Fourth DCA 1981) ("…The state has no duty to obtain information for the defense that the defense is able to obtain by means other than production by the state"); *Yanetta v. State*, 320 So.2d 23 (FL Third DCA 1975) ("A defendant should not be permitted to employ the pretrial discovery procedures for disclosure of information or documents which by the exercise of due diligence are readily available to him by subpoena or deposition"); *State v. Wright*, 803 So. 2d 793, 794 (FL Fourth DCA 2001) (*holding* "[b]efore requiring the state to secure this information for defense counsel, the trial court should have first ascertained whether the defendants could have obtained the requested criminal records from other sources through due diligence and determined whether the defendants had exerted their own efforts and resources and exhausted other available means to procure the information.").

### 2. ARGUMENT

The theme of these cases cited to is "one shall not do for another, what one can do for itself." Defense counsel from both the Public Defender's Office and Ms. Goerner have both had

the opportunity to depose twelve (12) State witnesses in this case. From the State's recollection, neither counsel asked any witness about their criminal history. Nor is there anything in the defense's motion suggesting the defense subpoenaed any criminal records from any criminal agency. It appears now in retrospect the defense wants the State to do the defense's job for the defense. This is not the State's job.

## II. <u>Response to Section 2 of Defense's Motion (Internal Affairs Investigations)</u>

There is nothing in the Florida Rules of Criminal Procedure that requires the State to actively seek out evidence for defense counsel. Internal Affairs Investigations are conducted by police agencies and not the State Attorney's Office. Moreover, the defense has deposed (12) State witnesses. One deponent stated during the deponent's deposition that there was a "Response Resistance Report," created in this case. On September 6, 2016, the State received a copy of that report and sent it to the defense.

Also, Defendant in this case filed a "Use of Force" complaint which in turn lead to an "Internal Affairs Investigation." If the defense believes that there are relevant material within that Internal Affairs Investigation then the defense should have subpoenaed those records. If the Defense believes there have been other Internal Affairs Investigations conducted against any State witness regarding another case, then the defense can subpoena those internal affairs records from the appropriate Police Department. *See Armstrong v. State*, 862 So.2d 705, 714 (Fla. 2003) (noting "*As a result of the public records productions*, the Defendant received internal affairs records from the Plantation Police Department...." However, in an abundance of caution, the State has obtained the Administrative Investigation Management Program Report for this "Use of Force" complaint. On September 2, 2016, the State sent the defense a copy of this report.

### III. Response to Section 3 of Defense's Motion (Threats to Government Witnesses of Prosecution)

The State is unaware of the status of, any threats, express or implied, made to a proposed State witness as to a criminal investigation; prosecution or potential prosecution which is pending or could be brought against the witness; any probationary, parole or deferred prosecutions pending or which could be initiated against the witness; or any tax, immigrations, administrative, or judicial claim or dispute which may be instituted against the witness by the Government or any state. Again, the defense has had the opportunity to depose twelve (12) state witnesses. For whatever reason, the defense chose not to ask any witness a question pertaining to this information sought. In addition, the defense has elected not to depose certain witnesses.

### IV. Response to Section 4 of Defense's Motion (Refusal to Testify)

The only instances the State is aware of where a State witness for this case has testified in regards to this case is during their depositions. The State is unaware of any occasion where a State witness in regards to this case has refused to testify before any court, grand jury or other body in regards to this case. The State is also unaware of any instance where a State witness in this case has testified or refused to testify before any court or grand jury in regards to another case. Again, the defense has had the opportunity to depose twelve (12) state witnesses. For whatever reason, the defense chose not to ask any witness a question pertaining to this information sought.

### V. Response to Section 5 of Defense's Motion ("Arguably" Probative Evidence and Records that Minimize involvement of Defendant)

To the State's knowledge, all of the discovery in the State's possession has been disclosed to the defense. Whatever records and information which "arguably" could be beneficial or useful to the State is contained within the discovery the State has provided to the defense via e-mail and personal delivery. The State is unaware of any such records or

information that minimizes Defendant's involvement in this crime other than any information contained within the discovery that was provided to the defense.

VI. **Response to Section 6 of Defense's Motion (Records of Non-Witness or Declarant)**

Other than the 911 caller, at this time, the State does not intend on using any other statement by a "Non-Witness or Declarant" as evidence during trial. The State's response to this request is the same as contained within sections A through E of this Response.

VII. **Response to Section 7 of Defense's Motion (Inconsistent Documented Evidence)**

To the State's knowledge, the defense has all of the discovery that the State has in regards to this case. Thus, it is unaware of any other documentary evidence that the defense does not have that is inconsistent with the expected testimony.

VIII. **Response to Section 8 of Defense's Motion (Written or Oral Statements made by State Witness)**

To the State's knowledge, the defense has all of the discovery that the State has in regards to this case. This discovery includes *inter alia*, police reports, photographs, and a 911 call. The state is unaware of any written, audio recorded, video recorded, video surveillance or oral statement in existence that the State has that the defense does not have.

IX. **Response to Section 9 of Defense's Motion (Dash Cam or Body Cam)**

The State does not have any surveillance video; dash cam video; or body camera video of this incident in its file. However, Officer John James does indicate in his deposition that he did have a body camera during this incident. The State has inquired about this body camera video. This issue has been discussed at length in Court on multiple occasions. The State has informed this Court and Defendant and defense counsel that the Orlando Police Department does not have a recording of this body camera video.

Initially, for officer safety purposes, the body camera was removed from Officer James's person and placed on a poll outside of the building to determine if the suspect, later determined

to be Defendant, was on the roof of the building. The body camera video was removed from the poll and the footage was viewed. The footage did not show any suspect on the roof of the building. From there, the body camera was returned to Officer James and Officer James determined the body camera to be operational. Officer James participated in the search for Defendant in the ceiling rafters. He was crawling in the rafters. During the search, the body camera either became unplugged or was not properly connected. The Orlando Police Department's policy states that body camera video footage is destroyed after thirty (30) days if the video contains no evidentiary value and a request is not made to maintain it for documentation. Since the initial footage did not show any person on the roof, and the body camera was not functioning properly while Officer James was in the ceiling rafters and during the apprehension of Defendant, the body camera video was destroyed.

### X.   Response to Section 10 of Defense's Motion (*Inter alia* Search Warrant Records relating to a Joint Law Enforcement effort)

To the State's knowledge, the defense has all of the discovery that the State has in regards to this case. The State is unaware of any other reports in existence in regards to this case. To the State's knowledge no other suspect was developed in regards to this case given Defendant was found in the building during the criminal episode.

### XI.   Response to Section 11 of Defense's Motion (Burglaries in the Area)

Again, the State is *not required to prepare* the defense's case for Defendant. *See Medina v. State*, 466 So.2d, at 1049. There is nothing in the Florida Rules of Criminal Procedure that requires the State to actively seek out evidence for defense counsel. Moreover, there is nothing in the Florida Rules of Criminal Procedure that requires or even suggests that the State produce for the defense a list or a report detailing burglaries to the address listed in the Information. The defense is seeking to use a certain theory of defense. It is not the State's job to assist the defense in making its theory stronger. The defense may choose to make a Public Records Request with

the appropriate police agency if it chooses.

I CERTIFY that a copy hereof has been furnished to Donna M. Goerner, donna@thejusticelawoffice.com, 283 Cranes Roost Blvd., Suite 111, Altamonte Springs, FL 32701 by e-mail on this 7th day of September, 2016.

JEFFREY L. ASHTON, State Attorney
Ninth Judicial Circuit of Florida

By: _____
Joseph A. Matera
Assistant State Attorney
Florida Bar # 0098014
Division19@sao9.org
PO Box 1673, 415 N Orange Ave
Suite 400
Orlando, FL 32802-1673
407-836-2188

# B

*APPENDIX 10*

IN THE CIRCUIT COURT OF THE
NINTH JUDICIAL CIRCUIT, IN AND FOR
ORANGE COUNTY, FLORIDA

STATE OF FLORIDA

                    Plaintiff,

vs.                                        CASE NO: 48-2014-CF-017252-O

                                           DIVISION: 19

JAMES EDWARD WASHINGTON

                    Defendant.

_____/

## NOTICE OF SUPPLEMENTAL DISCOVERY

COMES NOW, the State of Florida, by and through the undersigned Assistant State Attorney and hereby makes the following information available to the defense and states as follows:

EMAIL RESPONSE FROM LINDA RIDGE OF ORLANDO POLICE DEPT (TO BE MAILED TO DEFENDANT).

Copies of items listed will be provided under separate cover.

I DO CERTIFY that a copy (copies) hereof (has) (have) been furnished to JAMES EDWARD WASHINGTON, (pro se), P O Box 4970, (OCJ - Inmate #14045588), Orlando, FL 32802 by (delivery) (mail) (fax) **(e-mail)** on this 18th day of June, 2015.

Jordan Michael Ostroff
Assistant State Attorney
Florida Bar # 99590
Division19@sao9.org
PO Box 1673, 415 N Orange Ave
Suite 400
Orlando, FL 32802-1673
(407)836-2188

*APPENDIX   10*

This is the defendant who is pro se, can you please have this email sent to him at the jail.

**From:** Linda Ridge [mailto:opdphotolab@cityoforlando.net]
**Sent:** Wednesday, June 17, 2015 8:35 AM
**To:** Ostroff, Jordan
**Cc:** OPD Photo Lab; Hamilton, Donald J (ORPD); Cail, William T (ORPD); James, John Seth (ORPD)
**Subject:** WASHINGTON, JAMES EDWARD, Court Case No: 48-2014-CF-017252-O, Agency Case No: ORPD 14-536652

Good Morning Jordan Ostroff,

I have searched Evidence.com, specifically under Ofc. Seth James account. I found only one upload for 12/31/14 @ 08:54 of a traffic stop. Nothing matches what the report states for this case. I also searched a couple months past the date of the incident, just to make sure it didn't get uploaded at a later time.

Thanks, Linda


---------- Forwarded message ----------
**From:** "Ostroff, Jordan" <JOstroff@sao9.org>
**Date:** Jun 16, 2015 2:39 PM
**Subject:** FW: Out of town Re: Defendant: WASHINGTON, JAMES EDWARD, Court Case No: 48-2014-CF-017252-O, Agency Case No: ORPD 14-536652
**To:** "Cail, William T (ORPD)" <william.cail@cityoforlando.net>, "nicole.morgan@cityoforlando.net" <nicole.morgan@cityoforlando.net>
**Cc:**

Officer,

On this case, during the deposition of Officer James, he was talking to us about his body camera, but he didn't know if it had saved from that night (it's been over 6 months now). The defendant is currently Pro Se and filed a motion to compel the camera footage, but none of us even know if it still exists. Is there anyway to check? Please let me know.

Thank you!


Jordan Ostroff
Assistant State Attorney
State Attorney's Office, Ninth Circuit
Circuit Court, Divisions 17/19
P 407-836-1175


RECEIVED

1





LAW OFFICES OF

# PUBLIC DEFENDER

### SEVENTH JUDICIAL CIRCUIT
## FLAGLER, PUTNAM, ST. JOHNS & VOLUSIA COUNTIES

JAMES S. PURDY
PUBLIC DEFENDER

February 16, 2017

Mr. James Edward Washington
DC# 197574 – E21365
Madison Correctional Institution
382 S.W. MCI Way
Madison, FL 32340

Re: DCA Case Number 5D16-3743

Dear Mr. Washington:

I just received your letter. Thank you for the interesting research on police use of Sting Ray equipment. I note that your letter includes a court order from the March 9, 2016 hearing on your motion in limine and motion to suppress. I was already on it. Last week I asked the Court to supplement with transcripts of various hearings in your case, and those supplements were granted.

I expect it to take about a month before I receive the transcripts. Once I receive them, I will have to read and research the issues argued and presented to the trial court. I already have the trial transcript and the record prepared by the circuit clerk of court. I hope you received the motion to supplement and the supplemental designations we sent.

I have enclosed a copy of the Order granting supplementation. As you can see from the order, appellate attorneys can only raise on appeal matters that were actually considered by the trial court. Also, appellate attorneys do not receive any "discovery." Anything the trial attorneys may have received that was not made part of the record in the circuit court can't be considered on appeal. Once I have all the supplements that were approved, I will research and brief the case.

An appeal can be a long process. Your case involves a trial and numerous hearings, so it could be six months to a year after the briefs are all filed before the appeal is decided. This will require a lot of patience on your part, but I will keep you informed of all developments and you will receive a copy of all briefs filed by this Office or the Attorney General's office.

Page 2
February 16, 2017


Do not hesitate to write if you have any questions.

Sincerely,

Kathryn Rollison Radtke
Assistant Public Defender




KRR/lw


Enclosure

## IN THE FIFTH DISTRICT COURT OF APPEAL
## OF THE STATE OF FLORIDA

JAMES E. WASHINGTON,
     Petitioner,

                             Case No.: _____

v.                                L.T. Case No.: 5D16-3743

STATE OF FLORIDA,
     Respondent.
_____/

## PETITION FOR WRIT OF HABEAS CORPUS
(Alleging Ineffective Assistance of Appellate Counsel)

COMES NOW the Petitioner, James Edward Washington, pro se, pursuant to Fla.R.App.P. 9.141(d), and respectfully petitions this Honorable Court to GRANT this pleading and issue the Great Writ, thereby discharging Petitioner from his illegal incarceration within the Florida Department of Corrections with instructions for immediate release.

In support, Petitioner avers that appellate counsel assigned for the purpose of direct appeal was constitutionally ineffective failing to raise a meritorious issue during the course of said appeal, and that the presentation of issues would have resulted in reversal of Petitioner's convictions and sentences, had counsel briefed the claims within the proceeding.

This Petition is being filed in good faith and with the belief that the issues raised herein rises to the level of fundamental reversible error, and respectfully

avers that this Honorable Court will determine the same and provide the redress to which is entitled.

## JURISDICTION

This Honorable Court has jurisdiction to issue a Writ of Habeas Corpus under Article V., Section 4(b)(3) of the Florida Constitution and Rule 9.030(b)(3) of the Florida Rules of Appellate Procedures.

## NATURE OF RELIEF SOUGHT

The Petitioner seeks through this Petition the issuance of a Writ of Habeas Corpus requiring the immediate release of the Petitioner from his illegal incarceration on all felony counts by REVERSAL of the convictions being challenged.

## STANDARD OF REVIEW
### (Ineffective Assistance of Appeate Counsel)

Determining ineffective assistance of Appell... counsel requires applying a mixed standard of both law and fact under *Stricklan...* ...shington, 466 U.S. 668 (1984). This is the same standard applied to trial cou... s. See *MacArthur v. Moore*, 756 So.2d 232 (Fla. 3rd DCA 2000)

## TABLE OF CITATIONS

Strickland v. Washington, 466 U.S. 668 (1984)

Brady v. Maryland, 373 U.S. 83 (1963)

Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1967)

Kyles v. Whitley, 514 U.S. 419, 433-434, 115 S.Ct 1555, 131 L.Ed.2d 490 (1995)

Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959)

United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)

United States v. Agurs, 427 U.S. 97, 107, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)

Knight v. State, 394 So.2d., at 1001

Rummel v. Estelle, 590 F.2d at 104;

United States v. Moore, 180 U.S. App. D.C. 227, 554 F.2d 1086, 1092-93 (D.C. Cir. 1976)

Constanzo v. State, App. 4 Dist., 152 So.3d 737 (2014), rehearing denied.

Valien v. Public Health Trust of Dade County, 473 So.2d 1305 (3d DCA 1984), approved 507 So.2d 596 (Fla. 1987)

Ewing v. Williams, 596 F.2d 391, 398-399 (9th Cir. 1979)

Rowell v. Holt, 850 So.2d 474 (2003)


## OTHER AUTHORITIES CITED:

Section 119.071(L)(5) Florida Statutes

Section 918.13 Florida Statutes

## IN THE FIFTH DISTRICT COURT OF APPEAL
## OF THE STATE OF FLORIDA

JAMES E. WASHINGTON,
    Petitioner,

                                Case No.: 5D16-3743

v.                                 L.T. Case No.: 2014-CF-17252

STATE OF FLORIDA,
    Respondent.

_____/

## PRELIMINARY STATEMENT

In this brief, the following symbols will be used to designate references to record on appeal; "App" and the listed number will indicate the specific section of the designate references to the record on appeal:

    "R" – Court records and pleadings. (1-571).
    "SR"– Supplemental records. (561-658).
    "CR"– Confidential records. (1-33).
    "T"– Trial transcript. (1-576).
    "A"– Artist's drawing of K-9's knife-like dentures
    "D"– (3) Discovery photos of petitioner
    "D.1"– (3) Discovery photos of Gym bag and the tools
    "D.2"– (2) Discovery photos of location of the dog bite
    "IB"– Initial Brief
    "L"– 2-page letter with enclosures to Ms. Radtke date February 9, 2017
    "P.1"– Page 5 of case summary for case no: 2014-CF-003958-A-O
    "P.2"– Page 4 of case summary for case no: 2014-CF-004840-A-O
    "AC.1"– 2-page letter from Ms. Radtke date February 16, 2017
    "AC.2"– 1-page letter from Ms. Radtke date February 14, 2017

## STATEMENT OF CASE AND FACTS

The petitioner respectfully directs this Honorable Court to the Initial Brief of Appellant filed in Case No. 5D16-3743 **(App.IB)**, and hereby incorporates the statement of case and facts therein for the purposes of this petition. The Petitioner, James E. Washington, was accused in a three-count amended Information with armed burglary of a structure, possession of burglary tools-specifically a knife, or bolt-cutters or screwdriver or saw, resisting an officer without violence, and petit theft, concerning incidents that took place on December 31, 2014. [(R 239-241)=(App 1)]. Due to the ineffectiveness of petitioner's court-appointed representation, the petitioner felt it was in his best interest to proceed pro se for a time prior to trial. [(R 55-56)=(App 2)]; [(R 58-60)=(App32)]; [(R 101-102)=(App 4)] The petitioner needed court-appointed representation to compel the court to order the police to provide the body camera evidence that would prove he was only guilty of trespass and resisting without violence. [(R 68-70)=(App 5)] The petitioner needed the body camera evidence that would prove he was held down while in custody to allow a K-9 to bite him with knife-like dentures designed to puncture and cut to cause greater damage than a normal dog bite. [(SR 610-619)=(App 6)]; [(A)=(App 7)]; [(D)=(App 8)] Appellant counsel failed to mention how the police destroyed body camera evidence in her brief. [(IB)=(App 9)] The appellant counsel was briefed concerning the most important point that was needed

to be brought to the court's attention for consideration. [(L)=(App 10)]; [(AC.1)=(App 11)]; [(AC.2)=(App 12)] The body camera recorded evidence would have contradicted the officers' statements and rendered the collected evidence inadmissible. It became impossible for the petitioner to have a fair trial without being in violation of due process once the body camera evidence became unavailable. [(R 205-206)=(App 13)] Officer John Seth James committed a 3rd degree felony by deleting or failing to turn in the body camera evidence. (Section 918.13 Florida Statutes) The body camera would have exposed the fact that the officers were finding their evidence in one place searching for the petitioner, then relocating it to different areas to make it appear as if a more serious crime had occurred. The petitioner is a witness. A red and black gym bag with several tools was found in the attic, photographed in the doorway of the electrical room, then the tools were taken out to be on display on the roof. [(D.1)=(App 14)] Knives observed by officers in one location was taken to a different area to make it seem the petitioner was armed to justify releasing the K-9. [(T 275-276)=(App 15)]; [(T 280-285)=(App 16)]; [(T 234-235)=(App 17)]; [(T 262-265)=(App 18)]; The petitioner was in custody and restrained before the dog was released. The officers pulled the petitioner off to the side of the room, not the center, to attempt to execute him without being seen by non-officers. [(T 481-486)=(App 19)]; [(D.2)=(App 20)] The petitioner was looking at the body camera attached to officer

6

James' lapel the moment the dog attacked. The dog's bite was directed at a location where the knife-like extensions would connect after the application of pressure. The ritual was done in a way to cause death as a result of a totally natural bite that accidentally severed the femoral artery. Nobody would have requested the body camera if the petitioner would have died as intended. Those officers tried to record a ritualized execution. They are members of at least two secret societies. Officer Cote and company collected property all officers found throughout the entire building during their 4 hour search for the petitioner. [(T 310-315)=(App 21)]; [(T 364-371)=(App 22)] Officer Styer failed to observe or photograph the knives in the location all officers wrote in their statements or testified to during trial. [(T 405-408)=(App 23)]; [(T 413-415)=(App 24)] Officer Cote photographed the crime scene on the roof but failed to document it in his case narrative. [(T 381-382)=(App 25)] One officer wrote the story. All other officers collaborated in collusion. The police's code of silence is legendary. They all had to be team players to protect each other's career. It is essential for the protection of the group and organization. The integrity of the criminal judiciary process had to be protected. Despite several requests to 4 public defenders, the petitioner was denied the effective representation required by just compelling the court to order the police to turn over the body camera evidence. [(SR 602-622)=(App 26)] The petitioner's representation bought enough time for the police to have a legitimate

excuse not to have the evidence that would exonerate the petitioner and incriminate the officers. Lawyers are trained to know the law well enough to manipulate the scales of justice to achieve any desired result. The lawyers from the public defender's office knew what needed to be done and what was requested to be done, yet, chose to be ineffective. [(SR 620-622)=(App 26)] Their representation crossed the border into the territory of malpractice. Everything that happened before, during, and after the petitioner's arrest is now debatable. What was recorded on the body camera would have left no room for debate. The petitioner's lawyers' ineffectiveness deprived him of his constitutional right of effective representation and due process of law. The petitioner's appellate lawyer's ineffective assistance deprived him of the right to have the complaint addressed by the appellate court. The petitioner no longer have access to the irrefutable proof of recorded images contradicting the majority of the misrepresentations listed in the officers' case narratives, depositions, and trial testimonies. The petitioner no longer have access to the irrefutable proof of premeditated attempted murder. [(T 332-347)=(App 27)] The petitioner no longer have access to the opportunity of the fair trial guaranteed to every citizen by the United States Constitution.

## SUMMARY OF THE ARGUMENT

The petitioner was released from a Veteran's Administration sponsored treatment program on December 22, 2014 without transitional housing. The petitioner attended a status hearing court appearance with a public defender every month. [(P.1)=(App 28)]; [(P.2)=(App 29)] Although the petitioner informed the public defender concerning the necessity of obtaining the body camera evidence while waiting on Judge Brewer on January 7, 2015, the public defender would go no further than providing a police complaint form. Despite requesting effective representation was ineffective, the petitioner was finally able to sever ties with the public defender's office to get what the agency refused to provide. [(SR 632-658)=(App 30)] Nevertheless, the prosecutor had arranged to have the case transferred to a judge sympathetic to their objective [(SR 29-35)=(App 31)] The limitations placed upon the petitioner by the court through the Orange County Department of Corrections forced the petitioner to accept representation from the Office of Regional Conflict. Despite being provided a list of essential defense witnesses and the necessity of each one, the attorney chose to take the petitioner to trial as instructed by the judge without any witnesses or relevant medical records to support the petitioner's testimony and impeach the officers' testimonies. [(R 114-114)=(App 32)]; [(AC.1)=(App 11)] The petitioner was convicted due to the negligence of ineffective assistance of counsels not compelling the court to provide

exculpatory evidence recorded by officer James' body camera. The petitioner was denied effective assistance of appellate counsel when the appellate lawyer failed to mention the missing body camera evidence's exculpatory value as a point of argument in the initial brief. The petitioner was convicted without due process of law and due process of law is unavailable now that the body camera evidence has been destroyed. There is no corrective judicial process to remedy the petitioner's situation other than the reversal of the felony convictions being challenged. The petitioner has done more time than the misdemeanor convictions requires and respectfully petitions this Honorable Court to GRANT this pleading and issue the Great Writ, thereby discharging the petitioner from his illegal incarceration within the Florida Department of Corrections with instructions for immediate release.

## ARGUMENT – ISSUE ONE

Where a party has intentionally destroyed evidence, some courts have held that an inference will be raised that the evidence would be favorable to the other party. Valien v. Public Health Trust of Dade County, 473 So.2d 1305 (3d DCA 1984), approved 507 So.2d 596 (Fla. 1987. Due process prohibits the suppression by the government of evidence favorable to the accused or discrediting its own case. Florida law requires a law enforcement agency to retain a body camera recording for at least 90 days. Section 119.071(L)(5) Florida Statutes. A person is guilty of Tampering with or fabricating physical evidence if he or she alters, destroys, conceal, or removes any record, document, or thing with the purpose to impair its verity or availability in criminal trial or proceeding or an investigation by a duly constituted prosecuting authority, law enforcement agency, grand jury or legislative committee of this state is pending or is about to be instituted. Section 918.13 Florida Statutes. Officer James did not post the video footage online like he did the traffic stop recorded on the same day. Nobody got an opportunity to see what was considered to be of no evidentiary value. The Orlando Police Department don't have authority to institute a policy superseding the laws of the State of Florida and the United States Constitution. [(R 205-206)=(App 13)] Upon defendant's request, the government must disclose all such information. Brady v. Maryland, 373 U.S. 83 (1963) This requirement of disclosure includes any

information which concerns witnesses' credibility as well as matters concerning guilt or innocence of the defendant. <u>Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1967)</u> Officer James' body camera recorded evidence of knives observed by all officers in other locations before being relocated to a different area to facilitate the armed perpetrator theory justifying the release of the police dog on the unarmed suspect already in custody. [(T 275-276)=(App 15)]; [(T 280-285)=(App 16)]; [(T 234-235)=(App 17)]; [(T 262-265)=(App 18)] <u>Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959)</u> As observed by the Supreme Court in Napue v. Illinois: "The jury's estimate of the truthfulness and reliability of a given witness may well be determine of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." <u>360 U.S. at 269</u>. In Brady, this court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good or bad faith of the prosecution." <u>373 U.S. at 87, 83 S.Ct. 1194</u>. We have since held that the duty to disclose such evidence is applicable even though there has been no request by the accused, <u>United States v. Agurs, 427 U.S. 97, 107, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)</u>, and that duty encompasses impeachment evidence as well as exculpatory evidence, <u>United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481</u>

(1985). Such evidence is material "If there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Id., at 682, 105 S.Ct. 3375; See also Kyles v. Whitley, 514 U.S. 419, 433-434, 115 S.Ct 1555, 131 L.Ed.2d 490 (1995). Moreover, the rule encompasses evidence "known only to police investigators and not to the prosecutor," Id., at 438, 115 S.Ct. 1555. In order to comply with Brady, therefore, "The individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police." Kyles 514 U.S., at 437, 115 S.Ct. 1555. Officer John Seth James committed a third degree felony by deleting or failing to turn in the body camera evidence obtained before and after the arrest on December 31, 2014. In the case [Constanzo v. State, App. 4 Dist., 152 So.3d 737 (2014), rehearing denied.], police detective's conviction was overturned on appeal because the video he recorded was e-mailed to an attorney for the police benevolent association, texted to one other officer and eventually recovered from two of those locations. Officer James can be convicted of tampering with evidence because the video was not even posted at any time. Linda Ridge of the Orlando Police Department could not locate any evidence that it was uploaded under officer James' account or any other account in response to my motion to compel. The police tried to execute the petitioner in what could be arranged to look like an accident. Officer James wore a body camera that recorded

13

everything from beginning to end. He took it upon himself to eliminate the video evidence that would contradict their case narratives and photographs taken by the CSI. A Jury would have to access the truth based on perceived credibility instead of the recorded video evidence proving evidence tampering and police misconduct. There are three essential components of a true Brady violation: (1) The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) That evidence must have been suppressed by the state, either willfully or inadvertently; and (3) Prejudice must have ensued. This case has the components of all three; Consequently, due process was violated.

# ARGUMENT – ISSUE TWO

The 6th Amendment accords criminal defendants a right to counsel rendering "reasonably effective assistance given the totality of the circumstances." From the counsel's function as assistant to the defendant derive the overarching duty to advocate the defendant's cause. Four lawyers from the public defenders' office refused to secure Officer James' body camera video despite the petitioner's vehement requests within the 90 day window allowed by Florida law, (Section 119.071(L)(5) Florida Statutes). Permissible trial strategy can never include the failure to conduct a reasonably substantial investigation into a defendant's one plausible line of defense. (Ewing v. Williams, 596 F.2d 391, 398-399 (9th Cir. 1979)) Attorneys must conduct a substantial investigation which includes "an independent examination of the facts, circumstances, pleadings and laws involved." (Rummel v. Estelle, 590 F.2d at 104; United States v. Moore, 180 U.S. App. D.C. 227, 554 F.2d 1086, 1092-93 (D.C. Cir. 1976)). The question is whether there is a reasonable probability that, absent the error, the fact finder will produce a reasonable doubt respecting guilt. A court need not first determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alledged deficiencies. The prejudice standard articulated by Judge Levanthal in his plurality opinion in U.S. v. Decoster, and adopted by the state of Florida in (Knight v. State, 394 So.2d., at 1001, a standard

that requires a showing that specified deficient conduct of counsel likely to have an affect on the outcome of the proceeding. (Strickland v. Washington, 466 U.S. 668 (1984)). On certiorari, the United States Supreme Court reversed. Court held that a convicted defendant alledging ineffective assistance of counsel must show not only that counsel was not functioning as the counsel guaranteed by the Sixth Amendment so as to provide reasonably effective assistance but also that counsel's errors were so serious as to deprive the defendant of a fair trial because of a reasonable probability that, but for the counsel' unprofessional errors, the results would have been different. The petitioner's lawyers failed to obtain the body camera video evidence which would have exonerated him and implicated the police in premeditated attempted murder. The petitioner's appellant lawyer failed to mention this Brady violation as a point of argument in her initial brief. When a defense fails to investigate his client's only possible defense, although requested by him to do so, it can hardly be said that the defendant has had the effective assistance of counsel. Those officers illegal and inappropriate behavior is being concealed through the deliberate ineffectiveness of my appointed counsels. They are all guilty of malpractice. [(Rowell v. Holt, 850 So.2d 474 (2003)) = (App. 33)]

## CONCLUSION

**WHEREFORE**, based upon the foregoing issue, argument and authorities cited, Petitioner humbly prays this Honorable Court Grant this Petition for Writ of Habeas Corpus, REVERSE all felony convictions and sentences, and order the immediate release of the petitioner, James Edward Washington.

Respectfully Submitted

James Edward Washington
Appellant, pro se
DC# 197574
Madison Correctional Inst.
382 S.W. MCI Way
Madison, FL 32340-6499

## CERTIFICATE OF COMPLIANCE

**I HEREBY CERTIFY** that the forgoing petition complies with the font requirements of Fla.R.App.P. 9.100(1)

James Edward Washington
Appellant, pro se
DC# 197574

## **UNNOTARIZED OATH**

Under penalties of perjury and administrative sanctions from the Department of Corrections, including forfeiture of gain time if this motion is found to be frivolous or made in bad faith, I certify that I understand the contents of the foregoing motion, that the facts contained in the motion are true and correct, and that I have a reasonable belief that the motion is timely filed. I certify that this motion does not duplicate previous motions that have been disposed of by the court. I further certify that I understand English and have read the foregoing motion or had the motion read to me and I understand its contents.

This Declaration is being made pursuant to § 92.525, Fla. Stat.(2017), Rules 3.850(n), and 3.987, Fla. R. Crim. P. (2017), on this _9th_ day of _March_ , 2018.

James Edward Washington
Appellant, pro se
DC# 197574
Madison Correctional Inst.
382 S.W. MCI Way
Madison, FL 32340-6499

18

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY**, that a true and correct copy of the foregoing

"Petition for Writ of Habeas Corpus" has been furnished to the following parties:

1. Fifth District Court of Appeals
   300 S. Beach St.
   Daytona Beach, FL 32114

2. Attorney General Office
   444 Seabreeze Blvd., Ste. 500
   Daytona Beach, FL 32118

3. Law Offices of Stuart, Mount, Boylston, P.A.
   Attention: Michael Quintero or Jacob V. Stuart Jr.
   37 N. Orange Ave; Suite 1100
   Orlando, FL 32801

4. Law Offices of Robert Wesley
   Public Defender, 9th Judicial Circuit
   435 N. Orange Ave; Suite 400
   Orlando, FL 32801-1505

5. Law Offices of James S. Purdy
   Public Defender, 7th Judicial Circuit
   Appellate Division
   444 Seabreeze Blvd., Ste. 210
   Daytona Beach, FL 32118

By presenting said document to Madison Correctional Institution prison officials

for mailing, via U.S. Mail, this __9th__ day of __March_____, 2018.

_James Edward Washington_
James Edward Washington
Appellant, pro se
DC# 197574
Madison Correctional Inst.
382 S.W. MCI Way
Madison, FL 32340-6499

19

*APPENDIX  1*

## IN THE CIRCUIT COURT OF ORANGE COUNTY, STATE OF FLORIDA

THE STATE OF FLORIDA

VS.

JAMES EDWARD WASHINGTON

AMENDED
INFORMATION #   48-2014-CF-017252-O

DIVISION - 19

1. **ARMED BURGLARY OF STRUCTURE WITH EXPLOSIVES OR DANGEROUS WEAPON (F1 pbl-L8)**

2. **POSSESSION OF BURGLARY TOOLS (F3-L4)**

3. **RESISTING OFFICER WITHOUT VIOLENCE (M1)**

4. **PETIT THEFT (M2)**

---

### IN THE NAME AND BY THE AUTHORITY OF THE STATE OF FLORIDA:

JEFFREY L. ASHTON, State Attorney of the Ninth Judicial Circuit prosecuting for the State of Florida in Orange County, or JEFFREY L. ASHTON, State Attorney of the Ninth Judicial Circuit prosecuting for the State of Florida in Orange County, by and through the undersigned Designated Assistant State Attorney, under oath, CHARGES that JAMES EDWARD WASHINGTON, on or about the 31st day of December, 2014, in said County and State, did, in violation of Florida Statutes 810.02(1)(b)1. and 810.02(2)(b), enter into a structure, located in the vicinity of 5705 LA COSTA DRIVE, ORLANDO, FLORIDA, in the County and State aforesaid, the property of LG SEMORA LA COSTA LLC OR MATTHEW KNOWLES OR ANY COMBINATION OF THE TWO, as owner or custodian thereof, with the intent to commit an offense therein, at a time when the said premises were not open to the public, nor was the defendant licensed or invited to enter, and during the course of committing said offense, defendant was armed, or became armed within the structure, with explosives or a dangerous weapon.

FILED IN OPEN COURT  *9-12-16*
Cir. Ct., Orange Co., FL

By _____ D.C.

S.T. 06/23/15

APPENDIX 1

## COUNT TWO

JEFFREY L. ASHTON, State Attorney of the Ninth Judicial Circuit prosecuting for the State of Florida in Orange County, or JEFFREY L. ASHTON, State Attorney of the Ninth Judicial Circuit prosecuting for the State of Florida in Orange County, by and through the undersigned Designated Assistant State Attorney, under oath, CHARGES that JAMES EDWARD WASHINGTON, on or about the 31st day of December, 2014, in said County and State, did, in violation of Florida Statute 810.06, unlawfully possess a tool, machine or implement, to-wit:  KNIFE OR KNIVES OR BOLT CUTTERS OR SCREWDRIVER OR A SAW OR ANY COMBINATION THEREOF, with the intent to use the same, or allow the same to be used to commit a burglary or trespass.

## COUNT THREE

JEFFREY L. ASHTON, State Attorney of the Ninth Judicial Circuit prosecuting for the State of Florida in Orange County, or JEFFREY L. ASHTON, State Attorney of the Ninth Judicial Circuit prosecuting for the State of Florida in Orange County, by and through the undersigned Designated Assistant State Attorney, under oath, CHARGES that JAMES EDWARD WASHINGTON, on or about the 31st day of December, 2014, in said County and State, did, in violation of Florida Statute 843.02, resist, obstruct or oppose CHRISTOPHER BRILLANT OR DOUGLAS COTE OR NICOLE MORGAN OR DONALD HAMILTON OR ANY COMBINATION THEREOF, a law enforcement officer for the ORLANDO POLICE DEPARTMENT, in the lawful execution of a legal duty, to-wit:  A CRIMINAL INVESTIGATION OR AN ARREST, without offering or doing violence to the person of the said CHRISTOPHER BRILLANT OR DOUGLAS COTE OR NICOLE MORGAN OR DONALD HAMILTON OR ANY COMBINATION THEREOF, by FAILING TO COMPLY WITH THE LAWFUL COMMANDS OF SAID OFFICER OR SAID OFFICERS..

S.T. 06/23/15

*APPENDIX 1*

## COUNT FOUR

JEFFREY L. ASHTON, State Attorney of the Ninth Judicial Circuit prosecuting for the

State of Florida in Orange County, or JEFFREY L. ASHTON, State Attorney of the Ninth Judicial

Circuit prosecuting for the State of Florida in Orange County, by and through the undersigned

Designated Assistant State Attorney, under oath, CHARGES that JAMES EDWARD WASHINGTON,

on or about the 31st day of December, 2014, in said County and State, did, in violation of Florida

Statute 812.014(3)(a), knowingly obtain or use, or endeavor to obtain or use COPPER or METAL or an

Air Conditioner, the property of another, to-wit: LG SEMORA LA COSTA LLC OR MATTHEW

KNOWLES OR ANY COMBINATION OF THE TWO, as owner or custodian thereof, with the intent

to temporarily or permanently deprive said owner or custodian of a right to the property or any benefit

therefrom, or to appropriate the property to the use of the said JAMES EDWARD WASHINGTON or to

the use of a person not entitled thereto.

This information encompasses the transaction and all charges listed on Complaint Number 48-2014-CF-017252-O. The Orange County Sheriff's Office and the Orange County Corrections Department shall substitute the charge(s) indicated on the information for those on the above cited complaint. The bond(s) shall remain the same as that last set on 48-2014-CF-017252-O.

STATE OF FLORIDA
COUNTY OF ORANGE

    Personally appeared before me Joseph A. Matera, Assistant State Attorney of the Ninth Judicial Circuit of Florida, who being first duly sworn, says that he/she has received testimony under oath from the material witness or witnesses, which if true, would constitute the offense herein, and that he/she institutes the prosecution in good faith.

    The foregoing instrument was acknowledged before me this _12_ day of _September_, 20 _16_ by the aforementioned Assistant State Attorney who is personally known to me and who did take said oath.

JEFFREY L. ASHTON, State Attorney
Ninth Judicial Circuit of Florida

By _____
Joseph A. Matera
Designated Assistant State Attorney
Florida Bar No. 0098014

SB/JM



BERTHA RUBIO
Notary Public, State of Florida
Commission No. EE 660714
My Commission Expires Jan. 31, 2017

Page 3 of 3

S.T. 06/23/15

APPENDIX 2

STATE OF FLORIDA
VS.

IN THE CIRCUIT COURT OF THE
NINTH JUDICIAL CIRCUIT IN AND
FOR ORANGE COUNTY, FLORIDA

CASE NUMBER: 2014-CF-017252-A-O
DIVISION: Egan, Robert J

JAMES EDWARD WASHINGTON, Defendant

DOB: 2/19/1965

## ORDER

**DEFENDANT APPEARANCE:**

JAMES EDWARD WASHINGTON was present

**COUNSEL APPEARANCE:**

Counsel:  OFFICE OF PUBLIC DEFENDER, ESQUIRE was present J. OPATO

Asst State Attorney Present: DIV. 19

This case coming before the Court to be heard, and you, the defendant JAMES EDWARD WASHINGTON, having:

| Count: 001 | ARMED BURGLARY OF STRUCTURE WITH EXPLOSIVES OR DANGEROU WEAPON | 810.02(2)(B) | First Degree - Punishable By Life |
|---|---|---|---|
| Count: 002 | POSSESSION OF BURGLARY TOOLS | 810.06 | Third Degree - Felony |
| Count: 003 | OFFENSE AGAINST POLICE DOG, FIRE DOG OR POLICE HORSE | 843.19(3) | First Degree - Misd |
| Count: 004 | CR-RESISTING OFFICER WITHOUT VIOLENCE | 843.02 | First Degree - Misd |
| Count: 005 | PETIT THEFT | 812.014(3)(A) | Second Degree - Misd |
| Count: 006 | CR-CRIMINAL MISCHIEF | 806.13(1)(B)(1) | Second Degree - Misd |

**COURT ORDERS:**
**Court Minutes**
Per the Court:

COURT CONDUCTED A NELSON HEARING.
AFTER HEARING TESTIMONY, COURT DID NOT
MAKE FINDINGS TO DISCHARGE ATTORNEY.
OFFICE OF PUBLIC DEFENDER REMAINS
ATTORNEY OF RECORD.

DONE, ORDERED and FILED in
Open Court on May 8, 2015

Honorable Judge

Julie H OKane

Page 1 of 2

APPENDIX 2

---

**JAMES EDWARD WASHINGTON**

Deputy Clerk in Attendance:
Office of Tiffany M. Russell, Orange County Clerk of the Circuit and County Courts

| Defendant.Name____ | 951 CHELSEA WY LAKE WALES, FL, 33853 | (Bondsman)_____ | ASA ✕ | Dockets ✕ | |
|---|---|---|---|---|---|
| Atty ✕ | Prob____ | ACS____ | CFSC____ | IMR__ | Other____ |

APPENDIX 3

In the Circuit Court of the
Ninth Judicial Circuit, in and
for Orange County, Florida

Division: Div 19

Case No: 2014-CF-017252-A-O

State of Florida,
                    Plaintiff,

vs.

JAMES EDWARD WASHINGTON
                    Defendant.

Date of birth:     2/19/1965

## SETTING / RESET NOTICE

JAMES EDWARD WASHINGTON  was present

Counsel:  OFFICE OF PUBLIC DEFENDER, ESQUIRE was present Div 19

Asst State Attorney Present:  Div 19

Plea:

| Hearing Type | Judge | Date | Time | Location |
|---|---|---|---|---|
| Trial | Egan, Robert J | 5/27/2015 | 08:30 AM | Room 18-D On The 18th Floor |

Orange County Courthouse:  425 N Orange Avenue, Orlando, FL  32801

Trial Date Begins 3 Week Trial Period.
Court Minutes
Per the Court:

Nelson Hearing Conducted
Court Finds No Legitimate reason to Discharge
Public Defender's Office.

Faretta Hearing Conducted
Court Discharges Public Defender and Appoints
Public Defender as Standby Counsel.

DONE, ORDERED, AND FILED in Open Court
in Orange County, Florida on May 26, 2015.

Honorable Judge:

Robert J Egan

Page 1 of 3

*APPENDIX 3*

**X**_____

JAMES EDWARD WASHINGTON
951 CHELSEA WY
LAKE WALES, FL, 33853

Deputy Clerk in Attendance: Sonya H., Jill E.
Office of Tiffany M. Russell, Orange County Clerk of the Circuit and County Courts

Copies to: _____ SURETY _____ IMR _____ DEFT _____JA _____PROB
___x___ STATE ___x___ PD _____ CT DEPUTY _____ OTHER
___x___ DOCKETS
_____Attorney

> **If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact the ADA Coordinator, Human Resources, Orange County Courthouse, 425 N. Orange Avenue, Suite 510, Orlando, Florida, (407) 836-2303, at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711.**

## UNIFIED PRE-TRIAL ORDER

This order applies to all criminal cases prosecuted in the Ninth Judicial Circuit, State of Florida, including felonies, misdemeanors and criminal traffic cases in both Orange and Osceola counties.

**I. Trial:**

A.   State Attorneys, Defendants and their attorneys and witnesses are expected to be ready for trial and be available during the entire trial period.

B.   State Attorneys, Defendants and their attorneys must be on time for trial and not leave the Judge's court room until released by the Presiding Judge.

C.   Scheduling a case for trial, during pretrial or other court appearance is a representation that the party is ready for trial and that the trial period/trial date is satisfactory to the party.

D.   Criminal cases set for jury trial take precedence over motions, hearings, and civil trials, regardless of whether the motions, hearings or civil trials are in county or circuit court. (Rule 2.550 of the Florida Rules of Judicial Administration).

E.   All Attorneys must bring updated calendars to all court appearances. Once a case is scheduled for trial, any continuance due to a scheduling conflict will not be granted absent extraordinary circumstances.

**II. Motions to Transfer:**

All Motions to Transfer must be filed ten (10) days prior to trial and contain a waiver of speedy trial if filed by the Defendant and if the result of granting the motion would delay the trial. The Motion must be in the approved form.

**III. Discovery:**

Page 2 of 3

*APPENDIX* 3

The Assistant State Attorney shall promptly provide all discovery materials to the defense attorney upon the filing of a Notice Of Discovery. All parties shall commence and complete discovery prior to the Pre-Trial conference. Any motions shall be filed immediately upon discovery of the grounds for the motion and shall be set for hearing prior to the Pre-Trial conference. The only motions allowed after Pre-Trial will be those directed to the conduct of the trial and they shall be set after Pre-trial and before the trial period begins.

## IV. Pre-Trial Motions:

A. Motions for Continuance: (1) Absent extraordinary circumstances, motions to continue must be filed before or at the time of pretrial. (2) Any such motion must be in writing on the approved form, setting forth good cause and must be accompanied by the approved form order. (3) If, after the case is scheduled for trial, a continuance is requested due to witness unavailability, then it must be filed prior to the trial date. (4) A request for continuance due to scheduling conflict will not be granted absent extraordinary circumstances. (5) A request for continuance based upon the scheduling of a non-criminal jury trial case and/or bench trial or hearings shall be denied absent extraordinary circumstances.

B. Motions To Suppress: (1) Shall be filed at least ten (10) days prior to the Pre-trial conference and scheduled for hearing prior to the Pretrial conference, unless good cause is shown for the delay. (2) Shall clearly set forth evidence sought to be suppressed or excluded, the specific reasons for the suppression and a general statement of facts supporting the motion. (3) Attorneys, Defendants and witnesses shall be on time for the hearing. (4) Hearings shall not be continued due to the attorney's unavailability unless extraordinary circumstances exist. A conflicting trial or hearing date does not constitute an extraordinary circumstance. Attorneys are expected to have back up counsel ready to handle said motions. (5) Late filings of Motions to Suppress may result in denial without hearing. See State v. Powell, 717 So. 2d 1050(5th DCA 1998)

## V: Miscellaneous:

A. Interpreters: State Attorney and/or Defendant's attorney shall notify the Court at the pre-trial conference if a language interpreter is required for the defendant or any witness together with notice of the relevant language.

B. Trial Division: If the trial is moved to the Trial Division, counsel may not reargue motions already ruled upon.

C. Defendant's Presence: Unless excused by the Court, the Defendant, if not in jail, shall be present with counsel at all preliminary conferences except for arraignment or pre-trial conference if the attorney has timely filed a notice of appearance and waiver of arraignment and/or pre-trial conference. If the Defendant is in jail, Defense counsel shall consult with the Defendant during the week preceding the preliminary conference, and if such jailed Defendant is to enter a plea, counsel must notify the Judge's assistant by 2:00 pm on the working day preceding the Preliminary Conference unless otherwise scheduled by the Judge.

D. Clients represented by the public defender must stay in contact with the public defender as a condition of release. Failure to stay in contact with your public defender may result in revocation of your conditions of release and you may be incarcerated.

## VI: Case Management Conference:

The Defendant and Counsel of record shall be present (mandatory) at Felony Case Management Hearing and Trial Case Management Hearing. The presence of the Defendant and Counsel of record cannot be waived without written Order of the Court and only upon showing of good cause. See, Cruz v. State 822 So.2D 595 (Fla. 3rd DCA 2002).

Page 3 of 3

APPENDIX 4

STATE OF FLORIDA                          IN THE CIRCUIT COURT OF THE
VS.                                       NINTH JUDICIAL CIRCUIT IN AND
                                          FOR ORANGE COUNTY, FLORIDA

                                          CASE NUMBER: 2014-CF-017252-A-O
                                          DIVISION: Div 19

JAMES EDWARD WASHINGTON, Defendant

DOB: 02/19/1965

## ORDER  (CORRECTED AS TO ADDING COUNT 6)

**DEFENDANT APPEARANCE:**

JAMES EDWARD WASHINGTON
**COUNSEL APPEARANCE:**

Counsel:   OFC OF CRIMINAL CONFLICT & CIVIL REGIONAL COUNSEL

Asst State Attorney Present: JOSEPH MATERA

| Ct No. | Charge | Degree |
|---|---|---|
| 001 | ARMED BURGLARY OF STRUCTURE WITH EXPLOSIVES OR DANGEROU WEAPON | First Degree - Punishable By Life |
| 002 | POSSESSION OF BURGLARY TOOLS | Third Degree - Felony |
| 003 | OFFENSE AGAINST POLICE DOG, FIRE DOG OR POLICE HORSE | First Degree - Misd |
| 004 | CR-RESISTING OFFICER WITHOUT VIOLENCE | First Degree - Misd |
| 005 | PETIT THEFT | Second Degree - Misd |
| 006 | CR-CRIMINAL MISCHIEF | Second Degree - Misd |

This case coming before the Court to be heard, and you, the defendant JAMES EDWARD
WASHINGTON, having:

**COURT ORDERS:**

FARETTA HEARING CONDUCTED.

COURT FINDS DEFENDANT MAY REPRESENT HIMSELF.

NELSON HEARING CONDUCTED.

OFFICE OF REGIONAL COUNSEL ALLOWED TO WITHDRAW.

PRETRIAL PREVIOUSLY SET FOR 09/29/2015. TIME CHANGED TO 1:30 PM.

**NUNC PRO TUNC SEPTEMBER 11, 2015.**

Means relates back

                                          DONE, ORDERED and FILED in
                                          Open Court on September 18, 2015

                        Honorable Judge_____

Page 1 of 2

APPENDIX 4

Robert J Egan

_____

**JAMES EDWARD WASHINGTON**

Deputy Clerk in Attendance: JILL E.,
Office of Tiffany M. Russell, Orange County Clerk of the Circuit and County Courts

| Defendant.Name____ | LAKE WALES, FL 33853 | (Bondsman)_____ | · ASA____ | Dockets____ | | |
|---|---|---|---|---|---|---|
| Atty _____ | Prob____ | ACS____ | CFSC____ | IMR___ | Other_____ | |

**Page 2 of 2**

APPENDIX 5

STATE OF FLORIDA
VS.

IN THE CIRCUIT COURT OF THE
NINTH JUDICIAL CIRCUIT IN AND
FOR ORANGE COUNTY, FLORIDA

CASE NUMBER: 2014-CF-017252-A-O
DIVISION: Egan, Robert J

JAMES EDWARD WASHINGTON, Defendant

DOB: 2/19/1965

## ORDER

**DEFENDANT APPEARANCE:**

JAMES EDWARD WASHINGTON  was present

**COUNSEL APPEARANCE:**

Counsel:  OFFICE OF PUBLIC DEFENDER, ESQUIRE was not present  due to Defendant not having Counsel at this time. - Pro Se

Asst State Attorney Present: Jordan Ostroff

This case coming before the Court to be heard, and you, the defendant JAMES EDWARD WASHINGTON, having:

| Hearing Type | Judge | Date | Time | Location |
|---|---|---|---|---|
| Pre-Trial Conference | Egan, Robert J | 7/21/2015 | 01:30 PM | Room 18-D On The 18th Floor |
| Trial | Egan, Robert J | 8/3/2015 | 09:00 AM | Room 18-D On The 18th Floor |

**COURT ORDERS:**
Court Minutes
Per the Court:

Defense Motion to Compel is Granted in part and Denied in part.

Counts 1, 2, 3, 4, 5, 6: Moot
Count 7: Granted

State to provide evidence of body camera within 10 days.

Defense Motion to Continue is Granted.

Waive Speedy Trial.

DONE, ORDERED and FILED in Open Court on June 16, 2015

Honorable Judge _____

Robert J Egan

Page 1 of 2

APPENDIX 5

**JAMES EDWARD WASHINGTON**

Deputy Clerk in Attendance:  SM/JE

Office of Tiffany M. Russell, Orange County Clerk of the Circuit and County Courts

| Defendant.Name____ | 951 CHELSEA WY LAKE WALES, FL, 33853 | (Bondsman)_____ | ASA____ | Dockets____ |
| Atty _____ | Prob____ | ACS____ | CFSC____ | IMR___ | Other_____ |

**Page 2 of 2**

APPENDIX 5

IN THE CIRCUIT COURT, IN AND FOR ORANGE COUNTY, FLORIDA

JAMES EDWARD WASHINGTON       CASE NO: 48-2014-CF-017252-0
        DEFENDANT
VS                            DIVISION = 19

STATE OF FLORIDA              AGENCY: OR.PD. 14-536652
        PLAINTIFF

## MOTION TO COMPEL

HERE COMES JAMES EDWARD WASHINGTON FILING THIS MOTION TO COMPEL ACCORDING TO FLORIDA RULES OF CRIMINAL PROCEDURE 3.220 FLORIDA PLEADING AND PRACTICE FORMS § 93.26 AND 93.59:

### REQUESTED INFORMATION/VIDEOTAPE

1) THE NARRATIVE SUPPLEMENT OF OFFICER SMITH (30580)
2) THE NARRATIVE SUPPLEMENT OF OFFICER WILSON (10246)
3) THE NARRATIVE SUPPLEMENT OF OFFICER BRILLANT (16077)
4) THE NARRATIVE SUPPLEMENT OF OFFICER CONROY (17711)
5) THE NARRATIVE SUPPLEMENT OF OFFICER MICHAEL E. POLLOCK
6) THE NARRATIVE SUPPLEMENT OF OFFICER MICHELLE R. JEWELL
7) THE VIDEOTAPE EVIDENCE FROM THE BODY CAMERA WORN BY OFFICER JOHN SETH JAMES (12869).

FILED IN OPEN COURT  6-16-15
        Clerk, Cir. Ct., Orange Co., FL
By _____ D.C.

James Edward Washington
JAMES EDWARD WASHINGTON

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY A COPY OF THIS DOCUMENT WILL BE PROVIDED TO THE STATE ATTORNEY IN COURT ON JUNE 16, 2015.

# APPENDIX 6

1        **THE COURT:**  Oh, Brilliant.  Gotcha.  Okay.

2        Did he -- does he have a written report?

3    Brilliant, do you know?

4        **MR. OSTROFF:**  Not -- not that I know of,

5    Your Honor.  Like I said, I went through every report

6    that I have.  Obviously, based upon the first four

7    with a number afterwards, their ID, they're referenced

8    in other officers' reports as -- than listing that

9    officer's ID.

10        **THE COURT:**  And Officer Nicole Morgan, she wrote

11    the initial narrative?

12        **MR. OSTROFF:**  Correct.

13        **THE COURT:**  Okay.

14        **MR. OSTROFF:**  And then there are supplementals

15    from Officer James and another four or five officers.

16        **THE COURT:**  You know, Mr. Washington, generally

17    what happens, if the State is telling us they've

18    turned everything over, we accept that.  If it comes

19    out at trial that there is a report that you weren't

20    given, we would have to address that at that time, and

21    there would be remedies.  But if the State is saying

22    that they've given you every written report or

23    Ms. Opato, then I think one through six, they're not

24    denied, 'cause the State is required to give you

25    everything that they have --

APPENDIX 6

1        **THE DEFENDANT:**  Yes, sir.

2        **THE COURT:**  -- but they're moot.  They're telling

3    me they've complied.  Okay?

4        **THE DEFENDANT:**  Yes, sir.

5        **THE COURT:**  So we're not going to require the

6    State to do anything in addition on one through six.

7        I do want to ask Mr. Ostroff, there's been talk

8    before about a body camera and whether there exists

9    footage or film of the body camera.

10       **MR. OSTROFF:**  Correct.  And that came out during

11   the deposition of Officer James.  That was the first

12   that I heard about the actual existence of a body

13   camera involved in this case.  And I know briefly -- I

14   don't remember if Mr. Washington was in the courtroom

15   for this, but basically what Officer James said is

16   that the body camera is on his lapel, and at the point

17   that he put on the vest with the Clear Out or the

18   chemical substance that was dropped, that would cover

19   the body camera.  So he took the body camera off.  But

20   there are some points when the body camera was

21   attached to a fireman's pole and sucked up in the

22   rafters of the Perkins, but that at no point were --

23   did it ever see you or anybody else on the camera.  It

24   would just be dark or of the roof, showing nothing.

25       So based upon that, he did not know if the body

APPENDIX 6

1   camera had been saved or if it was determined it

2   didn't have evidence because it didn't show anything.

3   So he was going to look into that.  I haven't had a

4   chance to follow up.  Last time this was called up, he

5   was the one whose son was going in for the open heart

6   surgery.

7       **THE DEFENDANT:**  Well, sir, despite whether or not

8   it had video coverage, it had audio.  And a lot of

9   audio would prove and disprove what the officers said

10   and what I said, knowing the incident in which I was

11   arrested.  Because what they said is totally false.

12       **THE COURT:**  And we did talk about, I guess,

13   already, you were in the -- you were here when we

14   talked about the vest --

15       **THE DEFENDANT:**  Yes, sir.

16       **THE COURT:**  -- covering the camera.  Okay.

17       **THE DEFENDANT:**  And he had -- he had the camera

18   on prior to going inside the building, 'cause I

19   seen -- based on his investigative report, he had went

20   on to the roof and had coverage before he went into

21   the building.  So all of the video is not so you cant

22   use what actually was taking place.  So there's no

23   reason why it shouldn't be available to me to review

24   if it -- to my ability.  And I would just like --

25   trying to find out how it can be tracked down, or who

## APPENDIX 6

1      recorded it, who turned it in --

2          **THE COURT:**  Right.

3          **THE DEFENDANT:**  -- who -- like the chain of

4      custody, 'cause I'm pretty certain there's something

5      on there that going to be to my benefit.

6          **THE COURT:**  Well, if there's sound, I would

7      agree, you need to hear it.

8          I guess, Mr. Ostroff, you haven't been able to

9      verify whether -- you know, I'd like to know, sort of

10     procedurally, when an -- a police officer's wearing a

11     body camera, is the stuff stored digitally?  If it is,

12     how long is it kept?  Did it exist and has it been

13     erased or did it exist and it still exists?  Those are

14     the things, I guess, we need to know.  Even if it's

15     just sound, I do think Mr. Washington would have a

16     right to -- to hear it.  You know --

17         **MR. OSTROFF:**  Certainly.  I mean, if I had it, I

18     would turn it over.  If it existed, I would -- I would

19     get it and turn it over.  The thing I -- I don't know,

20     to be honest with you, and in terms of how they are

21     stored and for how long they are stored, as of, I

22     believe it was a week and a half ago now, maybe two

23     and a half weeks ago, there was a meeting between OPD,

24     Jeff Ashton, Bob Wesley to talk about the process

25     because the body camera usage is so new.  And so I

APPENDIX 6

1    don't know if -- what the procedure is now versus what

2    the procedure was then.

3         The officer said he believed they were stored for

4    30 days, unless they were flagged as evidentiary

5    value.

6         But I don't even know if they have audio, to be

7    honest with you. I have never seen a body

8    camera -- I've never seen body camera footage in the

9    way that it would be from a case like this, because of

10   the new -- because of the -- how -- for -- I'm sorry.

11   I can't speak. Because of how new the process is for

12   them to be wearing body cameras such as this.

13        **THE DEFENDANT:** They're obviously on news

14   programs. I was watching the news and I seen

15   different officers with body cameras and I heard

16   voices through the news channel and stuff.

17        **THE COURT:** Well, you know, what we hear and see

18   in the news may or may not apply. There's -- you

19   know, I do think dashcams -- I've heard sound as well

20   with that. I just -- I -- I, again, I am not familiar

21   enough with the body cameras to know whether those

22   have sound like a dashcam would.

23        **MR. OSTROFF:** And actually with a dashcam, the

24   cam itself does not have sound. The officer then

25   wears -- at least for DUI officers --

APPENDIX 6

1        THE COURT:  He's got --

2        MR. OSTROFF:   -- they wear a separate microphone

3    on themselves to get the sound.  Because from where

4    the camera's placed in the car, it's not going to do

5    any good.  I just -- I -- I don't know if they still

6    exist, if there is sound on it, et cetera.

7        THE COURT:  Yeah, but I guess, you know, it comes

8    down to -- and these are some of the reasons why

9    I'm -- certainly would like Mr. Washington to consider

10   his decision, we're, at some point, going to need to

11   have a Richardson hearing to figure out if this

12   existed, and if it did, and it doesn't anymore, why

13   and why not and are there issues of prejudice?

14       THE DEFENDANT:  Sir, I would --

15       THE COURT:  And you got a speedy trial running

16   as -- if I'm reading correctly, right?

17       THE DEFENDANT:  Sir, I -- I was there.  And there

18   was no change in uniform by any officer at the time

19   that they -- I mean, there was no chemical suit they

20   had to put on for that -- that Clear Out.  I don't

21   understand why him, specifically, had to have a change

22   of uniform, a vest to cover something no other officer

23   had to cover.

24       THE COURT:  You know, and -- and we can sit and

25   talk about it all day long.  It won't resolve anything

APPENDIX 6

1    until we have the necessary -- an evidentiary hearing

2    to find out, did he put a vest on?  Maybe he has the

3    vest here he can demonstrate.  I don't know, but it's

4    not an issue that I can resolve, I think, absent

5    hearing the testimony of that.

6         And who is -- that's not Officer Brilliant.  Who

7    actually had the vest?

8         **MR. OSTROFF:**  Officer James.

9         **THE COURT:**  James.  Officer James did.  And he

10   was in court that one day; is that right?

11        **MR. OSTROFF:**  He was -- he was here for

12   deposition, which is how this issue came to light.

13        **THE COURT:**  Okay.  Okay.  But he was not in

14   court.  He didn't --

15        **MR. OSTROFF:**  Correct.

16        **THE COURT:**  Okay.

17        **MR. OSTROFF:**  He has not been -- he has not been

18   in court as far as this case.

19        **THE COURT:**  You know, 'cause -- here's what I

20   would do.  I mean, if -- if there's anything related

21   to the body cam, even if it's black footage, sound and

22   it exists, yeah, I agree, I'll grant the motion,

23   require -- require the State to give it go you.  But

24   if the State tells us it doesn't exist --

25        **THE DEFENDANT:**  But, sir, if I -- if it doesn't

# APPENDIX 6

1   exist, it should have a policy about how they go about

2   getting rid of what is considered to be a public

3   record, shouldn't they?

4       THE COURT:  Well, and that's where a lawyer would

5   be helpful to you.  You know, that's an issue that

6   will probably come up in the middle of trial.  Now,

7   I'm going to have to figure out how to deal with it.

8   But, you know, we would instruct you to turn over

9   anything by Friday, if you have it.  And if you don't,

10  you don't.

11      But then when that officer takes the stand, I

12  imagine we'll probably have to excuse the jury and

13  talk about -- depending on what he says -- what the

14  officer says -- talk about whether there's been any

15  discovery violations.  I don't know.

16      MR. OSTROFF:  Then what I'm going to do right

17  now, I'm going e-mail the officer and ask if he's had

18  a chance to follow up on if the body camera footage

19  exists.  Period.  I mean, I think the first issue,

20  that would be first -- from the terms of a Richardson

21  hearing, the existence of it, or it being in the

22  possession of the State, whether actively or

23  constructively, would be the first question, as of

24  right now.

25      THE COURT:  And at any time.  I mean, are these

APPENDIX 6

1   things kept and saved?  And if so, if it has since

2   been discarded or erased, that would be an issue we

3   would need to address, why.  But yes, to the extent it

4   ever existed at all, you're entitled to it.  We're

5   trying to figure out whether it existed at all.

6       THE DEFENDANT:  Sir --

7       THE COURT:  You're telling me it did, Mr. Ostroff

8   says, I don't know.

9       THE DEFENDANT:  Sir, it's written -- it's written

10  in his report that it existed.

11      THE COURT:  That he had a body -- I don't

12  think -- that doesn't seem to be in dispute that he

13  was wearing a body cam.  What is in dispute, whether

14  it was covered up and whether it has sound, right?

15      MR. OSTROFF:  I -- I believe the dispute is

16  whether it still exists.  He did say that the camera

17  was used.  He did say how they used it.  He did

18  explain that it is stored, he believes, for 30 days.

19  He doesn't know if it was flagged for evidentiary

20  value or not, because it did -- they never found the

21  defendant when he had the camera out.  It was only

22  after the camera was covered and put away, and, in

23  essence, they were almost ready to leave, that they

24  ever found the defendant.

25      THE COURT:  Okay.  And those are legal issues

APPENDIX 6

1 that arise in what I believe would be called a

2 Richardson hearing.  And then I would have to make

3 some determinations about whether there is a discovery

4 violation, whether it was material, whether there's

5 prejudice, whether it was willful.  And that would

6 require a hearing.  Sometimes you do those hearings

7 right in the middle of a trial.  You send the jury out

8 and you talk about it.

9   So it comes down to, Mr. Washington, are you

10 ready to go to trial on June the 29th, which is a week

11 from Monday?

12   **THE DEFENDANT:**  No, sir, I hadn't -- like, I had

13 got a witness coordinator phone number, but I don't

14 have a witness coordinator address so I can, like,

15. have, like, subpoenas through the Clerk of Courts sent

16 out for the witnesses that I want to subpoena to

17 testify for a deposition.  So I got a number but I

18 don't have a address.

19   **THE COURT:**  Well, what would you like me to do?

20 I'm showing you have speedy trial -- it would expire

21 this month.

22   **MR. OSTROFF:**  Your Honor, no, there was a --

23 there's a motion to continue by Defense on the 27th.

24 That put us at PTC for 6/16.

25   **THE COURT:**  Uh-huh.



APPENDIX

Top k-9
BladedEndCap

Bottom k-9
BladedEndCap

PLACE HERE

CAP FOR
TOP K-9
FANG

CAPS
INSERTION
REPRESENTATION
FOR POLICE K-9 FANGS

PLACE
HERE

CAP FOR
BOTTOM K-9
FANG

APPENDIX 8











APPENDIX 8





*APPENDIX 9*

# IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
## FIFTH DISTRICT

| | | |
|---|---|---|
| JAMES WASHINGTON, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| vs. | ) | CASE No. 5D16-3743 |
| | ) | Lower Case No.: 2014-CF-17252 |
| STATE OF FLORIDA, | ) | |
| | ) | |
| Appellee. | ) | |
| _____ | ) | |

## APPEAL FROM THE CIRCUIT COURT
## IN AND FOR ORANGE COUNTY, FLORIDA

## <u>INITIAL BRIEF OF APPELLANT</u>

JAMES S. PURDY
PUBLIC DEFENDER
SEVENTH JUDICIAL CIRCUIT

KATHRYN ROLLISON RADTKE
Assistant Public Defender
Florida Bar No.  0656331
444 Seabreeze Blvd. Suite 210
Daytona Beach, FL  32118
(386) 254-3758
radtke.kathryn@pd7.org

COUNSEL FOR THE APPELLANT

*APPENDIX 9*

# TABLE OF CONTENTS

PAGE NO.

TABLE OF CONTENTS                                                    i

TABLE OF CITATIONS                                                 iii

STATEMENT OF THE CASE AND FACTS                         1

SUMMARY OF ARGUMENT                                         14

ARGUMENT                                                            15

>    **POINT I**
>    THE TRIAL COURT ERRED IN DENYING
>    APPELLANT'S MOTIONS FOR JUDGMENT OF
>    ACQUITTAL ON THE CHARGES, WHERE THE
>    EVIDENCE WAS INSUFFICIENT TO SUPPORT THE
>    CONVICTIONS.                                                    15

>    **POINT II**
>    THE TRIAL COURT ERRED IN FAILING TO
>    CONTROL THE IMPROPER CLOSING COMMENTS
>    OF THE PROSECUTOR.                                          19

CONCLUSION                                                          22

DESIGNATION OF E-MAIL ADDRESS                            23

CERTIFICATE OF FONT                                             23

CERTIFICATE OF SERVICE                                        23

i

*APPENDIX 9*

# TABLE OF CITATIONS

CASES CITED:                                                    PAGE NO.

Bass v. State
547 So.2d 680 (Fla. 1st DCA 1989)                                  19

Brooks v. State
23 So.3d 1227 (Fla. 2d DCA 2009)                                  17

Brooks v. State
23 So.3d 1227 (Fla. 2d DCA 2009)                                  17

Brooks v. State
762 So.2d 879 (Fla. 2000)                                        21

Carbone v. State
98 So.3d 657 (Fla. 4th DCA 2012)                                  18

Clark v. State
58 So.3d 401 (Fla. 1st DCA 2011)                                  16

Delgado v. State
19 So.3d 1055 (Fla. 3d DCA 2009)                                  15

Gore v. State
719 So.2d 1197 (Fla. 1998)                                       19

Guzman v. State
2017 WL 1282099 (Fla. 2017)                                      21

Hardwick v. State
16 So.3d 1045 (Fla. 1st DCA 2009)                                 18

Lynch v. State
293 So.2d 44 (Fla. 1974)                                         19

ii

APPENDIX   9

Mitchell v. State
118 So.3d 295 (Fla. 3d DCA 2013)                    19, 20

Mosley v. State
2009 WL 2045387 (Fla. 2009)                          15

Thomas v. State
531 So.2d 708 (Fla. 1988)                            17

Wilson v. State
493 So.2d 1019 (Fla. 1986)                           18

## OTHER AUTHORITIES CITED:

Section 810.06, Florida Statutes                    17, 18
Section 893.13, Florida Statutes                     12

*APPENDIX 9*

# IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
## FIFTH DISTRICT

| | | |
|---|---|---|
| JAMES WASHINGTON, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| vs. | ) | CASE No. 5D16-3743 |
| | ) | |
| STATE OF FLORIDA, | ) | |
| | ) | |
| Appellee. | ) | |
| _____ | ) | |

## PRELIMINARY STATEMENT

In this brief, the following symbols will be used to designate references to the record on appeal:

"R" - Court records, and pleadings. (1-571);
"SR" - Supplemental records. (561-658).
"CR" - Confidential records. (1-33).
"T" - Trial transcript. (1-576).

## STATEMENT OF THE CASE AND FACTS

Appellant, James Washington, was accused in a three-count amended Information with armed burglary of a structure, possession of burglary tools – specifically a knife, or bolt-cutters or screwdriver or saw, resisting an officer without violence, and petit theft, concerning incidents that took place on December 31, 2014. (R239-241). He appeals from his convictions for burglary of a

1

*APPENDIX 9*

structure, possession of burglary tools, and petit theft. Although the appellant was also found guilty of resisting without violence, he conceded his guilt to that charge at trial. (T531). As to count one, he argued he was guilty of trespass. (T533).

Mr. Washington proceeded *pro se* for a time prior to trial, during which the prosecutor moved for a competency evaluation. (R119-120). The trial court granted the motion and appointed Dr. Daniel Tressler. (R121-122; 125-127). Dr. Tressler conducted a competency evaluation of Mr. Washington, in which Mr. Washington willingly cooperated, the doctor opined that he is competent, and a report was filed. (CR1-6). The court held a hearing on the issue of competency and after considering the report and speaking with both the prosecutor and the appellant, found him to be competent to proceed. (SR565-571; R128-130).

Prior to trial, the office of Regional Conflict Counsel was appointed, but the court assured Mr. Washington that if he absolutely wanted to represent himself, that would be okay. (SR654). The State filed a habitual felony offender notice. (R280-290; T5-6). The court explained the implications of the notice prior to trial, and the appellant said he understood. (T7-8). Trial commenced on September 13, 2016, before the Honorable Julie H. O'Kane, circuit judge. (T1-576).

On December 31, 2014, Officer Nicole Morgan and her training officer Stephen Wilson, responded to a call for a building check at 5705 LaCosta Drive in

2

APPENDIX 9

Orlando. (T220). Officer Brillant was already there with his dog. (T221). They checked an area where they found an open door, leading to an electrical room and where a ladder was attached to the wall. (T221). The ladder led to a hatch opening onto the roof. (T221). Officer Brillant yelled at the open hatch and commanded anyone up there to walk out with their hands up. (T224). The hatch door was then shut. (T224).

Other officers arrived. (T224). Officer Morgan, Officer James and his recruit climbed to the roof but they found no one there. (T224-225). They descended and went inside the building, using a crowbar. (T225-226). Finding no one there, they began looking up at the ceiling. (T227). There was a ladder at the point of an opening that gave access to the rafters. (T227). Before going in, officers used a PA system to repeatedly announce: "we are the Orlando police department. We have the place surrounded. Come out with your hands up." (T228). They saw a man in the ceiling over the kitchen, who refused to comply with commands to come down, so they used pepper spray. (T228-229). Then four officers went up into the ceiling, wearing gas masks, but their search yielded no result. (T231).

Officer Morgan stayed on the ground floor and attempted to follow the subject's movement from below. (T232-233). She heard a noise in a bathroom and

3

APPENDIX 9

informed her fellow officers, asking for K-9 assistance. (T 233-234). As the dog

handler approached, the bathroom door opened and Mr. Washington walked

toward her. (T234).

She sais he continued to approach, so she drew her weapon and told him to

get on the ground and open his hands. (T234). She said his hands were clenched.

(T234). He ignored her commands, and then the dog latched onto his lower leg.

(T235). She saw a small flashlight come out of one of his hands, and an unknown

object flew out of the other hand. (T235). Mr. Washington then struggled with the

dog and did not immediately allow himself to be handcuffed as directed. (T236,

254, 305-306, 358-359).

Officer Morgan was aware that homeless people frequented the building.

(T256-257). Although the door that was open had a busted lock when she arrived,

she didn't know who busted the lock or how, or how long it had stood open.

(T257).

The building was closed and dilapidated. (T259). If there was damage to the

AC units, she had no knowledge of when it would have happened. (T261). Officer

Morgan never saw Mr. Washington with a backpack or bolt cutters or screwdriver

or saw. (T262).

Officer Brillant and his dog had reported first to a Dunkin Donuts next door

4

APPENDIX 9

to the abandoned Perkins restaurant, in order to view the roof of the old Perkins. (T351-352). He saw a black male wearing a windbreaker jacket up on the roof, moving back and forth between the roof hatch and air-conditioning units. (T352). He called for more units. (T353). He found the back door which led to the electrical room with the ladder going to the roof. (T 353). He identified himself by announcing: "Orlando police K-9. I know you're up there. Come out now or you will be bit by the dog." (T354). When appellant was apprehended, Officer Brillant directed the crime scene technician to the knife he saw fly out of the appellant's hand. (T360).

Officer Brillant admitted that he did not see Mr. Washington stripping copper, nor did he see him with a backpack. (T367).

Matthew Knowles, director of asset management for the Leon Capital Group, testified as property manager of the premises that only the demolition contractors were authorized to be on premises. (T388-389). They were there on a weekly basis at the time. (T388). Mr. Washington did not have permission to be inside the building. "No trespass' signs were affixed to the building at that time. (T386). Although the structure was still there on December 31, 2014, it has been demolished since. (T385). Mr. Knowles had last been at the premises the month before the arrest. (T388). He had no knowledge of whether Mr. Washington

5

*APPENDIX 9*

removed any property. (T389).

Officer Wilson saw damaged AC units when he went up on the roof, and tools lying about with copper piping cut. (T279). There was a hacksaw, pliers, bolt cutters. (T280). He saw, but did not move the backpack. (T311). He never saw Mr. Washington with the backpack. (T311).

Although Officer Wilson saw Mr. Washington on the roof when he closed the hatch door, the hatch is *not* near the damaged AC unit. (T313). He did not find anyone on the roof while up there. (T321).

Officer Cote removed the tools from the roof. (T391).

Crime scene technician Chantal Styer received a backpack, with tools inside it. (T397-398, 400). The tools inside the backpack included screwdrivers, wrenches, and a bolt cutter. (T398-399). She processed the scene for fingerprints, but she was unable to get any prints. (T 404). She didn't send the backpack to FDLE because it's a property crime and the state labs only accept items to process for touch DNA in violent crime cases. (T405).

Ms. Styer never saw any of these items in Mr. Washington's possession. (T408). The only flashlight she collected was inside the backpack. (T414).

Defense counsel moved for judgments of acquittal as to possession of burglary tools and petit theft. (T432-438).

6

APPENDIX 9

As to possession of burglary tools, the appellant argued the court must grant a motion for judgment of acquittal where there is a reasonable hypothesis of innocence which is not overcome. (T438). The reasonable hypothesis argued is that no evidence or testimony exists to show Mr. Washington had possession of any burglary tools. (T438). No one saw him near the tools. (T438). There was no testimony as to when the tools got on the roof or how long they were there. (T433). The state failed to establish elements two and three of the offense of possession of burglary tools, in that there was no evidence either that the tools were in Mr. Washington's possession or that he intended to use them in the commission of burglary. (T433). No one knows how the door to the building was opened or who opened it. (T433). There was no photograph of the busted padlock. (T433). The only evidence of anyone forcing the door was when police admitted to breaking the door open. (T433).

Appellant further noted that Officer Wilson testified he saw the defendant on the northeast corner of the roof, while the tools and backpack were found on the southeast corner. (T436). Officer Brillant said he saw Mr. Washington walking back and forth between the units but didn't see him doing anything to the units. (T437).

As to the petit theft, the appellant argued there was no evidence that he

7

APPENDIX 9

attempted to obtain or use the copper. (T434). No one saw him in possession of

the copper. (T434). No fingerprints were found on the tools or copper. (T434).

Nothing connects him to the backpack. (T434). A reasonable hypothesis of

innocence is that anyone could have done this prior to December 31, 2014 and the

state has not refuted that. (T435). Mr. Knowles testified that the last time he

visited the property was in November (2014), and construction workers were

authorized to be on the property. (T435). They might have been dismantling the

AC units in preparation for the demolition of the building. (T435).

The trial court denied the motions. (T438).

Mr. Washington testified that in December of 2014 he was homeless and on

the waiting list for housing through the Veterans Administration. (T446).He was

staying in the building for about a week, as were other homeless people. (T446-

448, 452). The other homeless were strangers to him, and they stayed there at

night while he stayed there in the daytime for safety. (T448, 452).

He denied breaking the door, and said it was already open when he arrived

that morning. (T449). He also denied ownership of the tools or backpack. (T449-

452). He said he didn't take the copper off the AC units. (T451). His own property

was on his person: he had his identification and wallet in his back pocket. (T450).

He also had his glasses and cell phone in his pockets. (T450-451). He denied

8

*APPENDIX 9*

going back and forth between the AC units. (T461).

When he heard the officers calling for someone to come out of the building he hoped they weren't talking to him. (T455). When they released the dog, he tried to avoid the dog because he was afraid it would bite him. (T456). He was bitten after being apprehended. (T462). He believed he was bitten because he didn't put his hand behind his back fast enough. (T463). Mr. Washington said he knew he wasn't supposed to be in the building, but thought it looked like an acceptable place for homeless people to congregate. (T468).

Mr. Washington recalled that he tried to leave but officers pulled him back into the building. (T469). Somewhat similarly, Officer Morgan testified that her report showed he was pulled back to the center of the room so officers could get a better handle on him. (T485). She recalled this happened after he first fell against a wall, but that was after he had been bitten. (T486).

After the State rested in rebuttal, the appellant again moved for judgment of acquittal as to counts two and four, based on the previous arguments. (T492). The motions were again denied. (T492).

The prosecutor argued in closing that the appellant "went in to steal copper, and the tools and backpack were his." (T510-512). Appellant objected to this as not in evidence. (T512). The objection was overruled. (T512). The prosecutor

9

*APPENDIX 9*

repeated this argument. (T515).

Later arguing witness credibility, the prosecutor remarked:

> "Think about those officers' testimony. You can judge their demeanor. You can judge their credibility. Do you actually believe those officers pulled him back into the Perkins, stomped him with their knee in his head, pulled his leg up so he could just get a nice fresh bite by the K-9? Do you really believe those police officers did, because if you believe, you will believe anything."

(T517).

Appellant objected to these remarks as improper argument, and the objection was sustained. (T517). The prosecutor then continued, instructing the jury to find him guilty because they could judge the officers' credibility, he told an "unreasonable story," and because the evidence showed him to be guilty of all he'd been charged with. (T517).

During defense closing, the appellant admitted to being guilty of trespass (T518), and that there was no dispute that he entered a structure, with the only issue being whether he intended to do anything other than trespass in the building. (T520). He also did not contest the resisting charge. (T531).

The prosecutor began rebuttal closing argument:

> "When the defendant admits to resisting without violence and trespass, that's him bolstering himself. That's him saying to you, 'I'll cop to these charges so they think I'm credible. I

10

*APPENDIX 9*

admit to what I do. . .'"

(T536-537).

Defense counsel objected to these remarks as improper comment on witness

credibility. (T537). The objection was overruled. (T537). The prosecutor

continued, repeating "he's trying to bolster his credibility." (T537).

A bit later in his closing argument, the prosecutor commented,

> "Where is Mr. Washington gonna take this copper? To a scrap
> yard to sell it. He's homeless. He needs money. That's why you
> take copper out of AC units for. That's why you burglarize these
> type of places. You get money for the copper. Put it in his bag.
> Carry it. He was taking the copper, though, use your common
> sense, to sell it because it doesn't have any value just walking
> around with it."

(T540).

Defense counsel objected to this as not being in evidence. (T540). The trial

court overruled the objection. (T541).

The prosecutor continued, "And, ladies and gentlemen, this case is about

credibility. It really is. Almost every single officer would have to be lying in this

case .. ." (T541).

Defense counsel objected to this is improper comment. (T541). The trial

court instructed the prosecutor to rephrase, and sustained the objection. (T541).

He continued:

> "For you to believe the defendant's statement about the encounter

11

*APPENDIX 9*

in front of the bathroom, Officer Brillant, Officer Morgan, and Officer Wilson would all have to be lying to you."

(T541). Defense counsel objected to these remarks as improper bolstering. (T541). That objection was overruled. (T541).

Appellant had no objections to the instructions as read to the jury. (T560).

The jury returned verdicts of guilt to the lesser included offense of burglary of a structure as to count one, and guilty as charged for each of the remaining counts. (T565).

At sentencing, defense counsel requested a fee of $750, and Mr. Washington agreed that was a reasonable fee. (R413-414). The trial court found that he had been noticed of the State's intention to seek a habitual felony offender sentence on September 13, 2016, and this was discussed at trial. (R414). The court also found the State had proved by a preponderance of the evidence that appellant was previously convicted of two felonies, in cases 2013-CF-1215 and 2014-CF-3958. (R415). The court found that the business records of the DOC showed he was released from prison on February 1, 2012, within five years of the incident in the case at bar, and that one of his prior felonies is not a violation of F.S. 893.13. (R415). In addition, defendant offered no proof that either prior conviction was set aside or pardoned. (R415-416).

12

APPENDIX 9

As to count one, appellant was sentenced to five years in prison as an habitual felony offender, with credit for one year and 306 days; as to count two, five years in prison, concurrent, with the same amount of credit; as to count three, 51 weeks in jail with credit; and as to count four, 60 days in jail, with credit. (R416). All sentences are to be served concurrently with the others. (R416).

A motion for arrest of judgment was also filed, and denied. (R262-264).

The office of the Public Defender was appointed for purposes of appeal. (R418). Notice of Appeal was timely filed. (R346). This appeal follows.

APPENDIX   9

# SUMMARY OF ARGUMENT

The trial court erred in denying Appellant's motion for judgments of acquittal where the evidence was insufficient to support convictions on the charges of possession of burglary tools and petit theft. The evidence adduced at trial was not sufficient to overcome Appellant's reasonable hypothesis of innocence that he had not committed those crimes, and that he was only guilty of trespass, and he was not in possession of any burglary tools and there was no proof offered that such tools as were found on the premises were ever used to effect a burglary.

The trial court erred in failing to control the improper closing arguments of the prosecutor, where the prosecutor's comments shifted the burden of proof and invited the jury to convict the defendant for some reason other than that the State had proved its case beyond a reasonable doubt. The prosecutor did this when he argued that the appellant was "bolstering himself," implying the defendant had a burden to prove his innocence, when he said all the State's witnesses would have to be lying for the jury to believe Mr. Washington's testimony, and when he alleged facts not in evidence, such as that the appellant had stolen copper in order to sell it – because he was homeless – when no witness saw him do any such thing.

APPENDIX 9

## ARGUMENT

## POINT I

THE TRIAL COURT ERRED IN DENYING
APPELLANT'S MOTIONS FOR JUDGMENT OF
ACQUITTAL ON THE CHARGES, WHERE THE
EVIDENCE WAS INSUFFICIENT TO SUPPORT THE
CONVICTIONS.

### Standard of Review

Where the state relies on direct evidence, appellate courts review a
defendant's motion for a judgment of acquittal de novo, but in doing so,
appellate courts review the evidence in the light most favorable to the state,
including conclusions that a jury might fairly and reasonably infer from the
evidence. *Delgado v. State*, 19 So.3d 1055, 1057 (Fla. 3d DCA 2009). If the
evidence is wholly circumstantial, not only must there be sufficient
evidence establishing each element of the offense, but the evidence must
also exclude the defendant's reasonable hypothesis of innocense. *Mosley v.
State*, 2009 WL 2045387 (Fla. 2009).

### Argument

The trial court, in ruling on the motions for judgment of acquittal, found that

the evidence was sufficient to submit the case to a jury. (T438).

The case at bar does not involve conflict in the evidence nearly as much as

it involves a lack of evidence, at least as to petit theft and possession of burglary

tools. Appellant did not move for judgment of acquittal as to the charge of

burglary.

Here, the appellant did not possess or have any burglary tools on him. There

15

APPENDIX 9

were no burglary tools on his person when apprehended, nor was there any

evidence that he had even broken into the structure or entered it with the intent to

commit any offense other than trespass. There was no evidence what tool, if any,

was used to enter the building. The backpack full of tools was not linked to him,

neither was it found in his possession. There were no fingerprints of DNA

evidence. Likewise, there was no evidence that he had stolen anything. No copper

wire was in his possession. Officer Brillant saw Mr. Washington on the roof but

did not see him removing any copper wire from the AC units. Officer Morgan

knew there had been homeless people in the structure, and Mr. Knowles had

authorized construction/demolition contractors to enter the building the month

prior to the appellant entering the structure.

There was evidence that a small knife flew out of Mr. Washington's hand

when he was apprehended. However, this was never shown to have been used as a

burglary tool. Evidence that a defendant possessed tools used for other purposes

does not support a conviction for possession of burglary tools. Clark v. State, 58

So.3d 401 (Fla. 1st DCA 2011).

Evidence that defendant was in possession of a flashlight is insufficient to

support a conviction for possession of burglary tools. Brooks v. State, 23 So.3d

1227 (Fla. 2d DCA 2009). In the case at bar, there was some testimony about a

16

APPENDIX 9

flashlight flying out of appellant's hand when he was taken down, but a flashlight

was not listed in the amended information as a purported burglary tool. In any

event, it would not qualify as a burglary tool. To support a conviction for

possession of burglary tools, the State must prove that the defendant had "in his or

her possession any tool, machine, or implement with intent to use the same, or

allow the same to be used, to commit any burglary or trespass." § 810.06, Fla. Stat.

Brooks v. State, 23 So.3d 1227, 1229 (Fla. 2d DCA 2009). Further, when a person

is accused of possessing burglary tools, the state must prove beyond a reasonable

doubt not merely that the accused intended to commit a burglary or trespass while

those tools were in his possession, but that the accused actually intended to use

those tools to perpetrate the crime. Thomas v. State, 531 So.2d 708, 709 (Fla.

1988).

Even in cases where the evidence shows the defendant carries on his person

wire cutters in order to cut copper tubing inside a house for the purpose of stealing

it, this does not satisfy the requirement of proof that he intended to use the tools to

commit burglary. Hardwick v. State, 16 So.3d 1045, 1046 (Fla. 1st DCA 2009). In

the case at bar, the appellant did not carry tools such as those described in

Hardwick on his person, but even if he had that would not make him guilty of

possession of burglary tools.

APPENDIX 9

No crime is committed under § 810.06, Fla. Stat. Until the tools are in the actual or constructive possession of a person who is using or attempting to use the objects as burglary tools. Carbone v. State, 98 So.3d 657, 658 (Fla. 4th DCA 2012).

As to the charge of petit theft, there is no evidence that the appellant was seen in possession of the copper wire or that he was removing it, while his reasonable hypothesis of innocence – that others had access to the structure and to anything in it – was not disproved. Indeed, State's witnesses Officer Morgan and Matthew Knowles confirmed the fact that homeless persons and contractors had access to the building.

A motion for judgment of acquittal should be granted in a circumstantial evidence case if the state fails to present evidence from which the jury can exclude every reasonable hypothesis except that of guilt. Wilson v. State, 493 So.2d 1019, 1022 (Fla. 1986), and especially where the State fails to offer evidence which is inconsistent with the Defendant's hypothesis of innocence. Lynch v. State, 293 So.2d 44, 45 (Fla. 1974).

Where the evidence is insufficient to support convictions, the appropriate remedy is to reverse the convictions.

APPENDIX 9

## POINT II

### THE TRIAL COURT ERRED IN FAILING TO CONTROL THE IMPROPER CLOSING COMMENTS OF THE PROSECUTOR.

Wide latitude is accorded a prosecutor during closing argument, and the control of those comments is within the discretion of the trial court absent an abuse of that discretion. Bass v. State, 547 So.2d 680, 682 (Fla. 1st DCA 1989). Florida courts have found reversible error for a prosecutor to make arguments that shift the burden of proof in a criminal case. Mitchell v. State, 118 So.3d 295, 296-97 (Fla. 3d DCA 2013). The Florida Supreme Court holds that the standard for a criminal conviction is not which side is more believable, but whether, taking all evidence into consideration, the State has proven every essential element of the crime beyond a reasonable doubt. Gore v. State, 719 So.2d 1197, 1200 (Fla. 1998). For that reason, it is error for a prosecutor to make statements that shift the burden of proof and invite the jury to convict the defendant for some reason other than that the State has proved its case beyond a reasonable doubt. Id.

In Mitchell, the prosecutor argued that the defense was asking the jury to believe that every single witness in the case was a liar, because that's what would have to happen for him to be not guilty. Mitchell v. State, 118 So.3d 295, 297 (Fla.3d DCA 2013). The court in that case held that this statement implied the

19

APPENDIX 9

defendant had a burden to prove all the State's witnesses were lying in order to establish his innocence. That argument is remarkably like the one in this case.

The prosecutor argued that if the jury believed the officers acted as Mr. Washington said they did, then "you will believe anything." (T517). Appellant's objection to this was sustained.

However, the prosecutor went on to make other comments, including that Mr. Washington was "bolstering himself" so that the jury would find him credible. (T536-537). Appellant's objection to this was overruled, and the prosecutor repeated it. These statements were burden shifting and designed to call the appellant a liar and invite the jury to find him guilty by implying he had to prove his innocence.

The prosecutor in this case several times during closing argument implied that the appellant had a burden to prove he was innocent or that the State's witnesses were lying. (T536-537, 540, 541). Some of the appellant's objections were on the ground that it was "improper argument." If any of the bases for objection lacked sufficient specificity, then those comments by the prosecutor were fundamental error, which vitiated the appellant's right to a fair trial. See Guzman v. State, 2017 WL 1282099 (Fla. 2017), quoting Brooks v. State, 762 So.2d 879, 898-99 (Fla. 2000).

20

APPENDIX 9

Additionally, the prosecutor argued allegations not in evidence. (510-512).

The objection was overruled.

APPENDIX 9

## CONCLUSION

Based upon the foregoing arguments, and the authorities cited therein, the Appellant respectfully requests that the judgments and sentences below be reversed, and that the convictions for petit theft and possession of burglary tools be vacated.

Respectfully submitted,

JAMES S. PURDY
PUBLIC DEFENDER
SEVENTH JUDICIAL CIRCUIT

/s/ *Kathryn Rollison Radtke*
Kathryn Rollison Radtke
Assistant Public Defender
Florida Bar No.  0656331
444 Seabreeze Blvd. Suite 210
Daytona Beach, FL  32118
 (386) 254-3758
radtke.kathryn@pd7.org

COUNSEL FOR THE APPELLANT

22

APPENDIX 9

# CERTIFICATE OF FONT

I HEREBY CERTIFY that the font used in this brief is 14 point proportionally spaced Times New Roman.

## DESIGNATION OF E-MAIL ADDRESS

I HEREBY DESIGNATE the following e-mail addresses for purposes of service of all documents, pursuant to Rule 2.516, Florida Rules of Judicial Administration, in this proceeding:  appellate.efile@pd7.org (primary) and radtke.kathryn@pd7.org (secondary).

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing has been filed electronically with the Fifth District Court of Appeal, 300 South Beach Street, Daytona Beach, Florida 32114, at http://edca.5dca.org; delivered electronically to the Office of the Office of the Attorney General, 444 Seabreeze Boulevard, fifth floor, Daytona Beach, Florida 32118 at crimappdab@myfloridalegal.com; and mailed to Mr. James Washington, Inmate #197574, Madison Correctional Institution, 382 Southwest MCI Way, Madison, Florida 32340-4430, on this 23rd day of June 2017.

/s/ *Kathryn Rollison Radtke*
KATHRYN ROLLISON RADTKE
Assistant Public Defender

23

FEBRUARY 9, 2017

THE LAW OFFICES OF
JAMES S. PURDY                    APPENDIX 10
PUBLIC DEFENDER
SEVENTH JUDICIAL CIRCUIT
444 SEABREEZE BLVD, SUITE 210
ATTN: KATHRYN ROLLISON RADTKE
DAYTONA BEACH, FLORIDA 32118

DEAR MS. RADTKE:

I AM WRITING TO GIVE YOU THE INFORMATION YOU NEED TO PREPARE THE BEST POSSIBLE APPEAL. THE ORANGE COUNTY JUDICIAL SYSTEM CONSPIRED TOGETHER TO PROTECT THE OFFICERS WHO TAMPERED WITH EVIDENCE THEN DESTROYED THE BODY CAMERA EVIDENCE TO CONCEAL THEIR ILLEGAL CONDUCT. DURING THEIR SEARCH FOR ME, I SAW THEM FIND AND RELOCATE EVIDENCE TO MAKE IT SEEM I HAD DONE MORE THAN I ACTUALLY DID. I ACKNOWLEDGE BEING GUILTY OF TRESPASSING AND RESISTING ARREST WITHOUT VIOLENCE. I DID NOT COME OUT WHEN THE OFFICER CALLED. WHEN THEY DECIDED TO COME IN AFTER ME, I WAS NOT GIVEN THE OPPORTUNITY TO GIVE UP. IT WAS A STRICTLY SEEK AND DESTROY MISSION. I WAS RUNNING FOR MY LIFE BECAUSE CERTAIN OFFICERS HAD PLOTTED TO SHOOT ME DEAD IF THEY GOT THE RIGHT SHOT AT THE FRONT PART OF MY BODY. I COULDN'T STOP THEM FROM SHOOTING ME BUT I COULD PREVENT THEM FROM SHOOTING ME WHERE THE SHOT COULD BE JUSTIFIED. THAT IS ALL I DID. I KNEW I COULDN'T GET AWAY, SO I PROTECTED MYSELF THE BEST WAY I COULD. WHEN I SAW AN OPPORTUNITY TO GET IN THE POSITION SO MY APPREHENSION COULD BE WITNESSED BY MORE THAN JUST THE OFFICERS WITHIN THE BUILDING, I JUMPED THROUGH THE SHEET ROCK CEILING AND RAN FOR THE OUTSIDE DOOR. OFFICER MORGAN BLOCKED MY EXIT AND OFFICER JAMES, IN ADDITION TO OTHER OFFICERS, GRABBED ME FROM BEHIND TO PULL ME BACK AWAY FROM THE DOOR SO NO ONE COULD SEE WHAT THEY INTENDED TO DO. I WAS HIT IN THE KIDNEY AREA SEVERAL TIMES BEFORE I WAS HELD DOWN IN A POSITION THAT SEEMED TO EXPRESS THE SACRIFICE OF CHRIST. THE K-9 OFFICER BRILLIANT INSTALLED THESE KNIFE CANINE DENTURES INSIDE THE DOG'S MOUTH. I STARTED TALKING TO OFFICER JAMES WHEN IT BECAME APPARENT THEY INTENDED TO KILL ME. I SAID, "YALL FIXING TO KILL ME." HE SAID, "YOU SHOULD HAVE CAME WHEN I CALLED YOU." I SAID, "THAT MEANS I GOTTA DIE." HE SAID, "YOUR KIND DESERVES TO DIE." I MADE MY PEACE WITH GOD AND EXPECTED TO BE KILLED. I WAS HELD DOWN BY OFFICERS WITH THIS DOG GROWLING AT ME WITH THESE KNIFE EXTENTIONS HANGING FROM IT'S MOUTH. I COULDN'T DO ANYTHING. THEY ALL STARTED CHANTING STOP RESISTING OVER AND OVER UNTIL THE CHANT PROVOKED THE DOG TO BITE ME. OFFICER BRILLIANT HAD THE DOG'S LEASH SHORT-COLLARED SO HE COULD DIRECT THE BITE. HE POINTED THE DOG'S HEAD TOWARDS MY THIGH WHERE THE RIGHT BITE WOULD CAUSE ME TO BLEED TO DEATH. I THOUGHT I WAS GOING TO DIE; THEY THOUGHT I WAS GOING TO DIE. GOD SPARED ME. WHEN I DIDN'T DIE, THEY DID WHAT THEY HAD TO DO TO PROTECT THEMSELVES AT MY EXPENSE. WITHOUT THAT BODY CAMERA EVIDENCE, I DON'T HAVE THE IRREFUTABLE PROOF THAT THEY RELOCATED EVIDENCE BEFORE AND AFTER THEY DECIDED TO TRY TO KILL ME. OFFICER JAMES HAD ON THE BODY CAMERA FROM THE BEGINNING TO THE END OF THE INCIDENT. THE CRIME SCENE INVESTIGATOR STYER PHOTOGRAPHED EVIDENCE IN DIFFERENT

*APPENDIX 10*  *FEBRUARY 9, 2017*

PUBLIC DEFENDER / KATHRYN ROLLISON RADTKE
SEVENTH JUDICIAL CIRCUIT
444 SEABREEZE BLVD; SUITE 210
DAYTONA BEACH, FLORIDA 32118

LOCATIONS THAN WHAT WAS WRITTEN IN THEIR CASE NARRATIVES. SHE TESTIFIED TO NOT TESTING FOR LATENT PRINTS BUT I ENCLOSED HER CASE NARRATIVE WHERE SHE STATES THAT SHE DID. OFFICER COTE TESTIFIED THAT HE RELOCATED THE EVIDENCE ON THE WITNESS STAND BUT FAILED TO WRITE THAT IN HIS REPORT. BOTH OF THEIR CASE NARRATIVE WERE SUBMITTED AS SUPPLIMENTAL DISCOVERIES 15 MONTHS AFTER MY ARREST IN AN EFFORT TO EXPLAIN THE DISCREPANCIES I HAD LISTED IN THE MOTIONS TO SUPPRESS AND MOTION TO DISMISS RULED ON JAN 27, 2016 AND MARCH 9, 2016. A FUNDAMENTAL ERROR HAS BEEN COMMITTED. THE BODY CAMERA EVIDENCE IS NO LONGER AVAILABLE. OFFICER JAMES TESTIFIED THAT HE DESTROYED THE EVIDENCE. I DIDN'T HAVE A FAIR TRIAL AND IT IS IMPOSSIBLE FOR ME TO HAVE A FAIR TRIAL WITHOUT THE BODY CAMERA EVIDENCE. A FUNDAMENTAL ERROR IN A CRIMINAL CASE MAY BE CORRECTED IN A DIRECT APPEAL EVEN IF THE ISSUE HAD NOT BEEN PRESERVED FOR APPELLATE REVIEW BY A TIMELY MOTION OR OBJECTION IN THE TRIAL COURT. THE PROSECUTOR ALLOWED MS STYER AND MR. COTE TO TESTIFY TO STATEMENTS INCONSISTENT WITH STATEMENTS PROVIDED IN THEIR CASE NARRATIVES. I NEVER WAS PROVIDED WITH A COPY OF THEIR DEPOSITIONS BUT BASED ON THEIR TESTIMONY COMPARED TO THEIR CASE NARRATIVES, A GIGLIO VIOLATION OCCURRED. TO MAKE MY SITUATION MORE DIFFICULT, JUDGE EGAN IMPLIED THAT HE WOULDN'T ENFORCE THE SUBPOENAS TO COMPEL MY WITNESSES TO TESTIFY. HE SAID IN COURT ON MARCH 16, 2016, THAT MY WITNESSES MIGHT NOT SHOW UP. THE ONLY WAY THEY DID NOT HAVE TO SHOW UP IS FOR HIM TO NOT ENFORCE HIS SUBPOENAS. THE NEXT TIME'S I WAS IN HIS COURTROOM, HE SAID I WOULD HAVE TO DO MORE THAN NOTIFY HIM AND THE CLERK OF COURT IN THE COURTROOM FOR MY WITNESSES TO SHOW UP. HE DENIED ME COMPULSORY PROCESS AND FORCED ME TO ACCEPT A LAWYER I DID NOT WANT THAT HE COULD CONTROL. HE DID EVERYTHING IN HIS POWER TO KEEP ME FROM INTRODUCING ENCLOSED STINGRAY PHONE TRACKER EVIDENCE ALONG WITH THE TESTIMONY OF MR. JOHN SAWICKI IN ADDITION TO THE 26 OTHER WITNESSES I HAD ON MY WITNESS LIST. IT WOULD BE HELPFUL FOR YOU TO OBTAIN THE C.D.s OF THE COURT PROCEEDINGS HE CONDUCTED BEFORE HE ALLOWED JUDGE JULIE O'KANE TO FINISH WHAT HE STARTED. I ENCLOSED THE FOLLOWING TO BETTER ASSIST YOU IN MY APPEAL:

① Case narrative of Officer James
② Case narrative of Officer Styes
③ Case narrative of Officer Cote
④ Complaint to the Judicial Qualifications Commission
⑤ Letters from the Judicial Qualifications Commission
⑥ Stingray phone tracker information from Wikipedia
⑦ Stingray information from wired.com

PLEASE CONTACT ME IF YOU THINK YOU NEED ANYTHING I MAY BE ABLE TO PROVIDE. KEEP ME INFORMED AS TO THE PROGRESS OF MY CASE. YOUR ASSISTANCE WILL BE GREATLY APPRECIATED.

SINCERELY,

*James Edward Washington*
JAMES EDWARD WASHINGTON

APPENDIX 10

## Orlando Police Department 8.11
### Supplement Report

Case Number . . : 2014-536652
Supplement Number:   3

Page:   1
Date Of Supplement: 01/02/2015

Date/Time Reported: 12/31/14  8:51 Hrs.
Location Occurred : 5705 LA COSTA DR
Reporting Officer :   30287  MORGAN,NICOLE,E,
Primary Unit Assigned to Investigate: E Property
Assigned Investigators:

Narrative Name: NARRATIVE SUPPLEMENT 1/2/2015 8:47 AM
On 12/31/2014 at 0851 hours, I, Officer James (12869) and Officer S. Smith (30580) responded to 5705 La Costa Drive, to assist Officer Morgan and Officer Wilson with the commercial burglary. Upon our arrival, I was informed of the suspect's description and last known location on the roof. We completed a search of the roof and were unable to locate the suspect.

On the roof, I observed a red and black in color back pack sitting beside one of the overhead air conditioning units. A knife and other tools, along with a water bottle were also observed in this area. Several of the buildings air conditioning units and vent were dismantled and a pile of copper was located beside the buildings roof access hatch, which is also where the suspect was last observed. After we completed a search of the roof, as we exited, I observed recent damage to the wall and exposed insulation pieces, which had been moved from their original position.

During this search numerous voice and public announcement commands were given telling the suspect to exit the building or to make his position known. I utilized my department issued body worn camera, to look and attempt to locate the suspect but this met with negative results. After numerous attempts to make contact, and with no answer from inside, it was determined for officer safety, that Clear out would be deployed inside the building. With the assistance of other Orlando Police Officers, 20 cans were deployed inside. after allowing time dispense, we attempted again to locate the suspect. Once the suspect was located, I assisted Officer Morgan and Officer Wilson in handcuffing the suspect.

At this time, I escorted the suspect to Florida Hospital East. Acting Supervisor, Officer Conroy (17711)  was notified of this incident. This report is to document my involvement in this incident.

*APPENDIX  10*

Orlando Police Department 8.11
Supplement Report

Case Number  . . : 2014-536652                          Page:    1
Supplement Number:  7                    Date Of Supplement: 01/20/2015


Date/Time Reported: 12/31/14  8:51 Hrs.
Location Occurred : 5705 LA COSTA DR
Reporting Officer :    30287  MORGAN,NICOLE,E,
Primary Unit Assigned to Investigate: PatrolSvcs
Assigned Investigators:
          11757     HOWARD,ANDRE,,
          30287     MORGAN,NICOLE,E,


------------------------------------------------------------------------

EVIDENCE COLLECTED INFORMATION

The following Evidence Information was added to this case.
          Knife

The following Evidence Information was added to this case.
          Miscellaneous Articles

The following Evidence Information was added to this case.
          Tools Used


Narrative Name: NARRATIVE SUPPLEMENT 1/20/2015 10:14 AM
     On December 31, 2014 at 1315 hours, I, CSI Styer (#14857) responded
to 5705 La Costa Drive, in reference to a commercial burglary. Upon
my arrival, I met and was briefed by Officer Cote (#16904).  After my
briefing, I took digital color photographs, depicting gray card with
date and case number, location, overall views of the exterior east
side of the business, with close up views of an open utility door,
and close up views of a red/white/black backpack on the ground in the
doorway.  Ofc. Cote then utilized my camera to take photographs of
the damage on the roof, and close up views of tools left on the roof.
He collected those tools and turned them over to my custody.

I then proceeded to take overall photographs inside the business,
with close up views of damage inside.  Directly inside the front
doors, I was directed to photograph suspected bloodstains on the
ground, as well as a knife blade, missing its handle.

Lastly, I took photographs of damage to the outside of the building,
as well as a close up view of a `No Trespassing` sign affixed to the
window on the south side of the business.

I processed the scene for latent prints with negative results.  I
collected the tools, backpack containing tools and other personal
items, as well as the knife blade as evidence.

I departed the scene at 1430 hours.

Upon my arrival at OPH, 73 photographs were downloaded and are on

*APPENDIX 10*

Orlando Police Department 8.11
Supplement Report

Case Number  . . : 2014-536652                           Page:    2
Supplement Number:   7                    Date Of Supplement: 01/20/2015

file with the Forensic Imaging Lab.  The collected items were secured
in a locker in the Forensic Lab for processing and packaging on a
later date.

Between 01/01/15 and 01/16/15, I processed the collected items for
latent prints with negative results.  All items were then packaged
and entered into Property and Evidence under #DE7169A.

Cost of Investigation =$86.00

****************************************************************

```
|I Swear or affirm the above statements |Officer Name/ID# (Print) |
|are correct and true.                  |                         |
|(Signature)_____   |                         |
|                                       |_____|
|Sworn to and subscribed before me, the undersigned Authority,    |
|                                                                 |
|This_____Day of _____,20____.   _____|
|Notary Public |_|  Law Enforcement Officer |_| Emp# ____ Orlando PD|
```

END OF SUPPLEMENT NUMBER    7

APPENDIX 10

### Orlando Police Department 8.11
### Supplement Report

Case Number . . : 2014-536652

Supplement Number: 4

Page: 1

Date Of Supplement: 01/05/2015

Date/Time Reported: 12/31/14  8:51 Hrs.
Location Occurred : 5705 LA COSTA DR
Reporting Officer :    30287  MORGAN,NICOLE,E,
Primary Unit Assigned to Investigate: E Property
Assigned Investigators:

Narrative Name: NARRATIVE SUPPLEMENT 1/5/2015 9:48 AM
    On December 31, 2014 I Officer Cote (16904) responded to the S Semoran Blvd and LaCosta Dr in reference to officers on scene needing more officers. When I arrived on scene I took became the cover officer for the K9 officer. After we deployed clear out and officers checked the drop ceiling I rechecked the kitchen vents and that is where I came in contact with the suspect that was in the vent over the food prep area. The suspect was inside the duct work lying still trying not to be detected. I could only see the suspects left side oh his face.

    I gave the suspect multiple orders to LET ME SEE YOUR HANDS and DO NOT MOVE, that he did not follow. The suspect was later sprayed in the rear of the building with chemical agent by other officers that I did not witness.

**********************************************************************

| I Swear or affirm the above statements are correct and true. (Signature)_____ | Officer Name/ID# (Print) _____ |
|---|---|
| Sworn to and subscribed before me, the undersigned Authority, | |
| This_____Day of _____,20___. _____ Notary Public ¦_¦  Law Enforcement Officer ¦_¦ Emp#ـــ  Orlando PD | |

END OF SUPPLEMENT NUMBER   4

APPENDIX 10

January 20, 2017

Judicial Qualification Commission
P.O. Box 14106
Tallahassee, FL 32317

Dear Sirs:

The Orlando Police Department lynched me after I was detained for an alledged burglary. They intended to kill me by holding me down to let this K-9 bite me with these specially designed knife capstone dentures attached to his teeth. The K-9 officer directed the dog's bite at a location where a deep cut would sever my femoral artery, causing me to bleed to death. When I survived, they rearranged the alledged crime scene to enhance my criminal intent to justify their actions. I saw them do all this and one of their officers had on a body camera that recorded everything I alledge. I had four public defenders who refused to compel the police to provide that body camera evidence; Consequently, I went Pro Se to compel the court only to find out that the evidence was no longer available. When it became apparent that I knew enough to be a threat to the case being prepared against me, the Department of Corrections and Judge Robert John Egan conspired together to restrict my access to the courts and deny me the right to compel witnesses. Judge Egan forced me to accept court-appointed counsel that I didn't want when he said he would not enforce the subpoenas for my witnesses to appear to testify. Ms. Donna M. Goerner told me that Judge Egan would not allow her to hire an investigator or obtain evidence and/or witnesses in my behalf. She did nothing to help me under Judge Egan's instructions. When I wrote the bar association to formalize my complaint against Ms. Goerner, the Department of Corrections intercepted my letter and informed Judge Egan

1 of 2

APPENDIX   10

January 20, 2017

Judicial Qualification Commission
P.O. Box 14106
Tallahassee, FL 32317

of the complaint I had against him. The next time I was
allowed to go to court, Judge Julie O'Kane was presiding in
his place in his courtroom. Ms. Goerner defended me based
on tampered evidence provided by the prosecutor. She did
exactly what Judge Egan told her to do and I couldn't do
anything about it besides complain afterwards. I
enclosed copies of the following documents to help support
my argument:

① Citizen's Complaint Form
② Police Department's reply from Dwain Rivers
③ Letter from the Fla. Bar dated May 19, 2015
④ E-mail response from Linda Ridge of the Orlando Police Dept.
⑤ Motion to Suppress prepared March 8, 2016
⑥ Order Denying Motion to Dismiss
⑦ Order Denying Motion to Suppress and Motion in Limine
⑧ Order Directing Transcription of Proceedings
⑨ Letter from the Fla. Bar dated July 28, 2016
⑩ Letter from the Fla. Bar dated January 4, 2017

Judge Robert Egan set the stage for me to be prosecuted
under the most unfavorable condition possible. My Due
Process rights were violated and I want to file a formal
complaint.

Sincerely,

James E. Washington

2 of 2

*APPENDIX    10*



# ORLANDO POLICE DEPARTMENT
## INTERNAL AFFAIRS SECTION

## CITIZEN'S COMPLAINT FORM

Complainant: *JAMES EDWARD WASHINGTON*

Address: *951 CHELSEA WAY, LAKE WALES, FLA 33853*

Telephone #: Home: _____ Other: _____ E-mail: _____

Complaint Against: *OFFICERS JAMES, COTE, ZAMBITO, ROBERTSON, WILSON, BRILLANT*
(Name of Employee)
*12869, 8690, 16220, 17291*
Employee #: *10246, 16077* _____ Vehicle # *SEVERAL UNKNOWN VEHICLE #*

Complaint Information:

Date of Incident: *DECEMBER 31, 2014*

Time of Incident: *BETWEEN 8:30 to 11:30AM*

Location of Incident: *5705 LA COSTA DRIVE*

Nature of Complaint:

*THE POLICE DEPARTMENT USED ILLEGAL WIRE TAPPING AND CELL TOWER TRACKING PROCESS TO TRACK ME TO A BUILDING THEN HELD ME DOWN TO ALLOW K9 TITAN TO MAUL MY LEGS. AFTERWARDS I WAS STRIPPED OF EYE GLASSES/CASE, PHONE, AND WALLET.*

I, *JAMES E. WASHINGTON*, do hereby swear (or affirm) that the facts stated above in this Citizen's Complaint are, to the best of my knowledge, true and based on fact.

*James E. Washington*
(Complainant's Signature)

Subscribed and sworn before me
this *19* day of *March* 20*15*

_____
Notary Public, State of Florida
at Large. My commission expires:

WOLANDA SMITH
MY COMMISSION # EE 179137
EXPIRES: March 13, 2016
Bonded Thru Notary Public Underwriters
(Notarial Seal)

Page *1* of *2*

APPENDIX  10

**CITIZEN'S COMPLAINT FORM (CONTINUED)**

OVER THE LAST COUPLE OF YEARS, I'VE NOTICED HOW O.P.D. SOMEHOW SHOWED UP NUMEROUS TIMES AT VARIOUS LOCATIONS WHERE I SOMETIMES LIVED DURING PERIODS OF HOMELESSNESS. MY LAST TWO COURT CASES BEGAN A PATTERN WHERE WITNESSES AND THE PHONE CALLS REPORTING CRIMES WERE NOT CONNECTED. THE DISCREPANCY ALLOWED ME TO ARRANGE ACCEPTABLE PLEA AGREEMENTS TO OBTAIN DRUG TREATMENT TO ALLEVIATE THE ROOT CAUSE OF MY LEGAL ISSUES. UNFORTUNATELY, THE TREATMENT CENTER RELEASED ME HOMELESS WHICH MADE IT POSSIBLE FOR ME TO BE IN AN UNOCCUPIED PLACE WHERE I SHOULD NOT HAVE BEEN. I KNOW THIS SITUATION WAS INTENTIONAL. NO OTHER CLIENT OF THE TREATMENT CENTER WAS EVER RELEASED AFTER COMPLETION WITHOUT SOME SORT OF TRANSITIONAL HOUSING. THEIR RECORDS WILL INDICATE THAT. AS A CONSEQUENCE OF MY HOMELESSNESS THE POLICE USED ILLEGAL MEANS TO TRAP ME IN A PLACE TO ASSAULT ME WITH THEIR K9 TITAN. I WAS FORCEFULLY HELD DOWN WHILE THE LISTED OFFICERS CHANTED STOP RESISTING OVER AND OVER UNTIL THE CHANT PROVOKED THE DOG TO VICIOUSLY BITE ME SEVERAL TIMES BEFORE OFC BRILLIANT DISLODGED HIM FROM MY LEG. AFTERWARDS, I WAS STRIPPED OF MY PHONE, WALLET, EYE GLASSES & CASE TO LIMIT MY ACCESS TO INFO TO COMPLAIN ABOUT THE INCIDENT.

James E. Washington
**Complainant's Signature**

Page 2 of 2

*APPENDIX 10*

# CITY OF ORLANDO



POLICE DEPARTMENT

May 28, 2015

Mr. James E Washington
#14045588
P O Box 4970
Orlando, Florida 32802

Mr. Washington:

I have received your complaint in regard to an incident which occurred on 12/31/2014. Based on a review of the testimony and source documents in this case, it was determined officers were dispatched to your location as you were suspected of committing a Commercial Burglary. The State Attorney's office has formally charged with you with Armed Burglary of a Structure with a Dangerous Weapon as well as several other charges. Your arrest by Orlando Police Department Officers on 12/31/2014 was based on a violation of Florida Statutes.

It was determined the actions taken by the officers were a direct response to your level of resistance. Their actions did not violate any Orlando Police Department's Regulations or Policies. A separate review of the Response to your Resistance was conducted and approved in this matter.

There was no video of your encounter with officers. Your complaint regarding your Public Defender, the Department of Corrections, and the treatment center that released you prior to this incident must be addressed by the individual agencies.

This case is considered closed. However, your complaint will remain on file in Internal Affairs. If you have any questions regarding the disposition of your complaint please do not hesitate to call me at 407-246-2352.

Sincerely,

Dwain Rivers
Orlando Police Department
Internal Affairs Section Manager

*APPENDIX 10*

IN THE CIRCUIT COURT OF THE
NINTH JUDICIAL CIRCUIT, IN AND FOR
ORANGE COUNTY, FLORIDA

STATE OF FLORIDA

               Plaintiff,

vs.

JAMES EDWARD WASHINGTON

               Defendant.

_____/

CASE NO:  48-2014-CF-017252-O

DIVISION:  19

## <u>NOTICE OF SUPPLEMENTAL DISCOVERY</u>

COMES NOW, the State of Florida, by and through the undersigned Assistant State Attorney and hereby makes the following information available to the defense and states as follows:

EMAIL RESPONSE FROM LINDA RIDGE OF ORLANDO POLICE DEPT (TO BE MAILED TO DEFENDANT).

Copies of items listed will be provided under separate cover.

I DO CERTIFY that a copy (copies) hereof (has) (have) been furnished to JAMES EDWARD WASHINGTON, (pro se), P O Box 4970, (OCJ - Inmate #14045588), Orlando, FL 32802 by (delivery) (mail) (fax) **(e-mail)** on this 18th day of June, 2015.

*Jordan Ostroff*

_____

Jordan Michael Ostroff
Assistant State Attorney
Florida Bar # 99590
Division19@sao9.org
PO Box 1673, 415 N Orange Ave
Suite 400
Orlando, FL 32802-1673
(407)836-2188

*APPENDIX    10*

This is the defendant who is pro se, can you please have this email sent to him at the jail.

**From:** Linda Ridge [mailto:opdphotolab@cityoflorlando.net]
**Sent:** Wednesday, June 17, 2015 8:35 AM
**To:** Ostroff, Jordan
**Cc:** OPD Photo Lab; Hamilton, Donald J (ORPD); Cail, William T (ORPD); James, John Seth (ORPD)
**Subject:** WASHINGTON, JAMES EDWARD, Court Case No: 48-2014-CF-017252-O, Agency Case No: ORPD 14-536652

Good Morning Jordan Ostroff,

I have searched Evidence.com, specifically under Ofc. Seth James account. I found only one upload for 12/31/14 @ 08:54 of a traffic stop. Nothing matches what the report states for this case. I also searched a couple months past the date of the incident, just to make sure it didn't get uploaded at a later time.

Thanks, Linda

---------- Forwarded message ----------
**From:** "Ostroff, Jordan" <JOstroff@sao9.org>
**Date:** Jun 16, 2015 2:39 PM
**Subject:** FW: Out of town Re: Defendant: WASHINGTON, JAMES EDWARD, Court Case No: 48-2014-CF-017252-O, Agency Case No: ORPD 14-536652
**To:** "Cail, William T (ORPD)" <william.cail@cityoflorlando.net>, "nicole.morgan@cityoflorlando.net" <nicole.morgan@cityoflorlando.net>
**Cc:**

Officer,

On this case, during the deposition of Officer James, he was talking to us about his body camera, but he didn't know if it had saved from that night (it's been over 6 months now). The defendant is currently Pro Se and filed a motion to compel the camera footage, but none of us even know if it still exists. Is there anyway to check? Please let me know.

Thank you!

Jordan Ostroff
Assistant State Attorney
State Attorney's Office, Ninth Circuit
Circuit Court, Divisions 17/19
P 407-836-1175



1

IN THE CIRCUIT COURT - *APPENDIX 10* COUNTY, FLORIDA

JAMES EDWARD WASHINGTON
*Defendant*
vs.
STATE OF FLORIDA
*Plaintiff*

CASE NO: 48-2014-CF-017252-0
DIVISION: 19
AGENCY: ORPD, 14-536652

# MOTION TO SUPPRESS

**COMES NOW** JAMES EDWARD WASHINGTON PURSUANT TO THE FLA. RULES OF CRIMINAL PROCEDURE 3.190(h)&(g), SOLICITS THIS HONORABLE COURT TO SUPPRESS ALL THE LISTED PHYSICAL EVIDENCE IN ADDITION TO THE 911 TAPE BASED ON THE FOLLOWING:

## MEMORANDUM IN SUPPORT

DUE PROCESS PROHIBITS THE SUPPRESSION BY THE GOVERNMENT OF EVIDENCE FAVORABLE TO THE ACCUSED OR DISCREDITING ITS OWN CASE. UPON DEFENDANT'S REQUEST, THE GOVERNMENT MUST DISCLOSE ALL SUCH INFORMATION. **BRADY V. MARYLAND** 373 U.S. 83, 83 S. CT. 1194, 10 L. ED. 2D 215 (1963). THIS REQUIREMENT OF DISCLOSURE INCLUDES "ANY INFORMATION WHICH CONCERNS WITNESSES' CREDIBILITY AS WELL AS MATTERS CONCERNING GUILT OR INNOCENSE OF THE DEFENDANT. **UNITED STATES** 405. U.S. 150, 92 S. CT. 763, 31L. ED. 2D 104 (1967); **NAPUE V. ILLINOIS** 360 U.S. 264, 79 S. CT. 1173, 3 L. ED. 2 D 1217 (1959) AS OBSERVED BY THE SUPREME COURT IN NAPUE V. ILLINOIS: "THE JURY'S ESTIMATE OF THE TRUTHFULNESS AND RELIABILITY OF A GIVEN WITNESS MAY WELL BE DETERMINATIVE OF GUILT OR INNOCENSE, AND IT IS UPON SUCH SUBTLE FACTORS AS THE POSSIBLE INTEREST OF THE WITNESS IN TESTIFYING FALSELY THAT A DEFENDANT'S LIFE OR LIBERTY MAY DEPEND." 360 U.S. AT 269. **IN BRADY, THIS COURT HELD "THAT THE SUPPRESSION BY THE PROSECUTION OF EVIDENCE FAVORABLE TO AN ACCUSED UPON REQUEST VIOLATES DUE PROCESS WHERE THE EVIDENCE IS MATERIAL EITHER TO GUILT OR TO PUNISHMENT, IRRESPECTIVE OF THE GOOD OR BAD FAITH OF THE PROSECUTION." 373 U.S., AT 87, 83 S. CT. 1194 WE HAVE SINCE HELD THAT THE DUTY TO DISCLOSE SUCH EVIDENCE IS APPLICABLE EVEN THOUGH THERE HAS BEEN NO REQUEST BY THE ACCUSED, **UNITED STATES V. AGURS**, 427 U.S. 97, 107, 96 S. CT. 2392, 49 L. ED. 2D. 342 (1976), AND THAT DUTY ENCOMPASSES IMPEACHMENT EVIDENCE AS WELL AS EXCULPATORY EVIDENCE, **UNITED STATES V. BAGLEY** 473 U.S. 667, 676, 105 S. CT. 3375, 87 L. ED. 2D. 481 (1985) SUCH EVIDENCE IS MATERIAL "IF THERE IS A REASONABLE PROBABILITY THAT, HAD THE EVIDENCE BEEN DISCLOSED TO THE DEFENSE, THE RESULT OF THE PROCEEDING WOULD HAVE BEEN DIFFERENT. I.D., AT 682, 105 S. CT. 3375; SEE ALSO **KYLES V. WHITLEY** 514 U.S. 419, 433-434, 115 S. CT. 1555, 131 L. ED. 2D. 490 (1995). MOREOVER, THE RULE ENCOMPASSES EVIDENCE "KNOWN ONLY TO POLICE INVESTIGATORS AND NOT TO THE PROSECUTOR." ID., AT 438, 115 S. CT. 1555. IN ORDER TO COMPLY WITH BRADY, THEREFORE, "THE INDIVIDUAL PROSECUTOR HAS A DUTY TO LEARN OF ANY FAVORABLE EVIDENCE KNOWN TO THE OTHERS ACTING ON THE GOVERNMENT'S BEHALF IN THIS CASE, INCLUDING THE POLICE." KYLES 514 U.S., AT 437, 115 S. CT. 1555.

RULE 3.220(n)(1) OF THE FLORIDA RULES OF CRIMINAL PROCEDURE ADDRESSES THE CONCERN OF PROCEDURAL HARM CAUSED BY DISCOVERY RULE NONCOMPLIANCE. IN ADDITION TO THE COURT ORDERING THE PARTY TO COMPLY WITH THE DISCOVERY OR INSPECTION OF MATERIALS NOT PREVIOUSLY DISCLOSED OR PRODUCED, GRANTING A CONTINUANCE, GRANTING A MISTRIAL, OR PROHIBITING THE PARTY FROM CALLING A WITNESS NOT DISCLOSED OR INTRODUCED INTO EVIDENCE THE MATERIAL NOT DISCLOSED, OR ENTER SUCH OTHER ORDER AS IT DEEMS JUST UNDER THE CIRCUMSTANCES. RULE 3.220 (n)(1) IS ACTUALLY A SHORTHAND REFERENCE TO THE DECISION OF THE FLORIDA SUPREME COURT IN **RICHARDSON V. STATE**, 246 SO. 2D. 771 (FLA. 1971). THE CONTROLLING DECISION PRESCRIBING THE PROCEDURES AND REMEDIES WHICH APPLY TO AVOID PROCEDURAL PRE-JUDICE AS A CONSEQUENCE OF THE PROSECUTION'S FAILURE TO DISCLOSE TO THE DEFENSE THE NAME OF A PERSON WITH KNOWLEDGE OF THE CIRCUMSTANCES OF THE CRIME CHARGED. WHEN A DISCOVERY

IN THE CIRCUIT COURT, IN AND FOR ORANGE COUNTY, FLORIDA

## MOTION TO SUPPRESS (CONTINUATION) APPENDIX 10

VIOLATION BY THE PROSECUTION IS PROMPTLY BROUGHT TO THE TRIAL JUDGE'S ATTENTION AND NO RICHARDSON HEARING IS CONDUCTED, THE TRIAL JUDGE'S FAILURE TO CONDUCT A RICHARDSON HEARING WILL REQUIRE A REVERSAL OF ANY ENSUING CONVICTION UNLESS THE APPELLATE COURT CAN CONCLUDE THAT THE FAILURE TO CONDUCT A RICHARDSON HEARING WAS HARMLESS BECAUSE IT IS APPARENT BEYOND AND TO THE EXCLUSION OF A REASONABLE DOUBT FROM AN EXAMINATION OF THE RECORD, EVEN WITHOUT THE BENEFIT OF A RICHARDSON HEARING, THAT THE DEFENDANT WAS NOT MATERIALLY HINDERED IN HIS TRIAL PREPARATION OR STRATEGY BY THE DISCOVERY VIOLATION, ONCE PUT ON NOTICE OF A VIOLATION, THE TRIAL COURT HAS AN AFFIRMATIVE OBLIGATION TO CONDUCT A HEARING WITHOUT THE DEFENDANT SPECIFICALLY REQUESTING A HEARING.

ACCORDING TO THE **90.802 HEARSAY RULE**, EXCEPT AS PROVIDED BY STATUE, HEARSAY EVIDENCE IS INADMISSIBLE. THE MAIN OBJECTION TO THE INTRODUCTION OF HEARSAY TESTIMONY IS THE LACK OF AN OPPORTUNITY FOR THE ADVERSE PARTY TO CROSS-EXAMINE THE DECLARANT. THE HEARSAY STATEMENT IS USUALLY NOT UNDER OATH AND THE JURY DOES NOT HAVE THE OPPORTUNITY TO OBSERVE THE DEMEANOR OF THE WITNESS.

## CONCLUSION

OFFICER JOHN SETH JAMES COMMITTED A 3RD DEGREE FELONY BY DELETING OR FAILING TO TURN IN THE BODY CAMERA EVIDENCE OBTAINED BEFORE AND AFTER MY ARREST ON 12/31/2014. HE TAMPERED WITH EVIDENCE TO ELIMINATE THE IRREFUTABLE PROOF TO IMPEACH THE ARRESTING OFFICERS' TESTIMONY AND CONCEAL EXCULPATORY EVIDENCE. THE BODY CAMERA RECORDED THINGS AS THEY WERE INSTEAD OF HOW EVIDENCE WAS REARRANGED TO BE SOMEWHAT CONSISTENT WITH THE ARRESTING OFFICERS' CASE NARRATIVES. UNFORTUNATELY FOR THE PROSECUTION, SOME OF THE EVIDENCE WAS RELOCATED TO DIFFERENT AREAS INCONSISTENT WITH THE DISCOVERY CRIME SCENE PHOTOGRAPHS. THE CASE NARRATIVES OF OFFICER MORGAN-30287/WILSON-10246 AND OFFICERS JAMES-12869/SMITH-30580 HAS A KNIFE AND A RED/BLACK BACK PACK LISTED AMONG THE ITEMS OBSERVED ON THE ROOF OF THE BUILDING. CSI VANDERBERG LATER PHOTOGRAPHED THE KNIFE ON A TILE FLOOR AND THE BACKPACK AT THE ENTRANCE TO A DOOR. COINCIDENTALLY, THERE ARE NO PHOTOGRAPHS OF A KNIFE OR A BACKPACK ON THE ROOF NOR ANY PHOTOGRAPHS OF THE FLASHLIGHT OFFICER MORGAN ALLEGE I THREW DOWN AFTER BEING BIT BY THE DOG. ONCE A PARTY PRODUCES EVIDENCE OF TAMPERING, PROPONENT OF PHYSICAL EVIDENCE IS REQUIRED TO ESTABLISH A PROPER CHAIN OF CUSTODY OR SUBMIT OTHER EVIDENCE THAT TAMPERING DID NOT OCCUR. ALL PHOTOGRAPHS OF PHYSICAL EVIDENCE SHOULD BE SUPPRESSED BECAUSE THE DISCREPANCY BETWEEN THE PHOTOGRAPH AND THE CASE NARRATIVES PROVES EVIDENCE TAMPERING. IN ADDITION, THE 911 TAPE WAS ALLEGEDLY RECORDED ON 12/31/2014. IT SHOULD HAVE BEEN INCLUDED WITH THE ORIGINAL DISCOVERY ALONG WITH THE NAME OF THE WITNESS AND THE 911 OPERATOR. IF THAT WITNESS WOULD HAVE BEEN AVAILABLE, HE WOULD AND SHOULD HAVE BEEN ON THE FIRST STATE'S WITNESS LIST. THE 911 TAPE'S INTRODUCTION 10 MONTHS AFTER MY ARREST IS A DISCOVERY VIOLATION AND I REQUEST A RICHARDSON HEARING TO SEE THAT THE NECESSARY SANCTION BE IMPOSED. THE 911 TAPE SHOULD BE SUPPRESSED BECAUSE IT IS HEARSAY THAT DON'T FIT IN ANY EXCEPTION.

*James Edward Washington*
@JAMES EDWARD WASHINGTON

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** THAT A COPY OF HEREOF WILL BE MAILED TO THE STATE ATTORNEY AT 415 N. ORANGE AVE, P.O. BOX 1673, ORLANDO, FLA 32801 OR HAND DELIVERED IN COURT THIS 8TH DAY OF MARCH 2016.

*APPENDIX 10*

IN THE CIRCUIT COURT OF THE
NINTH JUDICIAL CIRCUIT, IN AND
FOR ORANGE COUNTY, FLORIDA

CASE NUMBER: 2014-CF-017252-A-O

DIV 19

STATE OF FLORIDA

       Plaintiff,

vs.

JAMES EDWARD
WASHINGTON

a/k/a

       Defendant.

_____/

## ORDER DENYING MOTION TO DISMISS

       THIS CAUSE, having come on to be heard before the Court upon the MOTION TO DISMISS and the Court having reviewed the pleading and being otherwise duly advised in the premises, hereby

       **ORDERS AND ADJUDGES** as follows:

1.    The MOTION TO DISMISS is hereby **DENIED**.

       DONE AND ORDERED in chambers, at Orlando, Orange County, Florida this ___ day of _____, 20_____.

Original Signed

_____
Honorable Robert J Egan
Circuit Court Judge

JAN 27 2016

ROBERT J. EGAN
CIRCUIT JUDGE

*APPENDIX* 10

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the forgoing was furnished to the Office of State Attorney, 415 North Orange Avenue, Orlando, Florida, 32801 & James Edward Washington, # 14045588, Orange County Jail, P.O. Box 4970, Orlando, Florida 32802, on this _____ day of _____, 20___.


_____
Lynn Harasti
Judicial Assistant

Conformed and Mailed

JAN 27 2016

LYNN HARASTI
Judicial Assistant

2014-CF-017252-A-O

*APPENDIX _ 10*

STATE OF FLORIDA
VS.

IN THE CIRCUIT COURT OF THE
NINTH JUDICIAL CIRCUIT IN AND
FOR ORANGE COUNTY, FLORIDA

CASE NUMBER: 2014-CF-017252-A-O
DIVISION: Egan, Robert J

JAMES EDWARD WASHINGTON, Defendant

DOB: 2/19/1965

## ORDER

**DEFENDANT APPEARANCE:**

JAMES EDWARD WASHINGTON  was present

**COUNSEL APPEARANCE:**

Counsel:  was not present

Asst State Attorney Present: JOSEPH MATERA

This case coming before the Court to be heard, and you, the defendant JAMES EDWARD WASHINGTON, having:

| Count: 001 | ARMED BURGLARY OF STRUCTURE WITH EXPLOSIVES OR DANGEROU WEAPON | 810.02(2)(B) | First Degree - Punishable By Life |
| Count: 002 | POSSESSION OF BURGLARY TOOLS | 810.06 | Third Degree - Felony |
| Count: 003 | OFFENSE AGAINST POLICE DOG, FIRE DOG OR POLICE HORSE | 843.19(3) | First Degree - Misd |
| Count: 004 | CR-RESISTING OFFICER WITHOUT VIOLENCE | 843.02 | First Degree - Misd |
| Count: 005 | PETIT THEFT | 812.014(3)(A) | Second Degree - Misd |
| Count: 006 | CR-CRIMINAL MISCHIEF | 806.13(1)(B)(1) | Second Degree - Misd |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

**COURT ORDERS:**

Court Minutes

DEFENSE MOTION IN LIMINE IS HEREBY MOOT.

DEFENSE MOTION TO SUPPRESS IS HEREBY DENIED.

TRIAL SET FOR MARCH 22, 2016 AT 9AM, COURTROOM 18-D.

DONE, ORDERED and FILED in

APPENDIX 10

Open Court on March 9, 2016

**Honorable Judge** _____

Robert J Egan

_____

JAMES EDWARD WASHINGTON

Deputy Clerk in Attendance:  JE

Office of Tiffany M. Russell, Orange County Clerk of the Circuit and County Courts

| Defendant.Name____ | 951 CHELSEA WY LAKE WALES, FL, 33853 | (Bondsman)_____ | ASA____ | Dockets____ | |
|---|---|---|---|---|---|
| Atty _____ | Prob____ | ACS____ | CFSC____ | IMR___ | Other_____ |

*APPENDIX   10*

# IN THE CIRCUIT COURT OF THE NINTH JUDICIAL CIRCUIT, IN AND FOR ORANGE COUNTY, FLORIDA.

JAMES WASHINGTON,
        Defendant/Appellant,
vs.

CASE NO.: 48-2014-CF-017252-O
APPEAL NO.:

STATE OF FLORIDA.
      Plaintiff/Appellee

_____/

## ORDER DIRECTING TRANSCRIPTION OF PROCEEDINGS

THIS CAUSE having come on to be considered on the Defendant's Motion, and the

Defendant having filed an Affidavit of Insolvency for purposes of appeal, and this court having

previously found the Defendant to be an insolvent person, it is therefore

ORDERED AND ADJUDGED:

1.  That the Court Reporter be, and is hereby directed to transcribe the proceedings in

said cause as follows:

    a)    The trial proceedings in this cause held on September 13-14, 2016 including

        voir dire (jury selection) before Judge Julie O'Kane in courtroom 9-D,

        Orange County Courthouse.

    b)    The sentencing proceedings in this cause held on October 31, 2016 before

        Judge Julie O'Kane in courtroom 9-D, Orange County Courthouse.

2.  That the Office of the Public Defender has previously been appointed to

represent said Defendant/Appellant in effecting his appeal in said cause.

3.  That the cost of transcribing said proceedings and the appeal of said

Defendant be, and the same shall be borne by The State of Florida.



*APPENDIX 10    14 CF 17252*

DONE AND ORDERED in Chambers in Orlando, Orange County, Florida this *15th* day of *November*, 2016.

/s/ JULIE H. O'KANE

_____
Circuit Court Judge

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing has been furnished to the Office of the State Attorney, 415 North Orange Avenue, Post Office Box 1673, Orlando, Florida 32802 (Division19@sao9.org), The Office of the Attorney General, 444 Seabreeze Blvd., Suite 500, Daytona Beach, FL 32118 (Crimappdab@myfloridalegal.com), The Court Reporter, Orange County Courthouse, 425 N. Orange Ave., Orlando, FL 32801 (Ctrpnp1@ocnjcc.org and ctrpjd1@ocnjcc.org) and via U.S. mail delivery JAMES WASHINGTON, Inmate number 14045588, M-1C, P.O. Box 4970, Orlando, Florida 32802-4970 on this *16th* day of November, 2016.

/s/

_____
Judicial Assistant or other designee

*APPENDIX 10*



# The Florida Bar

**651 East Jefferson Street**
**Tallahassee, FL 32399-2300**

**John F. Harkness, Jr.**
**Executive Director**

**850/561-5600**
**www.FLORIDABAR.org**

July 28, 2016

Ms. Donna M Goerner
with Damore, Delgado, Romanik & Rawlins PLC
283 Cranes Roost Blvd Ste 111
Altamonte Springs, FL 32701-3437

Re:   James Edward Washington; RFA No. 17-1194

Dear Ms. Goerner:

The Attorney/Consumer Assistance Program (ACAP) of The Florida Bar has received a Request for Assistance from the above indicated client. The nature of the request suggests that there may have been a lack of communication with your office which, if substantiated, could constitute a violation of certain Rules Regulating The Florida Bar, and could lead to disciplinary action by the Bar.

No disciplinary file has been opened at this time, but ACAP is requesting that you contact this client by August 11, 2016, in order that this matter might be resolved without a disciplinary file being opened and investigated.

By copy of this letter to Mr. Washington, I am advising that should I fail to hear anything further from either of you within thirty days of the date of this letter, I will assume that the matter has been resolved. Pursuant to the Bar's records retention schedule, the computer record and file will be disposed of one year from the date of closing.

Thank you in advance for your efforts in assisting an expeditious and amicable resolution of this matter.

Sincerely,

Theodore P. Littlewood Jr., Bar Counsel
Attorney Consumer Assistance Program
ACAP Hotline 866-352-0707

cc:   Mr. Washington

*APPENDIX 10*



# The Florida Bar

**651 East Jefferson Street**
**Tallahassee, FL 32399-2300**

**John F. Harkness, Jr.**
**Executive Director**

**850-561-5600**
**www.FLORIDABAR.org**

January 4, 2017

Mr. James Edward Washington
Central Florida Reception Center - Main
7000 H. C. Kelley Road
Orlando, FL 32831-2518

Re:    Donna M Goerner; RFA No. 17-1194

Dear Mr. Washington:

Your letter dated December 14, 2016 is the first correspondence we have received from you regarding Ms. Goerner following our letter to her dated July 28, 2016.

Your question regarding Judge Egan is being addressed by separate correspondence.  Be advised that under Article V, Section 12 of the Florida Constitution, complaints against sitting judges are within the exclusive jurisdiction of the Judicial Qualifications Commission, P.O. Box 14106 Tallahassee, FL 32317.

Sincerely,

Theodore P. Littlewood Jr., Bar Counsel
Attorney Consumer Assistance Program
ACAP Hotline 866-352-0707

*APPENDIX 10*



STATE OF FLORIDA

# JUDICIAL QUALIFICATIONS COMMISSION

POST OFFICE BOX 14106

TALLAHASSEE, FLORIDA 32317

(850) 488-1581

HON. KRISTA MARX
CHAIR

HON. JAMES A. RUTH
VICE - CHAIR

MICHAEL L. SCHNEIDER
EXECUTIVE DIRECTOR
GENERAL COUNSEL

ALEXANDER J. WILLIAMS
ASSISTANT GENERAL COUNSEL

January 25, 2017

James Edward Washington
DC# 197574-E21365
Madison Corr. Inst.
382 S.W. MCI Way
Madison, Fl 32340

**Re:    *Docket No. 17-040; Egan***

Dear Mr. Washington:

The Commission has received your complaint. The Investigative Panel of the Commission meets approximately every six weeks. At the next meeting, the Panel will evaluate your complaint to determine whether your concerns fall within the Commission's jurisdiction, and if so, whether they merit further review.

Thank you for bringing this matter to the Commission's attention.

Sincerely yours,

Alexander J. Williams
Assistant General Counsel

AJW/mc

*Inquiries by the Commission are confidential pursuant to Art. V, Sec 12(a)(4) of the Florida
Constitution and Rule 2.420, Florida Rules of Judicial Administration.*

*APPENDIX 10*



STATE OF FLORIDA

**JUDICIAL QUALIFICATIONS COMMISSION**

HON. KRISTA MARX
CHAIR

HON. JAMES A. RUTH
VICE - CHAIR

POST OFFICE BOX 14106
TALLAHASSEE, FLORIDA 32317
(850) 488-1581

MICHAEL L. SCHNEIDER
EXECUTIVE DIRECTOR
GENERAL COUNSEL

ALEXANDER J. WILLIAMS
ASSISTANT GENERAL COUNSEL

February 27, 2017

James Edward Washington
DC# 197574-E21365
Madison Corr. Inst.
382 S.W. MCI Way
Madison, Fl 32340

**Re:**  ***Docket No. 17-040; Egan***

Dear Mr. Washington:

The Investigative Panel of the Commission has completed its review of your complaint in the above matter and has determined, at its most recent meeting, that the concerns you have expressed are not allegations involving a breach of the Code of Judicial Conduct warranting further action by the Commission but are matters for review through the normal court process.

The purpose of the Commission is to determine the existence of judicial misconduct and disability as defined by the Constitution and the laws of the State of Florida. If such misconduct or disability is found, the Commission can recommend disciplinary action to the Florida Supreme Court. The Commission has found no basis for further action on your complaint that therefore has been dismissed.

Sincerely yours,

Alexander J. Williams
Assistant General Counsel

AJW/mc

*Inquiries by the Commission are confidential pursuant to Art. V, Sec 12(a)(4) of the Florida Constitution and Rule 2.420, Florida Rules of Judicial Administration.*

*APPENDIX 10*

# Stingray phone tracker

From Wikipedia, the free encyclopedia

The **StingRay** is an IMSI-catcher, a controversial cellular phone surveillance device, manufactured by Harris Corporation.[2] Initially developed for the military and intelligence community, the StingRay and similar Harris devices are in widespread use by local and state law enforcement agencies across the United States and possibly covertly in the United Kingdom. **Stingray** has also become a generic name to describe these kinds of devices.[3]



A Stingray device in 2013, in Harris's trademark submission.[1]

## Contents

- 1 Technology
  - 1.1 Active mode operations
  - 1.2 Passive mode operations
  - 1.3 Active (cell site simulator) capabilities
    - 1.3.1 Extracting data from internal storage
    - 1.3.2 Writing metadata to internal storage
    - 1.3.3 Forcing an increase in signal transmission power
    - 1.3.4 Forcing an abundance of signal transmissions
    - 1.3.5 Tracking and locating
    - 1.3.6 Denial of service
    - 1.3.7 Interception of communications content
  - 1.4 Passive capabilities
    - 1.4.1 Base station (cell site) surveys
- 2 Usage by law enforcement
  - 2.1 In the United States
  - 2.2 Outside the United States
- 3 Secrecy
- 4 Criticism
  - 4.1 Counter "StingRay" and Anti-spy devices
- 5 See also
- 6 References
- 7 Further reading

## Technology

The StingRay is an IMSI-catcher with both passive (digital analyzer) and active (cell site simulator) capabilities. When operating in active mode, the device mimics a wireless carrier cell tower in order to force all nearby mobile phones and other cellular data devices to connect to it.[4][5][6]

The StingRay family of devices can be mounted in vehicles,[5] on airplanes, helicopters and unmanned aerial vehicles.[7] Hand-carried versions are referred to under the trade name **KingFish**.[8]

## Active mode operations                  *APPENDIX 10*

1. Extracting stored data such as International Mobile Subscriber Identity ("IMSI") numbers and Electronic Serial Number ("ESN"),[9]
2. Writing cellular protocol metadata to internal storage
3. Forcing an increase in signal transmission power,[10]
4. Forcing an abundance of radio signals to be transmitted
5. Interception of communications content
6. Tracking and locating the cellular device user,[4]
7. Conducting a denial of service attack
8. Encryption key extraction.[11]
9. Radio jamming for either general denial of service purposes[12] or to aid in active mode protocol rollback attacks

## Passive mode operations

1. conducting base station surveys, which is the process of using over-the-air signals to identify legitimate cell sites and precisely map their coverage areas

## Active (cell site simulator) capabilities

In active mode, the StingRay will force each compatible cellular device in a given area to disconnect from its service provider cell site (e.g., operated by Verizon, AT&T, etc.) and establish a new connection with the StingRay.[13] In most cases, this is accomplished by having the StingRay broadcast a pilot signal that is either stronger than, or made to appear stronger than, the pilot signals being broadcast by legitimate cell sites operating in the area.[14] A common function of all cellular communications protocols is to have the cellular device connect to the cell site offering the strongest signal. StingRays exploit this function as a means to force temporary connections with cellular devices within a limited area.

### Extracting data from internal storage

During the process of forcing connections from all compatible cellular devices in a given area, the StingRay operator needs to determine which device is a desired surveillance target. This is accomplished by downloading the IMSI, ESN, or other identifying data from each of the devices connected to the StingRay.[9] In this context, the IMSI or equivalent identifier is not obtained from the cellular service provider or from any other third-party. The StingRay downloads this data directly from the device using radio waves.

In some cases, the IMSI or equivalent identifier of a target device is known to the StingRay operator beforehand. When this is the case, the operator will download the IMSI or equivalent identifier from each device as it connects to the StingRay.[15] When the downloaded IMSI matches the known IMSI of the desired target, the dragnet will end and the operator will proceed to conduct specific surveillance operations on just the target device.[16]

In other cases, the IMSI or equivalent identifier of a target is not known to the StingRay operator and the goal of the surveillance operation is to identify one or more cellular devices being used in a known area.[17] For example, if visual surveillance is being conducted on a group of protestors,[18] a StingRay can be used to download the IMSI or equivalent identifier from each phone within the protest area. After identifying the phones, locating and tracking operations can be conducted, and service providers can be forced to turn over account information identifying the phone users.

### Writing metadata to internal storage   _APPENDIX 10_

### Forcing an increase in signal transmission power

Cellular telephones are radio transmitters and receivers much like a walkie-talkie. However, the cell phone only communicates with a "repeater" inside a nearby cell tower installation. At that installation, the devices take in all cell calls in its geographic area and repeat them out to other cell installations which repeat the signals onward to their destination telephone (either by radio or land-line wires). Radio is used also to transmit a caller's voice/data back to the receiver's cell telephone. The two-way duplex phone conversation then exists via these interconnections.

To make all that work correctly, the system allows automatic increases and decreases in transmitter power (for the individual cell phone and for the tower repeater, too) so that only the minimum transmit power is used to complete and hold the call active, "on," and allows the users to hear and be heard continuously during the conversation. The goal is to hold the call active but use the least amount of transmit power, mainly to conserve batteries and be efficient. The tower system will sense when a cell phone is not coming in clearly, and will order the cell phone to boost transmit power. The user has no control over this boosting; it may occur for a split second or for the whole conversation. If the user is in a remote location, the power boost may be continuous. In addition to carrying voice or data, the cell phone also transmits data about itself automatically, and that is boosted or not as the system detects need.

Coding of all transmissions allows two nearby cell user users no cross talk or interference between the two (this coding is not encryption, which is another, different coding). The boosting of power, however, is limited by the design of the devices to a maximum setting. The standard systems are not "high power" and thus can be overpowered by clandestine systems using much more boosted power that can then take over a user's cell phone. If overpowered that way, a cell phone will not indicate the change due to the clandestine radio being programmed to hide itself from normal detection. The ordinary user can not know if their cell phone is captured via overpower boosts or not. (There are other ways of clandestine capture that need not overpower, too.)

Just as a person shouting drowns out someone whispering, the boost in RF watts of power into the cell telephone system can overtake and control that system—in total or only a few, or even only one, conversation. This strategy only requires more RF watts of power, and thus it is more simple than other types of clandestine controls. Power boosting equipment can be installed anywhere there can be an antenna, including in a vehicle, perhaps even in a vehicle on the move. Once a clandestine boosted system takes control, any manipulation is possible from simple recording of the voice or data to total blocking of all cell phones in the geographic area.

### Forcing an abundance of signal transmissions

## Tracking and locating

*APPENDIX 10*

A StingRay can be used to identify and track a phone or other compatible cellular data device even while the device is not engaged in a call or accessing data services.

## Denial of service

The FBI has claimed that when used to identify, locate, or track a cellular device, the StingRay does not collect communications content or forward it to the service provider.[19] Instead, the device causes a disruption in service.[20] Under this scenario, any attempt by the cellular device user to place a call or access data services will fail while the StingRay is conducting its surveillance.

## Interception of communications content

By way of software upgrades,[11][21] the StingRay and similar Harris products can be used to intercept GSM communications content transmitted over-the-air between a target cellular device and a legitimate service provider cell site. The StingRay does this by way of the following man-in-the-middle attack: (1) simulate a cell site and force a connection from the target device, (2) download the target device's IMSI and other identifying information, (3) conduct "GSM Active Key Extraction"[11] to obtain the target device's stored encryption key, (4) use the downloaded identifying information to simulate the target device over-the-air, (5) while simulating the target device, establish a connection with a legitimate cell site authorized to provide service to the target device, (6) use the encryption key to authenticate the StingRay to the service provider as being the target device, and (7) forward signals between the target device and the legitimate cell site while decrypting and recording communications content.

The "GSM Active Key Extraction"[11] performed by the StingRay in step three merits additional explanation. A GSM phone encrypts all communications content using an encryption key stored on its SIM card with a copy stored at the service provider.[22] While simulating the target device during the above explained man-in-the-middle attack, the service provider cell site will ask the StingRay (which it believes to be the target device) to initiate encryption using the key stored on the target device.[23] Therefore, the StingRay needs a method to obtain the target device's stored encryption key else the man-in-the-middle attack will fail.

GSM primarily encrypts communications content using the A5/1 call encryption cypher. In 2008 it was reported that a GSM phone's encryption key can be obtained using $1,000 worth of computer hardware and 30 minutes of cryptanalysis performed on signals encrypted using A5/1.[24] However, GSM also supports an export weakened variant of A5/1 called A5/2. This weaker encryption cypher can be cracked in real-time.[22] While A5/1 and A5/2 use different cypher strengths, they each utilize the same underlying encryption key stored on the SIM card.[23] Therefore, the StingRay performs "GSM Active Key Extraction"[11] during step three of the man-in-the-middle attack as follows: (1) instruct target device to use the weaker A5/2 encryption cypher, (2) collect A5/2 encrypted signals from target device, and (3) perform cryptanalysis of the A5/2 signals to quickly recover the underlying stored encryption key.[25] Once the encryption key is obtained, the StingRay uses it to comply with the encryption request made to it by the service provider during the man-in-the-middle attack.[25]

## Passive capabilities

*APPENDIX 10*

In passive mode, the StingRay operates either as a digital analyzer, which receives and analyzes signals being transmitted by cellular devices and/or wireless carrier cell sites, or as a radio jamming device, which transmits signals that block communications between cellular devices and wireless carrier cell sites. By "passive mode," it is meant that the StingRay does not mimic a wireless carrier cell site or communicate directly with cellular devices.

### Base station (cell site) surveys

A StingRay and a test phone can be used to conduct base station surveys, which is the process of collecting information on cell sites, including identification numbers, signal strength, and signal coverage areas. When conducting base station surveys, the StingRay mimics a cell phone while passively collecting signals being transmitted by cell sites in the area of the StingRay.

Base station survey data can be used to further narrow the past locations of a cellular device if used in conjunction with historical cell site location information ("HCSLI") obtained from a wireless carrier. HCSLI includes a list of all cell sites and sectors accessed by a cellular device, and the date and time each access was made. Law enforcement will often obtain HCSLI from wireless carriers in order to determine where a particular cell phone was located in the past. Once this information is obtained, law enforcement will use a map of cell site locations to determine the past geographical locations of the cellular device.

However, the signal coverage area of a given cell site may change according to the time of day, weather, and physical obstructions in relation to where a cellular device attempts to access service. The maps of cell site coverage areas used by law enforcement may also lack precision as a general matter. For these reasons, it is beneficial to use a StingRay and a test phone to map out the precise coverage areas of all cell sites appearing in the HCSLI records. This is typically done at the same time of day and under the same weather conditions that were in effect when the HCSLI was logged. Using a StingRay to conduct base station surveys in this manner allows for mapping out cell site coverage areas that more accurately match the coverage areas that were in effect when the cellular device was used.

# Usage by law enforcement

## In the United States

The use of the devices has been frequently funded by grants from the Department of Homeland Security.[26] The Los Angeles Police Department used a Department of Homeland Security grant in 2006 to buy a StingRay for "regional terrorism investigations". However, according to the Electronic Frontier Foundation, the "LAPD has been using it for just about any investigation imaginable."[27]

In addition to federal law enforcement, military and intelligence agencies, StingRays have in recent years been purchased by local and state law enforcement agencies. According to the American Civil Liberties Union, 42 law enforcement agencies in 17 states own StingRay technology. In November 2014, *Slate* reported that at least 46 state and local police departments, from Sunrise, Florida, to Hennepin County, Minnesota, use cell-site simulators, with a price-tag of US$16,000 to more than US$125,000 for each

unit.[28] In 2015, it was reported that the Baltimore Police Department's frequency in using the device was "inexplicably high".[29] In some states, the devices are made available to local police departments by state surveillance units. The federal government funds most of the purchases with anti-terror grants.

In 2006, Harris employees directly conducted wireless surveillance using StingRay units on behalf the Palm Bay Police Department — where Harris has a campus[30] — in response to a bomb threat against a middle school. The search was conducted without a warrant or Judicial oversight.[31][32][33][34]

## Outside the United States     *APPENDIX 10*

Privacy International and *The Sunday Times* reported on the usage of StingRays and IMSI-catchers in Ireland, against the Irish Garda Síochána Ombudsman Commission (GSOC), which is an oversight agency of the Irish police force Garda Síochána.[35][36]

On June 10, 2015 the BBC reported on an investigation by Sky News[37][38] about possible false mobile phone towers being used by the London Metropolitan Police. Commissioner Bernard Hogan-Howe refused comment.

# Secrecy

The increasing use of the devices has largely been kept secret from the court system and the public.[29] In 2014, police in Florida revealed they had used such devices at least 200 additional times since 2010 without disclosing it to the courts or obtaining a warrant.[2] The American Civil Liberties Union has filed multiple requests for the public records of Florida law enforcement agencies about their use of the cell phone tracking devices.[39]

Local law enforcement and the federal government have resisted judicial requests for information about the use of stingrays, refusing to turn over information or heavily censoring it.[40] In June 2014, the American Civil Liberties Union published information from court regarding the extensive use of these devices by local Florida police.[41] After this publication, United States Marshals Service then seized the local police's surveillance records in a bid to keep them from coming out in court.[42]

In some cases, police have refused to disclose information to the courts citing non-disclosure agreements signed with Harris Corporation.[40][43][44] The FBI defended these agreements, saying that information about the technology could allow adversaries to circumvent it.[43] The ACLU has said "potentially unconstitutional government surveillance on this scale should not remain hidden from the public just because a private corporation desires secrecy. And it certainly should not be concealed from judges."[2]

In 2015 Santa Clara County pulled-out of contract negotiations with Harris for StingRay units, citing onerous restrictions imposed by Harris on what could be released under public records requests as the reason for exiting negotiations.[45]

# Criticism

In recent years, legal scholars, public interest advocates, legislators and several members of the judiciary have strongly criticized the use of this technology by law enforcement agencies. Critics have called the use of the devices by government agencies warrantless cell phone tracking, as they have frequently been used without informing the court system or obtaining a warrant.[2] The Electronic Frontier Foundation has called the devices "an unconstitutional, all-you-can-eat data buffet."[46]

In June 2015, WNYC Public Radio published a podcast with Daniel Rigmaiden about the StingRay device.[47]

## Counter "StingRay" and Anti-spy devices
*APPENDIX 10.*

In the wake of StingRay's reveal to the public on 2016, a counter government movement by cyber privacy and security professionals began to look into ways to working against the StringRay and it's functions.

John McAfee, a pioneer to Cyber security and an architect to the first commercial anti-virus program may have lead a team to developing the first device that is capable of thwarting the StringRay's capability on targeted phones. As mentioned in his team's webpage and app description section (D-Vasive (https://play.google.com/store/apps/details?id=com.Dvasive&hl=en)) "D-Vasive helps protect your privacy from invasive apps by alerting you when an application is trying to spy on you using your phone's camera, microphone, bluetooth or WiFi connections. D-Vasive also lists running and installed apps that have access to tracking your location. D-Vasive also allows you to lock down your device's hardware to prevent other apps from accessing your hardware without your knowledge."

It is expected for a wider range of cyber privacy and civil security development teams to release more or similar counter devices against the stingray and similar operations.

## See also

- Cellphone surveillance
- Mobile phone tracking
- *Kyllo v. United States* (lawsuit re thermal image surveillance)
- *United States v. Davis (2014)* found warrantless data collection violated constitutional rights, but okayed data use for criminal conviction, as data collected in good faith
- Evil Twin Attack

## References

1. "Notice, Acceptance, Renewal". Harris/US PTO. Retrieved 23 January 2016.
2. Zetter, Kim (2014-03-03). "Florida Cops' Secret Weapon: Warrantless Cellphone Tracking". *Wired.com*. Retrieved 2014-06-23.
3. Gallagher, Ryan (September 25, 2013). "Meet the machines that steal your phone's data". *Ars Technica* (Condé Nast). Retrieved August 22, 2014.
4. Valentino-Devries, Jen (Sep 22, 2011). "'Stingray' Phone Tracker Fuels Constitutional Clash". *The Wall Street Journal*. Retrieved Aug 22, 2014.
5. Harris WPG (November 29, 2006). "StingRay Cell Site Emulator Datasheet". Archived from the original (PDF) on August 29, 2014. Retrieved August 29, 2014.
6. Harris WPG (November 29, 2006). "StingRay Cell Site Emulator Datasheet". Archived from the original on August 29, 2014. Retrieved August 29, 2014.

*APPENDIX 10* free encyclopedia

7. Harris WPG. (Aug. 25, 2008). Harris Wireless Products Group catalog, available at https://www.documentcloud.org/documents/1282631-08-08-25-2008-harris-wireless-products-group.html [PDF p. 4] (last accessed: Aug. 29, 2014), archived from original at http://egov.ci.miami.fl.us/Legistarweb/Attachments/48000.pdf [PDF p. 4] (last accessed: Mar. 8, 2011) (Airborne DF Kit CONUS for StingRay)

8. Harris WPG. (Nov. 29, 2006). KingFish, KingFish GSM S/W, Pocket PC GSM S/W & Training Sole Source Justification for Florida, available at https://www.documentcloud.org/documents/1282625-06-11-29-2006-harris-kingfish-sole-source.html [PDF p. 1] (last accessed: Aug. 29, 2014), archived from original at http://egov.ci.miami.fl.us/Legistarweb/Attachments/34768.pdf [PDF p. 1] (last accessed: Aug. 29, 2014) ("The KingFish system is the only man-portable battery powered CDMA & GSM Interrogating, Active Location, and Signal Information Collection system currently available.").

9. United States v. Rigmaiden, CR08-814-PHX-DGC, Dkt. #0674-1 [Declaration by FBI Supervisory Agent Bradley S. Morrison], ¶ 5, p. 3 (D.Ariz., Oct. 27, 2011), available at https://www.documentcloud.org/documents/1282619-11-10-17-2011-u-s-v-rigmaiden-cr08-814-phx-dgc.html [PDF p. 3] (last accessed: Aug. 30, 2014) ("During a location operation, the electronic serial numbers (ESNs) (or their equivalent) from all wireless devices in the immediate area of the FBI device [(i.e., the StingRay)] that subscribe to a particular provider may be incidentally recorded, including those of innocent, non-target devices.").

10. Florida v. James L. Thomas, No. 2008-CF-3350A, Suppression Hearing Transcript RE: Harris StingRay & KingFish [testimony of Investigator Christopher Corbitt], p. 17 (2nd Cir. Ct., Leon County, FL, Aug. 23, 2010), available at https://www.documentcloud.org/documents/1282618-10-08-23-2010-fl-v-thomas-2008-cf-3350a.html [PDF. p. 17] (last accessed: Aug. 30, 2014) ("[O]nce the equipment comes into play and we capture that handset, to make locating it easier, the equipment forces that handset to transmit at full power.")

11. Drug Enforcement Administration. (Aug. 29, 2007). FY2011 FEDERAL APPROPRIATIONS REQUESTS [Sole Source Notice of Harris StingRay FishHawk GSM encryption key extraction and intercept upgrade], available at https://www.documentcloud.org/documents/1282642-07-08-29-2007-dea-purchase-of-stingray-fishhawk.html [PDF p. 1] (last accessed: Aug. 30, 2014), archived from original at https://www.fbo.gov/index?s=opportunity&mode=form&id=9aa2169a324ae7a1a747c2ca8f540cb3&tab=core&_cview=0 (last accessed: Aug. 30, 2014). ("The Harris StingRay system w/FishHawk GSM Intercept S/W upgrade is the only portable standard + 12VDC powered over the air GSM Active Key Extraction and Intercept system currently available.")

12. Hennepin County, MN. (Feb. 2, 2010). FY2011 FEDERAL APPROPRIATIONS REQUESTS [Cellular Exploitation System (Kingfish) - $426,150], available at https://www.documentcloud.org/documents/1282634-10-02-02-2010-kingfish-appropriations-request.html [PDF p. 6] (last accessed: Aug. 30, 2014), archived from original at http://board.co.hennepin.mn.us/sirepub/cache/246/5hnnteqb5wro1fl4oyplzrqo/1062800803020140152436364.PDF [PDF p. 6] (last accessed: Aug. 30, 2014) ("The system acts as a mobile wireless phone tower and has the capability to... deny mobile phones service.").

13. Florida v. James L. Thomas, No. 2008-CF-3350A, Suppression Hearing Transcript RE: Harris StingRay & KingFish [testimony of Investigator Christopher Corbitt], p. 12 (2nd Cir. Ct., Leon County, FL, Aug. 23, 2010), available at https://www.documentcloud.org/documents/1282618-10-08-23-2010-fl-v-thomas-2008-cf-3350a.html [PDF. p. 12] (last accessed: Aug. 30, 2014) ("In essence, we emulate a cellphone tower. so just as the phone was registered with the real verizon tower, we emulate a tower; we force that handset to register with us.").

14. Hardman, Heath (May 22, 2014). "THE BRAVE NEW WORLD OF CELL-SITE SIMULATORS". Albany Law School: 11–12. doi:10.2139/ssrn.2440982. Retrieved Aug 24, 2014. "For a cell-site simulator operator to induce a cellphone to camp on his or her cell-site simulator (CSS), all he or she needs to do is become the strongest cell in the target cellphones preferred network."

15. Florida v. James L. Thomas, No. 2008-CF-3350A, Suppression Hearing Transcript RE: Harris StingRay & KingFish [testimony of Investigator Christopher Corbitt], p. 13 (2nd Cir. Ct., Leon County, FL, Aug. 23, 2010), available at https://www.documentcloud.org/documents/1282618-10-08-23-2010-fl-v-thomas-2008-cf-3350a.html [PDF. p. 13] (last accessed: Aug. 30, 2014) ("The equipment will basically decode information from the handset and provide certain unique identifying information about the handset, being a subscriber identity and equipment identity.... We compare that with the information provided from Verizon to insure that we are looking at the correct handset.").

the one that we're looking for, for the information that we put into the box -- then it will hang onto that one a allow us to direction find at that point.").

17. In the Matter of The Application of the United States of America for An Order Authorizing the Installation a Use of a Pen Register and Trap and Trace Device, 890 F. Supp. 2d 747, 748 (S.D. Tex. 2012) (Law enforcem sought to use StingRay "to detect radio signals emitted from wireless cellular telephones in the vicinity of the [Subject] that identify the telephones (e.g., by transmitting the telephone's serial number and phone number). so the "[Subject's] Telephone can be identified." (quoting order application)).

18. Eördögh, Fruzsina (Jun 13, 2014). "Are Chicago Police Spying on Activists? One Man Sues to Find Out". *Mother Jones*. Retrieved Aug 24, 2014. "Martinez, who works in the software industry, first wondered about police surveilling his phone in 2012 while he was attending the NATO protests. 'I became suspicious because was really difficult to use our phones[.]'"

19. United States v. Rigmaiden, CR08-814-PHX-DGC, Dkt. #0674-1 [Declaration by FBI Supervisory Agent Bradley S. Morrison], ¶ 4, p. 2-3 (D.Ariz., Oct. 27, 2011), available at https://www.documentcloud.org/documents/1282619-11-10-17-2011-u-s-v-rigmaiden-cr08-814-phx-dgc.html [PDF pp. 2-3] (last accessed: Aug. 30, 2014) ("[T]he [][StingRay] used to locate the defendant's aircard did n capture, collect, decode, view, or otherwise obtain any content transmitted from the aircard, and therefore was unable to pass any information from the aircard to Verizon Wireless.").

20. United States v. Rigmaiden, CR08-814-PHX-DGC, Doc. #723, p. 14 (D.Ariz., Jan. 5, 2012) (Noting governm concession that the StingRay "caused a brief disruption in service to the aircard.").

21. Harris WPG. (Aug. 25, 2008). Harris Wireless Products Group catalog, available at https://www.documentcloud.org/documents/1282631-08-08-25-2008-harris-wireless-products-group.html [PDI 4] (last accessed: Aug. 29, 2014), archived from original at http://egov.ci.miami.fl.us/Legistarweb/Attachments/48000.pdf [PDF p. 4] (last accessed: Mar. 8, 2011) (GSM Software Intercept Package for StingRay and StingRay II)

22. Green, Matthew. "On cellular encryption". *A Few Thoughts on Cryptographic Engineering*. Retrieved Aug 29, 2014.

23. Barkan, Elad; Biham, Eli; Keller, Nathan. "Instant Ciphertext-Only Cryptanalysis of GSM Encrypted Communications" (PDF): 12–13.

24. Schneier, Brude. "Cryptanalysis of A5/1". *Schneier on Security*. Retrieved Aug 29, 2014.

25. Id.

26. "Police use cellphone spying device". Associated Press. 2014-05-30. Retrieved 2014-06-23.

27. Campbell, John (2013-01-24). "LAPD Spied on 21 Using StingRay Anti-Terrorism Tool". *LA Weekly*. Retrieve 2014-06-23.

28. Klonick, Kate (2014-11-10). "Stingrays: Not Just for Feds!". *Slate Magazine* (The Slate Group, a Graham Holdings Company). Retrieved 2014-11-13.

29. Fenton, Justin (April 20, 2015). "Baltimore Police say Stingray phone tracking use exceeds 25,000 instances". *The Baltimore Sun*. Retrieved April 20, 2015. "David Rocah, a staff attorney with the American Civil Liberties Union of Maryland, said the 25,000 figure seemed "inexplicably high.""

30. Nail, Derrol (23 February 2015). "Harris Corporation opens new tech center in Palm Bay". *myfoxorlando.com*. WOFL, Fox Broadcasting Company. Retrieved 4 April 2015.

31. Farivar, Cyrus (25 February 2015). "Powerful "stingrays" used to go after 911 hangup, ATM burglary". Ars Technica. Retrieved 25 March 2015. "...Palm Bay Police Department simply borrowed a stingray directly from i manufacturer, the Harris Corporation—located down the road in Melbourne, Florida—to respond to a 2006 bom threat at a school, absent any judicial oversight."

32. Detective M. J. Pusatere. "03.05.2014 PBPD Stingray Records (Bates Stamped) redacted" (PDF). *aclu.org*. Palm Bay Police Department, American Civil Liberties Union. p. 3. Retrieved 24 March 2015.

33. Aaronson, Trevor (23 February 2015). "ACLU Releases Florida StingRay Documents". *fcir.org*. Florida Center for Investigative Reporting. Retrieved 4 April 2015.

34. Rivero, Daniel (18 March 2015). "It's now a trend: third court orders the release of phone-tracking Stingray documents". *fusion.net*. Fusion. Retrieved 4 April 2015.

35. Mooney, John (9 February 2014). "GSOC under high-tech surveillance". The Sunday Times.

APPENDIX 10

KIM ZETTER   SECURITY   10.28.15   3:00 PM

# TURNS OUT POLICE STINGRAY SPY TOOLS CAN INDEED RECORD CALLS



GETTY IMAGES

**THE FEDERAL GOVERNMENT** has been fighting hard for years to hide details about its use of so-called stingray surveillance technology from the public.

The surveillance devices simulate cell phone towers in order to trick nearby mobile phones into connecting to them and revealing the phones'

locations.    *APPENDIX 10*

Now documents recently obtained by the ACLU confirm long-held

SUBSCRIBE

intercepting the content of voice and text communications. The documents also discuss the possibility of flashing a phone's firmware "so that you can intercept conversations using a suspect's cell phone as a bug."

The information appears in a 2008 guideline prepared by the Justice Department to advise law enforcement agents on when and how the equipment can be legally used.

The American Civil Liberties Union of Northern California obtained the documents (.pdf) after a protracted legal battle involving a two-year-old public records request. The documents include not only policy guidelines, but also templates for submitting requests to courts to obtain permission to use the technology.

The DoJ ironically acknowledges in the documents that the use of the surveillance technology to locate cellular phones "is an issue of some controversy," but it doesn't elaborate on the nature of the controversy. Civil liberties groups have been fighting since 2008 to obtain information about how the government uses the technology, and under what authority.

Local law enforcement agencies have used the equipment numerous times in secret without obtaining a warrant and have even deceived courts about the nature of the technology to obtain orders to use it. And they've resorted to extreme measures to prevent groups like the ACLU from obtaining documents about the technology.

Stingrays go by a number of different names, including cell-site simulator, triggerfish, IMSI-catcher, Wolfpack, Gossamer, and swamp box, according to the documents. They can be used to determine the location of phones,

computers using open wireless networks. and PC wireless data cards, also known as air cards.

APPENDIX 10

The devices, generally the size of a suitcase, work by emitting a stronger signal than nearby towers in order to force a phone or mobile device to connect to them instead of a legitimate tower. Once a mobile device connects, the phone reveals its unique device ID, after which the stingray releases the device so that it can connect to a legitimate cell tower, allowing data and voice calls to go through. Assistance from a cell phone carrier isn't required to use the technology, unless law enforcement doesn't know the general location of a suspect and needs to pinpoint a geographical area in which to deploy the stingray. Once a phone's general location is determined, investigators can use a handheld device that provides more pinpoint precision in the location of a phone or mobile device—this includes being able to pinpoint an exact office or apartment where the device is being used.

In addition to the device ID, the devices can collect additional information.

"If the cellular telephone is used to make or receive a call, the screen of the digital analyzer/cell site simulator/triggerfish would include the cellular telephone number (MIN), the call's incoming or outgoing status, the telephone number dialed, the cellular telephone's ESN, the date, time, and duration of the call, and the cell site number/sector (location of the cellular telephone when the call was connected)," the documents note.

In order to use the devices, agents are instructed to obtain a pen register/trap and trace court order. Pen registers are traditionally used to obtain phone numbers called and the "to" field of emails, while trap and trace is used to collect information about received calls and the "from" information of emails.

When using a stingray to identify the specific phone or mobile device a suspect is using, "collection should be limited to device identifiers," the DoJ document notes. "It should not encompass dialed digits, as that would

Case 6:18-cv-01915-GKS-KRS   Document 1   Filed 11/07/18   Page 148 of 188 PageID 148

entail surveillance on the calling activity of all persons in the vicinity of the subject."

*APPENDIX 10*

The documents add, however, that the devices "may be capable of intercepting the contents of communications and, therefore, such devices must be configured to disable the interception function, unless interceptions have been authorized by a Title III order."

Title III is the federal wiretapping law that allows law enforcement, with a court order, to intercept communications in real time.

Civil liberties groups have long suspected that some stingrays used by law enforcement have the ability to intercept the content of voice calls and text messages. But law enforcement agencies have insisted that the devices they use are not configured to do so. Another controversial capability involves the ability to block mobile communications, such as in war zones to prevent attackers from using a mobile phone to trigger an explosive, or during political demonstrations to prevent activists from organizing by mobile phone. Stingray devices used by police in London have both of these capabilities, but it's not known how often or in what capacity they have been used.

The documents also note that law enforcement can use the devices without a court order under "exceptional" circumstances. Most surveillance laws include such provisions to give investigators the ability to conduct rapid surveillance under emergency circumstances, such as when lives are at stake. Investigators are then to apply for a court order within 24 hours after the emergency surveillance begins. But according to the documents, the DoJ considers "activity characteristic of organized crime" and "an ongoing attack of a protected computer (one used by a financial institution or U.S. government) where violation is a felony" to be considered an exception, too. In other words, an emergency situation could be a hack involving a financial institution.

"While such crimes are potentially serious, they simply do not justify

bypassing the ordinary legal processes that were designed to balance the government's need to investigate crimes with the public's right to a government that abides by the law," Linda Lye, senior staff attorney for the ACLU of Northern California, notes in a blog post about the documents.

*APPENDIX 10*

Another issue of controversy relates to the language that investigators use to describe the stingray technology. Templates for requesting a court order from judges advise the specific terminology investigators should use and never identify the stingray by name. They simply describe the tool as either a pen register/trap and trace device or a device used "to detect radio signals emitted from wireless cellular telephones in the vicinity of the Subject that identify the telephones."

The ACLU has long accused the government of misleading judges in using the pen register/trap and trace term—since stingrays are primarily used not to identify phone numbers called and received, but to track the location and movement of a mobile device.

Investigators also seldom tell judges that the devices collect data from all phones in the vicinity of a stingray—not just a targeted phone—and can disrupt regular cell service.

It's not known how quickly stingrays release devices that connect to them, allowing them to then connect to a legitimate cell tower. During the period that devices are connected to a stingray, disruption can occur for anyone in the vicinity of the technology.

Disruption can also occur from the way stingrays force-downgrade mobile devices from 3G and 4G connectivity to 2G if they are being used to intercept the concept of communications.

In order for the kind of stingray used by law enforcement to work for this purpose, it exploits a vulnerability in the 2G protocol. Phones using 2G don't authenticate cell towers, which means that a rogue tower can pass

itself off as a legitimate cell tower. But because 3G and 4G networks have fixed this vulnerability, the stingray will jam these networks to force nearby phones to downgrade to the vulnerable 2G network to communicate.

APPENDIX 10

"Depending on how long the jamming is taking place, there's going to be disruption," Chris Soghoian, chief technology for the ACLU has told WIRED previously. "When your phone goes down to 2G, your data just goes to hell. So at the very least you will have disruption of internet connectivity. And if and when the phones are using the stingray as their only tower, there will likely be an inability to receive or make calls."

Concerns about the use of stingrays is growing. Last March, Senator Bill Nelson (D—Florida) sent a letter to the FCC calling on the agency to disclose information about its certification process for approving stingrays and any other tools with similar functionality. Nelson asked in particular for information about any oversight put in place to make sure that use of the devices complies with the manufacturer's representations to the FCC about how the technology works and is used.

Nelson also raised concerns about their use in a remarkable speech on the

Senate floor. The Senator said the technology "poses a grave threat to consumers' cellphone and Internet privacy," particularly when law enforcement agencies use them without a warrant.

The increased attention prompted the Justice Department this month to release a new federal policy on the use of stingrays, requiring a warrant any time federal investigators use them. The rules, however, don't apply to local police departments, which are among the most prolific users of the technology and have been using them for years without obtaining a warrant.

*APPENDIX 10*

#CELLPHONES  #GOVERNMENT SURVEILLANCE  #SPYING  #STINGRAYS

VIEW COMMENTS

## SPONSORED STORIES



**BUSINESS INSIDER**
The sweatshirt designed by an Apple engineer that's bring manufacturing back to America.



**TECHIE FANS**
Now you can track your car using your smartphone



**INSTANT CHECKMATE**
Type in your name or anyone's, this site is addicting

*APPENDIX II.*



LAW OFFICES OF

# PUBLIC DEFENDER

### SEVENTH JUDICIAL CIRCUIT

### FLAGLER, PUTNAM, ST. JOHNS & VOLUSIA COUNTIES

**JAMES S. PURDY**
PUBLIC DEFENDER

February 16, 2017

Mr. James Edward Washington
DC# 197574 – E21365
Madison Correctional Institution
382 S.W. MCI Way
Madison, FL 32340

Re: DCA Case Number 5D16-3743

Dear Mr. Washington:

I just received your letter. Thank you for the interesting research on police use of Sting Ray equipment. I note that your letter includes a court order from the March 9, 2016 hearing on your motion in limine and motion to suppress. I was already on it. Last week I asked the Court to supplement with transcripts of various hearings in your case, and those supplements were granted.

I expect it to take about a month before I receive the transcripts. Once I receive them, I will have to read and research the issues argued and presented to the trial court. I already have the trial transcript and the record prepared by the circuit clerk of court. I hope you received the motion to supplement and the supplemental designations we sent.

I have enclosed a copy of the Order granting supplementation. As you can see from the order, appellate attorneys can only raise on appeal matters that were actually considered by the trial court. Also, appellate attorneys do not receive any "discovery." Anything the trial attorneys may have received that was not made part of the record in the circuit court can't be considered on appeal. Once I have all the supplements that were approved, I will research and brief the case.

An appeal can be a long process. Your case involves a trial and numerous hearings, so it could be six months to a year after the briefs are all filed before the appeal is decided. This will require a lot of patience on your part, but I will keep you informed of all developments and you will receive a copy of all briefs filed by this Office or the Attorney General's office.

APPENDIX II

Page 2
February 16, 2017

Do not hesitate to write if you have any questions.

Sincerely,

Kathryn Rollison Radtke
Assistant Public Defender

KRR/lw

Enclosure

*APPENDIX 12*



## LAW OFFICES OF
# PUBLIC DEFENDER
### SEVENTH JUDICIAL CIRCUIT
### FLAGLER, PUTNAM, ST. JOHNS & VOLUSIA COUNTIES

**JAMES S. PURDY**
PUBLIC DEFENDER

March 14, 2017

Mr. James Washington
#197574
Madison Correctional Institution
382 Southwest MCI Way
Madison, Florida 32340-4430

RE: DCA Case No. 5D16-3743

Dear Mr. Washington:

Thank you for your letter and your explanation. I am currently in the process of reading and researching your record on appeal and the trial transcript – over 1200 pages.

I will certainly continue to provide you with copies of everything that is filed on your behalf.

Sincerely,

Kathryn Rollison Radtke
Assistant Public Defender

KRR/lw

*APPENDIX 13*

information that minimizes Defendant's involvement in this crime other than any information contained within the discovery that was provided to the defense.

   VI.  **Response to Section 6 of Defense's Motion (Records of Non-Witness or Declarant)**

   Other than the 911 caller, at this time, the State does not intend on using any other statement by a "Non-Witness or Declarant" as evidence during trial.  The State's response to this request is the same as contained within sections A through E of this Response.

   VII.   **Response to Section 7 of Defense's Motion (Inconsistent Documented Evidence)**

   To the State's knowledge, the defense has all of the discovery that the State has in regards to this case.  Thus, it is unaware of any other documentary evidence that the defense does not have that is inconsistent with the expected testimony.

   VIII.   **Response to Section 8 of Defense's Motion (Written or Oral Statements made by State Witness)**

   To the State's knowledge, the defense has all of the discovery that the State has in regards to this case.  This discovery includes *inter alia*, police reports, photographs, and a 911 call.  The state is unaware of any written, audio recorded, video recorded, video surveillance or oral statement in existence that the State has that the defense does not have.

   IX.  **Response to Section 9 of Defense's Motion (Dash Cam or Body Cam)**

   The State does not have any surveillance video; dash cam video; or body camera video of this incident in its file.  However, Officer John James does indicate in his deposition that he did have a body camera during this incident.  The State has inquired about this body camera video.  This issue has been discussed at length in Court on multiple occasions.  The State has informed this Court and Defendant and defense counsel that the Orlando Police Department does not have a recording of this body camera video.

   Initially, for officer safety purposes, the body camera was removed from Officer James's person and placed on a poll outside of the building to determine if the suspect, later determined

*APPENDIX 13*

to be Defendant, was on the roof of the building.  The body camera video was removed from the

poll and the footage was viewed.  The footage did not show any suspect on the roof of the

building.  From there, the body camera was returned to Officer James and Officer James

determined the body camera to be operational.  Officer James participated in the search for

Defendant in the ceiling rafters.  He was crawling in the rafters.  During the search, the body

camera either became unplugged or was not properly connected.  The Orlando Police

Department's policy states that body camera video footage is destroyed after thirty (30) days if

the video contains no evidentiary value and a request is not made to maintain it for

documentation.  Since the initial footage did not show any person on the roof, and the body

camera was not functioning properly while Officer James was in the ceiling rafters and during

the apprehension of Defendant, the body camera video was destroyed.

### X.  Response to Section 10 of Defense's Motion (*Inter alia* Search Warrant Records relating to a Joint Law Enforcement effort)

To the State's knowledge, the defense has all of the discovery that the State has in

regards to this case.  The State is unaware of any other reports in existence in regards to this

case.  To the State's knowledge no other suspect was developed in regards to this case given

Defendant was found in the building during the criminal episode.

### XI.  Response to Section 11 of Defense's Motion (Burglaries in the Area)

Again, the State is *not required to prepare* the defense's case for Defendant.  *See Medina

v. State*, 466 So.2d, at 1049.  There is nothing in the Florida Rules of Criminal Procedure that

requires the State to actively seek out evidence for defense counsel.  Moreover, there is nothing

in the Florida Rules of Criminal Procedure that requires or even suggests that the State produce

for the defense a list or a report detailing burglaries to the address listed in the Information.  The

defense is seeking to use a certain theory of defense.  It is not the State's job to assist the defense

in making its theory stronger.  The defense may choose to make a Public Records Request with

APPENDIX 14





APPENDIX 14



DSC_6004_8.JPG

SAO 5 Browning Div 22 2014-536652



APPENDIX 14



DSC_8062_0.JPG

SAO S Browning Div 22 2014-536652



DSC_8061_0.JPG

SAO S Browning Div 22 2014-536652

APPENDIX 15

1    of the officers had radioed as we were responding saying he

2    also saw a subject --

3            MS. GOERNER:   Objection, Your Honor, as to

4        hearsay.

5            THE COURT:   Sustained.

6    BY MR. MATERA:

7        Q.   Not testifying what anyone told you, but just

8    what did you do when you arrived on scene?

9        A.   We went to the east, northeast corner of the

10   building where there was a -- like an electrical room with

11   a door that had been forced open.

12       Q.   And when you walked into that door, what did you

13   observe?

14       A.   We observed -- it was a small room, like, with

15   electrical and control panels and stuff like that.   And

16   there was a ladder built into the wall.   So it was a

17   permanent ladder that went to a hatch that opened up to the

18   ceiling to the roof of the business.

19       Q.   And what did you observe at that time?

20       A.   We -- when we first looked in the control room,

21   the electrical room that we -- I looked up at the ladder

22   and noticed that the hatch leading to the roof was open.

23   There was a knife that was found on one of the electrical

24   boxes, like a circuit breaker box or something.   There was

25   a small knife on there immediately to the left when you

APPENDIX 15

1    entered the room, and the door had a lock on it that had

2    been damaged so that the door could be forced open.

3         Q.   And when you looked up, you said the door was --

4    the hatch was open?

5         A.   Yeah, the hatch was open.

6         Q.   All right.  At that point, what happened?

7         A.   Officer -- there was other officers on scene.  We

8    had the building surrounded.

9         Q.   Were you with Officer Brillant?

10        A.   I was with Officer Brillant.

11        Q.   Is Officer Brillant a K-9 officer?

12        A.   Yes.

13        Q.   At that point, when the hatch was opened, what

14   did you guys start doing?

15        A.   Yes.  Officer Brillant made multiple

16   announcements that we were with the Orlando Police

17   Department, that the subject -- he was calling to the

18   subject on the roof saying, "We know you're on the roof.

19   Come down and come down the ladder now, and put your hands

20   in the air."

21        Q.   After that command was given, what happened?

22        A.   After multiple commands, the -- later, the

23   arrestee walked up to the hatch, looked down at us, and

24   closed it from the roof.

25        Q.   So at that point, what was your concern?

*APPENDIX 16*

280

```
 1          showing the defense what's been marked as State's B

 2          for identification purposes.  Showing the defense

 3          what's been marked as State's C for identification

 4          purposes.  Also showing the defense what's been marked

 5          as State's A for identification purposes.

 6               May I approach the witness?

 7               THE COURT:  Yes.

 8               MR. MATERA:  I am showing the witness what's been

 9          marked as State's A for identification purpose.

10     BY MR. MATERA:

11          Q.   Officer Wilson, take a look at those photographs

12     and let me know if you recognize what those photographs

13     depict.  Or excuse me.  Do you recognize those photographs?

14          A.   Yes, I do.

15          Q.   Do those depict the backpack that you observed on

16     the roof near the tools?

17          A.   Yes.

18          Q.   Is it a fair and accurate depiction of the

19     backpack?

20          A.   Yes, that is the backpack.

21               MR. MATERA:  I'm showing Officer Wilson what's

22          been marked as State's C for identification purposes.

23     BY MR. MATERA:

24          Q.   Take a look at that, Officer, and let me know if

25     you recognize it.
```

*APPENDIX 16*

```
 1        A.    They -- these are the cutting tools that we

 2   found, the hacksaw, pliers, bolt cutters.

 3        Q.    Fair and accurate depiction of those tools that

 4   you observed on the roof?

 5        A.    Yes, and the damage to the A/C units.

 6        MR. MATERA:  Showing the witness what's been

 7        marked as State's B for identification purposes.

 8   BY MR. MATERA:

 9        Q.    Officer Wilson, take a look at those and let me

10   know if you recognize them.

11        A.    Yes.  It has the roof, showing the ledge around

12   the perimeter, and damage to the A/C vents.

13        Q.    A fair and accurate depiction of the wall and A/C

14   units --

15        A.    Yes.

16        Q.    -- on the roof?

17        MR. MATERA:  Showing the witness what's been

18        marked as State's E for identification purposes.

19   BY MR. MATERA:

20        Q.    Officer Wilson, take a look at that and let me

21   know if you recognize it.

22        A.    Yeah.  That is the pile of cut copper that we

23   found.

24        Q.    Those near A/C units where the backpack and the

25   tools were found?
```

APPENDIX 16

1    A.   Yes, all in the same general area.

2    Q.   Fair and accurate depiction of that?

3    A.   Yes.

4       MR. MATERA:  Judge, at this time, the State would

5   move what's been marked as State's E, State's B,

6   State's C, and State's A into evidence.

7       THE COURT:  Any objection?

8       MS. GOERNER:  Your Honor, may I voir dire the

9   witness?

10      THE COURT:  Counsel approach, please.

11      (Sidebar conference held on the record.)

12      THE COURT:  What is the purpose of the voir dire?

13      MS. GOERNER:  Well, they don't have anything that

14   connects those to my client.

15      THE COURT:  But this is -- the purpose of voir

16   dire -- the only purpose of voir diring the witness

17   with regard to introduction of evidence is to

18   establish that he cannot testify that these are fair

19   and accurate depictions of what they show.

20      MS. GOERNER:  Okay.  And I wasn't finished

21   because he just testified to seeing the backpack on

22   the roof.  Those pictures of the backpack are not on

23   the roof.

24      THE COURT:  Okay.  That would be a matter for

25   cross-examination.  That's not a matter of whether he

*APPENDIX 16*

1        can testify.

2              MS. GOERNER:  Well, I don't know how that is a

3        fair and accurate depiction of the backpack on the

4        roof if that's not a backpack on the roof.

5              THE COURT:  Okay.  He didn't say it was on the

6        roof.  He said it was a fair and accurate depiction.

7              MS. GOERNER:  Yes, he did.  He testified it was

8        on the roof, and that was his question.

9              THE COURT:  Okay.  Well, that's not -- well, that

10       is not voir dire.  That is cross-examination of the

11       witness.  So I will allow you to ask him that on

12       cross-examination.  Okay?

13             (The following was in open court.)

14             MS. GOERNER:  Your Honor, my objection is as to

15       relevance and lack of foundation.

16             THE COURT:  Okay.  So the defense objection is

17       overruled.

18             State's Exhibits A, B, C, and E will be received

19       as 8, 9, 10 and 11.

20             Is that right, Pam?

21             THE CLERK:  Yes.

22             THE COURT:  Okay.

23             (State's Exhibit No. 8 was received in evidence.)

24             (State's Exhibit No. 9 was received in evidence.)

25             (State's Exhibit No. 10 was received in

                          Ninth Judicial Circuit
                        Court Reporting Services

APPENDIX 16

1    evidence.)

2            (State's Exhibit No. 11 was received in

3    evidence.)

4            MR. MATERA:  May the witness step down?

5            May I publish those exhibits to the jury?

6            THE COURT:  Yes.

7    BY MR. MATERA:

8        Q.  Officer Wilson, the photograph of the backpack,

9    that's not where you observed it, correct?

10       A.  Not initially, no.

11       Q.  Okay.  Do you have any idea why the backpack was

12   moved to be photographed?

13       A.  Yes.

14       Q.  Why was that?

15       A.  It was raining that day on and off.  The backpack

16   was initially found on the roof in the same general

17   vicinity as the other tools, the damaged A/C units, and the

18   copper -- the pile of copper piping and other material that

19   had been cut.  It started to rain.  The tools and the

20   copper piping were getting wet.  There was equipment in

21   that backpack that we thought might have some value, as far

22   as evidence.

23           We took it out of the rain.  We moved it off the

24   roof so that the backpack and the material in it would not

25   get wet from the rain.  It was pouring at that point, so we

APPENDIX 16

1    just moved it into that general area where that electrical

2    room was.

3         Q.   Okay.  And, now, take a step down, Officer.

4              MR. MATERA:  May he step down, Judge?

5              THE COURT:  Yes.

6    BY MR. MATERA:

7         Q.   Go ahead and take a step down and come in front

8    of the jury, please.

9              MR. MATERA:  May I approach the jury?

10             THE COURT:  Yes.

11             MR. MATERA:  I am showing Officer Wilson C-3.

12        It's part of the State's Exhibit C.

13   BY MR. MATERA:

14        Q.   Now, these photographs, Officer Wilson, were

15   these tools already wet?

16        A.   Yes.

17        Q.   Okay.  Is that why they were photographed still

18   on the roof?

19        A.   Yes.

20        Q.   And where were those tools found?  Explain this

21   general area to the jury.

22        A.   This was kind of in the center of the -- the roof

23   next to one of the A/C handlers.  Okay?  You can see that

24   the -- the panels, the sides have been pulled open exposing

25   the inside of the A/C handlers.  And these tools were

*APPENDIX 17*

1        Q.   All right.  And what did you see?

2        A.   I had asked the K-9 to come back in because he

3   gave the dog a little bit of break because the gas affects

4   their skin, makes them agitated.  So he comes to my right.

5   There was a little wall between us, a little about this

6   high.  And as I have him come up to me, I watched the

7   bathroom door open, and the subject is walking towards me.

8        Q.   The person that began to walk towards you, do you

9   recognize him in the courtroom today?

10       A.   Yes.

11       Q.   Will you please point to him and describe an

12  article of clothing that he's wearing?

13       A.   The male sitting next to the defense attorney

14  wearing a gray shirt, long-sleeve collard shirt.

15            MR. MATERA:  Your Honor, may the record reflect

16       the witness identified the defendant?

17            THE COURT:  The record will so reflect.

18  BY MR. MATERA:

19       Q.   Is that the individual you also saw in the

20  rooftop?

21       A.   Yes.

22       Q.   And at that point, what did the defendant do?

23       A.   He continued to walk towards me.  At that point,

24  I drew my weapon.  I told him to get on the ground and to

25  open his hands.  His hands were clenched and he

                        Ninth Judicial Circuit
                      Court Reporting Services

*APPENDIX 17*

1   continuously walked towards me ignoring my commands to tell

2   him to get on the ground.

3        Q.   At that point, were you in fear?

4        A.   Yes.

5        Q.   Why?

6        A.   I have never had that situation before.

7             **MS. GOERNER:**  Objection as to relevance.

8             **THE COURT:**  Overruled.

9             **THE WITNESS:**  And throughout the building, we did

10       find two other knives.  I was afraid he was armed

11       again.

12  **BY MR. MATERA:**

13       Q.   At that point, what happened?

14       A.   The K-9 officer observed me yelling at somebody

15  to get on the ground.  He observed the male continuously

16  coming towards me ignoring my commands and deployed his

17  dog.

18       Q.   Did you observe the dog latch on to the

19  defendant?

20       A.   Yes.

21       Q.   Describe to the jury what happened at that time.

22       A.   The dog grabbed his lower leg around the shin.

23  At that point, a small flashlight came out of one hand.

24  And at the time, an unknown object flew out of the other

25  hand.  The subject constantly was yelling, "Get him off me.

APPENDIX 18

1    copper off of the units?

2          A.    No.

3          Q.    In fact, you never saw Mr. Washington with any

4    kind of cutting bolt cutters, did you?

5          A.    No.

6          Q.    Or screwdrivers?

7          A.    No.

8          Q.    Or saws?

9          A.    No.

10         Q.    Now, in looking for Mr. Washington in the

11   building, who you later identified to be Mr. Washington,

12   your agency -- you guys were ripping out ceiling tiles?

13         A.    Yes.

14         Q.    Pulling up benches to the chairs that were with

15   the tables inside?

16         A.    Yes.

17         Q.    Looking for Mr. Washington in there?

18         A.    Yes.

19         Q.    Did you ever see a backpack on the roof?

20         A.    No.

21         Q.    Did you ever see a water bottle?

22         A.    No.

23         Q.    Did you ever see a backpack at all?

24         A.    No.

25         Q.    Okay.  You mentioned yesterday that you saw at

APPENDIX 18

263

```
 1    least two knives in the building when you guys were

 2    searching, right?

 3         A.    Yes.

 4         Q.    Where did you see those knives?

 5         A.    The first one was right on the floor on the door

 6    that was opened.  And the second one was later identified

 7    when it came out of his hand.

 8         Q.    Okay.  So you didn't see two knives prior to

 9    Mr. Washington coming down out of the bathroom ceiling?

10         A.    Two knives coming out of his hand.

11         Q.    Yesterday you testified -- do you recall that you

12    testified that you saw two knives prior to Mr. Washington

13    coming out of the bathroom ceiling?

14         A.    I did not testify to that.  No, I did not.

15         Q.    So the one that was on the floor by the door that

16    was opened, that was the same one in Exhibit 1 that I just

17    showed you?

18         A.    You didn't show me a knife.

19         Q.    I'm sorry.  Let me rephrase that question.

20               In Exhibit 1, is this the door where you saw the

21    knife by?

22         A.    Yes.

23         Q.    When you walked in?

24         A.    Yes.

25         Q.    You know if anybody took a picture of that knife?
```

APPENDIX 18

1    A.   I do not.

2    Q.   And you didn't take a picture of that knife?

3    A.   I did not.

4         MS. GOERNER:   One moment, Your Honor.

5    BY MS. GOERNER:

6         Q.   And the knife that you observed by the door when

7    you came in, you didn't know when it got there?

8    A.   No.

9    Q.   You didn't know who put it there?

10   A.   No.

11   Q.   You don't know how long it had been there?

12   A.   No.

13   Q.   You didn't collect it?

14   A.   No.

15   Q.   You didn't check it for prints?

16   A.   No.

17   Q.   Now, when Mr. Washington came down out of the

18   ceiling tile in the bathroom, you said his fists were

19   clenched, correct?

20   A.   Once he came out of the door from the bathroom.

21   Q.   Okay.  All right.  So when -- so when he came out

22   of the door from the bathroom, you were standing in the

23   kitchen or dining room?

24   A.   In the dining room right by the door.

25   Q.   And the ceiling tiles, they were still up in that

APPENDIX 18

```
1    area or no?

2         A.    In the --

3         Q.    The dining room area where you were standing?

4         A.    Most were gone.  But right by the bathroom there

5    were tiles there, yes.

6         Q.    And you could see the bathroom from where you

7    were?

8         A.    The bathroom door.

9         Q.    Just the door?

10        A.    Yes.

11        Q.    So when Mr. Washington came out, you said both of

12   his fists were clenched?

13        A.    Yes.

14        Q.    And you could see a small flashlight in one hand?

15        A.    Yes.

16        Q.    And you didn't know or could tell if he had

17   something in the other hand?

18        A.    All I saw that it was clenched.

19        Q.    Okay.  Now, did you collect that flashlight?

20        A.    I did not personally, no.

21        Q.    Did you ever see that flashlight after he was

22   bitten by the dog?

23        A.    No.

24        Q.    Did you ever take a picture of that flashlight?

25        A.    I personally did not.
```

APPENDIX 19

1       please.

2                    THE WITNESS:  Officer Nicole Morgan.

3                         DIRECT EXAMINATION

4    BY MR. MATERA:

5         Q.   Officer Morgan, I want to fast forward to where

6    you're encountering the defendant at the bathroom area.

7         A.   Okay.

8         Q.   Tell the jury after you drew your firearm what

9    happened.

10        A.   After I drew my firearm, I was looking straight

11   at the subject.  My gun up.  I point it at him, and I

12   yelled at him to get on the ground, open his hands, to get

13   on the ground.  And I repeated that two to three times.

14        Q.   Did he ever try to make his way past you to a

15   door exit to the Perkins?

16        A.   No.  He was walking straights towards me.

17        Q.   Did any officer ever grab Mr. Washington and pull

18   him back into the Perkins?

19        A.   No.

20        Q.   Did any officer then did place their hand or

21   their knee on top of the officer -- on top of the

22   defendant, and at that time, did you hold his leg down

23   exposing his leg for the K-9 to bite?

24        A.   No.

25        Q.   Were you guys all chanting, "Stop resisting.

APPENDIX 19

1    Stop resisting," as the dog is biting the defendant?

2         A.    Stop resisting and to give me his hands.

3         Q.    Correct.

4               Did you purposely hold down the defendant in this

5    case to have the K-9 bite his leg?

6         A.    No.

7         Q.    Did any other officer that you were with hold

8    down the defendant just so the K-9 could bite his leg?

9         A.    No.

10        Q.    When the K-9 attacked, was the defendant first

11   standing up?

12        A.    Yes.

13        Q.    After the K-9 attacked, did the defendant fall?

14        A.    Yes.

15        Q.    When he fell, explain what happened to the jury.

16        A.    When the K-9 deployed, the K-9 officer is in

17   charge at that point because their dog is engaged with an

18   individual.  At that point, Officer Brillant was stating to

19   "Give me your hands.  Put your hands behind your back."

20        Q.    What was the defendant doing with his hands to

21   the dog?

22        A.    The subject was striking the dog in the snout and

23   anywhere that he could touch the animal.

24        Q.    Did the dog release?

25        A.    Yes.

APPENDIX 19

1      Q.   Okay.  And then what did the defendant do?

2      A.   Because -- once the dog released, the defendant

3   kicked out his legs attempting to kick the dog again, which

4   caused the dog to reengage to the other part of the thigh.

5      Q.   And at that point, did you-all -- was the dog

6   released from the defendant?

7      A.   Yes.

8      Q.   Were you able to handcuff him at that time?

9      A.   Yes, with the help of Stephen Wilson.

10     Q.   All right.

11          MR. MATERA:  No further questions.

12          THE COURT:  Any questions from the defense?

13          MS. GOERNER:  Yes, Your Honor.

14                     CROSS-EXAMINATION

15   BY MS. GOERNER:

16     Q.   Officer Morgan, when you and Officer Brillant

17   encountered the -- Mr. Washington coming out of the

18   bathroom, and you said Mr. Washington was coming towards

19   you, that that's when the dog bit Mr. Washington?

20     A.   When he was coming towards me after my orders,

21   yes.

22     Q.   When the dog bit Mr. Washington, Mr. Washington

23   went down to the ground?

24     A.   Yes.

25     Q.   And did Mr. Washington try to get back up?

*APPENDIX 19*

1    A.   He was fighting with the dog.  I don't know if

2   that was to get back up or just fight the dog.

3    Q.   Did you grab Mr. Washington's leg at that point

4   when it seemed like he was trying to fight the dog or get

5   back up?

6    A.   No, I wasn't grabbing the leg when the dog was

7   there.

8    Q.   Did you grab a part of Mr. Washington as he was

9   fighting to try to get Mr. Washington to stop fighting?

10    A.   Like the first bite or --

11    Q.   Yes.

12    A.   No.

13    Q.   What about the second bite?

14    A.   Yes.

15    Q.   Okay.  So at that point, you grabbed

16   Mr. Washington and tried to get him to stop fighting?

17    A.   Yes.

18    Q.   Now -- and you were present there with Officer

19   Brillant?

20    A.   Yes.

21    Q.   And you-all were -- and you-all actually had to

22   pull -- you-all actually pulled Mr. Washington back into

23   the center of the room where you go hands on more safely?

24    A.   No.  Where he fell and the dog latched on when

25   the dog was removed, wherever he is, is where we went hands

APPENDIX 19

1    on.

2        Q.    Officer Morgan, I want to -- would it refresh

3    your recollection to review your report about pulling

4    Mr. Washington back into the center of the room?

5        A.    Absolutely.

6        Q.    Okay.

7            MS. GOERNER:  May I approach the witness?

8            THE COURT:  You may.

9    BY MS. GOERNER:

10       Q.    I just want to confirm this is your report,

11   correct?

12       A.    Yes.

13       Q.    And I want to show you page 5.  And I want you to

14   read silently to yourself this portion right here

15   (indicating.)

16       A.    (Complying.)

17       Q.    Okay.  Does that refresh your recollection?

18       A.    Yes, it does.

19       Q.    So Mr. Washington was pulled back into the center

20   of the room so you guys can get a better handle on

21   Mr. Washington at that point?

22       A.    Yes.

23       Q.    Okay.

24           MS. GOERNER:  I have nothing further.

25           THE COURT:  Any redirect?

*APPENDIX 19*

486

1        **MR. MATERA:**  One moment, Judge.

2        **REDIRECT EXAMINATION**

3  **BY MR. MATERA:**

4     **Q.**  When was he pulled back into the room?

5     **A.**  Still the same room.  That's the thing.  When he

6  first fell, he's against -- when you fall, there's a wall.

7  When he got handcuffed the first time, it didn't work.  He

8  put his other hand underneath of him.  We pulled -- pulled

9  him away from the wall, more -- towards so more officers

10  could help, and we got the other hand.

11     **Q.**  So you didn't pull him back in before he was bit?

12     **A.**  No.

13     **Q.**  Right.

14     And you didn't pull him back in to let the K-9

15  bite him?

16     **A.**  No.

17     **Q.**  This was after the K-9 had bitten him?

18     **A.**  Yes.

19     **MR. MATERA:**  No further questions.

20     **THE COURT:**  Members of the jury, do you have any

21  questions of the witness?  If so, please raise your

22  hand.

23     All right.  I see no hands.

24     Thank you, ma'am.

25     **THE WITNESS:**  Thank you.

*APPENDIX 20*





← Blood located by wall

DSC_0026_6.JPG

SAO S Browning Div 22 2914-536652

APPENDIX 20



↑
Blood located by wall

↑
Blood located by Wall



DSC_0023_0.JPG

SAD S Browning Div 22 2014-536652

*APPENDIX 21*

1    A.    I don't recall for sure, but in that general

2    vicinity.

3    Q.    Was it inside the backpack?

4    A.    I don't recall.  I don't believe so, though.  I

5    never -- you have to understand, I personally never went

6    into the backpack itself.

7    Q.    Okay.

8    A.    Okay?  So I can't truly testify to what exactly

9    the contents of the backpack were.

10   Q.    Was that backpack, was it opened or closed when

11   you saw it?

12   A.    I did not look inside it, so I can't -- I saw it

13   there next to -- close proximity to the tools and the

14   copper and everything.

15   Q.    I'm gonna show you what's previously been entered

16   into evidence as State's Exhibit A.

17         This is a photograph -- these are photographs of

18   the backpack that you saw?

19   A.    Yes.

20   Q.    And that backpack is closed in that photograph,

21   correct?

22   A.    This backpack?  I'm sorry.  Say that again.

23   Q.    The backpack is closed in that photograph,

24   correct?

25   A.    It is closed.

APPENDIX 21

1     Q.   Did you close the backpack?

2     A.   No.

3     Q.   Did you collect that backpack?

4     A.   No, I did not.

5     Q.   Are you the person who moved the backpack from

6   the roof down to the floor?

7     A.   No.

8     Q.   Now, that backpack is -- the picture of the

9   backpack is downstairs, correct?

10    A.   Yes, it is.

11    Q.   It's downstairs by the door that was next to the

12  electrical room?

13    A.   Yes.

14    Q.   And you didn't put it there?

15    A.   No, I did not.

16    Q.   Do you have any idea who put it there?

17    A.   No.  One of the officers that was -- it was a

18  bunch of us up on the roof.

19    Q.   Okay.  You didn't take anything out of the

20  backpack?

21    A.   I did not, no.

22    Q.   You never saw Mr. Washington with the backpack,

23  did you?

24    A.   No.  I never saw Mr. Washington up on the roof to

25  begin with.

APPENDIX 21

1      Q.   Okay.  So then you never saw Mr. Washington with

2  the saw?

3      A.   No.

4      Q.   You never saw Mr. Washington with the bolt

5  cutters?

6      A.   No.  They were all laying on the roof when I went

7  up onto the roof.  I apologize.  I apologize.  I did see

8  Mr. Washington on the roof when he came and closed the

9  hatch.  That was the only time I saw him up on the roof.

10     Q.   Okay.  That hatch, is it near -- I'm gonna show

11  you what's been previously marked State's Exhibit 10 for

12  identification.

13          Now, State's Exhibit 10 is the unit that you saw

14  was dismantled with the saw and the bolt cutters, correct?

15     A.   Yes.

16     Q.   Now, that hatch is not next to that particular

17  unit, is it?

18     A.   No.

19     Q.   Okay.

20     A.   Let me try to get my bearings here.

21          Okay.  Here's the Walgreens.  So this is -- this

22  A/C unit is in the -- what would be the southwest corner of

23  the roof.  Okay?  This is Semoran Boulevard here.  This is

24  LaCosta Drive on this side.  The hatch was on the north --

25  what would be the northeast corner.

APPENDIX 21

1     Q.    So the other side of the building?

2     A.    Yes, the other side.

3     Q.    Okay.  So you never saw Mr. Washington in this

4  area of the unit?

5     A.    No.  The only time I saw him on the roof was when

6  he came and closed the hatch on us.

7     Q.    On the north side of the building?

8     A.    The northeast side, yes.

9     Q.    So you never saw Mr. Washington with the saw?

10    A.    No, ma'am.

11    Q.    You never saw him with the bolt cutters?

12    A.    No, ma'am.

13    Q.    You never saw him with the saw?

14    A.    No.

15    Q.    Or near the bolt cutters?

16    A.    No.

17    Q.    You never saw him near the area where the

18  backpack was found?

19    A.    No.

20    Q.    Now -- and again in that exhibit, as well as in

21  State's Exhibit No. 9, which I will show you, you mentioned

22  earlier that there is a -- and you can kind of show it to

23  the jury as you're explaining, but there's like a wall

24  that's about three feet tall?

25    A.    Yes.  That's -- that would be this here

APPENDIX 21

1    (indicating.)

2        Q.   So that wall, if you're standing down on the --

3    on the street or on the sidewalk, you can't see onto the

4    roof?

5        A.   No, you cannot.

6        Q.   Is that why you had to get in the bucket to go up

7    and to try to look for him?

8        A.   Yes.

9        Q.   You mentioned that when you first came into the

10   building on the side where the ladder led up to the roof

11   hatch that you saw a knife on the circuit breaker box?

12       A.   There's a door that leads from the outside of the

13   building into that electrical room.  Okay?  When you

14   walked -- when you walked in through that door, the

15   electrical room was right here, and it was -- that door led

16   only to the electrical room and the ladder up to the roof.

17   You could not get into the building from there.

18            So here's a wall.  As you enter, there's a wall

19   right here that comes around.  There was an electrical box,

20   like a control panel right there to your left shoulder as

21   you enter, and it was sitting on there next to the ladder

22   that went up.

23       Q.   So if I can have you step down.

24            MS. GOERNER:  May I have the witness step down?

25            THE COURT:  Yes.

Ninth Judicial Circuit
Court Reporting Services

*APPENDIX 21*

1   **BY MS. GOERNER:**

2       Q.   Showing you now State's Exhibit 1 in evidence.

3   Is this the breaker box that you are talking about, the

4   second photograph?

5       A.   Let me look at -- okay.  Here's the room.   This

6   is one of them.  And that looks like -- that is the ladder

7   that goes up -- that is the ladder that goes up to the

8   hatch.

9       Q.   All right.  So the knife that you saw, would it

10  have been on top of this?

11      A.   It was somewhere right in this -- no.  It was

12  closer to the door, which is like right here (indicating).

13      Q.   Okay.  But it wasn't on the floor?

14      A.   No.

15      Q.   Okay.  Thank you.

16           And you never saw Mr. Washington with that knife,

17  correct?

18      A.   I did not.

19      Q.   In fact, this was an abandoned building?

20      A.   It was.

21      Q.   Are you familiar with that particular building?

22      A.   Yes.

23      Q.   Had it been abandoned for a while?

24      A.   Yes.

25      Q.   More than a year?

*APPENDIX 22*

1   in?

2       A.   I don't know.

3       Q.   And when you first walked into -- you walked into

4   that door near the roof hatch?

5       A.   I did.   I walked directly up to it.

6       Q.   And as you walked up to that door, you noticed

7   the steak knife on the ground next to the door, didn't you?

8       A.   I did, just inside of the threshold of the door.

9       Q.   Do you remember whether that knife had a handle

10  or no?

11      A.   I don't.   No, ma'am.

12      Q.   You didn't collect it?

13      A.   I did not.   No, ma'am.

14      Q.   You didn't check it for prints?

15      A.   I did not.

16      Q.   You never saw Mr. Washington with it, though, did

17  you?

18      A.   No, ma'am.

19      Q.   Now, I guess shortly thereafter you made some

20  kind of -- you made the announcement, "I know you're on the

21  roof.   Come down or you will be bit by the dog"?

22      A.   Correct.

23      Q.   You made that announcement several times, right?

24      A.   Yes, ma'am.   I did.

25      Q.   And he didn't come down?