APPENDIX 22

1      A.   He did not.  No, ma'am.

2      Q.   And that's when you let K-9 Titan go ahead and go

3   through the building to look for him?

4      A.   After we determined that there was nobody any

5   longer on the roof, we made entry into the side door.  Yes,

6   ma'am.

7      Q.   And determining that there was nobody any longer

8   on the roof, that was when -- was it Officer Pollock got

9   into the fire truck bucket and went up to look and see on

10  top of the roof?

11     A.   Yes, ma'am.

12     Q.   Because, at that point, you couldn't see the roof

13  from where you were?

14     A.   I could not.  No, ma'am.

15     Q.   Now, you had never been on that roof of the

16  building before, correct?

17     A.   No, I have not.

18     Q.   On this particular day, did you go up onto the

19  roof to look for the suspect?

20     A.   I did not, no.

21     Q.   So then you are not aware of what condition the

22  air handlers were in prior to that day, correct?

23     A.   No, ma'am.

24     Q.   And on that particular day when you saw the

25  person moving back and forth between the two units, you

APPENDIX 22

366

1    couldn't -- you couldn't see the condition of the air

2    handlers or yes?

3        A.   Partially, yes.

4        Q.   And could you see whether they had been

5    dismantled at that point or not?

6        A.   From the side I was on, they were not.  He was

7    moving back and forth from pretty much the west side of the

8    unit back to the roof hatch, which I could not completely

9    see that side of the air unit.

10       Q.   Okay.  And you were on which side of the

11   building?

12       A.   The north.

13       Q.   You were on the north side of the building?

14       A.   The north initially when I arrived on scene, and

15   then the northeast corner when I went to the open door.

16       Q.   Okay.  So when you were in the parking lot of the

17   Dunkin Donuts, you could just see the north side of the

18   building?

19       A.   I could see the north and east and part of the

20   west side of the building.

21       Q.   I'm sorry.  The north side of the roof?

22       A.   Yes, ma'am.

23       Q.   Okay.  And how many A/C units could you see from

24   where you were on that north side of the building?

25       A.   I don't recall at this point.

*APPENDIX 22*

1      Q.   Now, you never saw Mr. Washington with any tools,

2   did you, meaning a saw?

3      A.   I did not, no.

4      Q.   You never saw Mr. Washington with any bolt

5   cutters?

6      A.   No, ma'am.

7      Q.   And other than the small flashlight you described

8   seeing in Mr. Washington's hands after he came down in the

9   bathroom area, you didn't see him with any other

10   flashlights, right?

11      A.   No other flashlights to my knowledge.  No, ma'am.

12      Q.   After K-9 Titan bit Mr. Washington, did you see

13   where that flashlight went?

14      A.   It dropped directly almost next to the ground

15   next to him.

16      Q.   Do you know what happened to that flashlight?

17      A.   I do not.  No, ma'am.

18      Q.   Did you ever see Mr. Washington with a backpack?

19      A.   Not to my knowledge, no.

20      Q.   Did you ever see Mr. Washington near a backpack?

21      A.   No, ma'am.

22      Q.   Did you ever see Mr. Washington stripping any

23   copper from the building?

24      A.   Not that I could tell from my vantage point, no.

25      Q.   Did you ever see Mr. Washington in possession of

APPENDIX 22

1    any copper?

2         A.   No.

3         Q.   You had mentioned earlier when you deployed K-9

4    Titan to go through the building looking for the suspect,

5    that Mr. -- that K-9 Titan was to smell for fear odor, a

6    human odor?

7         A.   A human odor.

8              Typically, when somebody's adrenaline is pumping

9    or either running or hiding from the police, their body

10   will create more of an odor.  We call that a fear odor.

11        Q.   That's what you meant by "fear odor"?

12        A.   Yes, ma'am.

13        Q.   That was my question to explain what a fear odor

14   is.

15        A.   Yes, ma'am.

16        Q.   Okay.  Thank you.

17             Now, you mentioned also that Titan was pretty

18   much focusing on the kitchen area with his nose up towards

19   the ceiling implying there was a human odor above the

20   kitchen area?

21        A.   Yes, ma'am.

22        Q.   Was there any other areas that Titan was hitting

23   on like that, or was he pretty much focused on the kitchen?

24        A.   Mainly in the kitchen area.

25        Q.   And that's on the north side of the building or

## APPENDIX 22

1    the south side?

2        A.   That is the north, more towards the east.

3        Q.   And when K-9 Titan bit Mr. Washington, you said

4    that you observed both the knife and the flashlight fly out

5    of -- or the cutting object fly out of Mr. Washington's

6    hand, and the flashlight fly out of Mr. Washington's hand?

7        A.   Yes, ma'am.

8        Q.   But you didn't see which direction the cutting

9    object went in?

10        A.   I could tell it went off to his right, which was

11    the hand it came out of.  I didn't follow with my eyes.  I

12    was focused on him at the time.

13        Q.   Now, you didn't go back and collect that item of

14    evidence, did you?

15        A.   I did not.  I just showed the crime scene

16    investigator where it was.

17        Q.   Okay.  And you didn't take pictures of it?

18        A.   I did not.  No, ma'am.

19        Q.   And you didn't check it for prints?

20        A.   No, ma'am.

21        Q.   And would it be fair to say that the flashlight

22    was laying in the same area near the knife?

23        A.   No, ma'am.  They were on opposite ends.  Probably

24    the knife blade ended up being, I would guesstimate,

25    approximately 10 feet away from where Mr. Washington was.

APPENDIX 22

370

1        Q.    Did you write a report in this case?

2        A.    I did.  Yes, ma'am.

3        Q.    And one of the reasons for writing a report in

4   this case is to make sure to help you recall things later?

5        A.    Yes.

6        Q.    And, of course, this happened, what, almost two

7   years ago?

8        A.    Yes, ma'am.

9        Q.    Okay.  Would it refresh your recollection if I

10  show you the report?

11       A.    I believe my report says directly next to the

12  area where he was taken down, if I'm correct.

13       Q.    Can I show you your report?  Would that refresh

14  your recollection?

15       A.    Yes, ma'am.  Absolutely.

16       Q.    Just one moment.  I'm showing the prosecutor.

17       A.    Okay.

18       Q.    Does that refresh your recollection?

19       A.    Yes, ma'am.

20       Q.    And, in fact, the knife was laying on the ground

21  in the same area in which Mr. Washington made the throwing

22  motion, which was also close to the flashlight; is that

23  correct?

24       A.    Within the same area, yes, ma'am.

25       Q.    Okay.  So it's something that the crime scene

*APPENDIX 22*

1    technician would have seen or should have picked up on?

2         A.   I don't know.   I brought her in to the knife.   I

3    don't believe I showed her where the flashlight was.

4         Q.   They were within feet of each other, though,

5    correct?

6         A.   In the same area.   Yes, ma'am.

7              MS. GOERNER:  One moment.

8              I have no further questions.

9              THE COURT:  Any redirect?

                        REDIRECT EXAMINATION

11   BY MR. MATERA:

12        Q.   Officer Brillant, when you brought the crime

13   scene tech back into the building, fair to say you were

14   more concerned about the knife?

15        A.   I was.   Yes, sir.

16        Q.   The knife as a cutting tool?

17        A.   Correct.

18        Q.   You were in fear of that knife as opposed to in

19   fear that Officer Morgan was going to get struck with that

20   knife?

21        A.   Correct.

22             MR. MATERA:  No further questions.

23             THE COURT:  Members of the jury, do you have any

24   questions of the witness?  If so, please raise your

25   hand.

*APPENDIX 23*

1      Q.   Did you send the backpack to FDLE to test for

2   DNA?

3      A.   No.

4      Q.   Why did you not do that?

5      A.   This was a property crime, and our State lab only

6   accepts touch DNA cases on violent crimes.

7           **MR. MATERA:**  No further questions.

8           **THE COURT:**  Any questions from the defense?

9           **MS. GOERNER:**  Yes, Your Honor.

10          **THE COURT:**  You may proceed.

11                      **CROSS-EXAMINATION**

12   **BY MS. GOERNER:**

13     Q.   Good afternoon.

14     A.   Good afternoon.

15     Q.   You had indicated that you responded out to the

16   scene, and that part of your job in documenting the scene

17   is to take photographs, correct?

18     A.   Yes.

19     Q.   And you took 73 photographs -- or between you and

20   some other officers you took 73 total photographs?

21     A.   Yes, ma'am.

22     Q.   I want to talk to you about those photographs.

23   When you came on the scene, did you encounter a door that

24   was opened near the roof access to the building where there

25   was a ladder coming down from the building?

APPENDIX 23

1       A.    Yes.

2       Q.    And did you take photographs of that door?

3       A.    Yes.

4       Q.    Did you notice the lock on that door to be a

5  busted lock?

6       A.    Yes.

7       Q.    And did you take pictures of the busted lock?

8       A.    Of the outside of it, yes.

9       Q.    I'm gonna ask you --

10            MS. GOERNER:   Your Honor, may I approach the

11  witness?

12            THE COURT:   Yes.

13  BY MS. GOERNER:

14      Q.    I'm gonna ask you to thumb through the exhibits

15  that have been introduced into evidence so far and to tell

16  us whether or not you see a photograph of that busted lock.

17      A.    There's a red door that has damage that I

18  photographed.

19            Is that the door you're referring to?

20      Q.    I'm asking you about the door that's by the roof

21  hatch where the ladder was coming down.

22      A.    I do not have a close up of the lock, no.

23      Q.    Okay.  And is that the lock that you observed?

24  Was it a Padlock that was busted off?

25      A.    I don't recall.

APPENDIX 23                                                    407

1        Q.    Did you document whether or not it was a Padlock

2    that was busted off the door?

3        A.    No, I did not.

4        Q.    Did you collect any Padlock that was busted off

5    the door?

6        A.    No.

7        Q.    Now, the picture that you're referring to where

8    there's damage to the door, can you hold that up for us,

9    please?

10       A.    That would be some pry marks.

11       Q.    Okay.  Now, you are aware that law enforcement

12   had to actually use a crowbar and break into one of the

13   doors, correct?

14       A.    Yes, I am aware.

15       Q.    Okay.  So you don't know which door that is?

16       A.    No.

17       Q.    Okay.  And taking photographs -- let me ask --

18   when you came into that -- that door where the roof hatch

19   access is where the ladder is, did you notice a knife on

20   the ground by that door as you were entering?

21       A.    No.

22       Q.    Did you notice any kind of knife on the circuit

23   board -- the electronic panel that was next to that door?

24   Did you recognize that next to the ladder?

25       A.    Yes.

*APPENDIX 23*

```
 1        Q.   Did you notice a knife on the electrical panel --

 2   the circuit breaker?

 3        A.   No.

 4        Q.   Did you -- when you went into -- and you never

 5   went up on the roof, right?

 6        A.   Correct.

 7        Q.   When you collected that backpack, was it -- it

 8   was down on the first floor by the door?

 9        A.   Yes.

10        Q.   And it was by the door where the roof hatch was?

11        A.   Yes.

12        Q.   You don't know how that backpack got there, do

13   you?

14        A.   No.

15        Q.   You never saw the defendant, Mr. Washington, with

16   that bag?

17        A.   No.

18        Q.   You never saw Mr. Washington with any of those

19   tools that were brought down from the roof to you, correct?

20        A.   Correct.

21        Q.   I notice in this backpack that there were a

22   number of tools.

23             MS. GOERNER:  May I approach the witness?

24             THE COURT:  Yes.

25
```

APPENDIX 23.

1    BY MS. GOERNER:

2       Q.   Actually.  I'm sorry.  Let me rephrase that.

3            In this box that was introduced as State's

4    Exhibit 15 --

5            MS. GOERNER:  May I approach the witness?

6            THE COURT:  Yes.

7    BY MS. GOERNER:

8       Q.   I'm just gonna ask you to look into that for a

9    moment.  I want to pull out one of the photographs of the

10   scene.

11           Now, it was Officer Cote who took pictures of the

12   tools on the roof, correct?

13      A.   Yes, ma'am.

14      Q.   And he turned that over to you for your report?

15      A.   Yes, he did.

16      Q.   I want to show you what's previously been marked

17   and entered into evidence as State's Exhibit No. 10.  I'm

18   gonna ask you to take a look at that.

19      A.   Okay.

20      Q.   So these are the tools that Officer Cote brought

21   down to you as representing as having been the tools that

22   he collected from the roof, correct?

23      A.   Yes.

24      Q.   And so inside this box is this particular tool,

25   correct?

APPENDIX 24

1    A.   No, ma'am.

2    Q.   His name wasn't on any of the items in the

3 backpack?

4    A.   No.

5    Q.   You never sent that bottle of water to the

6 Florida Department Of Law Enforcement for DNA testing, did

7 you?

8    A.   No.

9    Q.   You never sent the deodorant stick to the Florida

10 Department Of Law Enforcement for DNA testing, correct?

11   A.   Correct.

12   Q.   So -- strike that.

13        And you are aware that this was an abandoned

14 business?

15   A.   Yes.

16   Q.   It had been closed for a while?

17   A.   Yes.

18   Q.   So you don't know whether any of the items that

19 were collected were present in that building before

20 December 31, 2014?

21   A.   No, I do not.

22   Q.   Now, you were aware that there was a

23 confrontation between Mr. Washington and law enforcement

24 and a K-9 downstairs when he was apprehended, correct?

25   A.   Yes.

APPENDIX 24

1       Q.   In fact, you photographed some droplets of blood

2   from where Mr. Washington had been bit by the dog?

3       A.   Yes.

4       Q.   In that area, you collected, I believe, that

5   knife blade that you just showed to the jury?

6       A.   Yes, ma'am.

7       Q.   Did you collect the -- a small flashlight in that

8   area?

9       A.   I don't recall, no.

10      Q.   Did anybody point out a small flashlight to you

11  in that area?

12      A.   No.

13      Q.   Did you ever photograph a small flashlight in

14  that area?

15      A.   No.

16      Q.   Did you ever photograph any flashlight on the

17  property?

18      A.   No.

19      Q.   Did you ever collect any flashlight on the

20  property?

21      A.   The only flashlight was inside the backpack.

22      Q.   Okay.  But this backpack was the backpack that

23  was down by the front door?

24      A.   Yes.

25      Q.   And is this the flashlight you are talking about?

*APPENDIX 24*

415

1      A.   Yes.  There might be others in there, as well.

2      Q.   Okay.  But nothing was actually collected on the

3  floor sprawled out in the area of the knife blade?

4      A.   No.

5      Q.   Those are also a package of razor blades in the

6  backpack?

7      A.   Yes.

8      Q.   And they could have also been sent off to FDLE

9  for testing, correct?

10     A.   Yes, they could.

11     Q.   And that didn't happen?

12     A.   No.

13     Q.   Now, you photographed the downstairs area of the

14  building yourself, correct?

15     A.   Yes.

16         MS. GOERNER:  I'm sorry, Your Honor.  Just one

17     moment.

18         THE COURT:  That's fine.

19         MS. GOERNER:  May I approach the witness?

20         THE COURT:  Yes.

21  BY MS. GOERNER:

22     Q.   I'm going to show you what's previously been

23  marked as State's KK for identification, and ask you to

24  take a look at that.

25         Do you recognize that?

*APPENDIX 25*

1       Q.   So you are the one that pried it open with a

2   crowbar?

3       A.   Yes, ma'am.

4       Q.   And when you-all went inside the door, you-all

5   went inside the building?

6       A.   Yes, ma'am.

7       Q.   Looking for the suspect?

8       A.   Yes, ma'am.

9       Q.   And didn't find him?

10      A.   No, we did not.

11      Q.   And you didn't go up onto the roof, correct?

12      A.   No, I did not.  After -- I did go up after he was

13  detained to take pictures.

14      Q.   Okay.  So you didn't go up onto the roof looking

15  for the suspect?

16      A.   No, I did not.

17      Q.   And you never saw the suspect or Mr. Washington

18  up on the roof?

19      A.   No, I did not.

20      Q.   You never saw Mr. Washington with any kind of

21  saw?

22      A.   No, I did not.

23      Q.   Any kind of bolt cutters?

24      A.   No, I did not.

25      Q.   You never saw Mr. Washington with any knife?

*APPENDIX 25*

1   A.   No, I did not.

2   Q.   You never saw Mr. Washington with any kind of

3   copper?

4   A.   No, I did not.

5   Q.   You ever see Mr. Washington near any copper?

6   A.   No, I did not.

7   Q.   Now, you hadn't been up on that roof before that

8   day, correct?

9   A.   No, I had not.

10   Q.   So when you went up on the roof after the fact to

11   take photographs, you saw the condition of the

12   air-condition units?

13   A.   Yes, I did.

14   Q.   You didn't know when that damage occurred to

15   those you units, do you?

16   A.   No, I do not.

17   Q.   You don't know if that damage occurred prior to

18   December 31, 2014, do you?

19   A.   No.

20   Q.   I imagine one of the pictures that you -- I guess

21   you saw a pile of copper near one of the units?

22   A.   Yes, ma'am.

23   Q.   You don't know when that pile of copper was cut

24   away, do you?

25   A.   No, I do not.

APPENDIX 26

1       **MR. OSTROFF:**  When Your Honor discharged the

2    public defender, we then called Mr. Washington back in

3    the next day.

4       **THE COURT:**  Oh.

5       **MR. OSTROFF:**  The State was ready for trial.  At

6    that point, he requested a continuance.  And

7    Your Honor briefed him on that means he would waive

8    speedy trial.

9       **THE COURT:**  Okay.  Good.  It is there.

10       (Pause in proceedings.)

11       And, Mr. Washington, before we start the trial, I

12    would go through the same questions I did before.  I'm

13    not required today to make sure you're doing a --

14    knowing, informed decision about representing

15    yourself.  We talked about it before.  Every stage, I

16    need to redo it again.  And the next material stage, I

17    think, would be jury selection.  And we'll go through

18    the same questions again.

19       But I would ask you to reconsider.  You're

20    charged with -- Count 1 is punishable by life in

21    prison.  I'm not so sure it's a good idea to represent

22    yourself.  We talked about that before.  If you want

23    to, you can do it.

24       **THE DEFENDANT:**  Sir, I don't feel like it's a

25    good idea, but my -- the officers -- the lawyers I had

APPENDIX 26

1  representing me, they knew to file a motion to compel

2  and a public records request back in January.  I

3  notified them everything that I've notified the Court,

4  and it seemed like they just made every effort to make

5  it possible for the tape that I know that can clear me

6  to become a possibility.  It was like a sure thing

7  within the first 20, 30 days, and I was writing

8  letters every day explaining my situation.  So I'm

9  like, I need representation, but I know it's not the

10  best that I'm getting.  I'm like -- I feel like they

11  just representing me in a way that would set me up for

12  the prosecutor.  That's what it seemed like because

13  I'm asking them -- this is what happened and this was

14  recorded.  And now it's a debate as to whether or not

15  it even exists.

16      Man, it just -- it's just -- I did all I could to

17  try to provide assistant to my representation, and

18  it's just like I'm falling short.  And I guess it's

19  hard for me to trust somebody else to do something

20  that I know that it'll take a little time.  I'll

21  figure out how to do it just as good myself.  I'm just

22  not trying to get rushed in a trial situation where

23  I'm not prepared because I don't have access to the

24  legal information that he has.  I don't have the

25  knowledge and experience, but I don't have the trust

APPENDIX 26

1    and the -- and the support of the lawyer that has been

2    representing me so far. So I'm -- up until I see

3    where it's to my best interest to trust another

4    lawyer, I'm saying I'd rather do it by myself.

5        THE COURT:  Well, I think under the circumstances

6    and the work that you need to do, we're going to have

7    to continue your trial. Okay? Which we'll do. And

8    if you need us to instruct the clerk to issue trial

9    subpoenas, we can do that. But we're going to have to

10   move your trial to a pretrial on August the 25th.

11       MR. OSTROFF:  Is it possible to move this one to

12   July, Your Honor? Because the only contact I can have

13   is when we're in court. And so this way at least I

14   can update Mr. Washington a little bit faster about

15   what steps I've taken to see if the body camera still

16   exists, or the results of that. Otherwise, all I can

17   do is mail stuff to him at the jail and hope that he

18   gets it.

19       THE COURT:  Well, if -- if body cam exists, you

20   know, we do grant the motion. We've just given you a

21   continuance -- or we will. At least, let's talk about

22   the day in a second. We'll give you ten days.

23   That's -- gets you into next week. If it exists, you

24   got to get it to him within ten days.

25       MR. OSTROFF:  For the body camera?

APPENDIX 27

| | |
|---|---|
| 1 | THE COURT:  What was the name? |
| 2 | MR. MATERA:  James. |
| 3 | THE COURT:  James? |
| 4 | MR. MATERA:  John James. |
| 5 | JOHN JAMES |

6  was called as a witness and, having first been duly sworn,

7  testified as follows:

8  THE WITNESS:  Yes, ma'am.  I do.

9  THE COURT:  Hello, sir.  You may be seated.

10  THE WITNESS:  Thank you, Your Honor.

11  THE COURT:  Please tell us your name.

12  THE WITNESS:  John Seth James, Your Honor.

13  THE COURT:  You may inquire, Counsel.

14  DIRECT EXAMINATION

15  BY MR. MATERA:

16  Q.  Officer James, please introduce yourself to the

17  jury.

18  A.  Yes, sir.

19  Good morning.  I'm officer John Seth James with

20  the Orlando Police Department.

21  Q.  How long have you been employed at the Orlando

22  Police Department?

23  A.  I have been with the City of Orlando since 2001,

24  sir.

25  Q.  So around 15 years, sir?

Ninth Judicial Circuit
Court Reporting Services

*APPENDIX 27*

1      A.   Yes, sir.

2      Q.   You have any prior law enforcement experience?

3      A.   No, sir.  I do not.

4      Q.   Before becoming a law enforcement officer, what

5   type of training did you receive?

6      A.   Are you referring to the basic law enforcement

7   academy?

8      Q.   Yes, sir.

9      A.   Just that.

10      Q.   Okay.  On December 31 of 2014, in the morning,

11   were you issued a body camera from the Orlando Police

12   Department?

13      A.   Yes, sir.  I was.

14      Q.   Do you recall being called out to 5705 LaCosta

15   Drive on that day?

16      A.   Yes, sir.  I do.

17      Q.   And at that time, did you have the body camera on

18   you?

19      A.   Yes, sir.

20      Q.   Explain to the jury what a body camera is.

21      A.   Yes, sir.

22           The body camera is a recording device that is

23   issued to our officers mostly for transparency.  It's an

24   active recording, kind of like the cameras that are always

25   in the police cars.  What it does is it gives a better view

APPENDIX 27                                    334

1    of an up-close personal encounter.  That way it records

2    both the video and the audio of anything that an officer

3    might say or an individual might say during an

4    investigation of a crime.

5        Q.   Where do you keep the body camera on your person?

6        A.   When I am on the road and operating with the body

7    camera, there's one up on my vest, which would be kind of

8    where my glasses are.

9        Q.   On that day, you had a body camera?

10       A.   Yes, sir.  I did.

11       Q.   Were you aware whether this body camera was

12   working at that time?

13       A.   It was.  Yes, sir.

14       Q.   When you reached at the scene, 5750 LaCosta

15   Drive, where did you put the body camera?

16       A.   Initially when I arrived or once I --

17       Q.   When you arrived, where did you have the body

18   camera?

19       A.   It was still on my lapel.

20       Q.   After arriving and being briefed by the officer,

21   where did you place the body camera?

22       A.   The body camera, the way it attaches to our

23   polyester uniform is by a magnet, which means it can be

24   attached to any metal object or any opposite magnet for

25   officer safety concerns.  With the description that was

Ninth Judicial Circuit
Court Reporting Services

APPENDIX 27                                    335

1   given to me by the initial officers on scene, instead of

2   putting officers with guns in a confrontation, possibly,

3   the decision was made to remove the body camera from my

4   uniform, place it onto a metal pole.

5           The body camera, because it is a recording

6   device, is -- allows us to have access through Bluetooth

7   within a short range to witness what is actually going on.

8   For example, if I have the body camera with me, I could

9   actually turn it on and show you on my phone what is being

10  recorded.  So this was a tactic used for officer safety to

11  try to clear the roof and look for the initial suspect,

12  sir.

13      Q.   On December 31st of 2014, was the body camera a

14  fairly new system to the Orlando Police Department?

15      A.   Yes, sir.  Only been out for a few months.

16      Q.   Did your body camera capture anyone on the move?

17      A.   No, sir.  It did not.

18      Q.   Was the body camera given back to you?

19      A.   Yes.

20           The body camera was with me the entire time, but

21  it went from my uniform, my shoulder to the pole to be used

22  in an attempt to locate a suspect.  And then I retained it

23  and put it back on my uniform, sir.

24      Q.   Where did you go after you obtained the body

25  camera back from the pole?

APPENDIX 27                                        339

1        A.     As you previously stated, Counsel, the body

2    camera, the Orlando Police Department was still in the test

3    phases to see if it would be appropriate for the community

4    and for the officers for transparency.  One of the initial

5    requirements was once we arrived on scene is to activate

6    the camera to have it to record.  We are -- we were

7    instructed at the time not to review or check anything on

8    the camera until after an incident was cleared.  That way

9    you would ensure that anything that we were doing would be

10   recorded for the video and the audio, so it was a

11   requirement that once everything is done.

12        For example, when our investigation is complete,

13   we will then check and see what was recorded.  And at the

14   time it was then to make notification that, okay, it did

15   record, this is how it's properly saved.  Or if it's not,

16   to notify our chain in command so it would be documented.

17        Q.     How is it attached on your lapel of your uniform?

18   Explain the wiring, how --

19        A.     Yes, sir.

20        Unfortunately, being it's newer technology to law

21   enforcement, it's, I guess, still in a testing phase.  The

22   body camera is three separate components.  There is a

23   camera portion as we were describing, which is what is on

24   my lapel.  The camera portion is ran by a battery pack,

25   which is kept either on our gun belt or in our pockets.

APPENDIX 27                                            340

1   Connecting with the camera to the battery pack is a wire

2   cord.  The wire cord plugs into the camera and then plugs

3   into the battery.  Any tug of the cord or anything of that

4   nature can -- it can become dislodged.  That is one of the

5   issues with the camera.  Once it's dislodged, the camera

6   doesn't have power.  The camera will not record.

7        Q.   Had your body camera even functioned properly at

8   that time, would you have observed the K-9 make a bite on

9   the defendant?

10       A.   No, sir.  I was not there at that time.

11            MR. MATERA:  No further questions, Judge.

12            THE COURT:  Any questions from the defense?

13            MS. GOERNER:  Yes, Your Honor.

14                      CROSS-EXAMINATION

15  BY MS. GOERNER:

16       A.   Good morning, ma'am.

17       Q.   Good morning, sir.

18            When you responded out to this Perkins, was this

19  part of your normal patrol routine?

20       A.   I was requested by dispatch to respond.  There is

21  an area -- my main responsibility of patrol, yes, ma'am.

22  But I was called after the fact.

23       Q.   No, that's fine.  But it's an area that you

24  regularly patrol?

25       A.   Yes, ma'am.

APPENDIX 27

1      Q.   So you are familiar that this business had been

2   abandoned?

3      A.   Yes, ma'am.

4      Q.   Had been closed down?

5      A.   For some time.  Yes, ma'am.

6      Q.   For some time?

7      A.   Yes, ma'am.

8      Q.   You are familiar with the homeless population

9   that kind of frequented, I guess, the park area nearby?

10     A.   Are you referring to the LaCosta Wetlands, ma'am?

11   I guess, east of that location?

12     Q.   Wherever the homeless people gather.

13     A.   Yes, ma'am.

14     Q.   It was pretty close by?

15     A.   Unfortunately, there's a lot of unfortunate

16   people in that area.  Yes, ma'am.

17     Q.   Okay.  And in responding to this particular

18   incident, you were not in the first group of officers that

19   responded, correct?

20     A.   That is correct, ma'am.  I was not.

21     Q.   You were in the second group of officers?

22     A.   Yes, ma'am.

23     Q.   Okay.  And when you responded, you had your --

24   you turned on your camera -- your body camera?

25     A.   Yes, ma'am, when I arrived on scene.

APPENDIX 27

```
 1        Q.    So you were recording from that moment, correct?

 2        A.    Yes, ma'am.

 3        Q.    And the camera was functioning properly?

 4        A.    Yes, ma'am.

 5        Q.    Now -- and at some point you took the camera off

 6   your person and put it on a pole?

 7        A.    Yes, ma'am.

 8        Q.    And you extended the pole up so you could see

 9   onto the roof.

10              Is that what you did with it?

11        A.    Yes, ma'am.

12        Q.    And so it recorded on top of the roof, correct?

13        A.    Yes, ma'am.

14        Q.    And you actually reviewed that footage, correct?

15        A.    Myself and a supervisor, yes, ma'am.

16        Q.    And in reviewing that footage, y'all did not

17   provide copies to the State to review?

18        A.    No, ma'am.

19        Q.    You didn't provide copies to the defense to

20   review?

21        A.    No, ma'am.

22        Q.    You and another officer made a decision that it

23   was not of evidentiary value?

24        A.    No, ma'am.  I would disagree with that.

25        Q.    Okay.  Well, you didn't save the video, correct?
```

APPENDIX 27

344

1    not that you reviewed the footage after?

2         A.    It's a live feed.  Yes, ma'am.  Like I explained.

3         Q.    Okay.  And isn't it true that your department's

4    policy at that time was that it was, in fact, recording,

5    and it was destroyed 30 days later?

6         A.    Yes, ma'am.  When there's not a request -- a

7    public records demand for a video, because of all the

8    length and space that it retains, the department does purge

9    that after 30 days.  Yes, ma'am.

10        Q.    So there was a recording?

11        A.    Yes, ma'am.

12        Q.    Okay.  And so after you took that camera off the

13   pole, you put it back on your person?

14        A.    Yes, ma'am.

15        Q.    And you then proceeded to assist other law

16   enforcement in looking for the suspect, correct?

17        A.    Yes, ma'am.

18        Q.    And you believed that your camera was working

19   properly then?

20        A.    I can only make that assumption.  Yes, ma'am.

21        Q.    Because it had been working properly before?

22        A.    Correct, ma'am.  Yes, ma'am.  I agree with you on

23   that, Counsel.

24        Q.    And when you made entry into the building, you

25   were the one that was deploying the Clear Out?

APPENDIX 27

1      A.   Yes, ma'am.

2      Q.   And about how many cannisters of that did you go

3   through?

4      A.   Twenty canisters to my recollection, ma'am.

5      Q.   So that would be pretty strong?

6      A.   If they were given in one area, yes, it would be.

7      Q.   How long does the effects of that Clear Out last

8   after you deploy a cannister?

9      A.   It varies, depending on the amount of exposure

10   and, again, how confined of a space it is.

11      Q.   In that particular building, you have on gas

12   masks, correct?

13      A.   Yes, ma'am.  I did.

14      Q.   The other law enforcement officers had gas masks

15   on?

16      A.   That is correct.

17      Q.   Typically, how long does the effects of that

18   Clear Out last in that particular space that you were in,

19   the Perkins?

20      A.   It can last anywhere from 15 to 30 minutes.

21      Q.   Fifteen to thirty minutes?

22      A.   Yes, ma'am.

23      Q.   And you said that eventually you observed the

24   suspect being in the process of being handcuffed, correct?

25      A.   That is correct, Counsel.

## APPENDIX 27

```
1        Q.   Did you see anything in his hands?

2        A.   No, ma'am.  I saw officers trying to handcuff

3   him.

4        Q.   Did you see any gloves on him on his hands?

5        A.   Not that I recall.  But I don't have recollection

6   of his hands, ma'am.

7        Q.   Did you actually go up onto the roof to look for

8   the suspect?

9        A.   Yes, ma'am.

10        Q.   You didn't see him on the roof, did you?

11        A.   No, ma'am.

12        Q.   You never saw him -- you saw the dismantled A/C

13   handlers on the roof?

14        A.   The aftermath of it.  Yes, ma'am.

15        Q.   You don't have any idea when those A/C handlers

16   became dismantled, do you?

17        A.   No, ma'am.

18        Q.   You don't have any idea who did that, do you?

19        A.   No, ma'am.  I did not witness that.

20        Q.   You never saw Mr. Washington with any kind of

21   tools?

22        A.   No, ma'am, not in any of my -- my up-close

23   encounters with him.  No, ma'am.  I did not.

24        Q.   You never saw Mr. Washington with or near any

25   kind of backpack?
```

*APPENDIX 27*                                                        347

1       A.   No, ma'am.  I did not.

2       Q.   And you didn't hear Mr. Washington making any

3    statements, did you?

4       A.   Just -- I want to make sure, during the incident

5    or --

6       Q.   At any time.

7       A.   Respectfully, Counsel, I was with the

8    transporting officer to take Mr. Washington for medical

9    treatment from the scene to the local hospital.

10      Q.   So while at the Perkins, you didn't hear

11   Mr. Washington make any statements, did you?

12      A.   That's what I wanted to clarify.  No, ma'am.  I

13   did not hear him make any statements while on scene.

14      Q.   And you don't know whether or not any damage to

15   those air handlers had, in fact, occurred prior to

16   December 31, 2014, do you?

17      A.   No, ma'am.  I have never been on that roof

18   before, ma'am.

19           MS. GOERNER:  May I have just a moment?

20           THE COURT:  You may.

21           MS. GOERNER:  I have nothing further, Your Honor.

22           THE COURT:  Any redirect?

23           MR. MATERA:  No, Your Honor.

24           THE COURT:  Members of the jury, do you have any

25           questions of the witness?  If so, please raise your

# CASE SUMMARY
## CASE NO. 2014-CF-003958-A-O

| | |
|---|---|
| 01/07/2015 | **Status Hearing** (1:30 PM) (Judicial Officer: Court, Veteran)<br>*Veterans Court* |
| 01/09/2015 | Order<br>*to Discharge Case from Veterans Court (**Reset in Div 19)* |
| 01/23/2015 | Written Plea of Not Guilty; Waiver of Arraignment |
| 01/28/2015 | **Arraignment** (8:30 AM) (Judicial Officer: Thorpe, Janet C)<br>*DETERMINATION OF NEW TRIAL DATES* |
| 01/28/2015 | Correspondence Received from Judge |
| 01/28/2015 | Court Minutes |
| 03/05/2015 | **Case Management Conference** (9:30 AM) (Judicial Officer: Egan, Robert J) |
| 03/05/2015 | Commitment Issued |
| 03/05/2015 | Order of Disposition |
| 03/05/2015 | Order for Cost Recorded |
| 03/05/2015 | Order for Cost Recorded |
| 03/05/2015 | Sentence Guidelines Score Sheet |
| 03/05/2015 | Restitution Order / DNA Order / Victim Form |
| 03/05/2015 | Notice of Fines and Costs - Courtroom generated |
| 03/05/2015 | **Sentence** (Judicial Officer: Egan, Robert J)<br>1. GRAND THEFT THIRD DEGREE<br>    Adult Type - Criminal Non Citation<br>    Confinement (Effective 03/05/2015, Min. Not Applicable, Max. 17.7 Mo , Department of Corrections)<br>      Credit for Time Served: 331 Days<br>    Sentence Status (Concurrent, Any active sentence being served)<br>    Provisions (Provisions Confinement or Fine) |
| 03/05/2015 | Court Ordered Payment Due |
| 03/05/2015 | Sentence |
| 03/06/2015 | Bond Discharged |
| 03/10/2015 | Commitment Packet Sent to Dockets |
| 04/07/2015 | *CANCELED* Pre-Trial Conference (8:30 AM) (Judicial Officer: Egan, Robert J)<br>*Case Closed Prior to Hearing*<br>*Trial 4/20/2015* |

| DATE | FINANCIAL INFORMATION | |
|---|---|---|
| | **Defendant** WASHINGTON, JAMES EDWARD | |
| | Total Charges | 668.00 |
| | Total Payments and Credits | 0.00 |
| | **Balance Due as of** 2/17/2016 | 668.00 |

*Printed on 02/17/2016 at 1:39 PM*

# CASE SUMMARY
## CASE NO. 2014-CF-004840-A-O

| | |
|---|---|
| 10/08/2014 | Status Hearing (1:30 PM) (Judicial Officer: Brewer, Jerry L) |
| 10/08/2014 | Court Minutes |
| 10/08/2014 | Per the Court:<br>*COURT WITHDRAWS COMMITMENT ORDERS.* |
| 10/13/2014 | Arrest Affidavit |
| 10/13/2014 | Court Minutes<br>*IA* |
| 10/13/2014 | Advice to Defendant, First Appearance |
| 10/14/2014 | Order<br>*to Release ROR* |
| 10/14/2014 | ROR Form - Orange County Corrections |
| 10/16/2014 | Warrant Returned Served<br>*Commitment Order* |
| 11/12/2014 | Status Hearing (1:30 PM) (Judicial Officer: Brewer, Jerry L)<br>*Veterans Court* |
| 11/12/2014 | Status Hearing (1:00 PM) (Judicial Officer: Brewer, Jerry L)<br>*Added because of a Clerk Edition Walk In* |
| 11/12/2014 | Court Minutes |
| 01/07/2015 | Status Hearing (1:30 PM) (Judicial Officer: Court, Veteran)<br>*Veterans Court* |
| 01/09/2015 | Order<br>*to Discharge Case from Veterans Court (\*\*Reset in Div 11)* |
| 01/13/2015 | Sentencing (9:00 AM) (Judicial Officer: Lubet, Marc L) |
| 01/13/2015 | Court Minutes |
| 01/26/2015 | Sentencing (9:00 AM) (Judicial Officer: Lubet, Marc L) |
| 01/26/2015 | Fines & Costs Reduced to Judgment<br>*Costs Previously Imposed at Plea on 4/18/2014.* |
| 01/26/2015 | Disposition (Judicial Officer: Lubet, Marc L)<br>001. BURGLARY OF STRUCTURE<br>1 - Adjudicated Guilty<br>OBTS: 8888888888  Sequence: 001 |
| 01/26/2015 | Sentence (Judicial Officer: Lubet, Marc L)<br>001. BURGLARY OF STRUCTURE<br>Adult Type - Criminal Non Citation<br>Provisions (Provisions Confinement or Fine,<br>Other Court Restrictions/Judicial Warning)<br>Confinement (Effective 01/26/2015, Min. Not Applicable, Max. 24 Mo , Department of Corrections) |

*APPENDIX 29*

## APPENDIX 30

1                    **IN THE CIRCUIT COURT OF THE**
                            **NINTH JUDICIAL CIRCUIT, IN AND**

2                    **FOR ORANGE COUNTY, FLORIDA**
                   **CRIMINAL JUSTICE DIVISION**

3

4   **STATE OF FLORIDA,**

5        Plaintiff,

                    **CASE NO.: 48-2014-CF-17252-A-O**

6   **vs.**

                    **DIVISION NO.: 19**

7   **JAMES WASHINGTON,**

8        Defendant./

9

10                       **HEARING**

11                       **BEFORE**

12       **THE HONORABLE ROBERT J. EGAN**

13                 In the Orange County Courthouse
                  Courtroom 18D

14                 Orlando, Florida 32801
                  July 21, 2015

15                 Christine Lively, CER, CET

16

17   **A P P E A R A N C E S:**

18   **JORDAN OSTROFF, ESQUIRE**
    Office of the State Attorney

19     415 North Orange Avenue
    Building B

20     Orlando, Florida 32801
    On behalf of the State

21

    **JOANNA OPATO, ESQUIRE**

22   **Office of the Public Defender**
    435 North Orange Avenue

23     Suite 400
    Orlando, Florida 32801

24

25

APPENDIX   30

1                           —    —    —

2                      P R O C E E D I N G S

3              (The following proceedings commenced on

4      July 21, 2015, at 1:38 p.m.)

5              THE CLERK:  State of Florida vs.

6      James Edward Washington.  Case No. 2014-CF-17252.

7              THE COURT:  Okay.  And good afternoon,

8      Mr. Washington.

9              THE DEFENDANT:  How you doing, sir?

10             THE COURT:  Doing well.  Thank you.

11             We had you brought over here today for a pretrial

12     conference.  I know you're set for trial coming up

13     next month.  And right now we still have you

14     representing yourself.  Is that right?

15             THE DEFENDANT:  Yes, sir.

16             THE COURT:  Mr. Ostroff, anything you want to --

17             MR. OSTROFF:  Yes, Your Honor.  A couple things

18     to address.

19             Firstly, I know we made sure that Ms. Opato was

20     here.  She's standby counsel for the Defense.  Last

21     time we were here, which I believe I sent the audio --

22     or at least I filled Ms. Opato in on what happened --

23     was the defendant's motion to compel, or the first

24     motion to compel.

25             THE COURT:  Uh-huh.

*APPENDIX  30*

3

1      **MR. OSTROFF:**  So I sent the defendant an e-mail

2      response that I got that there was nothing uploaded by

3      that officer on that night, or it had a range of a

4      couple days before and after.  But there was nothing

5      uploaded from this, so there would be no body camera

6      footage that anybody could find for this case.

7          I know, subsequent to that, the defendant made

8      another filing that was initially rejected because it

9      was still showing he was represented by the PD, so I

10     was hoping we could address that motion today.  I

11     don't know if Your Honor has a copy.  If not, I can

12     pull it up.

13     **THE COURT:**  Okay.  It's a -- let me see -- motion

14     to compel.

15         Let's see.  June 29th?

16     **MR. OSTROFF:**  That sounds about right.  I know

17     I -- I contacted your JA when I got the -- when I got

18     back, that it had been denied, and then was told the

19     earliest we'd have would be today, because of being in

20     the trial period.  So I was hoping we could just

21     address that motion filed by the defendant.

22     **THE COURT:**  Well, this one lists six things.

23         No. 1, official documentation of the chain of

24     custody of the body camera.

25         2, official policy on how, when and where to

APPENDIX   30

1    destroy body camera evidence.

2         3, list of cases where body camera evidence was

3    destroyed or tampered with during prosecution.

4         4, a list of cases involving K9 dog bites over

5    the last year, and the types of injuries sustained.

6         5, employment records for police officers

7    involved at arrest.

8         And 6, criminal records --

9    **MR. OSTROFF:**  Correct.  For, I believe two other

10   cases.

11   **THE COURT:**  Discovery of criminal records of

12   Orlando Police Department or law enforcement

13   agencies -- yes.  And -- no, that's it.

14   **MR. OSTROFF:**  And I believe I -- I believe, for

15   the most part, I don't have a position on any of

16   those.  Those would have to be public records requests

17   through OPD.  Many of those documents, we don't have

18   access to in any way, shape or form.

19        And then in regards to any body camera footage or

20   chain of custody on this case, it won't exist, because

21   at least I can't find any body camera footage for this

22   case.

23        So I believe in terms of any sort of hearing

24   further, there would have to be notice to OPD,

25   coordinated with whoever over there would handle this

*APPENDIX   30*

5

1    thing so that they know who to bring in to answer

2    those questions.  Unfortunately, me as the prosecutor,

3    is not in a position to present any evidence of the

4    OPD procedures.

5         **THE COURT:**  Okay.  Mr. Washington, the things

6    that you requested are the sorts of things that

7    typically would be done by either an attorney or

8    investigator.  They're not necessarily evidence

9    that's -- the State would disclose in this case.

10   It's -- you'd either take a deposition of a records

11   custodian or a police officer, or make a public

12   records request, or have an investigator to go do some

13   legwork on -- on your behalf.

14        I know it's difficult for you because you're

15   currently incarcerated, but I would deny the motion to

16   compel.  I don't think that it's -- what you've

17   requested, some of it makes some sense, but it would

18   not be subject to -- to the type of things that we

19   would require the State to compel.  They're things

20   that you would investigate on your own.

21        I would like to talk to you more about whether

22   you -- you still think representing yourself is a good

23   idea.

24        **THE DEFENDANT:**  Well, sir --

25        **THE COURT:**  You're welcome to do that, of course;

*APPENDIX 30*

1    we've talked about that.  We've talked about the

2    difficulty for anyone to do that in a case like this,

3    let alone someone who's currently incarcerated.

4         So have you given that some thought?

5         **THE DEFENDANT:**  Sir, my problem is that I feel

6    like a Richardson hearing should be conducted, because

7    they're hiding evidence that they got written in their

8    reports.  They wouldn't have never wrote it in their

9    reports if they never did have it.  By them denying

10   it, it don't mean it never did exist.  They saying,

11   they can't find it.  If they found they don't have

12   evidence that's favorable to me and they don't

13   disclose it, I got the right to have the case

14   dismissed.

15        So it should be determined, one way or another,

16   whether or not they got the evidence or they destroyed

17   it in order to conceal what actually transpired.

18        I was lynched.  They held me down and let the dog

19   bite me and had it recorded and got rid of the

20   evidence.  That's what I -- I was there.  I was the

21   one held down, being bit by a dog while I was in

22   custody.

23        **THE COURT:**  Well, I'm --

24        **THE DEFENDANT:**  And I heard them record it.

25        **THE COURT:**  I'm being told that video was not

*APPENDIX   30*

1 uploaded.  And that's the extent of what I know.  I

2 know as much as you do now.  But --

3   **THE DEFENDANT:**  But -- and then another thing,

4 sir, they -- I got a letter form one of the -- the

5 inmates saying that Department of Corrections don't

6 allow CDs, and they didn't allow me the tape that he

7 sent for me to review, to listen to --

8   **THE COURT:**  Uh-huh.

9   **THE DEFENDANT:**  -- a deposition.  And I finally,

10 after a couple of weeks, got access to the tape at

11 3:00 o'clock in the morning to find out it wasn't a

12 deposition, it was a copy of the pretrial conference

13 we had last on the -- on the 16th.

14   **THE COURT:**  Okay.

15   **THE DEFENDANT:**  I never heard a deposition up

16 until this day.  I don't know what's on it.  And -- to

17 also be threatening me about being overburdened about

18 trying to get access to material that, if it was

19 written in the form of a transcript, I wouldn't have

20 to ask for officers to give me access to a recorded

21 tape that they got in their possession.  I never had

22 that in my possession.  And according to this letter,

23 the Public Defender's Office knew that I couldn't have

24 got that.  They told Opato that the state attorney

25 knew I wouldn't be able to get that CD also.  Now I

*APPENDIX  30*

1    find out it's not even what we requested.  It's a

2    pretrial conference.  I still don't know what's on the

3    deposition.

4           THE COURT:  Okay.

5           MR. OSTROFF:  Can I address that issue?

6           THE COURT:  Sure.

7           MR. OSTROFF:  So the last time we were in court,

8    the issue of the depositions came up.  And I said that

9    the Public Defender's Office had them, I had copies,

10   and then I e-mailed copies to Your Honor because there

11   was no other way for me to get them to the defendant.

12   I then, after that, found out that we can, in fact,

13   send disks to the jail.  So at the last hearing, I had

14   the audio pulled, sent that to you.  And I believe

15   sent a copy to Ms. Opato, so that she was caught up.

16   I'm not certain about that one.  And then I got

17   contacted by the -- somebody at the Orange County Jail

18   to make sure that was intentional, that they would

19   give him access to something to listen to the disk

20   with.

21       I believe we talked last time about possibly

22   having Your Honor issue an order to transcribe the

23   depo, so that way the defendant can just have the

24   transcription, because of how difficult it is to get

25   disks to him.  However, from the last hearing, I had

*APPENDIX 30*

```
1     no interest in transcribing it, so that's why I just
2     double-checked that he could get an audio copy.  In
3     terms of when they give him access to, I have no
4     control over that.
5           THE COURT:  What was on the disk?
6           MR. OSTROFF:  The disk was the last hearing we
7     had.  As --
8           THE COURT:  Okay.  And he -- Mr. Washington is
9     looking for a deposition.
10          MR. OSTROFF:  Correct.
11          THE COURT:  Okay.
12          MR. OSTROFF:  And so last time we were here, the
13    last PTC, I sent a copy to Your Honor and -- and I
14    know we briefly discussed possibly just having
15    Your Honor order a transcription made of it.  I don't
16    have a problem with that.  Otherwise, I can't e-mail
17    him a copy of the depositions.  I can put them on disk
18    and send them.  But, again, we're going to run into
19    the same problem that he's having if they're not going
20    to let him use the computers until 3:00 o'clock in the
21    morning.
22          THE DEFENDANT:  And that's one time since I got
23    it on the 3rd of June.  And every other time, they be
24    confrontational on me to the point where I feel
25    threatened about asking about stuff that I wouldn't
```

APPENDIX 30                                    10

1    have to ask for if it was in written form instead of

2    video or audio.  It's like they going out their way to

3    try to do something that --

4         THE COURT:  I'm not going to have audiotapes

5    transcribed for you.  We do not have the resources to

6    do that.  Okay?

7         THE DEFENDANT:  But, sir, I hadn't even got a

8    deposition yet.

9         THE COURT:  Well, that's what we're going to try

10   to find out right now.  You -- you -- you don't

11   need -- he got the transcript of the hearing.

12        MR. OSTROFF:  Correct.

13        So the way it works is that when -- the

14   depositions were held at the Public Defender's Office.

15        THE COURT:  Right.

16        MR. OSTROFF:  At -- I believe it's once a week or

17   once every few days, it uploads from their system and

18   gets automatically put into our system.  So what I can

19   do, if this is the easiest thing, is I can copy it

20   from our system to a disk and send the disk to him.  I

21   have no control over what Corrections does --

22        THE COURT:  Right.

23        MR. OSTROFF:  -- and how often he gets access to

24   it or anything along those lines.

25        THE COURT:  But is that what you sent me, the

1        audio of the depositions?

2                MR. OSTROFF:  Yes, Your Honor.

3                THE COURT:  Because I don't remember getting --

4        Ms. Opato, in -- did you -- whatever you had, did you

5        give it over to Mr. Washington?

6                MS. OPATO:  Yes, Judge.  The -- and my position

7        would be the same as Ostroff's.  I checked with my

8        supervisor because I knew as soon as I was taken off

9        this case, that that would be the biggest hurdle --

10               THE COURT:  Uh-huh.

11               MS. OPATO:  -- is the depositions.  My

12       understanding is, is I can provide a disk and then,

13       you know, Corrections has to allow him the opportunity

14       to listen to those depositions on the disk.

15               THE COURT:  And --

16               MS. OPATO:  But I -- I'm -- I was -- I was

17       actually told I was not to order transcripts through

18       my office.

19               THE COURT:  Uh-huh.

20               MS. OPATO:  If that was something the Court did,

21       then, you know, that was . . .

22               THE COURT:  But, I mean, I don't -- that's not

23       tied in to the -- our official court reporters --

24       if -- I can have something transcribed that was done

25       in this room, but I don't think a deposition taken

APPENDIX 30

1    outside of the courthouse -- so . . .

2         MR. OSTROFF:  On 6/16 of 2015 at 2:33 p.m. and

3    2:34 p.m., I e-mailed copies of the two depositions to

4    Your Honor.

5         THE COURT:  June 16th?  Let me see.

6         MR. OSTROFF:  I can -- I mean, I can re-email

7    them.  That's fine.  I just -- in terms of the only

8    other option I have is to burn them to a CD and have

9    them sent to the jail.

10        THE COURT:  Okay.  Well, I think it's probably

11   the easiest way to do it, is -- is get them to you on

12   a CD, Mr. Washington.  But it still comes down to

13   whether you want to represent yourself.

14        THE DEFENDANT:  Sir, they got 24-hour access to a

15   CD that the Department of Corrections can use it to

16   deny me access to the same CD they can use and observe

17   and listen to any time they see fit.  Why constrain me

18   to the --

19        THE COURT:  You are incarcerated, sir.

20        THE DEFENDANT:  I understand that.  But there --

21        THE COURT:  Okay.  There are significant

22   limitations to your ability to represent yourself.

23   There's nothing I can do about that.  Okay?  I can let

24   Corrections know they are to give you access to a tape

25   recorder, but they also have security concerns that,

APPENDIX 30

1       frankly, I'm not going to be able to do anything

2       about.

3           We've talked about the decision and how wise or

4       unwise it is for you to represent yourself.  Okay?

5       And the constraints on you, being currently

6       incarcerated, make it much more difficult.  I

7       understand that.  But you chose to do this.  Every

8       time I see you, I give you a choice -- an option to

9       change your mind and give you a chance to do it again

10      today.  If you want to represent yourself, that's

11      fine, but you're going to have to live with the rules

12      that we're all dealing with.  And you are currently

13      incarcerated in the Orange County Jail.  Nothing I can

14      do about that.

15          So we can get these disks to you.  I can let the

16      chief down there know that you are to have access to a

17      player, a recording, some way to play those.  But

18      again, it may be at a weird time of night.  I don't

19      know.  But you think it's a good idea to represent

20      yourself.  We're have your trial in the next few

21      weeks.

22          **THE DEFENDANT:**  I know it ain't a good idea, sir,

23      but it wasn't a good idea having these people

24      represent me that I know is trying to sabotage my

25      defense.  And that's what they showing.  They should

APPENDIX 30

1    have been -- had the motion to compel, and wouldn't

2    have to go through this -- what I'm going through;

3    uncertainty about the type of people that trying to

4    represent my best interest.  They done show up and

5    they not trying to represent my best interest.  It's

6    slamming against me.  The Department of Corrections,

7    they threaten me every time I come out that cell to

8    get the information that would be more readily

9    accessible to me if it was in written form.

10        THE COURT:  Are you ready for trial?

11        MR. OSTROFF:  Yes, Your Honor.

12        THE COURT:  Okay.  So, Mr. Washington, we're

13    going to get the disks to you that have the audio of

14    the depositions you've been looking for.  We've denied

15    your motion to compel.

16        Anything else you want me to consider?

17        THE DEFENDANT:  No, sir.

18        (Pause in proceedings.)

19        THE COURT:  So, Mr. Washington, we're putting in

20    your court minutes that the county jail is to give you

21    access to equipment to -- for you to play the DVD

22    [sic] that  Mr. Ostroff is going to be providing to

23    you.  Okay?

24        THE DEFENDANT:  So, Judge, what if they decide to

25    give me access to it the day before trial, and that's

APPENDIX 30

1       the only day that they feel like, would that secure

2       some kind of concern that I'm only getting one day to

3       listen to a tape that going to be something that

4       determines the rest of my --

5           THE COURT:  Well, if you come over here on the

6       day of trial and you don't think you're sufficiently

7       prepared, you can ask me for a continuance and I

8       can -- would consider that.  Okay?  But we'll just

9       have to see how that plays out.

10          THE DEFENDANT:  All right, sir.

11          THE COURT:  Is there anything else you wanted to

12      talk about today?

13          But we can set Mr. Washington for a --

14          THE DEFENDANT:  Sir, I would like to motion for a

15      Nelson -- a Richardson hearing, 'cause I honestly know

16      that it was a tape of what actually transpired.  You

17      get them officers to acknowledge or really -- don't --

18      get interviews on record about what actually

19      transpired during that incident.  Let's not totally

20      ignore the fact that it's a tape is not being

21      accounted for.

22          THE COURT:  Okay.  The request has been made for

23      a Richardson hearing.  We can have that.  I don't know

24      if I know whether --

25          MR. OSTROFF:  I don't have it to turn over.  It's

APPENDIX 30

1       not something -- it's not late disclosure --

2            THE COURT:  Well --

3            MR. OSTROFF:  -- it's not --

4            THE COURT:  We know that, so the motion to compel

5       is denied.  I think the -- the suggestion is that

6       evidence -- evidence has been spoiled.

7            MR. OSTROFF:  And that wouldn't be proper for a

8       Richardson hearing.  There would be other hearings

9       that could be filed.  There's a Youngblood hearing,

10      which would require proof by the Defense of the

11      intentional destruction of evidence.  But from a

12      Richardson --

13           THE COURT:  I don't know.  Why wouldn't a

14      Richardson hearing -- I mean, if it existed at one

15      time and wasn't -- I'm not saying it was or wasn't.  I

16      don't know.

17           MR. OSTROFF:  Right.

18           THE COURT:  It was not disclosed or turned over,

19      why wouldn't that be Richardson?

20           MR. OSTROFF:  Because a Richardson hearing would

21      govern items that are in possession of the State that

22      are not turned over to Defense or turned over too late

23      or turned over incorrectly.  And I don't have it to

24      turn it over.  I wish -- I wish I had more

25      information.  I wish we did have the video.  I wish we

APPENDIX 30

1    knew what was going on, but I don't.  And everything

2    that I'm hearing is that there was never a video.

3         So if the -- if Mr. Washington believes that the

4    video was intentionally destroyed to -- for OPD to

5    cover themselves, that's not a Richardson hearing.

6    And that would require -- that would put the burden on

7    the Defense to show that it was intentionally

8    destroyed with asking -- I -- I don't even know where

9    you would start to figure out who might have done

10   this.

11        THE COURT:  Well, what was said about the camera

12   at the officer's deposition?

13        MR. OSTROFF:  The officer said that the camera is

14   worn on his lapel, that for some period of time, he

15   took the camera off his lapel, attached it to a

16   fireman's pole with the battery pack and some tape,

17   stuck it up into the ceilings of the building to see

18   if they could find Mr. Washington.  At no point were

19   they able to find Mr. Washington on that video

20   footage.  So then they decided to use Clear Out, I

21   think is the proper -- is the name of the chemical.

22   But basically it's like a -- it's basically like mace,

23   put a -- and then that officer is the grenadier, which

24   means he's the one in charge of doing that.  So he

25   then put on a flack jacket that says, grenadier, OPD,

APPENDIX 30

1    or whatever it is that has all the cannisters on it,

2    which would cover the camera anyway.

3         So he didn't have the camera on.  And even if

4    he'd still had the camera on, it wouldn't show any of

5    this.  At which point, the video footage not showing

6    that there was the defendant because they never found

7    him with the camera footage, that's why he didn't know

8    if it was ever uploaded or not, because it would be

9    from his standpoint, nonessential.  And I understand

10   that that may not be the best policy, but ultimately,

11   nobody can find that video in any way, shape or form

12   to show whether or not it does show the defendant or

13   it has sound or -- et cetera.

14        So I don't have the video to present.  Your Honor

15   can -- can suppress the evidence that I don't have.

16   And Mr. Washington, or whoever represents him, is free

17   to cross-examine the officer, same as was done in the

18   deposition, that hey, there was this video, where is

19   it.  And that's something that could be argued for

20   reasonable doubt.  But at the end of the day,

21   unfortunately, there's nothing for me to turn over, or

22   at least as of right now, from what I've been told by

23   everybody that I've asked.  Because I've tried to get

24   this video.

25        **THE DEFENDANT:**  Sir, Judge, I got Officer James'

1    narrative supplement where it on -- it -- I can read

2    it word for word, it say, on the roof, I observed a

3    red and black backpack and a knife and other tools and

4    stuff. And I got all pictures. That's why I've been

5    adamant with the State and Ms. Opato about the

6    evidence they turned over as pictures. And I got a

7    lot of pictures. And none of them show a backpack on

8    a roof. And this guy had on the camera at the time

9    that he was on the roof. The backpack that I see is

10   inside of a building. And the knife that they say

11   that was on the roof is inside the building. But I

12   don't have any pictures of what they said was on the

13   roof.

14        So if he had on the camera, which he did at the

15   time that he was on the roof, that would show that

16   that crime scene had been tampered with. So they

17   destroyed evidence that was favorable to me by getting

18   rid of it.

19        **THE COURT:** No one has established that anyone's

20   destroyed anything. Okay? I mean, these things come

21   out during effective cross-examination. If somebody

22   wrote somebody -- something in a report that's

23   inconsistent with what they're doing, that's what

24   lawyers do.

25        So the things you seem to be concerned about,

APPENDIX 30                                              20

1      Mr. Washington, are fine.  And -- but they're the type

2      of things that I think are best addressed with --

3      through cross -- effective cross-examination of the

4      witnesses that you're concerned about; in this case,

5      you know, law enforcement officers.  So I think it's

6      probably best addressed at trial.  Okay?

7           THE DEFENDANT:  Sir, and we never did, like, get

8      into, like, explaining how they were going about

9      getting the depositions done and how we're going to be

10     provided with transcripts or a copy of the CD once

11     they're done --

12          THE COURT:  Well, we're going to get you the CD

13     out there this week.  Okay?

14          THE DEFENDANT:  I'm talking about the future

15     depositions of the officers and my defense list

16     witness, Mr. John Sawicki.

17          THE COURT:  What do you want me to do about

18     Mr. Sawicki?

19          THE DEFENDANT:  Well, I'm saying -- I'm saying I

20     would like -- he say he's going to coordinate when

21     those depositions be done and the -- and the CD of

22     those depositions be provided to me at the jailhouse

23     also.

24          THE COURT:  Well, if you want to take a

25     deposition, you're going to have to do it yourself.

_APPENDIX 30_

1     **THE DEFENDANT:**  But, sir, I'm not -- I don't have

2     any means of having access to the coordinator without

3     writing them.  I don't have access to a phone.

4     **THE COURT:**  Well, if you want me to instruct the

5     Clerk of the Court to issue a subpoena -- but there

6     are security concerns, you know, which goes back to

7     whether it's a good idea for you to be representing

8     yourself.

9          But you're telling me you want to do a lot of

10    things.  I don't really have a specific request from

11    you, what you would like me to do.  Okay?

12         There's been insufficient discussion today that

13    there's been a Richardson violation.  Okay?  When we

14    take testimony at trial and you want to renew that

15    request, we can have a Richardson hearing in the

16    middle of the trial.  We excuse the jury.  We'll talk

17    about it.  But right now, we -- we would deny the

18    request for a Richardson hearing.  Okay?  You're

19    talking about depositions you want to take, but -- and

20    I know a name of Mr. Sawicki.  But what would you like

21    me to do about that?

22    **THE DEFENDANT:**  I would like to coordinate a

23    deposition for that witness, sir.

24    **MR. OSTROFF:**  For Mr. John Sawicki?

25    **THE DEFENDANT:**  Yes, sir.

*APPENDIX 30*

1       **MR. OSTROFF:**   That would be a Defense witness.

2       And I believe that's a -- would be a expert witness

3       called by the Defense.  I spoke with Mr. Sawicki.  He

4       explained that he had received some mail from

5       Mr. Washington, but had not had any direct contact.

6       And I believe Mr. Sawicki charges for his time.  I

7       don't want to depose him.  If we want to issue a

8       subpoena for him for trial, then that's a -- a

9       separate issue that would have to be dealt with.  But

10      in my discussion of -- of him, I don't know what he

11      has that's relevant to this case.

12          I believe he gave some sort of presentation or

13      news story regarding body camera footage and it being

14      mishandled in other cases.  I -- I believe that's what

15      he would be called to testify.  I'm not really sure.

16      But he'd be a Defense witness.

17          (Pause in proceedings.)

18          **THE COURT:**  Mr. Washington, if -- if I . . .

19          (Pause in proceedings.)

20          I presume there's been a previous waiver of

21      speedy.

22          **MR. OSTROFF:**  There's been several waivers of

23      speedy trial.  Yes.

24          (Pause in proceedings.)

25          **THE COURT:**  Okay.  Mr. Washington, what we're

APPENDIX 30

1    going to do is I'm going to continue your trial.

2    We're going to appoint the Office of Regional Conflict

3    Counsel to represent you.  Ms. Goerner, presumably,

4    G-o-e-r-n-e-r will be in touch with you.  Okay?

5    You're simply not equipped to do -- to represent

6    yourself effectively.

7         I'm not making any finding that the

8    Office of the Public Defender did anything wrong,

9    'cause I don't think they did.  But to avoid more

10   trouble than we're already having, we will appoint

11   conflict counsel to represent you.  If you still

12   absolutely want to represent yourself, that's fine.

13   We'll see you Monday, August the 8th.

14        But if I appointed another office to represent

15   you, is that something you would like me to do?

16        **THE DEFENDANT:**  Yes, sir.

17        **THE COURT:**  Okay.  So we're going to continue

18   this case.  We'll move it to the September 29th

19   pretrial at 8:30.  That's an October 12th trial date.

20   We are appointing the Office of Regional Conflict

21   Counsel to represent Mr. Washington.  And Ms. Goerner

22   will be in touch with you during one of her upcoming

23   visits to the county jail.  Okay?

24        **THE DEFENDANT:**  Yes, sir.

25        **THE COURT:**  Okay, Mr. Washington.  And you can

APPENDIX 30

1   raise the concerns you have with her.  She can take

2   whatever depositions she feels is necessary and we'll

3   go from there.

4        THE DEFENDANT:  Sir, can I get a contact

5   information of the person that you just appointed?

6        THE COURT:  We wrote that on -- on his paperwork.

7        It will be on -- it'll be on your paperwork --

8   okay -- that you'll get today.

9        THE DEFENDANT:  All right.

10       THE COURT:  Okay.  Thank you, sir.

11       Anything from the State?

12       MR. OSTROFF:  So just to be clear, Your Honor

13  is -- is finding that -- not that the

14  Public Defender's Office did anything wrong, just that

15  Mr. Washington is now going to be appointed RCC and he

16  has requested RCC.

17       THE COURT:  Yes.

18       MR. OSTROFF:  Okay.  No problem.

19       And then -- so we'll be back on the 9/29 PTC?

20       THE COURT:  Yes, sir.

21       Okay?  Thank you.

22       THE DEFENDANT:  Sir, and my next court date is

23  what, September --

24       THE COURT:  September 29th.  Okay?

25       THE DEFENDANT:  -- 29th?

APPENDIX 30                                    25

1            THE COURT:  And Ms. Goerner will be able to

2    advise you from this point going forward.   Okay?

3            THE DEFENDANT:  All right.

4            THE COURT:  All right.   Thank you, sir.

5            (These proceedings were concluded at 2:05 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

APPENDIX 30                                        26

1                    C E R T I F I C A T E

2

3         I, Christine Lively, being a Digital Court

4    Reporter of the Ninth Judicial Circuit as authorized by Rule

5    2.535(h)(3), Florida Rules of Judicial Administration, and

6    the Administrative Order of the Ninth Judicial Circuit

7    numbered 07-98-43, certify that the foregoing transcription

8    is true and correct.

9

10        WITNESS my hand this 27th day of February,

11        2017, in the City of Orlando, County of Orange, State

12        of Florida.

13

14

15             s/Christine Lively, CER, CET

16             CHRISTINE LIVELY, CER, CET

17

18

19

20

21

22

23

24

25

*APPENDIX 3D*

IN THE CIRCUIT/COUNTY COURT OF THE
NINTH JUDICIAL CIRCUIT, IN AND
FOR ORANGE COUNTY, FLORIDA

Lower Tribunal Case No.:   2014-CF-017252-A-O

Higher Court Case No.:   5D16-3743

I, Clerk of the Circuit and County Courts in and for Orange County,
Florida do hereby certify that the foregoing pages contain a correct transcript of the record.

IN WITNESS WHEREOF, I have set my hand and affixed the seal of the Circuit Court
in and for Orange County, Florida, on this 3rd day of March, 2017.

Tiffany Moore Russell
Clerk of the Circuit and County Courts
425 N. Orange Ave., Orlando, FL 32801
(407) 836-2000
DIS-eDCA-Appeals@myorangeclerk.com



*Laura Keating*
Deputy Clerk

CC:
AAG
CCRC

658

Filing # 23125880 E-Filed 01/29/2015 12:02:27 PM

*APPENDIX 31* UIT COURT OF THE
CIAL CIRCUIT, IN AND FOR
ORANGE COUNTY, FLORIDA

STATE OF FLORIDA

           Plaintiff,

vs.

JAMES EDWARD WASHINGTON

           Defendant.

_____/

CASE NO:   48-2014-CF-017252-O

DIVISION:  22

## MOTION FOR ADMINISTRATIVE TRANSFER
## BETWEEN DIVISIONS

COMES NOW, the State of Florida, by and through the undersigned Assistant State Attorney, pursuant to Administrative Order No. 2003-39-02, and hereby moves this Honorable Court to direct the Clerk of the Court to transfer the above-styled case from Felony Subdivision 22 **to Felony Subdivision 19** for the following reasons(s):

1.  That active case(s) with lower number(s) are pending in the subdivision to which this case will be transferred: 2014-CF-3958.

2.  That it would be in the interest of judicial economy to have all pending cases under Judge EGAN, ROBERT, Division 19.

I DO CERTIFY that a copy (copies) hereof (has) (have) been furnished to ,   by (delivery) (mail) (fax) **(e-mail)** on this 29th day of January, 2015.

Stephen William Browning
Assistant State Attorney
Florida Bar # 75864
Division22@sao9.org
PO Box 1673, 415 N Orange Ave
Suite 300
Orlando, FL 32802-1673
(407)836-2190

2/4/2015 12:17 PM FILED IN THE OFFICE OF TIFFANY M. RUSSELL CLERK OF CIRCUIT COURT ORANGE CO FL

APPENDIX 31

IN THE CIRCUIT COURT OF THE
NINTH JUDICIAL CIRCUIT, IN AND FOR
ORANGE COUNTY, FLORIDA

STATE OF FLORIDA

        Plaintiff,

vs.

JAMES EDWARD WASHINGTON

        Defendant.

_____/

CASE NO:  48-2014-CF-017252-O

DIVISION:  22

## ORDER FOR ADMINISTRATIVE TRANSFER BETWEEN DIVISIONS

THE COURT having reviewed the State Attorney's Motion for Administrative Transfer Between Divisions in the above-styled case, it is hereby

ORDERED AND ADJUDGED as follows:

1. The State Attorney's Motion for Administrative Transfer Between Divisions is hereby *granted*. The Clerk shall transfer this case from Subdivision 22 to Subdivision 19 (companion and/or lower case number(s): 2014-CF-3958).

DONE AND ORDERED in Chambers at Orlando, Orange County, Florida, this 3rd day of ~~January~~ February, 2015.

Julie H. O'Kane
Administrative Judge
Circuit Criminal Division

Copies to:
Honorable Judge Wooten
Honorable Judge EGAN, ROBERT
Office of the State Attorney, Division 22
Office of the State Attorney, Division 19
for James Edward Washington,
McDONNOUGH,     ZEA,     PD's     Office

APPENDIX 32

IN THE CIRCUIT COURT, IN AND FOR ORANGE COUNTY, FLORIDA

JAMES EDWARD WASHINGTON                    CASE NO: 48-2014-CE-017252-O
                  Defendant
          VS                                DIVISION: 19
     STATE OF FLORIDA                        AGENCY: ORPD, 14-536652
              Plaintiff


## DEFENSE WITNESS LIST


**COMES NOW**, JAMES EDWARD WASHINGTON, PURSUANT TO FLORIDA
RULES OF CRIMINAL PROCEDURE 3.220(b), AND IN RESPONSE TO THE STATE'S
NOTICE FOR DISCOVERY DISCLOSES THE FOLLOWING NAMES AND ADDRESSES
OF ALL PERSONS KNOWN TO THE DEFENDANT TO HAVE INFORMATION WHICH
MAY BE RELEVANT TO ANY OFFENSE CHARGED, OR ANY DEFENSE, THERETO,
OR TO ANY SIMILAR FACT EVIDENCE TO BE PRESENTED AT TRIAL
UNDER SECTION 90.404(2), FLORIDA STATUTES:

CATEGORY "A"

FILED IN OPEN COURT 9-30-15
Clerk, Cir. Ct., Orange Co., FL
By _____ D.C.

JOHN SAWICKI, FORENSIC DATA CORP, P.O. BOX 16552, TALLAHASSEE,
FLA. 3231T-6552 * (850) 766-7447
ZEA MCDONNOUGH, 435 N. ORANGE AVE, SUITE 400, ORLANDO,
FLA. 32801 * (407)836-4851
MOLINA ARENA-RANDALL, 435 N. ORANGE AVE, SUITE 400, ORLANDO
FLA. 32801 * (407)836-4800
JARED M. ADELMAN, 435 N. ORANGE AVE, SUITE 400, ORLANDO
FLA. 32801 * (407)836-4886
JOANNA SNOW OPATO, 435 N. ORANGE AVE, SUITE 400, ORLANDO,
FLA. 32801 * (407)836-4754

1 OF 3

APPENDIX 32

BENJAMIN L. JONES, 435 N. ORANGE AVE., SUITE 400, ORLANDO,
FLA. 32801 * (407) 836-4729

DONNA M. GOERNER, 283 CRANES ROOST BLVD, STE. 111,
ALTAMONTE SPRINGS, FLA 32701 * (407) 478-5900

JOHN SETH JAMES, P.O. BOX 913, 100 S. HUGHEY AVE, ORLANDO,
FLA 32802-0913

DWAIN RIVERS, P.O. BOX 913, 100 S. HUGHEY AVE, ORLANDO,
FLA 32802-0913

SGT RAMSAY, ORANGE COUNTY JAIL, P.O. BOX 4970, ORLANDO,
FLA 32802 * 1800-0600 SHIFT

SGT HOLMES, ORANGE COUNTY JAIL, P.O. BOX 4970, ORLANDO
FLA 32802 * 0600-1800 SHIFT

SGT WALKER, ORANGE COUNTY JAIL, P.O. BOX 4970, ORLANDO,
FLA 32802 * 1800-0600 SHIFT * MEDICAL ASSAULT ON 01/27/15

CPL HICKS, ORANGE COUNTY JAIL, P.O. BOX 4970, ORLANDO,
FLA 32802 * 0600-1800 SHIFT * SUPERVISOR 09/21/15 INCIDENT

CPL DANIELS, ORANGE COUNTY JAIL, P.O. BOX 4970, ORLANDO,
FLA 32802 * 0600-1800 SHIFT AS CONFINEMENT SUPERVISOR

CPL BUIZ, ORANGE COUNTY JAIL, P.O. BOX 4970, ORLANDO,
FLA 32802 * 1800-0600 SHIFT * COULDN'T LOCATE CDs 09/20/15

CPL FELTON, ORANGE COUNTY JAIL, P.O. BOX 4970, ORLANDO,
FLA 32802 * 1800-0600 SHIFT

OFFICER WARREN, ORANGE COUNTY JAIL, P.O. BOX 4970, ORLANDO,
FLA 32802 * 1800-0600 SHIFT * 1K OFFICER ON 09/20/15

OFFICER DAVIS, ORANGE COUNTY JAIL, P.O. BOX 4970, ORLANDO,
FLA 32802 * 0600-1800 SHIFT * REGULAR 1K AND 1L OFFICER

OFFICER WRIGHT, ORANGE COUNTY JAIL, P.O. BOX 4970, ORLANDO,
FLA 32802 * 0600-1800 SHIFT * WROTE ME A BOGUS D.R. 09/21/15

2 OF 3

APPENDIX 32

OFFICER GAINES, ORANGE COUNTY JAIL, P.O. BOX 4970, ORLANDO
FLA 32802 * 0600-1800 SHIFT * ASSAULTED ME ON 09/21/15
NURSE FAYSON, ORANGE COUNTY JAIL, P.O. BOX 4970, ORLANDO
FLA 32802 * 0600-1800 SHIFT * DUTY NURSE ON MED CART ON 09/21/15
OFFICER KIRBY, ORANGE COUNTY JAIL, P.O. BOX 4970, ORLANDO,
FLA 32802 * 0600-1800 SHIFT * INMATE AFFAIRS OFFICER ON 09/24/15
NURSE DOMINEUS, ORANGE COUNTY JAIL, P.O. BOX 4970, ORLANDO,
FLA 32802 * 0600-1800 SHIFT * INMATE AFFAIRS OFFICER ON 09/24/15
NURSE CAMPBELL, ORANGE COUNTY JAIL, P.O. BOX 4970, ORLANDO,
FLA 32802 * 0600-1800 SHIFT * REGULAR NURSE ON (E) BUILDING ROUTE
REGISTERED NURSE EVANS, ORANGE COUNTY JAIL, P.O. BOX 4970, ORLANDO,
FLA 32802 * 0600-1800 SHIFT * BEGAN MY TREATMENT 12/31/14 IN B.R.C.
DR. CALIOLIO, ORANGE COUNTY JAIL, P.O. BOX 4970, ORLANDO,
FLA 32802 * 0600-1800 SHIFT * DOCTOR FOR THE FACILITY
CORNITA A. RILEY, ORANGE COUNTY JAIL, P.O. BOX 4970, ORLANDO
FLA 32802 * CHIEF OF ORANGE COUNTY CORRECTIONS DEPARTMENT

PURSUANT TO FLORIDA RULES OF CRIMINAL PROCEDURE 3.220(h)
PLEASE CONTACT THE DEPARTMENT OF CORRECTIONS TO IDENTIFY THE
RIGHT OFFICERS WHO WORKED THE (E) BUILDING MAIN 1K SECTION
WHERE I WAS HOUSED AND THE MEDICAL SECTION TO IDENTIFY THE
RIGHT MEDICAL PERSONNEL LISTED TO COORDINATE THE DATE, TIME,
AND LOCATION OF ANY DEPOSITIONS TO BE SCHEDULED.

*James Edward Washington*
JAMES EDWARD WASHINGTON

## CERTIFICATE OF SERVICE

I CERTIFY THAT A COPY HEREOF WILL BE PROVIDED TO
THE ASSISTANT STATE ATTORNEY IN COURT ON SEPTEMBER 30, 2015.

3 OF 3

APPENDIX 33

Rowell v. Holt, 850 So.2d 474 (2003)

28 Fla. L. Weekly S491

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by    Ware ex rel. Ware v. ANW Special Educ. Co-op.
No. 603,    Kan.App.,    April 11, 2008

850 So.2d 474
Supreme Court of Florida.

John C. ROWELL, Petitioner,
v.
Julianne M. HOLT, Respondent.

No. SC01-2010.    |    June 26, 2003.

Client brought legal malpractice action against the Office of the Public Defender, alleging that the assistant public defenders handling his case were negligent, in that he presented them with a document that could have secured his immediate release, yet it took them over 10 days to do so. The Circuit Court, Hillsborough County, Manuel Menendez, Jr., J., entered judgment on jury verdict, awarding client $504 for his loss of earning capacity and $16,500 for his mental anguish, pain, and suffering. The Office of the Public Defender appealed. The District Court of Appeal, 798 So.2d 767, affirmed in part, reversed in part, remanded, and certified question. The Supreme Court, Lewis, J., held that impact rule did not bar award of emotional damages.

Question answered; approved in part, quashed in part and remanded.

Wells, J., concurred and filed opinion in which Anstead, C.J., joined.

Pariente, J., concurred specially and filed opinion.

**Attorneys and Law Firms**

*475 Theodore" Ted" E. Karatinos of Seeley & Karatinos, P.A., St. Petersburg, Florida; and James W. Holliday of Prugh, Holliday & Deem, P.L., Tampa, FL, for Petitioner.

Todd W. Vraspir of Papy, Weissenborn, Poole & Vraspir, P.A., Spring Hill, FL, for Respondent.

Joseph W. Little, Gainesville, Florida; Robert C. Widman, Venice, Florida; and Robert V. Potter, Jr., Clearwater, FL, for Ernest Morgan and Beverly Keehnle, Amici Curiae.

**Opinion**

LEWIS, J.

We have for review a decision of a district court of appeal on the following question, which the court certified to be of great public importance:

> DOES THE IMPACT RULE APPLY TO PROHIBIT THE RECOVERY OF NONECONOMIC DAMAGES IN A LEGAL MALPRACTICE CLAIM WHEN THE NEGLIGENCE OF A CRIMINAL DEFENSE ATTORNEY RESULTS IN A LOSS OF LIBERTY AND RESULTING EMOTIONAL OR PSYCHOLOGICAL HARM?

*Holt v. Rowell*, 798 So.2d 767, 773 (Fla. 2d DCA 2001). We have jurisdiction. *See* art. V, § 3(b)(4), Fla. Const. Because we believe the instant case presents a unique factual scenario deserving of an equally tailored principle of law, we rephrase the certified question as follows:

> IN AN ACTION FOR LEGAL MALPRACTICE, DOES THE IMPACT RULE PRECLUDE RECOVERY OF NONECONOMIC DAMAGES WHEN THE UNCONTROVERTED NEGLIGENT FAILURE TO DELIVER A *476 DOCUMENT THAT WOULD HAVE PRODUCED THE IMMEDIATE RELEASE OF A PRETRIAL DETAINEE RESULTED IN A PROTRACTED PERIOD OF WRONGFUL PRETRIAL IMPRISONMENT WITH RESULTANT EMOTIONAL DISTRESS OR PSYCHOLOGICAL HARM, BUT NO PHYSICAL IMPACT?

For the following reasons, we answer the rephrased certified question in the negative. We therefore quash that portion of the district court's decision reversing the jury award of damages for psychological injury, and remand the case for reinstatement of the award of noneconomic damages.

Rowell v. Holt, 850 So.2d 474 (2003)

28 Fla. L. Weekly S491

## BACKGROUND AND FACTS

The facts underlying the instant action, exhaustively well detailed in the district court's decision below, are as follows:

In May 1995, John Rowell sold two firearms to a pawnshop. Based upon these sales, Mr. Rowell was arrested on July 6, 1995, in Marion County, Florida, for two counts of felon in possession of a firearm. In fact, Mr. Rowell was innocent of these charges. Although Mr. Rowell had been convicted of a felony in 1966 when he was 22 years past of age, he had received a restoration of his civil rights on June 18, 1975. Mr. Rowell was unable to convince the arresting officers that he was innocent of the crimes charged. He was transported to the Hillsborough County Jail, where he remained overnight until his first appearance hearing scheduled for the following morning, July 7, 1995.

In the Thirteenth Judicial Circuit, preliminary presentation hearings are often performed via closed circuit television. The defendants are physically located at the jail, and an assistant public defender is assigned to this location. A second assistant public defender is present in the courtroom with the presiding judge and the assistant state attorney.

At Mr. Rowell's preliminary presentation hearing on the morning of Friday, July 7, an assistant public defender at the jail spoke with Mr. Rowell, and Mr. Rowell signed an affidavit of indigency and an invocation of rights, thus establishing an attorney-client relationship with the Office of the Public Defender. Mr. Rowell had in his possession a document indicating that his civil rights had been restored. When the trial judge called Mr. Rowell's case, Mr. Rowell told the trial judge directly that he had proof of the restoration of his civil rights and held up the document. Because the trial judge could not see the contents of the document, the trial judge instructed the assistant public defender to obtain a copy of that document so that the case could be resolved if Mr. Rowell was indeed permitted to possess a firearm. On the videotape of this event, Mr. Rowell can be seen handing the document to the assistant public defender at the jail. It is not clear what the assistant public defender who received the document did with it after this hearing. At the time of trial, the assistant public defender could not remember following up on the judge's instructions.

The first appearance judge, concerned that Mr. Rowell might be wrongfully charged, ordered that Mr. Rowell

case be placed on the docket for review on Tuesday, July 11, four days later. This hearing never occurred. According to the assistant public defenders involved in this case, they took no responsibility in keeping track of these types of hearings; instead, they traditionally relied exclusively upon the clerk of the court to properly document and schedule them. It appears that the clerk in this case mistakenly noted that the hearing would **477 be held on July 15, a Saturday on which no hearings were held. Although hearings presumably occurred before this judge with the participation of assistant public defenders on July 11, Mr. Rowell's case was not addressed. As a result, Mr. Rowell remained in jail past July 11 and July 15.

Meanwhile, through the natural process of opening files, Mr. Rowell's case was assigned to a third assistant public defender. This attorney first reviewed the file on July 12, 1995. The file did not contain the document indicating Mr. Rowell's civil rights had been restored or any notation that a hearing had been scheduled. The assistant public defender therefore gave the case no particular priority, but scheduled his first visit with Mr. Rowell at the jail on July 18, 1995. Once this assistant public defender met with Mr. Rowell on July 18, and Mr. Rowell provided the attorney with yet another copy of the document restoring Mr. Rowell's civil rights, the assistant public defender was able to obtain Mr. Rowell's release from jail within two days. The charges against Mr. Rowell were ultimately dismissed.

Mr. Rowell filed a legal malpractice action against the Office of the Public Defender. At trial, he contended that the assistant public defenders handling his case were negligent, because he presented them with a document that could have secured his immediate release, yet it took them over ten days to do so. As a result, he requested damages including his lost earning capacity and damages for his "loss of liberty," including the mental anguish, inconvenience, and embarrassment caused by his unnecessarily extended incarceration..

Throughout the trial, counsel for the Office of the Public Defender sought to limit Mr. Rowell's recovery to his economic damages because Mr. Rowell had not suffered any impact or physical injury as a result of his incarceration. The trial judge rejected this argument and held that the "impact rule" did not apply in this context....

The jury found that the assistant public defenders were negligent, and their negligence caused Mr. Rowell to suffer certain damages. They awarded Mr. Rowell $504

*APPENDIX 33*

Rowell v. Holt, 850 So.2d 474 (2003)

28 Fla. L. Weekly S491

for his loss of earning capacity and $16,500 for his mental anguish, pain, and suffering. After the verdict, the Office of the Public Defender filed a motion for judgment notwithstanding the verdict, again challenging the award of noneconomic damages as a violation of the impact rule. The trial court denied this motion and entered a final judgment in favor of Mr. Rowell in accordance with the jury's verdict.

*Rowell*, 798 So.2d at 768-70.

Based on the facts presented, the district court following existing precedent, as required, held that existing Florida law pertaining to the impact rule precluded an award of damages for mental injury, and begrudgingly reversed that portion of the jury award. *See id.* at 770. The district court articulately expressed its misgivings and reservations with regard to applying the impact rule in the context of Rowell's action, but did so with the certification of a question to this Court to determine whether the rule should preclude recovery for emotional harm in the instant case. *See id.* at 770-72. This review followed.

## ANALYSIS

**[1]**   We begin our analysis of the question presented with a brief review of the impact rule as it has been applied by the courts in this state. The rule requires that "before a plaintiff can recover damages for emotional distress caused by the negligence of another, the emotional distress *478 suffered must flow from physical injuries sustained in an impact." *R.J. v. Humana of Fla., Inc.*, 652 So.2d 360, 362 (Fla.1995) (quoting *Reynolds v. State Farm Mut. Auto. Ins. Co.*, 611 So.2d 1294, 1296 (Fla. 4th DCA 1992)). The impact rule has been traditionally applied primarily as a limitation to assure a tangible validity of claims for emotional or psychological harm. *See R.J.*, 652 So.2d at 363; *Gonzalez v. Metro. Dade County Pub. Health Trust*, 651 So.2d 673, 675 (Fla.1995); *Kush v. Lloyd*, 616 So.2d 415, 423 n. 5 (Fla.1992). Florida jurisprudence has generally reasoned that such assurance is necessary because, unlike physical injury, emotional harm may not readily align with traditional tort law damage principles. Our courts have explained that the existence of emotional harm is difficult to prove, resultant damages are not easily quantified, and the precise cause of such injury can be elusive. *See R.J.*, 652 So.2d at 362. This Court has also theorized that without the impact rule,

Florida courts may be inundated with litigation based solely on psychological injury. *See Gonzalez*, 651 So.2d at 675.

**[2]    [3]**   In recent years, this Court has had occasion to review the continued vitality of the impact rule, and has consistently reaffirmed that the rule serves as an important safeguard when applied under certain proper circumstances in our judicial system. *See, e.g., R.J.*, 652 So.2d at 363; *Gonzalez*, 651 So.2d at 674-75. The impact rule is not, however, an inflexible, unyielding rule of law, so sacred that it must be blindly followed without regard to context. If we were to ascribe such weight to the doctrine, the impact rule itself would exceed the parameters of its underlying justifications. Exceptions to the rule have been narrowly created and defined in a certain very narrow class of cases in which the foreseeability and gravity of the emotional injury involved, and lack of countervailing policy concerns, have surmounted the policy rationale undergirding application of the impact rule. *See Tanner v. Hartog*, 696 So.2d 705, 708 (Fla.1997); *Kush*, 616 So.2d at 422-23. [1]

In *Kush*, the parents of a child born with a genetic impairment initiated an action for wrongful birth against the hospital and physicians who had informed them prior to the mother's becoming pregnant that neither parent carried a genetic abnormality. *See Kush*, 616 So.2d at 417. The parents sought recovery for both the expenses incurred in caring for their child as well as damages for mental anguish. *See id.* This Court held the impact rule inapplicable to wrongful birth actions, and in so doing, expressed doubt that the impact rule was ever intended to embrace the tort of wrongful birth "where emotional damages are an additional 'parasitic' consequence of conduct that itself is a *479 freestanding tort apart from any emotional injury." *Id.* at 422 (citing W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 54, at 361-65 (5th ed.1984)). The Court further reasoned that to the extent the impact rule does not apply to recognized torts such as defamation and invasion of privacy, which result in predominantly emotional damages, it should not preclude recovery for the mental anguish flowing from a wrongful birth, where such harm is equally foreseeable and certainly more grievous. *See id.* at 422 (citing *Miami Herald Publ'g*, 66 So.2d at 681, and *Cason*, 20 So.2d at 243). In the words of the *Kush* Court:

> There can be little doubt that emotional injury is more likely to occur when negligent medical advice leads parents to give birth to a severely impaired

child than if someone wrongfully calls them liars, accuses them of unchastity, or subjects them to any other similar defamation. A defamation may have little effect, may not be believed, might be ignored, or could be reversed by trial publicity. But the fact of a child's serious congenital deformity may have a profound effect, cannot be ignored, and at least in this case is irreversible.

*Id.* at 422-23.

In *Tanner,* this Court again invoked the concept of foreseeability in holding that the impact rule should not preclude the parents of a child stillborn as a result of negligent medical care from recovering for the mental anguish sustained. *See Tanner,* 696 So.2d at 708. The Court correctly reasoned that the impact rule should not be applied to produce the "outright denial of a claim for the mental pain and anguish *which is so likely to be experienced* by parents as a result of the birth of a stillborn child caused by the negligence of another." *Id.* (emphasis added). The *Tanner* Court also carefully expressed its limited determination that the case constituted a "natural evolution of the common law," which was not intended to degrade the impact rule. *Id.*

[4] Considering and applying the reasoning employed in *Kush* and *Tanner,* we determine that the impact rule should not preclude recovery of noneconomic damages in the instant case. In rendering this decision, we approve the reasoning of the district court below that the special professional duty created by the relationship between Rowell and his attorney, coupled with the clear foreseeability of emotional harm resulting from a protracted period of wrongful pretrial incarceration, render application of the impact rule unjust and without an underlying justification in the factual circumstances here. Moreover, we are persuaded by the petitioner's arguments that the facts presented in the instant action neither implicate nor call forth the legal and policy concerns that have been historically advanced as justification for the application of the impact rule.

There is no question that, as Rowell's attorney, the assistant public defender who participated in the preliminary presentation hearing had a special, professional, and independent duty to "exercise the degree of reasonable knowledge and skill which lawyers of ordinary ability and skill possess and exercise." *Home Furniture Depot, Inc. v. Entevor AB,* 753 So.2d 653, 655 (Fla. 4th DCA 2000). It is

also uncontroverted that clearly Rowell had been wrongfully arrested and confined, and-as proven by the videotape of the presentation hearing-that he provided his attorney with the document necessary to secure his immediate release from his pretrial incarceration. There is also no dispute that, once in the possession of Rowell's attorney, the document apparently vanished, and, in any case, was not produced to the presiding judge as the judge had **\*480** specifically instructed. Rowell, in effect, laid in his attorney's hands the very keys to the jailhouse door, which his attorney negligently failed to place in the lock. As a direct result of his attorney's negligence, Rowell was subjected to a protracted period of wrongful pretrial confinement, and concomitant loss of treasured liberty.

Given the facts of this case, Rowell's attorney-whose sole concern should have been to facilitate Rowell's immediate release from pretrial incarceration-could doubtlessly foresee that his negligent failure to end his client's wrongful incarceration would result in significant emotional distress. Indeed, the citizens of a free society can conceive of no greater injury than the continued unjust deprivation of liberty. The special duty undertaken by Rowell's attorney, along with the foreseeability of the harm that would flow from his breach of that duty, lead us to conclude that the impact rule should have no application here to preclude Rowell's recovery of damages for psychological injury.

We are also persuaded that the facts of the instant case do not implicate the legal and policy concerns that are traditionally voiced as undergirding the impact rule. Unlike some actions involving emotional harm, the issue of causation presented here is straightforward and beyond reasoned dispute. A direct causal link can be clearly and rationally drawn in the instant case from the attorney's negligent failure to transmit the document showing the restoration of Rowell's civil rights to the extended period of continuing wrongful pretrial confinement and resultant emotional injury.

Moreover, the damages suffered in the instant case are reasonably capable of measurement. This is not a case in which Rowell simply experienced a few hours or one day of unjust pretrial imprisonment. Here, the hours became days and the days extended beyond a week as he was confined within the walls of a small cell deprived of one's most basic freedoms-the freedom of movement, the right to privacy, and the freedom to associate with persons of one's own choosing. For the emotional trauma flowing from this deprivation of liberty, and corresponding injury, albeit mental in nature, a

*APPENDIX* 33

jury of his peers deemed $16,500 to be proper compensation. While we are cognizant of precedent suggesting that the impact doctrine properly reflects the principle that "[t]here must be some level of harm which one should absorb without recompense as the price he pays for living in an organized society," *Gonzalez,* 651 So.2d at 675 (quoting *Stewart v. Gilliam,* 271 So.2d 466, 477 (Fla. 4th DCA 1972) (Reed, C.J., dissenting), *quashed,* 291 So.2d 593 (Fla.1974)), we believe that Rowell paid too high a price with his pretrial liberty to be forced to forego compensation based upon rigid application of a limiting doctrine, and that the jury award reasonably represented the damages logically flowing from his injury. No man or woman should be forced to be wrongfully incarcerated on a continuing extended basis in a pretrial detention posture while his or her attorney holds the key in hand to simply open the door to freedom. Under these circumstances, it is beyond reason to suggest that society or the law should insulate one causing such continuing confinement with application of harsh artificial doctrines of such extreme impact.

In rendering this decision, we reject the respondent's arguments that permitting the assessment of damages for psychological injury in the instant case will open a Pandora's Box to claims for emotional distress for "anyone who spent time in jail justifiably or not." Our holding today is limited to matters involving wrongful, not justifiable, extended pretrial confinement *481 where the incarcerated individual's attorney holds the key to freedom, but fails to deliver material to a judge as instructed, and either discards or misplaces the evidence. It is beyond dispute that Rowell was innocent of the crime charged, should not have been arrested, and was wrongfully confined on a continuing basis in pretrial detention. Moreover, as previously expressed, the period of wrongful confinement in this case was lengthy. One whose arrest and imprisonment is even arguably justifiable, whose unjustified incarceration is relatively brief, or whose legal representative does not have the clear and uncontroverted evidence in hand which facially eliminates the basis for the charges, will find no succor in this decision.

Furthermore, we deem untenable respondent's contention that our holding will implicate the entire spectrum of legal defense work, including claims of ineffective assistance of counsel, and we specifically state that such is not the field in which this decision flows. The instant case does not simply involve negligence arising from insufficient preparation, incomplete investigation, legal ineptitude, or any other subjective indicia of a lawyer's performance. To obtain his client's release, Rowell's attorney here needed only to deliver, transmit, or

hand over to the judge the document which he had been provided and which he held in his hands. The attorney simply and completely failed to follow through or do anything, which resulted in Rowell's lengthy period of continuing pretrial confinement. In light of the unique facts of this case, we are satisfied that our holding here today will not-as respondent claims-subject defense attorneys to incessant second-guessing and excessive litigation.

This determination should not, and we are confident will not, be interpreted to cast doubt on the continued viability of the impact rule, nor should this decision be extended any further than as narrowly tailored. We reaffirm the role the impact rule plays as a safeguard against unduly speculative claims. However, neither law nor policy compels or justifies application of the impact rule in the instant case. *Cf. R.J.,* 652 So.2d at 363-64 (refusing to create an exception to the impact rule for emotional distress suffered from negligent medical testing and expressly stating that the creation of such an exception would have a "substantial impact" on the provision of medical care). Where an attorney bearing a special professional duty to protect the rights of his client is provided the means to unquestionably break down the walls of wrongful, unjust pretrial restraint, but negligently fails to do so by not even delivering the clear and uncontroverted evidence, the impact rule should not bar recovery for the emotional distress that would foreseeably result.

## CONCLUSION

For the foregoing reasons, we quash that portion of the district court's decision that reversed the jury award for psychological damages, approve the remainder of the decision below, and remand for a reinstatement of the noneconomic damages awarded by the jury.

It is so ordered.

QUINCE, J., and SHAW, Senior Justice, concur.

WELLS, J., concurs with an opinion, in which ANSTEAD, C.J., concurs.

PARIENTE, J., concurs specially with an opinion.

WELLS, J., concurring.

Rowell v. Holt, 850 So.2d 474 (2003)      *APPENDIX* 33

28 Fla. L. Weekly S491

I concur with the decision reached by the majority. However, I would answer the question as it was phrased to the *482 district court. I also reach this decision by different reasoning.

I note that in *Schreiber v. Rowe*, 814 So.2d 396, 399 (Fla.2002), this Court adopted a specific rule pertaining to legal malpractice claims against public defenders that a plaintiff "as part of the causation element of the cause of action, [is] to prove by the greater weight of the evidence that he was innocent of the crimes charged in the underlying criminal proceeding." *Id.* at 399 (quoting *Rowe v. Schreiber*, 725 So.2d 1245, 1251 (Fla. 4th DCA 1999)); *see Johnson v. Gibson*, 837 So.2d 481 (Fla. 5th DCA 2002), *review dismissed*, No. SC03-399, 845 So.2d 890 (Fla. Apr.24, 2003).

In view of this specific condition requiring a plaintiff to prove innocence in this cause of action, I believe that when a plaintiff can carry this burden of proof and also demonstrate that the legal malpractice caused a loss of liberty, the damages which should be available to be recovered by the plaintiff should logically be the same damages as are available to be recovered for the tort of false imprisonment. Certainly, I recognize that false imprisonment, unlike legal malpractice, is an intentional tort. But under our precedent, a claim for false imprisonment can be brought regardless of malice. Thus, I cannot see that the difference between intent and negligence in this instance should control the compensatory damages which can be recovered. An innocent person falsely imprisoned is equally damaged in respect to compensatory damages, regardless of whether the imprisonment flows from intentional conduct by a store owner or negligent conduct by a public defender.

In *S.H. Kress & Co. v. Powell*, 132 Fla. 471, 180 So. 757 (1938), this Court set out the available damages recoverable for false imprisonment:

> In an action for *false imprisonment*, which may be brought regardless of whether there was, or was not, malice, the elements of recoverable *compensatory damages* may include bodily injuries or physical suffering, which are the proximate result of the unlawful *imprisonment*, or illness caused thereby; physical inconveniences and discomfort suffered by reason of the condition of the place of confinement; loss of time, and losses sustained in

> the business or employment of the plaintiff; expenses incurred as a result of the unlawful imprisonment; mental suffering endured because thereof, such as embarrassment, humiliation, deprivation of liberty, disgrace and injury to the feelings of the person unlawfully imprisoned, as well as injury to his reputation, resulting therefrom. 25 C.J. 556-560.

*Id.* at 763; *see Normius v. Eckerd Corp.*, 813 So.2d 985, 987 (Fla. 2d DCA 2002).

On the basis of this reasoning, I would answer the question certified by the district court in the negative.


ANSTEAD, C.J., concurs.

PARIENTE, J., specially concurring.
I write separately to indicate my agreement with the approach set forth in Justice Wells' separate concurrence. Further, although I agree with the majority that the impact rule should not bar the petitioner's recovery of damages in this case, I write to once again express my view that the Court should abolish the impact rule. *See Gracey v. Eaker*, 837 So.2d 348, 358 (Fla.2002) (Pariente, J., concurring).

The issue in this case is whether the impact rule should prohibit Rowell from recovering emotional damages sustained during his incarceration for a period extending nearly two weeks-a loss of liberty which directly resulted from the uncontroverted negligence of his attorney. I fully concur with the majority that none of the *483 policy reasons underlying the impact rule would be served by denying Mr. Rowell his right to recover the damages awarded by the jury. I further agree with Justice Wells that this legal malpractice action should be conceptually analyzed as a claim of false imprisonment. As the Second District in this case pointed out, the damages awarded by the jury to Mr. Rowell are no different than those to which he would have been entitled if the underlying cause of action had been for malicious prosecution or false imprisonment rather than for wrongful incarceration directly resulting from his attorney's negligence. *See Holt v. Rowell*, 798 So.2d 767, 772 n. 3 (Fla. 2d DCA 2001) ("The existence of a freestanding tort explains the trial judge's inclination to treat the recoverable damages as

similar to those in the torts of malicious prosecution or false imprisonment.").

This case is one more example of why "Florida should join the growing number of states that have abolished the arbitrary restriction on tort claims imposed by the judicially created impact rule." *Gracey*, 837 So.2d at 358 (Pariente, J., concurring). In my view, the recovery of damages for mental anguish should not depend on whether Mr. Rowell suffered an actual injury while he was incarcerated or alternatively became physically ill because of his incarceration.[2] As I stated in my recent concurrence in *Gracey:*

> The impact rule, as applied in Florida, holds that, in the absence of a discernible physical injury or illness flowing from emotional distress or an actual impact, a person cannot recover compensatory damages for mental distress or psychiatric injury. *See generally Hagan v. Coca-Cola Bottling Co.*, 804 So.2d 1234, 1236-38 (Fla.2001). The rationale for the impact rule as a limitation on certain claims is that it serves as a means of "assuring the validity of claims for emotional or psychic damages." *R.J. v. Humana of Florida, Inc.*, 652 So.2d 360, 363 (Fla.1995). However, this Court's wariness of psychic damages has not prevented it from carving out exceptions to the impact rule in a variety of circumstances-as the present case demonstrates. *See, e.g., Kush v. Lloyd*, 616 So.2d 415, 422-23 (Fla.1992); *Champion v. Gray*, 478 So.2d 17, 19-20 (Fla.1985), *receded from on other grounds in Zell v. Meek*, 665 So.2d 1048, 1053 (Fla.1995).

> In my view, the impact rule reflects an outmoded skepticism for damages resulting from mental injuries. As best summarized by the Illinois Supreme Court:

>> The requirement [of physical manifestation of emotional distress] is overinclusive because it permits recovery for     **\*484** mental anguish when the suffering accompanies or results in any physical impairment, regardless of how trivial the injury. More importantly, the requirement is underinclusive because it arbitrarily denies court access to persons with valid claims they could prove if permitted to do so.

> Additionally, the requirement is defective because it "encourages extravagant pleading and distorted testimony." To continue requiring proof of physical injury when mental suffering may be equally

recognizable standing alone would force "victim[s] to exaggerate symptoms of sick headaches, nausea, insomnia, etc., to make out a technical basis of bodily injury upon which to predicate a parasitic recovery for the more grievous disturbance, the mental and emotional distress she endured."

*Corgan v. Muehling*, 143 Ill.2d 296, 158 Ill.Dec. 489, 574 N.E.2d 602, 608 (1991) (quoting *St. Elizabeth Hosp. v. Garrard*, 730 S.W.2d 649, 652 (Tex.1987)) (citations omitted).

I believe that the traditional foreseeability analysis applicable to negligence claims is the more appropriate framework for a limitation on tort recovery in this State. *See McCain v. Florida Power Corp.*, 593 So.2d 500, 502 (Fla.1992) ("The duty element of negligence focuses on whether the defendant's conduct foreseeably created a broader 'zone of risk' that poses a general threat of harm to others.").

837 So.2d at 358-59 (Pariente, J., concurring). As the Second District in this case explained, the foreseeability analysis fits logically into the factual framework presented here.

In reviewing the policy reasons behind the impact rule, we tend to agree [with Rowell that the impact rule should not bar his claim]. There is no question that the Office of the Public Defender established an attorney-client relationship with Mr. Rowell, and thus owed to Mr. Rowell a duty to exercise the degree of reasonable knowledge and skill that lawyers of ordinary ability and skill possess and exercise. *See Home Furniture Depot, Inc. v. Entevor AB*, 753 So.2d 653 (Fla. 4th DCA 2000). *Because this was a criminal matter subjecting Mr. Rowell to confinement, it was foreseeable that the neglect of such a duty could cause a loss of liberty and attendant emotional and psychological harm. In our estimation, this case is similar to Tanner, 696 So.2d 705, and Kush, 616 So.2d 415, in that the emotional damages are a "parasitic" consequence of conduct that itself is a freestanding tort. In other words, there is a clearly defined duty due to the direct relationship between the attorney and client that, if breached, presents a substantial risk of emotional or psychological harm. Under these circumstances, the application of the impact rule deprives Mr. Rowell of any real remedy for the malpractice of his attorney, despite the duty owed and breached and the foreseeability of the damages*

Rowell v. Holt, 850 So.2d 474 (2003)

28 Fla. L. Weekly S491

caused. *See, e.g., Tanner,* 696 So.2d at 708 ("It is difficult to justify the outright denial of a claim for the mental pain and anguish which is so likely to be experienced."). As a practical matter, this result also insulates criminal defense attorneys from all but nominal damage awards when their negligence results in the extended incarceration of their client, absent proof that their dereliction was willful, wanton, or malicious.

*Holt,* 798 So.2d at 772 (emphasis supplied) (footnotes omitted).

Simply stated, since none of the policy reasons for the impact rule exist in this *485 case, I agree with the majority that damages were properly recoverable. Moreover, as the well-reasoned opinion of the Second District in this case demonstrates, I believe the traditional foreseeability analysis is a more logical approach in these cases. Thus, I would eliminate the arbitrary requirement of the impact rule.

**All Citations**

850 So.2d 474, 28 Fla. L. Weekly S491

Footnotes

1    The impact rule does not apply to recognized intentional torts that result in predominantly emotional damages, including the intentional infliction of emotional distress, *see Eastern Airlines, Inc. v. King,* 557 So.2d 574, 576-77 (Fla.1990), defamation, *see Miami Herald Publishing Co. v. Brown,* 66 So.2d 679, 681 (Fla.1953), and invasion of privacy, *see Cason v. Baskin,* 155 Fla. 198, 20 So.2d 243, 251 (1944). While classification has not been consistent throughout our jurisprudence, intentional torts have been deemed exclusions from, as opposed to exceptions to, the impact rule. *See Eastern,* 557 So.2d at 579 (Ehrlich, C.J., specially concurring) (reiterating that a physical manifestation of psychological trauma is not required in connection with intentional infliction of emotional distress). *But see R.J.,* 652 So.2d at 363 (discussing *Eastern* in the context of exceptions to the impact rule). There is, however, no cognizable action for simple negligence resulting in psychological trauma, alone, unless the case fits within one of the narrow exceptions to the impact rule. *See R.J.,* 652 So.2d at 363; *Brown v. Cadillac Motor Car Div.,* 468 So.2d 903, 904 (Fla.1985).

2    As the Second District in this case observed regarding confusion as to whether the impact rule describes the need for a primary impact or for physical injury from psychological trauma:

In Florida, the combination of these two principles has been called the "impact rule" or "impact doctrine." This results in some confusion as to whether "impact" refers to a physical impact upon the plaintiff at the time of the accident, or the physical injury a plaintiff may suffer after psychological trauma. *See, e.g., Reynolds v. State Farm Mut. Auto. Ins. Co.,* 611 So.2d 1294, 1296 (Fla. 4th DCA 1992) (describing the impact rule as "preclud[ing] the recovery of damages for negligent infliction of emotional distress unless the emotional distress arises directly from the physical injuries sustained by the plaintiff in the impact"). In fact, the latter analysis that requires the plaintiff manifest some physical injury as a result of the emotional trauma is commonly known as the "zone of danger" rule, as it requires the plaintiff to be within the "zone of danger" created by the defendant's negligence. *See Davies, Direct Actions for Emotional Harm: Is Compromise Possible?,* 67 Wash. L.Rev. 1, 8 (Jan.1992).

*Holt,* 798 So.2d at 770 n. 1.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FIFTH DISTRICT

JAMES E. WASHINGTON
                 Petitioner,

V.
                                          CASE NO: 5D18-0795
STATE OF FLORIDA
                 Respondent,

REPLY TO RESPONDENT'S RESPONSE TO PETITIONER'S PETITION
ALLEGING INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

COMES NOW, Petitioner, pursuant to this Court's order, and files this reply to Respondents' response:

1. FACTS: The Petitioner was charged and convicted of ①.Burglary of a structure, ② possession of burglary tools, ③ resisting an officer without violence, and ④ petit theft. The threat of great bodily harm caused the petitioner to initially avoid a direct confrontation with the police. During the search for the petitioner, several officers found items throughout the building, then relocated them to different locations to give the appearance of a crime being perpetrated. The letter to the Petitioner's appellate lawyer listed as (Appendix G) has a copy of Officer John James' case narrative, which is consistent with the affidavit written by Officer Nicole Morgan and Officer Stephen Wilson. Officer James had on a properly operating body camera that recorded things as they were at the time all officers were on the roof prior to the petitioner's arrest. His trial testimony confirms this (Appendix B) Initially, there was not a backpack or any tools on the roof. Officer Morgan admitted this fact during her trial testimony (Appendix F, page 262) The tools and the backpack were found throughout the building while searching for the Petitioner before being transported to the roof. Two

pictures of the backpack were photographed on the ground in a electrical room doorway. (Appendix O) The officers knew they were tampering with physical evidence. Officer Wilson's trial testimony listed as (Appendix A) provides an excuse for moving the backpack but don't explain what the sensitive evidence was or who actually moved the backpack. How would he know anyway, he never looked inside the backpack nor did he open or close it. (Appendix A, page 310) Officer Wilson also saw the knife on the circuit breaker box in the electrical room. (Appendix A) Officer Morgan saw two other knives found during their search for the Petitioner. (Appendix F, page 235) Officer Brilliant saw a steak knife in the electrical room. (Appendix C, pages 369-371). Officer Brilliant planted the broken knife they all saw in the electrical room to justify releasing the dog on the Petitioner while detained. The Petitioner never had a knife nor a flashlight. No flashlight was recovered to be photographed. The body camera Officer James wore recorded everything those officers saw before they tampered with physical evidence. He tested the camera by reviewing previous recorded footage. (Appendix B) He never turned in the video to be destroyed. There was video footage of a traffic incident he recorded the same day that was turned in to be placed on his department website. There was no policy to destroy unsolicited body camera evidence before this incident. If there were, Linda Ridge would have brought that information to the court's attention before or after she discovered the body camera video was unavailable. The policy would have been mentioned in one of pre-trial conferences or the Motion to Compel. (Appendix M); (Appendix N); (Appendix O). The policy is against Florida Law. Section 119.071 (2)(L) 5. Public records. General exemptions from inspection or copying of public records states that a law enforcement agency must retain a body camera recording for at least 90 days. To cover their asses, they broke the law and violated due process by destroying

physical evidence in 30 days. They had to. We can debate now. The body camera video recorded their crimes that would have left no room for debate. They tried to kill me in a way they could justify. When the Petitioner survived, they had to tamper with physical evidence to justify the act. Unarmed black men get shot dead in the middle of the street. If the petitioner had anything they could have assumed as a weapon in a dark abandoned building, he would have gotten mased, tased, stabbed, shot, and bit by the dog. The police can't break the law in enforcement of the law. (Appendix P) Officer James can be convicted of a crime. (Appendix S) He did what was necessary to protect the group. Officer Morgan and Officer Wilson got together to write an Arrest Affidavit that says the same things in the same way Officer James wrote his case narrative. (Appendix I) There is no way to destroy exculpatory and impeaching evidence without violating due process. The Petition was provided ineffective assistance of counsel when the public defenders refused to compel the court to order the police to turn over that body camera video. The Petitioner was provided ineffective assistance of appellate counsel when the public defender fail to argue the Brady violation in the initial brief.

CONCLUSION: Officer Brilliant took CSI to the knife alleged to be possessed by the Petitioner. (Appendix E, page 40) Officer Cote took all the pictures of the roof but failed to say so in his case narrative. (Appendix E, page 404) CSI Chantal Styer never saw the knives in the places the other officers saw them. (Appendix E, pages 407-408) Officer Morgan acknowledged not seeing a backpack on the roof or a water bottle. (Appendix F, page 262) Officer James did not use a fireman's pole with the body camera outside. Officer Morgan's trial testimony indicated he and his recruit used a ladder provided by the Fire department (Appendix F, page 225). The body camera

3

video would have contradicted the pictures provided as discovery and impeached the officers conflicting testimonies. The Petitioner's lawyers were ineffective because they refused to compel the court to order the police to provide the body camera video. The petitioner terminated their services due to this fact. Due process was violated the moment the body camera video was destroyed. There are three essential components of a true Brady violation: (1) The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) That evidence must have been suppressed by the state, either willfully or inadvertently; and (3) prejudice must have ensued. This case has the components of all three; Consequently, due process was violated. Petitioner received ineffective representation.

Wherefore, the Petitioner humbly prays this Honorable Court Grant this Petition for Writ of Habeas Corpus, REVERSE all felony convictions and sentences and order the immediate release of the Petitioner, James Edward Washington.

Respectfully submitted,

James Edward Washington
JAMES EDWARD WASHINGTON
DC# 197574, Petitioner, Pro Se
Madison Correctional Institution
382 S.W. MCI Way
Madison, FL 32340-6499

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the above reply has been sent to the Attorney General, 444 Seabreeze Blvd, 5th Floor, Daytona Beach FL 32118; 5th District Court of Appeals, 300 S. Beach St., Daytona Beach FL 32114; Public Defender, 435 N. Orang Ave., Suite 400 Orlando, FL 32801-1505; Public Defender, 7th Judicial Circuit, Appellate Division, 444 Seabreeze Blvd., Ste 210, Daytona Beach, FL 32118, this 8th day of June 2018.

IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FIFTH DISTRICT

JAMES E. WASHINGTON
         Petitioner,

V.                                    CASE NO: 5D18-0795

STATE OF FLORIDA
         Respondent,

## NOTICE OF FILING APPENDIX

COMES NOW, Petitioner, filing this index to the appendixes to the Respondent's response to Petitioner's Petition Alleging Ineffective Assistance of Appellate Counsel.

| Appendix | Pages | Subject Matter |
|---|---|---|
| A | 61 | Stephen Wilson's trial testimony |
| B | 17 | John James' trial testimony |
| C | 25 | Christopher Brillant' trial testimony |
| D | 14 | Douglas A. Cote's trial testimony |
| E | 24 | Chantal Styer's trial testimony |
| F | 55 | Nicole Morgan's trial testimony |
| G | 43 | Letter to Kathryn Rollison Radtke |
| H | 3 | Letter from Kathryn Rollison Radtke |
| I | 4 | Arrest Affidavit |
| J | 3 | Discovery Listing the 911 call |
| K | 8 | State's response showing evidence destroyed |
| L | 7 | Daniel Tressler's psycological exam results |
| M | 27 | Pre-trial Conference, July 21, 2015 |
| N | 32 | Pre-trial Conference and Motion to Compel |
| O | 29 | Pre-trial Conference, March 9, 2016 |
| P | 2 | Tampering with or Fabricating Physical Evidence |
| Q | 4 | 2 pictures of backpack, 1 Picture of the Knife |
| R | 4 | 3 pictures of the wall around the roof |
| S | 3 | Constanzo v. State, 152 So. 3d 737 (2014) |

Respectfully submitted,

*James E. Washington*
JAMES E. WASHINGTON
DOC# 197574; E2136S
Madison Correctional Institution
382 S.W. M C I Way
Madison, Florida 32340-6499

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the above and foregoing Reply has been sent to Allison Leigh Morris, Assistant Attorney General, 444 Seabreeze Blvd., Fifth floor, Daytona Beach, FL 32118; Fifth District Court of Appeals, 300 S. Beach St., Daytona Beach, FL 32114; Law Offices of Robert Wesley, Public Defender, 9th Judicial Circuit, 435 N. Orange Ave; Suite 400, Orlando FL 32801-1505; Law Offices of James S. Purdy, Public Defender, 7th Judicial Circuit, Appellate Division, 444 Seabreeze Blvd., Ste. 210, Daytona Beach, FL 32118.

*James E. Washington*
JAMES E. WASHINGTON
DOC# 197574; E2136S
Madison Correctional Institution
382 S.W. M.C.I. Way
Madison, FL 32340-6499



1                          STEPHEN WILSON

2    was called as a witness and, having first been duly sworn,

3    testified as follows:

4              THE WITNESS:  Yes.

5              THE COURT:  Good morning, sir.  You may be

6         seated.

7              THE WITNESS:  Good morning.

8              THE COURT:  Tell us your name, please.

9              THE WITNESS:  Stephen Wilson.

10             THE COURT:  Spell your last name for our court

11        reporter.

12             THE WITNESS:  W-I-L-S-O-N.

13             THE COURT:  Thank you.

14        You may inquire.

15                      DIRECT EXAMINATION

16   BY MR. MATERA:

17        Q.   Officer Wilson, please introduce yourself to the

18   jury.

19        A.   I'm Officer Stephen Wilson of the Orlando Police

20   Department.

21        Q.   How long have you worked with the Orlando Police

22   Department?

23        A.   I'm in my 20th year.

24        Q.   What was your assignment on December 31st of

25   2014?

1    A.   I was assigned to the east patrol division.  We
2  have multiple sectors in the city.  That sector is the
3  India sector.  I'm on the India shift squad.  And I was a
4  field-training officer, and Officer Morgan was my recruit.
5    Q.   Officer Morgan, the officer that you just saw
6  walk out of the courtroom?
7    A.   Yes.  At the time she was in training, and she
8  was my recruit officer.
9    Q.   How long at that time were you a field-training
10  officer?
11    A.   I've been a field-training officer -- I had been
12  one for two years.  When I first started at OPD, I went to
13  the detective division, and with the detective for seven
14  and a half years before returning to the patrol to train
15  again.  So I would say at that point I probably had about
16  eight years of training -- field training.
17    Q.   At that time on December 31st of 2014, was
18  Officer Morgan fairly new to the unit?
19    A.   Yes.  Yeah.  She was probably -- it was her first
20  phase of training.  There's four phases of training that
21  recruits go through after the academy.  They spend about a
22  month in orientation at Orlando P.D.  And then they hit the
23  road with us, and they go through four 15-day training
24  phases with us.  Our shifts are 12 hours long.  So they
25  have 15 days in the first phase, 15 days in the second, 15

1    in the third.  And at that point, she was with me probably

2    midway through her first phase.

3        Q.    Explain the type of training that you do and

4    teach officers that are underneath you when you're a

5    field-training officer?

6        A.    Everything.  I mean, everything related to law

7    enforcement in a patrol officer capacity.  They have to

8    from the very foundation on up until the first phase, we

9    talk a lot about law -- criminal law.  We -- they respond

10   with us to all calls that we go to.  They're with us at

11   those calls.  As they progress through training, we make

12   them do more and more work.  So by the time they hit the

13   fourth phase, they are basically just proving to us that

14   they have the capability of handling the job.

15           At that point, she was still very early in her

16   training and was basically -- at that point, they don't

17   shadow us.

18       Q.    Do you assist these officers in writing reports?

19       A.    Yes.

20       Q.    Okay.  Do you review their reports that they

21   write?

22       A.    Oh, yeah.  Yeah, because all of the reports

23   ultimately end up our responsibility -- the field-training

24   officer's responsibilities.

25       Q.    So, essentially, you swear to the same statement

1    that Officer Morgan writes?

2        A.   Yes.

3        Q.   Do you recall being called out to an incident

4    occurring at 5705 LaCosta Drive?

5        A.   Yes.

6        Q.   That was on December 31st of 2014?

7        A.   Yes.

8        Q.   Was this formally a Perkins restaurant?

9        A.   It was.

10       Q.   Tell the jury what happened when you arrived on

11   scene at that point.

12       A.   I want to say the call -- it was probably around

13   8:45 in the morning.  We received a call that someone was

14   on the roof --

15            MS. GOERNER:  Objection as to hearsay.

16            THE COURT:  Sustained.

17   BY MR. MATERA:

18       Q.   Not as to the basis for why you were called or

19   what someone said, but just when you arrived, what did

20   you -- what were you there for?

21       A.   We were there because somebody had been seen up

22   on the roof, and we were checking the building to see if

23   anybody had made entry into it.

24       Q.   And when you arrived, what happened next?

25       A.   We set up a perimeter around the building.  One

1    of the officers had radioed as we were responding saying he

2    also saw a subject --

3              MS. GOERNER:  Objection, Your Honor, as to

4         hearsay.

5              THE COURT:  Sustained.

6    BY MR. MATERA:

7         Q.   Not testifying what anyone told you, but just

8    what did you do when you arrived on scene?

9         A.   We went to the east, northeast corner of the

10   building where there was a -- like an electrical room with

11   a door that had been forced open.

12        Q.   And when you walked into that door, what did you

13   observe?

14        A.   We observed -- it was a small room, like, with

15   electrical and control panels and stuff like that.  And

16   there was a ladder built into the wall.  So it was a

17   permanent ladder that went to a hatch that opened up to the

18   ceiling to the roof of the business.

19        Q.   And what did you observe at that time?

20        A.   We -- when we first looked in the control room,

21   the electrical room that we -- I looked up at the ladder

22   and noticed that the hatch leading to the roof was open.

23   There was a knife that was found on one of the electrical

24   boxes, like a circuit breaker box or something.  There was

25   a small knife on there immediately to the left when you

1   entered the room, and the door had a lock on it that had

2   been damaged so that the door could be forced open.

3       Q.   And when you looked up, you said the door was --

4   the hatch was open?

5       A.   Yeah, the hatch was open.

6       Q.   All right.  At that point, what happened?

7       A.   Officer -- there was other officers on scene.  We

8   had the building surrounded.

9       Q.   Were you with Officer Brillant?

10      A.   I was with Officer Brillant.

11      Q.   Is Officer Brillant a K-9 officer?

12      A.   Yes.

13      Q.   At that point, when the hatch was opened, what

14  did you guys start doing?

15      A.   Yes.  Officer Brillant made multiple

16  announcements that we were with the Orlando Police

17  Department, that the subject -- he was calling to the

18  subject on the roof saying, "We know you're on the roof.

19  Come down and come down the ladder now, and put your hands

20  in the air."

21      Q.   After that command was given, what happened?

22      A.   After multiple commands, the -- later, the

23  arrestee walked up to the hatch, looked down at us, and

24  closed it from the roof.

25      Q.   So at that point, what was your concern?

1       A.   Well, we knew he was up on the roof.  We wanted

2    to get a permanent visual of him.  So we called for OFD to

3    bring one of their ladder trucks where they have the

4    basket.  We had them park to the north in the building --

5    the parking lot to the north, which is a Dunkin Donuts.  An

6    officer climbed in the ladder with some firefighters, and

7    they raised the basket up to the point where he had

8    overwatch on the -- on the roof.

9       Q.   Was the subject observed at that time?

10      A.   Yes.

11      Q.   Okay.

12           MS. GOERNER:  Objection as to hearsay.

13           MR. MATERA:  Well, may I approach on that?

14           THE COURT:  Overruled.

15   BY MR. MATERA:

16      Q.   Okay.  When you say the subject was "observed at

17   that time," go ahead and say that again.

18      A.   Well, the officer who went up in the basket saw

19   the -- saw the --

20           MS. GOERNER:  Objection as to hearsay.

21           THE COURT:  Sustained as to that question.

22   BY MR. MATERA:

23      Q.   Okay.  At that point, what did you believe --

24   where did you believe the subject to be?

25      A.   On the roof.

1        Q.    Okay.  Did you go up to the roof at that time?

2        A.    Not immediately.  After visual was lost of the

3   subject -- you have to understand we had officers all the

4   way around the building.  Okay?  We had probably -- there

5   were probably seven or eight officers surrounding the

6   building.  There was no way for the subject to get off of

7   the roof or exit that area.  All doors were covered that

8   led into it.  All windows were covered.  So we knew that --

9   that he could not escape without one of us at least seeing

10  him.  Okay?  So it reached a point where we no longer could

11  see him on the roof and we had lost visual.  So we had to

12  go up on the roof and check it.

13          Now, the way that the roof is -- the way this

14  building is designed, all the way along the perimeter of

15  the roof is a wall that probably goes up several feet,

16  maybe three feet or so.  Okay?  And then it's down, and the

17  roof itself is flat.  So at the time we thought, okay,

18  maybe he's hiding up against the edge of the wall.  All

19  right?

20        Q.    So what did you do at that point?

21        A.    Myself and several other officers went up on the

22  roof up the ladder through the hatch.

23        Q.    And when you went up onto the roof, did you

24  observe the suspect?

25        A.    No.

1       Q.   Did you observe anything else on the roof?

2       A.   There were multiple A/C handlers and --

3   air-conditioner handlers and other electrical equipment up

4   there.  A bunch of them were damaged.  There was copper

5   cut -- copper piping in a small pile near one of the A/C

6   handlers.  There were some tools laying around, like a

7   hacksaw and some other pliers and some stuff like that.

8   There was a bag -- a red gym bag that had tools inside of

9   it up on the roof, but the suspect -- and there was a --

10  the suspect wasn't found on the roof.  We looked everywhere

11  up there.  We noticed that there was an A/C vent that led

12  into a -- like an air duct system that was open allowing

13  access into the interior of the building through the A/C --

14  air duct system.

15      Q.   Were photographs taken of the tools you just

16  described, the backpack --

17      A.   Yes.

18      Q.   -- and the A/C units?

19      A.   Yes.

20      Q.   Was a photograph of what you just described as

21  copper being removed from the A/C units, photos taken of

22  that, too?

23      A.   Yes.

24      MR. MATERA:  I am showing the defense what's been

25  marked as State's E for identification purposes.  I am

1      showing the defense what's been marked as State's B

2      for identification purposes.  Showing the defense

3      what's been marked as State's C for identification

4      purposes.  Also showing the defense what's been marked

5      as State's A for identification purposes.

6           May I approach the witness?

7           THE COURT:  Yes.

8           MR. MATERA:  I am showing the witness what's been

9      marked as State's A for identification purpose.

10   BY MR. MATERA:

11        Q.   Officer Wilson, take a look at those photographs

12   and let me know if you recognize what those photographs

13   depict.  Or excuse me.  Do you recognize those photographs?

14        A.   Yes, I do.

15        Q.   Do those depict the backpack that you observed on

16   the roof near the tools?

17        A.   Yes.

18        Q.   Is it a fair and accurate depiction of the

19   backpack?

20        A.   Yes, that is the backpack.

21           MR. MATERA:  I'm showing Officer Wilson what's

22      been marked as State's C for identification purposes.

23   BY MR. MATERA:

24        Q.   Take a look at that, Officer, and let me know if

25   you recognize it.

1       A.   They -- these are the cutting tools that we

2    found, the hacksaw, pliers, bolt cutters.

3       Q.   Fair and accurate depiction of those tools that

4    you observed on the roof?

5       A.   Yes, and the damage to the A/C units.

6            MR. MATERA:  Showing the witness what's been

7       marked as State's B for identification purposes.

8    BY MR. MATERA:

9       Q.   Officer Wilson, take a look at those and let me

10   know if you recognize them.

11      A.   Yes.  It has the roof, showing the ledge around

12   the perimeter, and damage to the A/C vents.

13      Q.   A fair and accurate depiction of the wall and A/C

14   units --

15      A.   Yes.

16      Q.   -- on the roof?

17           MR. MATERA:  Showing the witness what's been

18      marked as State's E for identification purposes.

19   BY MR. MATERA:

20      Q.   Officer Wilson, take a look at that and let me

21   know if you recognize it.

22      A.   Yeah.  That is the pile of cut copper that we

23   found.

24      Q.   Those near A/C units where the backpack and the

25   tools were found?

1      A.   Yes, all in the same general area.

2      Q.   Fair and accurate depiction of that?

3      A.   Yes.

4           MR. MATERA:  Judge, at this time, the State would

5      move what's been marked as State's E, State's B,

6      State's C, and State's A into evidence.

7           THE COURT:  Any objection?

8           MS. GOERNER:  Your Honor, may I voir dire the

9      witness?

10          THE COURT:  Counsel approach, please.

11          (Sidebar conference held on the record.)

12          THE COURT:  What is the purpose of the voir dire?

13          MS. GOERNER:  Well, they don't have anything that

14     connects those to my client.

15          THE COURT:  But this is -- the purpose of voir

16     dire -- the only purpose of voir diring the witness

17     with regard to introduction of evidence is to

18     establish that he cannot testify that these are fair

19     and accurate depictions of what they show.

20          MS. GOERNER:  Okay.  And I wasn't finished

21     because he just testified to seeing the backpack on

22     the roof.  Those pictures of the backpack are not on

23     the roof.

24          THE COURT:  Okay.  That would be a matter for

25     cross-examination.  That's not a matter of whether he

1    can testify.

2        MS. GOERNER:  Well, I don't know how that is a

3    fair and accurate depiction of the backpack on the

4    roof if that's not a backpack on the roof.

5        THE COURT:  Okay.  He didn't say it was on the

6    roof.  He said it was a fair and accurate depiction.

7        MS. GOERNER:  Yes, he did.  He testified it was

8    on the roof, and that was his question.

9        THE COURT:  Okay.  Well, that's not -- well, that

10   is not voir dire.  That is cross-examination of the

11   witness.  So I will allow you to ask him that on

12   cross-examination.  Okay?

13       (The following was in open court.)

14       MS. GOERNER:  Your Honor, my objection is as to

15   relevance and lack of foundation.

16       THE COURT:  Okay.  So the defense objection is

17   overruled.

18       State's Exhibits A, B, C, and E will be received

19   as 8, 9, 10 and 11.

20       Is that right, Pam?

21       THE CLERK:  Yes.

22       THE COURT:  Okay.

23       (State's Exhibit No. 8 was received in evidence.)

24       (State's Exhibit No. 9 was received in evidence.)

25       (State's Exhibit No. 10 was received in

1    evidence.)

2              (State's Exhibit No. 11 was received in

3    evidence.)

4              **MR. MATERA:**  May the witness step down?

5              May I publish those exhibits to the jury?

6              **THE COURT:**  Yes.

7    **BY MR. MATERA:**

8         **Q.**   Officer Wilson, the photograph of the backpack,

9    that's not where you observed it, correct?

10        **A.**   Not initially, no.

11        **Q.**   Okay.  Do you have any idea why the backpack was

12   moved to be photographed?

13        **A.**   Yes.

14        **Q.**   Why was that?

15        **A.**   It was raining that day on and off.  The backpack

16   was initially found on the roof in the same general

17   vicinity as the other tools, the damaged A/C units, and the

18   copper -- the pile of copper piping and other material that

19   had been cut.  It started to rain.  The tools and the

20   copper piping were getting wet.  There was equipment in

21   that backpack that we thought might have some value, as far

22   as evidence.

23              We took it out of the rain.  We moved it off the

24   roof so that the backpack and the material in it would not

25   get wet from the rain.  It was pouring at that point, so we

1    just moved it into that general area where that electrical

2    room was.

3         Q.   Okay.  And, now, take a step down, Officer.

4              MR. MATERA:  May he step down, Judge?

5              THE COURT:  Yes.

6    BY MR. MATERA:

7         Q.   Go ahead and take a step down and come in front

8    of the jury, please.

9              MR. MATERA:  May I approach the jury?

10             THE COURT:  Yes.

11             MR. MATERA:  I am showing Officer Wilson C-3.

12        It's part of the State's Exhibit C.

13   BY MR. MATERA:

14        Q.   Now, these photographs, Officer Wilson, were

15   these tools already wet?

16        A.   Yes.

17        Q.   Okay.  Is that why they were photographed still

18   on the roof?

19        A.   Yes.

20        Q.   And where were those tools found?  Explain this

21   general area to the jury.

22        A.   This was kind of in the center of the -- the roof

23   next to one of the A/C handlers.  Okay?  You can see that

24   the -- the panels, the sides have been pulled open exposing

25   the inside of the A/C handlers.  And these tools were

1    laying on one of the handlers on the -- like the interior

2    part of the panel that had been opened and laid down.

3          Q.    Okay.

4          MR. MATERA:   Now I am showing the witness C-2

5    that's in Composite C.

6    BY MR. MATERA:

7          Q.    Is this just a distance shot of what you were

8    just describing?

9          A.    Yes.

10         Q.    Okay.  And, again, is this just another distance

11   shot of what you were referring to?

12         A.    Yes.

13         Q.    Go ahead and stay there, Officer Wilson.

14         Officer Wilson --

15         MR. MATERA:   I am showing the witness what's been

16   marked as State's B for identification purpose.  First

17   showing Officer Wilson State's B-2 within State's B.

18   BY MR. MATERA:

19         Q.    Go ahead and tell the jury what that photo

20   depicts, as well.

21         A.    Just more of the damage from some of the A/C

22   handlers and other equipment that was up on the roof.

23         Q.    And what about this photograph?

24         MR. MATERA:   This is, Judge, B-1.

25         THE WITNESS:   Same -- more of the same.

1   BY MR. MATERA:

2       Q.   Okay.  Stay right there one more time.

3           MR. MATERA:  I am showing the witness State's E

4       in evidence.

5   BY MR. MATERA:

6       Q.   Explain to the jury what this is.

7       A.   This is another A/C handler.  And next to it, you

8   can see a pile of cut copper piping and other wires and

9   stuff of that nature that had been cut out of the A/C

10  units.

11      Q.   Are you familiar with what kind of tools need to

12  be used to take these items out of there?

13      A.   Hacksaws, bolt cutters are usually the main

14  pieces of equipment that are used to do that.

15      Q.   And some of the tools that were located on the

16  roof, were those bolt cutters and hacksaws?

17      A.   Yes.

18      Q.   You can sit down, Officer.

19           After you observed all these items, where did you

20  go?

21      A.   Well, again, we did not find the defendant up on

22  the roof.  We found an opening leading into the interior of

23  the building down, which would have been one of the -- like

24  the air ducts.

25      Q.   There was a photograph taken of that hole?

1    A.   Yes.

2         MR. MATERA:   Showing the defense what's been

3    marked as State's D for identification purposes.

4         Thank you.

5         May I approach the witness, Judge?

6         THE COURT:   You may.

7         MR. MATERA:   Showing the witness what's been

8    marked as State's D for identification purposes.

9    BY MR. MATERA:

10        Q.   Officer Wilson, do you recognize that photograph

11   or what's depicted in that photograph?

12        A.   Yes.

13        Q.   Is that an air duct hole that you believed the

14   only access to the ceiling area would be?

15        A.   Yes.   That was the only thing that we could find

16   that would allow access into the building.

17        MR. MATERA:   Your Honor, at this time, State

18   would move State's D into evidence.

19        THE COURT:   Any objection?

20        MS. GOERNER:   No objection.

21        THE COURT:   State's Exhibit D for identification

22   will be received as State's No. -- is it 13?

23        THE CLERK:   Twelve.

24        THE COURT:   Twelve.

25        (State's Exhibit No. 12 was received in

Ninth Judicial Circuit
Court Reporting Services

1   evidence.)

2          MR. MATERA:  May I approach the clerk?

3          THE COURT:  Yes.

4          MR. MATERA:  May I publish to the jury after the

5   clerk marks it?

6          THE COURT:  Yes.

7          MR. MATERA:  Thank you.

8          May I approach the jury?

9          THE COURT:  Yes.

10          (The exhibit was published to the jury.)

11          MR. MATERA:  May I approach the clerk?

12          THE COURT:  Yes.

13   BY MR. MATERA:

14      Q.   After you located that hole into the air duct,

15   where did you go?

16      A.   Well, we had a very brief conversation about

17   whether we were gonna follow or try to get into the

18   building through that air duct.  But officer safety wise,

19   that would have been ludicrous.

20      Q.   Why?

21      A.   Well, there's -- it's kind of, like, you know,

22   like the tunnels in Vietnam.  Only one person can fit in,

23   and we don't know what we're crawling into.

24      Q.   Fear that someone might be armed?

25      A.   Yes.

1      Q.    All right.  So what did you-all decide to do at

2   that point?

3      A.    We left -- I want to say we left one person --

4   one or two officers on the roof, and the rest of us exited

5   the roof, climbed back down through that hatch down the

6   ladder into the electrical room there, and met to figure

7   out how we were going into -- get into the building.  We

8   were also calling headquarters to ask him to get a

9   responder to see if anybody was in charge of the building

10  so we could have somebody come and potentially unlock the

11  door for us -- one of the doors so we could get in, but

12  there was nobody that could come and unlock them.

13     Q.    Were announcements made to come out over the P.A.

14  system?

15     A.    Yeah.  We pulled the patrol car up to the door --

16  or up to the building.  And over the police patrol car's PA

17  system, had an officer announce for probably 10 minutes,

18  "This is the Orlando Police Department.  We need you to

19  come out of the building.  We know you're in the building.

20  We need you to come out of the building."  But we did not

21  get any response.

22     Q.    At that point, what did you decide to do?

23     A.    We decided we would have to breach a door to go

24  into the building to try to locate the defendant.

25     Q.    And was the door breached?

1        A.   Yes.

2        Q.   All right.  And when you went inside of the

3    building, what happened?

4        A.   I mean, we were in there.  We searched the entire

5    interior of the building.  And it was pretty extensive.

6    We're talking about restrooms, a dining area.  The way that

7    restaurant had been set up, there were multiple dining

8    areas, so we had multiple dining areas, some with booths.

9    Some of the booths had loose seats on them, so we had to

10   lift all of those to see if maybe he was hiding in the --

11   in one of the seats itself of the booths.

12        We had to check the restrooms.  The kitchen area

13   was very extensive.  There was a freezer area.  We had to

14   go and check all of that.  The cabinets -- everything that

15   was in the kitchen had to be searched.  And then what we

16   did is we kept an officer in each area -- after we cleared

17   it, we kept an officer in each area so that if -- because

18   in certain parts of the restaurant, you could access

19   different areas multiple ways.  Okay?  It wasn't one way

20   in, one way out.  So with the exception of the restrooms --

21   so we kept officers in place as we continued to search and

22   clear room by room, section by section.  And then after

23   probably half an hour of searching -- extensive search, he

24   was nowhere in the -- that portion of the restaurant.

25        Q.   At that point, did you as police officers make a

1    determination that you were gonna use Clear Out?

2        A.   Well, at that point, we realized he's in the

3    ceiling.  There was a drop-down ceiling.  Okay?  So you

4    have the roof, and then you had the drop-down ceiling that

5    was -- you know, this is where all of the air ducts and

6    everything else, wiring and stuff are -- are housed in this

7    building.  And we realized he's in there because the

8    officers on the roof are radioing to us saying, "Look, he

9    hasn't come out."  We knew he wasn't there.  So we cycled

10   officers through to get our gas masks, and we punched

11   holes, and we tore down some of the ceiling panels, and

12   deployed Clear Out up into the ceiling.

13       Q.   Before Clear Out was deployed, did you guys give

14   any sort of command saying, "Come out.  We don't want to

15   deploy"?

16       A.   Oh, yeah.

17       Q.   Explain those kind of warnings or messages to the

18   jury, please.

19       A.   After we cleared everything downstairs -- or in

20   the main area of the restaurant, we started announcing, "If

21   you don't come -- you know, up in the ceiling, if you don't

22   come out, we are going to deploy Clear Out."  And that

23   announcement was made multiple times.  I couldn't put a

24   number on it, but it was being made as officers were

25   cycling.  One would come in with a gas mask.  Another would

1   go out, get his, and he would replace -- this took a while.

2   While all of that was happening, we were announcing, "If

3   you do not come out, we're going to deploy Clear Out to" --

4   or for purposes of him understanding what we were saying,

5   we were saying we're deploying gas.  Okay?  Because some

6   people are not gonna know what Clear Out is.  So we're just

7   gonna deploy gas if you don't come out of the ceiling.

8       Q.    And this Clear Out gas, it's not something you

9   guys enjoy deploying; is that correct?

10      A.    No.

11      Q.    Right.

12            And why is that?  Explain that to the jury.

13      A.    It's uncomfortable.  It's an irritant.  It makes

14  it hard to breathe.  It burns your eyes, especially.  If it

15  gets in your throat, it burns your throat.  It does not

16  offer -- it does not -- there's no actual physical injury

17  that it causes.  It's just extremely irritating.  You see

18  video of tear gas being deployed, it has a similar effect.

19  It's an aerosol, and it's in a can about this big.  And you

20  pop the top of it and it sprays it, and it fills an area

21  and kind of settles.

22      Q.    And if you are in that area, you are taking in

23  that stuff, too, right?

24      A.    Yeah, especially if your mask is -- if you don't

25  have a mask on, it makes it virtually impossible to

1    effectively work.

2         Q.   You said it affects your skin, as well?

3         A.   Not the Clear Out.  Not as much, no.  Not like a

4    pepper spray would.

5         Q.   All right.  So after you deploy the Clear Out,

6    what occurs next?

7         A.   We got no response from him.  We deployed a lot

8    of Clear Out in certain areas of the -- in the ceiling in

9    the roof.  We also -- we were punching holes trying to get

10   in certain areas in corners and this and that.  But in

11   those ceiling areas, there's insulation and stuff.  We

12   hadn't been up in the ceiling yet, so we don't know.  But

13   just based on experience, there's -- lot of times you find

14   insulation.  And people, if they're smart, they'll shield

15   their face using insulation from the Clear Out.  So we

16   thought, okay, well, he's found a way to defeat it.  We

17   have no choice now, but gonna have to go up in the ceiling

18   and try to find him.

19        Q.   In order to get up into the ceiling, what did you

20   use?

21        A.   We had to use a ladder to actually climb up.  We

22   found a, probably, five-foot ladder, and it allowed

23   officers who were tall enough to be able to reach, grab

24   some two-by-fours that were up in the ceiling, and pull

25   ourselves up, and swing our legs up into the ceiling.

1      Q.    Okay.

2            MR. MATERA:  I am showing defense counsel what's

3      been marked as State's F for identification purposes.

4            May I approach the witness, Your Honor?

5            THE COURT:  Yes.

6            MR. MATERA:  I am showing the witness what's been

7      marked as State's F for identification purposes.  It's

8      a composite.  There are two photographs, F-1 and F-2.

9    BY MR. MATERA:

10     Q.    Officer Wilson, please take a look at those

11     photographs and let me know if you recognize them.

12     A.    Yeah.  This is the --

13     Q.    Well, before saying what's in the photograph, you

14     recognize what's in the photo?

15     A.    Yes, I do.

16     Q.    Is it a fair and accurate depiction of the ladder

17     that you used to get up in the roof, or that the officers

18     were using?

19     A.    Yes.

20     Q.    Yes?

21     A.    Yes.

22           MR. MATERA:  At this time, the State would move

23     what's been marked as State's F into evidence.

24           THE COURT:  Any objection?

25           MS. GOERNER:  No objection.

1              THE COURT:  State's Exhibit F for identification

2         will be received as State's No. 13.

3              (State's Exhibit No. 13 was received in

4      evidence.)

5              MR. MATERA:  Permission to publish to the jury?

6              THE COURT:  You may.

7              MR. MATERA:  May Officer Wilson step down again,

8         Your Honor?

9              THE COURT:  Yes.

10             MS. GOERNER:  This is exhibit what, please?

11             MR. MATERA:  F.

12             MS. GOERNER:  Is this Exhibit 13 or 14?

13             MR. MATERA:  Exhibit 13.

14    BY MR. MATERA:

15        Q.   Officer Wilson, I am showing you what's in

16    evidence as State's F-2.

17             Tell the jury what that is.

18        A.   Okay.  Here you're looking at the top of the

19    ladder.  Okay?  That was the top step right there, that

20    green -- might be able to see better.

21        Q.   Showing the witness State's F-1.

22        A.   This is the ladder here.  Okay?  So it wasn't

23    five foot.  It was probably four foot at the most.

24    Basically, a giant step stool.  So here's where we were

25    standing.  This was the opening.  You can see a two-by-four

1    running horizontally.  They were all two-by-fours.  Were

2    probably this far apart.  So we had to jump from the top of

3    the ladder, had to jump, catch on to the two-by-fours and

4    pull ourselves up, and then swing our feet up into the

5    crawl space to get access.

6         Q.    Okay.  You can sit back down, Officer Wilson.

7              MR. MATERA:  May I approach the clerk?

8              THE COURT:  Yes.

9    BY MR. MATERA:

10        Q.    So when you went up into the ceiling, what

11   happened at that point?

12        A.    Four of us went into the ceiling, and we

13   basically set up a grid search where we went in different

14   directions, took sections of the ceiling area, and just

15   crawled along.  We couldn't stand up in there.  There was

16   probably this much room between the top of the two-by-fours

17   and the roof.  And the roof had nails that penetrated

18   through from the -- from the -- the tar paper that they had

19   up there and everything.  And there was insulation that we

20   had to constantly move out of the way.  And we just pulled

21   ourselves along section by section up in the ceiling area.

22              There were air duct vents that we had to crawl

23   over and sometimes under.  In some cases, it didn't allow

24   access because it was so tight.  And with all this gear on,

25   it's, you know, you almost double your normal width.  So we

1   had to cut the air ducts open just to slide through, and it

2   was awful.

3       Q.   How far were these two-by-fours away from each

4   other to where you had to, like, crawl?

5       A.   Maybe -- maybe 18 inches or so, 18 to 24 inches.

6   So it was just holding on and pulling yourself along.  And,

7   you know, there was nothing under them except the ceiling

8   panels.  And couple times we misstepped.  It was pitch

9   black up there, so you're trying to hold a flashlight as

10  you're doing it.  And couple times you would lose your

11  balance or whatever.  And two of us fell through the -- the

12  ceiling panels and caught ourselves and had to pull

13  ourselves back up in there.  So it was long and it was

14  tedious.

15      Q.   At any time during that did the defendant ever

16  show himself, say, "Hey, I give up," or come out?

17      A.   No, not while we were -- not while we were up

18  there.  We could hear movement.  But up there because of

19  all the insulation, and it really muffled the noises, so

20  you couldn't tell if it was one of the other officers.  We

21  were trying to communicate.  But even then, sometimes we

22  couldn't hear each other.  So you would hear, like, a

23  banging noise of -- we assumed it was rats, that it was

24  because there were rats up there and stuff.  So we thought,

25  okay, it's probably rats.  Or is it him or is it one of the

1    other officers?  And, I mean, we couldn't find him.  We

2    couldn't locate him.

3       Q.    After you couldn't locate him on the roof, what

4    happened?

5       A.    We deployed more Clear Out up this time up there

6    while we were up there wearing our gas masks, and it had no

7    effect.  So we realized, okay, he's -- the reason the Clear

8    Out is not working, the reason we are not finding him, he

9    is actually in one of the air ducts.  And there were -- I

10   can't even tell you how much -- I mean, you're talking

11   about a massive restaurant, a room bigger than this, the

12   entire building.  There were air ducts just all over the

13   ceiling, I mean, intersecting and everything else.  So the

14   entire area was filled with air ducts that were about this

15   big, large enough for a person to crawl through.  And we

16   realized this is why the Clear Out was not working because

17   those are self contained.  You know, they're designed so

18   that air can't get out and makes its way from the A/C unit

19   down into the restaurant itself.  So he was shielded from

20   the Clear Out.

21      Q.    And the Clear Out was getting down by the

22   officers down there?

23      A.    Yeah.  We were feeling the effects of the Clear

24   Out more than he ever was.

25      Q.    So then continue.  What happened next?

1      A.   So we started cutting into -- using our knives to

2   cut into the A/C units, or the A/C ducts.  We realized it

3   was pretty -- it was pretty futile.  I mean, at this point

4   it just -- there was only four of us who could actually get

5   up in there and crawl around.  It was like -- it was like

6   chasing, you know, chasing somebody all over the place

7   where we didn't know where he was.  It was -- and it

8   just -- it was fatiguing.  We were probably up there for

9   two hours.  And so we decided to, okay, let's get out.  We

10   know where he was.  He's in the air duct system.  We went

11   down and to -- tried to come up with another way of

12   accessing the air ducts.  We started throwing Clear Out

13   from the roof into that hole that we showed you earlier

14   that led into -- we threw Clear Out in there.

15          And I don't -- while we were out of the roof --

16   while we were out of the ceiling area, he came out of

17   the -- one of the air ducts.  I don't know.

18      Q.   The hole that you were referring to is the access

19   hole that you believed he entered through the ceiling?

20      A.   Yes, from the roof into the air conduct system.

21      Q.   Okay.  So at that point when you guys are

22   spraying the Clear Out up into the roof again, tell me what

23   happened.

24      A.   Whoever was on the roof deployed a can of Clear

25   Out into the air duct system.  We at that point had climbed

1    out of the roof.  We knew where he was, but we couldn't --

2    it was -- we were just trying to figure out how we were

3    gonna access all that air duct system.  While we were out,

4    he came somehow out of somewhere out of the air duct system

5    into the crawl space that we had been in.  And that was the

6    first time we actually saw the defendant.

7         Q.   Okay.  And what did you do at that point?

8         A.   Well, we were pulling ceiling panels down because

9    we saw him -- like, I observed him from the center of the

10   restaurant move east along next to one of the air duct

11   systems.

12        Q.   Are you trying to get out panels ahead of him?

13        A.   Yeah.  We were trying to knock panels out of the

14   ceiling so we can keep an eye on him and where he is.  And

15   we are yelling at him, "Come down.  Get your hands out.

16   Get out of the ceiling.  Come out now.  Come out now."

17             And at one point, he looked right at me and

18   then -- I mean, really, I was surprised how fast he moved

19   eastbound through the -- so I took my pepper spray out and

20   I sprayed.  I sprayed him.

21        Q.   And explain based upon your training when you're

22   supposed to use pepper spray.

23        A.   It's a, what we call, a soft control.  Okay?  If

24   a person is offering passive resistance, we can use pepper

25   spray.  Passive resistance, if an officer says to you,

1    "You're under arrest, put your hands behind your back," and

2    you refuse to do it, we don't have to warn you and say,

3    "You need to put your hands behind your back or we're gonna

4    pepper spray you." We can tell them, "You need to put your

5    hands behind your back," and if he doesn't, or she doesn't,

6    we can spray. It's like Clear Out, it does not leave any

7    physical injury. It's just extremely irritating. If you

8    get it in your eyes, it's virtually impossible to see.

9    It's almost impossible to open your eyes. If you get it in

10   your mouth, it gives you the feeling that you're choking,

11   and you will see people gag. It causes -- it causes your

12   sinuses to just deplete any fluid that's in them, so you

13   see people have, like, mucus coming out their noses and

14   stuff like that. It is extremely irritating. So that's

15   why I sprayed that at him when he tried to slide away.

16        Q.   Did the pepper spray have any effect?

17        A.   No.

18        Q.   So what happened after that?

19        A.   We got -- well, he worked his way from the east.

20   He went south and dropped down into one of the bathrooms.

21   I had gone back up into the ceiling to try to go after him

22   in the ceiling. And as I was working my way into the

23   ceiling, all of a sudden I heard Officer Morgan and Officer

24   Brillant, who had his K-9, screaming, "Get on the ground.

25   Get on the ground. Get on the ground now." So I jumped

1    back down out of the ceiling and ran around.

2         Q.   And when you ran around, what did you see?

3         A.   I saw the defendant on the ground.  Well, he was

4    standing on the floor.  Okay?  And I came around behind

5    Officer Morgan from where I was.  I had to come in from --

6    from a different angle.  So I was approaching from behind.

7    And he had -- he was starting to walk towards Officer

8    Morgan.

9         Q.   Can you describe his demeanor at that time?

10        A.   He was crouched down.  He had -- he had an object

11   in his right hand and an object in his left hand.  Okay?

12   And she had her gun on him, and she had her mask on.  So

13   she's screaming, "Get on the ground.  Get on the ground."

14   And he's coming at her.

15        Q.   Are you in your full police uniform?

16        A.   Yes.  All of us were.

17        Q.   Go ahead.  Continue.

18        A.   And he was coming at her.  He seemed a little bit

19   disoriented, but as though he was -- he wasn't gonna

20   comply.  Okay?  So...

21        Q.   Would you describe his movements towards Officer

22   Morgan as aggressive?

23        A.   Yes.  And he had what turned out to be a knife in

24   his right hand.

25        Q.   So go ahead.  Continue.  Describe what happened

1    after that.

2         A.    Initially, I didn't see the knife.   Okay.

3    Officer Morgan did.   Officer Brillant released the dog on

4    him.   And Officer Brillant -- as Morgan is screaming at

5    him, Officer Brillant is screaming, "I'll release the dog.

6    I'll release the dog."

7              Officer Brillant was behind him.   He's moving

8    away from Brillant towards Morgan.   They're both yelling --

9    you know, she's yelling, "Get on the ground.   Get on the

10   ground now."

11             I'm coming up behind and --

12        Q.    Was the K-9 still on a leash at that point?

13        A.    At that moment, it was on a leash.

14        Q.    And Mr. Washington is actually walking towards

15   the K-9?

16        A.    No.   He was walking towards -- the K-9 was behind

17   him.   He was between Officer Morgan and the K-9.

18        Q.    And the K-9 was behind.

19             Was the K-9 barking?

20        A.    Loud.   Yeah.

21        Q.    Continue.   Go ahead.

22        A.    And instead of listening to the commands and

23   getting on the ground, with the knife in his hand, he's

24   coming at Morgan.   So Officer Brillant released the dog,

25   who grabbed him on his leg, and he fell to the ground.   The

1    knife went skidding away from him.  The flashlight went in

2    another direction.

3         Q.   Okay.  And after the dog bit him, did you-all

4    attempt to secure him?

5         A.   Well, he rolled around and started punching the

6    dog.

7         Q.   So what happened after that?

8         A.   So the dog -- I don't remember exactly.  But the

9    dog, I believe, released.  We tried to handcuff him.  He

10   was resisting our efforts to handcuff.  The dog grabbed him

11   again and latched on again, and he tried to fight the dog

12   again.  Officer Morgan grabbed one hand.  I grabbed another

13   hand.  She was trying to get his arm around.  I was able to

14   get his arm around behind his back and get the handcuffs on

15   him.

16        Q.   When you were trying to apply the handcuffs, was

17   he still resisting?

18        A.   Yes.  Yes.

19        Q.   Describe that resisting to the jury.

20        A.   Well, for us to get the handcuffs on, you have to

21   understand about K-9s, and Officer Brillant would be -- I

22   mean, he's the expert.  But we all are warned about this.

23   K-9s can't distinguish between cop and suspect.  All right?

24   So if you're not careful, K-9 can attack us, as well.  It

25   doesn't recognize a police uniform.  It just -- it has been

1    given the order to bite, and so it bites, and it bites the

2    closest thing to it or what appears to be the most

3    aggressive.  Okay?

4           In a situation like this where you have officers

5    who are actively trying to take someone in custody who's

6    actively resisting and violently resisting, it's a violent

7    confrontation, so the dog is not gonna be able to

8    distinguish between who the suspect is and the cop and

9    who's more aggressive because everybody's trying to get --

10   get this person restrained.  Okay?

11          So Officer Brillant had let go of the dog.  When

12   he -- or had let -- had made the dog release his bite,

13   let's put it that way, at that point, we moved in, and

14   that's -- the minute -- the second the dog let go and

15   Officer Brillant pulled him back, I jumped in, got on the

16   floor.  He was on his chest.  We're trying to get up.  And

17   I grabbed his arm and pulled his arm around.  And Officer

18   Morgan and, I think another officer, helped her to get his

19   other arm behind his back and we handcuffed him.

20        Q.   All right.  After you handcuffed him, can you

21   describe his demeanor as you're leading him out of the

22   building?  Is he still --

23        A.   No.  He was not -- at that point, he was not

24   resisting anymore.  He was in pain from the dog bites.

25        Q.   Okay.

1      A.   We exited the building.  And he got -- he got cut

2   pretty bad from the bog bites, so I was calling for OFD to

3   come in to treat him.

4      Q.   And the fact that he got bit, that is not

5   something you guys are happy about it, the Orlando Police

6   Department, right?

7      A.   No.  No.

8      Q.   That's something you guys do as a last ditch

9   effort to secure somebody?

10     A.   Yes.  And, you know, it's -- that is much higher

11  on the level of force that we're allowed to use.  I mean,

12  we don't deploy a dog just because a person is noncompliant

13  in a manner such as that.  In this case, we had a

14  subject -- we -- first of all, the dogs can only be used

15  for certain crimes, and they have to be a felony of that

16  nature.  And in this case, like I said, he had a knife in

17  his hand, and so the threat that it poses to us, we rather

18  use a dog to disarm him than have to shoot.

19     Q.   All right.  And you've been describing this male

20  that you saw in the ceiling, you described this male that

21  fell from the bathroom that you observed walking towards

22  Officer Morgan.

23          Do you observe that person in the courtroom

24  today?

25     A.   Yes, I do.

1       Q.   Can you please point to that person and describe

2   an article of clothing that he's wearing?

3       A.   He's wearing a grayish buttoned-down dress shirt.

4       Q.   Is he sitting next to the female defense counsel?

5       A.   Yes.

6            MR. MATERA:   Your Honor, would the record please

7   reflect the witness has identified the defendant?

8            THE COURT:   The record will so reflect.

9   BY MR. MATERA:

10      Q.   And, Officer Wilson, all the events you just

11  testified to, they all occurred in Orlando?

12      A.   Yes.

13      Q.   In Orange County, Florida?

14      A.   Yes.

15           MR. MATERA:   One moment, Your Honor, please.

16           I have no other questions for the witness, Judge.

17           THE COURT:   Ms. Goerner, any questions of the

18  witness?

19           MS. GOERNER:   Yes, Your Honor.

20           THE COURT:   You may proceed.

21                      CROSS-EXAMINATION

22  BY MS. GOERNER:

23      Q.   Good morning.

24      A.   Good morning.

25      Q.   Now, you, I guess, started out by saying that

1    because you were the field-training officer for Officer

2    Morgan that you review her statements, correct?

3         A.   Yes, ma'am.

4         Q.   And you essentially swear to the same thing that

5    she's writing?

6         A.   Yes.

7         Q.   All right.  So you responded out to the scene.

8    At some point, you were up on the roof searching the roof

9    for the suspect?

10        A.   Yes.

11        Q.   And you observed a backpack while up on the roof?

12        A.   I did.

13        Q.   Did you also observe, I guess with this backpack,

14   a water bottle and some tools?

15        A.   Yes.

16        Q.   And the tools included a knife, a screwdriver,

17   and some bolt cutters?

18        A.   Yes.

19        Q.   Now, were the knife, screwdriver, and bolt

20   cutters in the backpack, or did you observe them somewhere

21   else?

22        A.   They were -- there was multiple tools.  Some were

23   in the backpack, and others were on the roof outside of the

24   backpack.

25        Q.   And the water bottle was where?

1    A.   I don't recall for sure, but in that general

2    vicinity.

3         Q.   Was it inside the backpack?

4         A.   I don't recall.  I don't believe so, though.  I

5    never -- you have to understand, I personally never went

6    into the backpack itself.

7         Q.   Okay.

8         A.   Okay?  So I can't truly testify to what exactly

9    the contents of the backpack were.

10        Q.   Was that backpack, was it opened or closed when

11   you saw it?

12        A.   I did not look inside it, so I can't -- I saw it

13   there next to -- close proximity to the tools and the

14   copper and everything.

15        Q.   I'm gonna show you what's previously been entered

16   into evidence as State's Exhibit A.

17             This is a photograph -- these are photographs of

18   the backpack that you saw?

19        A.   Yes.

20        Q.   And that backpack is closed in that photograph,

21   correct?

22        A.   This backpack?  I'm sorry.  Say that again.

23        Q.   The backpack is closed in that photograph,

24   correct?

25        A.   It is closed.

1      Q.   Did you close the backpack?

2      A.   No.

3      Q.   Did you collect that backpack?

4      A.   No, I did not.

5      Q.   Are you the person who moved the backpack from
6    the roof down to the floor?

7      A.   No.

8      Q.   Now, that backpack is -- the picture of the
9    backpack is downstairs, correct?

10     A.   Yes, it is.

11     Q.   It's downstairs by the door that was next to the
12   electrical room?

13     A.   Yes.

14     Q.   And you didn't put it there?

15     A.   No, I did not.

16     Q.   Do you have any idea who put it there?

17     A.   No.  One of the officers that was -- it was a
18   bunch of us up on the roof.

19     Q.   Okay.  You didn't take anything out of the
20   backpack?

21     A.   I did not, no.

22     Q.   You never saw Mr. Washington with the backpack,
23   did you?

24     A.   No.  I never saw Mr. Washington up on the roof to
25   begin with.

1      Q.   Okay.  So then you never saw Mr. Washington with

2   the saw?

3      A.   No.

4      Q.   You never saw Mr. Washington with the bolt

5   cutters?

6      A.   No.  They were all laying on the roof when I went

7   up onto the roof.  I apologize.  I apologize.  I did see

8   Mr. Washington on the roof when he came and closed the

9   hatch.  That was the only time I saw him up on the roof.

10     Q.   Okay.  That hatch, is it near -- I'm gonna show

11   you what's been previously marked State's Exhibit 10 for

12   identification.

13          Now, State's Exhibit 10 is the unit that you saw

14   was dismantled with the saw and the bolt cutters, correct?

15     A.   Yes.

16     Q.   Now, that hatch is not next to that particular

17   unit, is it?

18     A.   No.

19     Q.   Okay.

20     A.   Let me try to get my bearings here.

21          Okay.  Here's the Walgreens.  So this is -- this

22   A/C unit is in the -- what would be the southwest corner of

23   the roof.  Okay?  This is Semoran Boulevard here.  This is

24   LaCosta Drive on this side.  The hatch was on the north --

25   what would be the northeast corner.

1      Q.   So the other side of the building?

2      A.   Yes, the other side.

3      Q.   Okay.  So you never saw Mr. Washington in this

4   area of the unit?

5      A.   No.  The only time I saw him on the roof was when

6   he came and closed the hatch on us.

7      Q.   On the north side of the building?

8      A.   The northeast side, yes.

9      Q.   So you never saw Mr. Washington with the saw?

10      A.   No, ma'am.

11      Q.   You never saw him with the bolt cutters?

12      A.   No, ma'am.

13      Q.   You never saw him with the saw?

14      A.   No.

15      Q.   Or near the bolt cutters?

16      A.   No.

17      Q.   You never saw him near the area where the

18   backpack was found?

19      A.   No.

20      Q.   Now -- and again in that exhibit, as well as in

21   State's Exhibit No. 9, which I will show you, you mentioned

22   earlier that there is a -- and you can kind of show it to

23   the jury as you're explaining, but there's like a wall

24   that's about three feet tall?

25      A.   Yes.  That's -- that would be this here

1    (indicating.)

2         Q.   So that wall, if you're standing down on the --

3    on the street or on the sidewalk, you can't see onto the

4    roof?

5         A.   No, you cannot.

6         Q.   Is that why you had to get in the bucket to go up

7    and to try to look for him?

8         A.   Yes.

9         Q.   You mentioned that when you first came into the

10   building on the side where the ladder led up to the roof

11   hatch that you saw a knife on the circuit breaker box?

12        A.   There's a door that leads from the outside of the

13   building into that electrical room.  Okay?  When you

14   walked -- when you walked in through that door, the

15   electrical room was right here, and it was -- that door led

16   only to the electrical room and the ladder up to the roof.

17   You could not get into the building from there.

18             So here's a wall.  As you enter, there's a wall

19   right here that comes around.  There was an electrical box,

20   like a control panel right there to your left shoulder as

21   you enter, and it was sitting on there next to the ladder

22   that went up.

23        Q.   So if I can have you step down.

24             MS. GOERNER:  May I have the witness step down?

25             THE COURT:  Yes.

Ninth Judicial Circuit
Court Reporting Services

1   BY MS. GOERNER:

2        Q.   Showing you now State's Exhibit 1 in evidence.

3   Is this the breaker box that you are talking about, the

4   second photograph?

5        A.   Let me look at -- okay.  Here's the room.  This

6   is one of them.  And that looks like -- that is the ladder

7   that goes up -- that is the ladder that goes up to the

8   hatch.

9        Q.   All right.  So the knife that you saw, would it

10  have been on top of this?

11       A.   It was somewhere right in this -- no.  It was

12  closer to the door, which is like right here (indicating).

13       Q.   Okay.  But it wasn't on the floor?

14       A.   No.

15       Q.   Okay.  Thank you.

16            And you never saw Mr. Washington with that knife,

17  correct?

18       A.   I did not.

19       Q.   In fact, this was an abandoned building?

20       A.   It was.

21       Q.   Are you familiar with that particular building?

22       A.   Yes.

23       Q.   Had it been abandoned for a while?

24       A.   Yes.

25       Q.   More than a year?

1      A.   I can't tell you that.  I don't know that for

2   sure.

3      Q.   More than six months?

4      A.   Possibly.

5      Q.   Okay.  Homeless people frequented that area?

6      A.   Yeah, but we had never had an issue with them

7   breaking in.  That building was actually pretty well

8   secured --

9      Q.   Okay.

10      A.   -- based on my experience.

11      Q.   Well, when you got there, the door was open,

12   correct?

13      A.   The door leading to the electrical room was open.

14      Q.   And you don't know how it got open?

15      A.   It had been -- well, it was obvious that it had

16   been broken into.  The lock on it had been damaged allowing

17   access.

18      Q.   You don't know when that happened?

19      A.   No.

20      Q.   You don't know how long that door had been

21   opened?

22      A.   No.  But I will say that that area is -- that is

23   actually in my district within our sector, and I patrol

24   that area all the time, and I had never seen that door

25   open.

1       Q.   Well, the last time that you had been in that

2    particular location had been when?

3       A.   I don't remember the exact work schedule, but

4    probably the day before.

5       Q.   And homeless people do frequent that area,

6    correct?

7       A.   Not -- there was a -- across the street from

8    there is a -- there was an old bowling alley, and they

9    would often stay in the woods behind that, but not

10   actually -- it was really no place for them to get any

11   shelter in that building on the exterior.  It didn't have a

12   lot of overhang or something where they would find shelter.

13      Q.   But if they could gain access inside the

14   building, they could get shelter inside the building,

15   correct?

16      A.   Yes.

17           MS. GOERNER:  Showing the State what's been

18       marked for identification as Defense Exhibit AK.

19           Your Honor, may I approach the witness?

20           THE COURT:  You may.

21   BY MS. GOERNER:

22      Q.   Mr. Wilson, I am showing you what's previously

23   been marked as Defense Exhibit AK.

24           Do you recognize that as one of the photographs

25   taken of the abandoned Perkins on that day?

1      A.    Yes.

2      Q.    And did you, in fact, see a shopping cart inside
3   the Perkins on that day?

4      A.    I don't recall seeing it, but, obviously, there
5   was one.

6      Q.    The only way to get a shopping cart inside of the
7   Perkins would have been through an open door, correct?

8      A.    Correct.

9      Q.    There was no open windows?

10     A.    No.  Everything was completely secured.

11     Q.    And it would have been very -- almost impossible
12   to get a shopping cart inside of the restaurant through the
13   roof, right?

14     A.    You wouldn't have been able to, that I could see.

15     Q.    And you don't have any idea how or when that
16   would have happened?

17     A.    No.

18     Q.    Earlier you were asked to review or take a look
19   at, I believe, State's Exhibit 11.  It's a cut copper
20   piping on the roof?

21     A.    Yes, ma'am.

22     Q.    Now, where was that cut copper piping?  Was that
23   on the southeast corner near where you found -- saw the
24   tools, or was that on the other side of the building?

25     A.    I don't remember exactly for sure.  I mean, it's

1 a very large roof, and there were multiple A/C units and

2 other type of electrical equipment up there, but it was

3 closer to the tools than it was the actual hatch that led

4 back down to the ground.

5   Q. Okay.  So not in the area where you observed the

6 defendant, Mr. Washington?

7   A. No.

8   Q. And you never saw Mr. Washington cutting the

9 copper from the building or from the A/C units?

10   A. No.

11   Q. You never saw him with the copper?

12   A. I did not.  You have to -- if I may?

13   You have to realize, we didn't immediately go up

14 onto the roof.  Our first -- when I -- I remember thinking

15 when the call first came out, well, somebody is probably up

16 there.  One of two things is happening.  Somebody is either

17 up there fixing the A/C because we're getting ready to

18 remodel the building, or somebody's stealing the copper,

19 which is a very common occurrence, especially with

20 abandoned buildings.  But we did not arrive there and

21 immediately go up on the roof.

22   Q. I understand, Mr. Wilson.  But the thing is, you

23 don't know when that copper was cut from the A/C units?

24   A. No.

25   Q. You don't know if that happened before

1   December 31, 2014, do you?

2       A.   No.

3       Q.   And even when you were patrolling the area, you

4   didn't go up onto the roof to see the condition of the

5   air-conditioning units, right?

6       A.   No.  The A/C units -- or the only way up onto the

7   roof would be a large ladder, which, obviously, I don't

8   carry, but also to break into that electrical room.  And I

9   had never noticed that door damaged in any way or open.

10  And that day it was wide open.

11      Q.   I understand that.

12           But you had not noticed that while patrolling the

13  area?

14      A.   No.

15      Q.   You don't know whether or not that damage to the

16  A/C units had occurred prior to that day?

17      A.   No.

18      Q.   You don't know whether that copper was cut from

19  the units prior to that day?

20      A.   No, I don't.

21      Q.   You don't know whether somebody else gained

22  access to the roof by putting a ladder to the building

23  prior to that day?

24      A.   No.  But, normally, if somebody is gonna cut

25  copper --

1    Q.  Mr. Wilson, there's no question pending.

2    A.  Okay.

3    Q.  Thank you.

4        You said that four of you-all went onto the roof

5    looking for Mr. Washington, or looking for the suspect?

6    A.  No.  Four of us went into the ceiling, the crawl

7    space area.

8    Q.  Okay.  That was the crawl space area?

9    A.  Yeah.

10   Q.  Which four officers did that?

11   A.  I believe it was -- it was me, I believe Officer

12   John James, Mike Zambito, and Dan Robertson, I think was

13   the four of us.

14   Q.  And none of you-all found the suspect in the

15   crawl space, correct?

16   A.  Not while we were up there, no.

17   Q.  And you-all didn't find him on the roof while you

18   were up there?

19   A.  No.

20   Q.  You had talked about the effects of the Clear

21   Out.  You said that that can affect somebody's ability to

22   see, or did you say that?

23   A.  Yes.

24   Q.  Okay.  And it's not as irritating to the skin as

25   pepper spray, but it is irritating?

1     A.   I have never felt Clear Out.  You know, if it's

2  on my arms or something like that if I'm walking through

3  it, I don't -- I have never felt it.

4     Q.   Okay.  And if it's inhaled, makes it difficult to

5  breathe?

6     A.   Yes.

7     Q.   Now, when the suspect, Mr. Washington, finally

8  came out into the crawl space the first time that you saw

9  him, you said you deployed your pepper spray?

10    A.   I tried.  Yeah.

11    Q.   And that would have caused also the same effects

12 of making it difficult to see?

13    A.   Yeah.  But I didn't -- when I tried to deploy it,

14 he had already moved to a section where there was still

15 some ceiling panels.  We couldn't predict -- they were

16 trying to predict what direction he's going to go.  When I

17 sprayed, I think I hit him from about here down.

18    Q.   Okay.

19    A.   Okay.  On his clothing.  And when that -- when we

20 deploy that pepper spray, there's certain kinds.  There's

21 some that shoot in, like, a stream, and they can shoot

22 about 15 feet.  And there's others where it comes out

23 almost as a mist.  Okay?

24         The kind that we use at Orlando Police now is a

25 mist.  It comes out as a spray -- as an aerosol spray.  And

1    the point of it is to cover a wide area so that it -- more

2    likelihood that it's gonna hit somebody.

3         Q.   So what kind did you use on that day?

4         A.   That day I used -- I used what I was issued,

5    which is that kind.  And the problem with it is, at the

6    height of that ceiling, it did not -- unlike a stream that

7    would have easily made it that distance, I can't guarantee

8    and couldn't guarantee that day it actually had much of an

9    impact if it got close enough to him to really affect him.

10        Q.   So you don't know whether it made contact with

11   Mr. Washington or not?

12        A.   I couldn't say for sure.

13        Q.   So going back again to the effects.  If, in fact,

14   it had gotten into Mr. Washington's eyes, it would have

15   made it difficult to see?

16        A.   In most cases.

17        Q.   Cause bloodshot eyes.

18        A.   Every once in a while there's people, who for

19   whatever reason, it doesn't affect them.

20        Q.   I understand.

21             But the typical effects is that it makes it

22   difficult to see?

23        A.   Yeah.  It forces you to really squint your eyes

24   and close your eyes.

25        Q.   It would cause bloodshot eyes?

1     A.   Yes.

2     Q.   If it got on the skin, it would irritate the

3  skin?

4     A.   It can irritate the skin.

5     Q.   It would make it difficult to breathe?

6     A.   Yes.  If a person is especially wet, like if

7  they're sweaty, the pepper spray actually affects them

8  more.

9     Q.   Because it gets into the pores of the skin?

10    A.   Yeah.

11    Q.   It makes it even more irritating?

12    A.   Exactly.

13    Q.   Okay.  Now, at some point, you said that you

14  observed -- well, I guess you heard Mr. Washington drop

15  down out of the ceiling, or you heard a commotion over in

16  the bathroom area?

17    A.   Yes.

18    Q.   You actually saw Mr. Washington shortly after you

19  heard that commotion, correct?

20    A.   Yeah.

21    Q.   And he appeared a little bit disoriented to you?

22    A.   Yeah.  He -- well, I guess -- I guess you could

23  call it that because he -- he was not in any way complying

24  with the commands.  And the commands were very clear, "Get

25  on the ground.  Get on the ground.  Get on the ground now."

1    And instead of doing that, he approached -- at fast, he

2    approached Officer Morgan.

3        Q.   Now, you said that you observed both hands

4    clenched?

5        A.   Yes.

6        Q.   And you observed what?

7        A.   In his left hand, he was holding a small

8    flashlight.

9        Q.   And you observed that?

10       A.   I observed that, and I observed it in a -- an

11   instrument in his right hand, which turned out to be a

12   knife.

13       Q.   At the time you observed the instrument in his

14   other hand, you couldn't tell what it was at that time,

15   correct?

16       A.   I couldn't for sure.

17       Q.   And after Mr. Washington had been bit by the dog,

18   both objects flew out of his hands?

19       A.   The second the dog latched on, he fell forward

20   because the dog grabbed him, basically, yanking his leg out

21   from under him.  So he fell forward, put his hands out like

22   this, and the knife went in one direction, and the

23   flashlight in the other towards Officer Morgan and I.

24       Q.   Let me just kind of go back to the pepper spray

25   incident again.  You sprayed Mr. Washington.  Did that

1      A.  Yes.

2      Q.  And did, in fact, pepper spray appear to strike

3  Mr. Washington on his chest and neck area?

4      A.  Yes.

5      Q.  Now, this abandoned Perkins, it has since been

6  demolished, right?

7      A.  It has.

8          MS. GOERNER:  May I have a moment?

9          THE COURT:  Yes.

10  BY MS. GOERNER:

11      Q.  Mr. Wilson, did you ever see that flashlight

12  after it flew out of Mr. Washington's hand?

13      A.  No.

14      Q.  You never collected it?

15      A.  I did not.

16      Q.  You ever take a photograph of it?

17      A.  No.  That would have been done by a crime scene

18  investigator.

19      Q.  So do you know if anybody from the unit -- OPD

20  did that?

21      A.  I do not recall.  You got to -- when I removed

22  him from the -- we brought him right over to the medical

23  staff that was out there, the fire department and

24  ambulance.  And I stayed with him the entire time until he

25  was transported to the hospital.  So I never went back in

1    there or saw what happened after that.

2         Q.   Okay.  Very good.  Thank you.

3              THE COURT:  Any redirect?

4              MR. MATERA:  Briefly, Judge.

5                         REDIRECT EXAMINATION

6    BY MR. MATERA:

7         Q.   Officer Wilson --

8              MR. MATERA:  May it please the Court?

9              THE COURT:  Yes.

10   BY MR. MATERA:

11        Q.   Officer Wilson, when you sprayed the defendant

12   with pepper spray -- or let me take that back.

13             What is the desired effect when you spray someone

14   with pepper spray?  What do you want to see happen?

15        A.   Compliance.

16        Q.   Okay.  Typically, when you use your pepper spray

17   in the past and you sprayed individuals with pepper spray,

18   what occurs?

19        A.   They immediately -- within seconds, within

20   seconds they will almost always close their eyes.  They

21   start to gag.  They start to -- they salivate.  Their nose

22   depletes itself of any mucous.  And in most cases, it's

23   almost so disorienting that any resistance that they've

24   been giving us, they stop because they're more focused on

25   the discomfort that it causes.

1      Q.   After you sprayed the defendant with the pepper

2  spray, did he act as the other people act when you normally

3  spray them with pepper pray?

4      A.   No.

5      Q.   Did he continue to move after you sprayed him

6  with the pepper spray?

7      A.   Yes.  And as a matter of fact, after -- in

8  reading the report, after I sprayed the first time, I tried

9  to move ahead of him in the direction that he was going.

10  And when he -- I removed some ceiling panels, and he looked

11  down and saw me and backed up because he saw that I was

12  gonna spray a second time, so...

13      Q.   Do you know of burglars to leave their copper

14  behind when they steal it?

15      A.   No.

16          MS. GOERNER:  Objection.

17          MR. MATERA:  No further questions, Judge.

18          THE COURT:  Basis of the objection?

19          MS. GOERNER:  Relevance and form of the question.

20          THE COURT:  Sustained.

21          MR. MATERA:  No further questions, Judge.

22          THE COURT:  Members of the jury, do you have any

23      questions of the witness?  If so, please raise your

24      hand.

25          All right.  I see no hands.

1           Thank you, sir.  You are free to leave.

2           Members of the jury, we have been sitting for a

3      while.  We are gonna take a recess at this time.

4      You're excused to the jury room.  Please remember to

5      leave your notepads on the chair as you exit.  Please

6      also remember not to discuss the case amongst

7      yourselves or conduct any investigation of your own.

8      We will be with you momentarily.  You are excused to

9      the jury room.

10          COURT DEPUTY:  Jurors are exiting.

11          (The jury exits the courtroom.)

12          THE COURT:  All right.  We will take a 10-minute

13     recess.

14          MR. MATERA:  Judge?

15          THE COURT:  Yes.

16          MR. MATERA:  Is it safe to tell -- what time

17     would you plan on stopping today?

18          THE COURT:  We will stop at a logical stopping

19     point, so I don't know when that might be.

20          MR. MATERA:  Okay.

21          THE COURT:  How many more witnesses do you have?

22          MR. MATERA:  The witnesses I have that are left

23     are shorter, but about four, five.

24          THE COURT:  Okay.

25          MR. MATERA:  One individual is in flight is the

# B

1          THE COURT:  What was the name?

2          MR. MATERA:  James.

3          THE COURT:  James?

4          MR. MATERA:  John James.

5                        JOHN JAMES

6    was called as a witness and, having first been duly sworn,

7    testified as follows:

8          THE WITNESS:  Yes, ma'am.  I do.

9          THE COURT:  Hello, sir.  You may be seated.

10         THE WITNESS:  Thank you, Your Honor.

11         THE COURT:  Please tell us your name.

12         THE WITNESS:  John Seth James, Your Honor.

13         THE COURT:  You may inquire, Counsel.

14                  DIRECT EXAMINATION

15   BY MR. MATERA:

16     Q.   Officer James, please introduce yourself to the

17   jury.

18     A.   Yes, sir.

19          Good morning.  I'm officer John Seth James with

20   the Orlando Police Department.

21     Q.   How long have you been employed at the Orlando

22   Police Department?

23     A.   I have been with the City of Orlando since 2001,

24   sir.

25     Q.   So around 15 years, sir?

1        A.    Yes, sir.

2        Q.    You have any prior law enforcement experience?

3        A.    No, sir.  I do not.

4        Q.    Before becoming a law enforcement officer, what

5   type of training did you receive?

6        A.    Are you referring to the basic law enforcement

7   academy?

8        Q.    Yes, sir.

9        A.    Just that.

10        Q.    Okay.  On December 31 of 2014, in the morning,

11   were you issued a body camera from the Orlando Police

12   Department?

13        A.    Yes, sir.  I was.

14        Q.    Do you recall being called out to 5705 LaCosta

15   Drive on that day?

16        A.    Yes, sir.  I do.

17        Q.    And at that time, did you have the body camera on

18   you?

19        A.    Yes, sir.

20        Q.    Explain to the jury what a body camera is.

21        A.    Yes, sir.

22              The body camera is a recording device that is

23   issued to our officers mostly for transparency.  It's an

24   active recording, kind of like the cameras that are always

25   in the police cars.  What it does is it gives a better view

1    of an up-close personal encounter.  That way it records

2    both the video and the audio of anything that an officer

3    might say or an individual might say during an

4    investigation of a crime.

5        Q.    Where do you keep the body camera on your person?

6        A.    When I am on the road and operating with the body

7    camera, there's one up on my vest, which would be kind of

8    where my glasses are.

9        Q.    On that day, you had a body camera?

10       A.    Yes, sir.  I did.

11       Q.    Were you aware whether this body camera was

12   working at that time?

13       A.    It was.  Yes, sir.

14       Q.    When you reached at the scene, 5750 LaCosta

15   Drive, where did you put the body camera?

16       A.    Initially when I arrived or once I --

17       Q.    When you arrived, where did you have the body

18   camera?

19       A.    It was still on my lapel.

20       Q.    After arriving and being briefed by the officer,

21   where did you place the body camera?

22       A.    The body camera, the way it attaches to our

23   polyester uniform is by a magnet, which means it can be

24   attached to any metal object or any opposite magnet for

25   officer safety concerns.  With the description that was

1    given to me by the initial officers on scene, instead of

2    putting officers with guns in a confrontation, possibly,

3    the decision was made to remove the body camera from my

4    uniform, place it onto a metal pole.

5         The body camera, because it is a recording

6    device, is -- allows us to have access through Bluetooth

7    within a short range to witness what is actually going on.

8    For example, if I have the body camera with me, I could

9    actually turn it on and show you on my phone what is being

10   recorded.  So this was a tactic used for officer safety to

11   try to clear the roof and look for the initial suspect,

12   sir.

13        Q.    On December 31st of 2014, was the body camera a

14   fairly new system to the Orlando Police Department?

15        A.    Yes, sir.  Only been out for a few months.

16        Q.    Did your body camera capture anyone on the move?

17        A.    No, sir.  It did not.

18        Q.    Was the body camera given back to you?

19        A.    Yes.

20        The body camera was with me the entire time, but

21   it went from my uniform, my shoulder to the pole to be used

22   in an attempt to locate a suspect.  And then I retained it

23   and put it back on my uniform, sir.

24        Q.    Where did you go after you obtained the body

25   camera back from the pole?

1      A.   Back to my patrol car and my perimeter position.

2      Q.   Did you make entry into the building located at

3   5705 LaCosta Drive?

4      A.   A short time later, yes, sir.  I did.

5      Q.   All right.  And when you went into the building,

6   tell the jury what happened at that point.

7      A.   Respectfully, Counsel, are you referring to

8   before making entry or once already inside?

9      Q.   Once already inside.

10     A.   Ultimately, once I made entry into the building,

11   we did a search of the empty commercial building.

12     Q.   And before you went inside the building, where

13   did you --

14     A.   I apologize.  That's what I'm trying to clarify

15   with you, Counsel.

16     Q.   Yes.

17     A.   I am one of the department less than lethal

18   instructors, which means in addition to my normal patrol

19   tasks, I also carry a chemical spray.  That chemical spray

20   was deployed in the building before I actually entered into

21   it, sir.

22     Q.   That spray known as Clear Out?

23     A.   Yes, sir.  That is what it's commonly referred

24   as.

25     Q.   At that time, did you believe your body camera to

1    be recording at that time?

2        A.   Yes, sir.

3        Q.   Where did you go after the Clear Out did not have

4    the desired effect?

5        A.   Ultimately, we had to search the building, so we

6    did a -- a search of the building on foot, meaning -- for

7    example, for the jury, we would be walking around this room

8    and then a second search was done in-between the -- I guess

9    the ceiling panels and the top of the roof, sir, crawling

10   in the crawl space.

11       Q.   You went up there in the crawl space?

12       A.   Yes, sir.  I did.

13       Q.   Can you describe the crawl space to the jury?

14       A.   I would do my best, Counsel.

15            There are wooden support beams.  This was a

16   closed restaurant, so very soft, I guess, ceiling tiles,

17   softer than what you would see here in the courtroom.  And

18   in-between them, very small, I guess, two-by-four or

19   four-by-four support beams.  And basically had to crawl

20   hands and knees with a short distance between where I was

21   crawling in the roof in an attempt to search that area,

22   Counsel.

23       Q.   During that search, you were on your hands and

24   knees and elbows?

25       A.   Yes, sir.  Very confined space, sir.

1    Q.   Described as a tight squeeze?

2    A.   Yes, sir.

3    Q.   After you did not locate the suspect, where did
4    you go?

5    A.   Got off of the roof, sir.

6    Q.   All right.  After you got off of the roof, what
7    happened inside of the building?

8    A.   In an area where I was not standing, I heard
9    other officers giving verbal commands.  They had observed
10   the suspect and were attempting to make contact with him.

11   Q.   Did you go towards that area?

12   A.   Ultimately, I did.  Yes, sir.

13   Q.   And when you arrived in that area, what did you
14   observe?

15   A.   Respectfully, Counsel, the initial contact with
16   the other officers and the suspect probably was several
17   minutes.  But once I made it over to where they were where
18   he was located, they were in the process of handcuffing
19   him.

20   Q.   So in the process of being handcuffed.

21        Would -- did you determine at a later point that
22   your body camera was not functioning properly?

23   A.   Yes, sir, at the hospital.

24   Q.   Okay.  What made you realize that the body camera
25   was not functioning properly?

1       A.   As you previously stated, Counsel, the body

2   camera, the Orlando Police Department was still in the test

3   phases to see if it would be appropriate for the community

4   and for the officers for transparency.  One of the initial

5   requirements was once we arrived on scene is to activate

6   the camera to have it to record.  We are -- we were

7   instructed at the time not to review or check anything on

8   the camera until after an incident was cleared.  That way

9   you would ensure that anything that we were doing would be

10   recorded for the video and the audio, so it was a

11   requirement that once everything is done.

12          For example, when our investigation is complete,

13   we will then check and see what was recorded.  And at the

14   time it was then to make notification that, okay, it did

15   record, this is how it's properly saved.  Or if it's not,

16   to notify our chain in command so it would be documented.

17       Q.   How is it attached on your lapel of your uniform?

18   Explain the wiring, how --

19       A.   Yes, sir.

20          Unfortunately, being it's newer technology to law

21   enforcement, it's, I guess, still in a testing phase.  The

22   body camera is three separate components.  There is a

23   camera portion as we were describing, which is what is on

24   my lapel.  The camera portion is ran by a battery pack,

25   which is kept either on our gun belt or in our pockets.

1    Connecting with the camera to the battery pack is a wire

2    cord.  The wire cord plugs into the camera and then plugs

3    into the battery.  Any tug of the cord or anything of that

4    nature can -- it can become dislodged.  That is one of the

5    issues with the camera.  Once it's dislodged, the camera

6    doesn't have power.  The camera will not record.

7        Q.    Had your body camera even functioned properly at

8    that time, would you have observed the K-9 make a bite on

9    the defendant?

10       A.    No, sir.  I was not there at that time.

11            MR. MATERA:  No further questions, Judge.

12            THE COURT:  Any questions from the defense?

13            MS. GOERNER:  Yes, Your Honor.

                            CROSS-EXAMINATION

15   BY MS. GOERNER:

16       A.    Good morning, ma'am.

17       Q.    Good morning, sir.

18            When you responded out to this Perkins, was this

19   part of your normal patrol routine?

20       A.    I was requested by dispatch to respond.  There is

21   an area -- my main responsibility of patrol, yes, ma'am.

22   But I was called after the fact.

23       Q.    No, that's fine.  But it's an area that you

24   regularly patrol?

25       A.    Yes, ma'am.

1       Q.   So you are familiar that this business had been

2   abandoned?

3       A.   Yes, ma'am.

4       Q.   Had been closed down?

5       A.   For some time.   Yes, ma'am.

6       Q.   For some time?

7       A.   Yes, ma'am.

8       Q.   You are familiar with the homeless population

9   that kind of frequented, I guess, the park area nearby?

10       A.   Are you referring to the LaCosta Wetlands, ma'am?

11   I guess, east of that location?

12       Q.   Wherever the homeless people gather.

13       A.   Yes, ma'am.

14       Q.   It was pretty close by?

15       A.   Unfortunately, there's a lot of unfortunate

16   people in that area.   Yes, ma'am.

17       Q.   Okay.   And in responding to this particular

18   incident, you were not in the first group of officers that

19   responded, correct?

20       A.   That is correct, ma'am.   I was not.

21       Q.   You were in the second group of officers?

22       A.   Yes, ma'am.

23       Q.   Okay.   And when you responded, you had your --

24   you turned on your camera -- your body camera?

25       A.   Yes, ma'am, when I arrived on scene.

342

1       Q.  So you were recording from that moment, correct?

2       A.  Yes, ma'am.

3       Q.  And the camera was functioning properly?

4       A.  Yes, ma'am.

5       Q.  Now -- and at some point you took the camera off

6  your person and put it on a pole?

7       A.  Yes, ma'am.

8       Q.  And you extended the pole up so you could see

9  onto the roof.

10       Is that what you did with it?

11       A.  Yes, ma'am.

12       Q.  And so it recorded on top of the roof, correct?

13       A.  Yes, ma'am.

14       Q.  And you actually reviewed that footage, correct?

15       A.  Myself and a supervisor, yes, ma'am.

16       Q.  And in reviewing that footage, y'all did not

17  provide copies to the State to review?

18       A.  No, ma'am.

19       Q.  You didn't provide copies to the defense to

20  review?

21       A.  No, ma'am.

22       Q.  You and another officer made a decision that it

23  was not of evidentiary value?

24       A.  No, ma'am.  I would disagree with that.

25       Q.  Okay.  Well, you didn't save the video, correct?

1      A.   No, ma'am.

2      Q.   And you deleted the video?

3      A.   That is not a true statement.

4      Q.   Okay.  Well, what happened to the video footage

5  that you reviewed of the roof?

6      A.   If I may clarify, Counsel.  The company is called

7  Taser International.  What happens with the body cameras

8  is, the options are to record and to show what is being

9  recorded.  What I have access to witness what is going on

10  in the roof is a live feed.  It is something that is right

11  now -- again, this is a new technology, so they are working

12  out the issues.  One of the issues the Orlando Police

13  Department has already documented is, if I review something

14  that the camera is watching instantaneously as it is

15  happening, it -- the system does not allow us to fully

16  record any aspect of saving it as evidence.  It is a live

17  feed.  It would kind of be like a camera system without the

18  option to record.  It's one of the chief complaints the

19  Orlando Police Department determined after this incident

20  and other incidents.  So at the time when the camera was

21  put onto the pole, ma'am, and looked at the roof, it was

22  recording in the sense of allowing us to witness it, but it

23  would not allow us to record it to the device itself.

24      Q.   Okay.  So then you're saying that you were able

25  to view the footage while the camera was up on the pole and

1    not that you reviewed the footage after?

2         A.   It's a live feed.  Yes, ma'am.  Like I explained.

3         Q.   Okay.  And isn't it true that your department's

4    policy at that time was that it was, in fact, recording,

5    and it was destroyed 30 days later?

6         A.   Yes, ma'am.  When there's not a request -- a

7    public records demand for a video, because of all the

8    length and space that it retains, the department does purge

9    that after 30 days.  Yes, ma'am.

10         Q.   So there was a recording?

11         A.   Yes, ma'am.

12         Q.   Okay.  And so after you took that camera off the

13    pole, you put it back on your person?

14         A.   Yes, ma'am.

15         Q.   And you then proceeded to assist other law

16    enforcement in looking for the suspect, correct?

17         A.   Yes, ma'am.

18         Q.   And you believed that your camera was working

19    properly then?

20         A.   I can only make that assumption.  Yes, ma'am.

21         Q.   Because it had been working properly before?

22         A.   Correct, ma'am.  Yes, ma'am.  I agree with you on

23    that, Counsel.

24         Q.   And when you made entry into the building, you

25    were the one that was deploying the Clear Out?

Ninth Judicial Circuit
Court Reporting Services

1      A.   Yes, ma'am.

2      Q.   And about how many cannisters of that did you go

3   through?

4      A.   Twenty canisters to my recollection, ma'am.

5      Q.   So that would be pretty strong?

6      A.   If they were given in one area, yes, it would be.

7      Q.   How long does the effects of that Clear Out last

8   after you deploy a cannister?

9      A.   It varies, depending on the amount of exposure

10   and, again, how confined of a space it is.

11      Q.   In that particular building, you have on gas

12   masks, correct?

13      A.   Yes, ma'am.  I did.

14      Q.   The other law enforcement officers had gas masks

15   on?

16      A.   That is correct.

17      Q.   Typically, how long does the effects of that

18   Clear Out last in that particular space that you were in,

19   the Perkins?

20      A.   It can last anywhere from 15 to 30 minutes.

21      Q.   Fifteen to thirty minutes?

22      A.   Yes, ma'am.

23      Q.   And you said that eventually you observed the

24   suspect being in the process of being handcuffed, correct?

25      A.   That is correct, Counsel.

Ninth Judicial Circuit
Court Reporting Services

346

1        Q.    Did you see anything in his hands?

2        A.    No, ma'am.  I saw officers trying to handcuff
3    him.

4        Q.    Did you see any gloves on him on his hands?

5        A.    Not that I recall.  But I don't have recollection
6    of his hands, ma'am.

7        Q.    Did you actually go up onto the roof to look for
8    the suspect?

9        A.    Yes, ma'am.

10       Q.    You didn't see him on the roof, did you?

11       A.    No, ma'am.

12       Q.    You never saw him -- you saw the dismantled A/C
13   handlers on the roof?

14       A.    The aftermath of it.  Yes, ma'am.

15       Q.    You don't have any idea when those A/C handlers
16   became dismantled, do you?

17       A.    No, ma'am.

18       Q.    You don't have any idea who did that, do you?

19       A.    No, ma'am.  I did not witness that.

20       Q.    You never saw Mr. Washington with any kind of
21   tools?

22       A.    No, ma'am, not in any of my -- my up-close
23   encounters with him.  No, ma'am.  I did not.

24       Q.    You never saw Mr. Washington with or near any
25   kind of backpack?

1       A.   No, ma'am.  I did not.

2       Q.   And you didn't hear Mr. Washington making any

3  statements, did you?

4       A.   Just -- I want to make sure, during the incident

5  or --

6       Q.   At any time.

7       A.   Respectfully, Counsel, I was with the

8  transporting officer to take Mr. Washington for medical

9  treatment from the scene to the local hospital.

10      Q.   So while at the Perkins, you didn't hear

11  Mr. Washington make any statements, did you?

12      A.   That's what I wanted to clarify.  No, ma'am.  I

13  did not hear him make any statements while on scene.

14      Q.   And you don't know whether or not any damage to

15  those air handlers had, in fact, occurred prior to

16  December 31, 2014, do you?

17      A.   No, ma'am.  I have never been on that roof

18  before, ma'am.

19           MS. GOERNER:  May I have just a moment?

20           THE COURT:  You may.

21           MS. GOERNER:  I have nothing further, Your Honor.

22           THE COURT:  Any redirect?

23           MR. MATERA:  No, Your Honor.

24           THE COURT:  Members of the jury, do you have any

25  questions of the witness?  If so, please raise your



1    hand.

2            All right.  I see no hands.

3            Thank you.

4        **THE WITNESS:**  Thank you, Your Honor.

5        **THE COURT:**  Have a nice day.

6            State, you may call your next witness.

7        **MR. MATERA:**  State calls Officer Brillant to the

8    stand.

9                    **CHRISTOPHER BRILLANT**

10   was called as a witness and, having first been duly sworn,

11   testified as follows:

12       **THE WITNESS:**  I do.

13       **THE COURT:**  Hello, sir.  You may be seated.

14       **THE WITNESS:**  Good morning, Your Honor.

15       **THE COURT:**  Would you state your name for the

16   record, please.

17       **THE WITNESS:**  Officer Christopher Brillant,

18   B-R-I-L-L-A-N-T.

19       **THE COURT:**  Thank you.

20           You may inquire.

21                    **DIRECT EXAMINATION**

22   BY MR. MATERA:

23       Q.  Officer Brillant, please introduce yourself to

24   the jury.

25       A.  Officer Christopher Brillant with the Orlando

1    Police Department.

2        Q.   How long have you been working for OPD?

3        A.   Approximately nine and a half years.

4        Q.   What are your current duties at OPD?

5        A.   Currently assigned as an agent to the

6    Metropolitan Bureau of Investigation.

7        Q.   Were you ever a K-9 handler?

8        A.   I was.  Yes, sir.

9        Q.   Explain to the jury what a K-9 handler is.

10       A.   A K-9 handler is basically a more senior officer

11   within the department who's proven themselves,

12   decision-making, liability, stuff like that.  Gets selected

13   through an interview process, physical process, to handle a

14   police K-9, which is a patrol K-9 who's trained in

15   tracking, building searches, area searches, evidentiary

16   searches, and criminal apprehension, as well.

17       Q.   On December 31, 2014, during that day in the

18   morning, did -- were you with a K-9?

19       A.   I was.  Yes, sir.

20       Q.   What was the name of your K-9?

21       A.   K-9's name was Titan.

22            THE COURT:  I'm sorry.  I didn't hear you.

23            THE WITNESS:  Titan, T-I-T-A-N.

24   BY MR. MATERA:

25       Q.   Explain to the jury what type of training you

1   obtained before becoming a K-9 handler.

2       A.    Before becoming a K-9 handler, you go through all

3   the requirements as a police officer.  You go through many

4   years on the road.  To get selected for K-9, they select a

5   dog for you.  They maintain -- a trainer will go out, look

6   at dogs, select the potential dog for you.  And the dog and

7   I both went through training together, which was about a

8   400-hour patrol school to learn criminal apprehension and

9   all of the searching techniques with the dog, and about 160

10  or 180-hour narcotics detection school on top of that.

11      Q.    Explain to the jury how the dog is trained to

12  detect a person.

13      A.    Basically, it's a lot of different ways.  During

14  tracking, the dog might do something different than

15  building search.  In a building search, the dog is

16  basically trained to sniff out human odor.  Typically,

17  there will be a lot of fear odor and just dead skin cells

18  and everything that come off a person's body as they move

19  throughout the building that the dog can follow.  And

20  they're trained to go to a specific area where that odor is

21  strongest and alert if they're not able to get to anything.

22      Q.    You say "alert."  What does "alert" mean?

23      A.    That alert would be the dog barking at a door if

24  somebody was on the opposite side of the door.  That alert

25  could be, for certain dogs, sitting and barking, scratching

1    at the door, anything like that.

2        Q.   And throughout your hours of training, did you

3    train with Titan, as well?

4        A.   I did.  Yes, sir.

5        Q.   And what do you typically use Titan for?

6        A.   Titan was a dual purpose Belgian Malinois.

7        THE COURT REPORTER:  Belgian?

8        THE WITNESS:  Malinois.  M-A-L-I-N-O-I-S, I

9    believe.

10       He was trained for criminal apprehension, all of

11       the patrol functions that the dog would typically go

12       through, and narcotics detection dog.

13   BY MR. MATERA:

14       Q.   Do you recall being called out to an incident

15   occurring at 5705 LaCosta Drive?

16       A.   I do.  Yes, sir.

17       Q.   When you first arrived, you didn't arrive at that

18   abandoned Perkins first, correct?

19       THE COURT REPORTER:  I'm sorry?

20   BY MR. MATERA:

21       Q.   You didn't arrive at that abandoned Perkins

22   first, correct?

23       A.   I did.

24       Q.   Okay.  The first place you went, though, was the

25   Dunkin Donuts?

1      A.    I went to the Dunkin Donuts.

2      Q.    Explain to the jury where the Dunkin Donuts is in

3    relation to the building.

4      A.    At Semoran and LaCosta.  The building is pretty

5    much the northeast corner of the intersection.  If you went

6    directly north from that building back towards 408, that's

7    where the Dunkin Donuts is.  It's approximately a business

8    away from where the Perkins was.

9      Q.    When you parked at the Dunkin Donuts, did you

10   look on the roof of 5705 LaCosta Drive?

11     A.    I did.

12     Q.    About how far distance away were you from that

13   roof?

14     A.    I would say probably 60 to 70 yards,

15   approximately.

16     Q.    When you were looking on top of that roof, what

17   did you observe?

18     A.    Looking up, I observed a black male wearing what

19   appeared to be like a black windbreaker-style jacket,

20   hooded jacket.  I saw that male moving back and forth from

21   what appeared to be the area where a roof hatch would be

22   and the air-conditioning units multiple times going back

23   and forth.  I would observe him go over to the

24   air-conditioning units, move around a little bit, and then

25   go back towards the area of the roof hatch.

1    Q.   At that point, where did you go?

2    A.   At that point, I called out over the radio that I

3  needed more units to respond.  I believed there to be a

4  commercial burglary in progress.  Once other units arrived,

5  we put a perimeter around the building.  I retrieved K-9

6  Titan from the back of my patrol car and began doing a

7  search around the bottom of the building to look for any

8  entry point.

9    Q.   When you searched around the building, did you

10  find any entrance points?

11    A.   I did the entire bottom, which was the only story

12  of the building was completely secure, except for a back

13  door on the east side of the building, the northeast corner

14  that led into an electrical room and had a ladder going up

15  to the roof hatch.

16    Q.   All right.  When you -- I take it you walked in

17  there with K-9 Titan?

18    A.   I did.

19    Q.   And when you walked in there with K-9 Titan, what

20  did you observe?

21    A.   Basically, as I came up to the door, I observed a

22  kind of like a latch that went over the door with a Padlock

23  attached to it, which had been pried off.  As I made my way

24  into the electrical room, I could tell it didn't go

25  anywhere into the building, only a ladder going straight up

1    with a roof hatch wide open.

2         Q.   What did you do when you observed the ladder and

3    the hatch?

4         A.   At that point, we knew somebody was on the roof.

5    I identified myself, made a loud K-9 announcement, which is

6    what we are trained to do.  I basically yelled out through

7    the roof hatch, "Orlando Police K-9.  I know you're up

8    there.  Come out now or give up now or you will be bit by

9    the dog."

10        Q.   So there was an "or if you don't come out, you

11   may be bit by the dog"?

12        A.   Correct.

13        Q.   And if the person were to have come out, you

14   would not have released the dog, correct?

15        A.   That's correct.

16        Q.   At the hatch, what did you see?

17        A.   At that point, after I made the first K-9

18   announcement, I believe I saw what I believe to be a shadow

19   moving over towards the roof hatch.  At that point, I knew

20   somebody was close to it.  I made another K-9 announcement

21   exactly like the first one.  At that point, the roof hatch

22   was slammed shut, and I began to back out of the doorway.

23        Q.   When you began to back out of the doorway, what

24   did you do?

25        A.   I backed out of the doorway, looked up towards

1    the roof.  Knowing somebody was there, again made another

2    K-9 announcement like I did the first two, and I received

3    no response again.

4         Q.    Was Orange County Fire Department called at that

5    time?

6         A.    I believe the Orlando Police Department was

7    called for use of their ladders so that we could get up

8    onto the roof and see onto the roof to see where the person

9    had gone.

10        Q.    Was anyone located on the roof?

11        A.    They were not.  No, sir.

12        Q.    At that point, what did you do with Titan?

13        A.    At that point, we knew somebody was there.  They

14   were no longer on the roof, as far as we could tell.  We

15   made entry in through a door on the north side of the

16   building that we had to pry open to get in.  Made another

17   K-9 announcement at that point and --

18        Q.    Describe the K-9 announcement you made at that

19   point before releasing Titan.

20        A.    At that point, it would have been primarily the

21   same, "Orlando Police K-9.  We know you're in here.  Come

22   out now or give up now" -- I'm not sure exactly which words

23   I used -- "or you will be bit by the dog."

24             I received no response.  At that point, I took

25   the leash off of K-9 Titan and sent him into the building

1    to search.

2        Q.   What's the purpose of releasing K-9 Titan into

3    the building as opposed to you guys just going in there?

4        A.   The primary way our building searches are taught

5    is to let the dog search off lead.  They're more effective

6    that way.  They can go wherever they need to go if they're

7    following an odor trail.

8             In addition to that, it's an officer safety

9    issue.  It's much safer to send a dog in who's got a nose

10   and can smell human odor, find somebody hiding, as opposed

11   to us going in, opening closed doors, and sticking our

12   heads in places, potentially put us in danger.

13       Q.   Did K-9 Titan locate anyone in the building?

14       A.   We did not initially.  We went in.  K-9 Titan

15   spent a lot of time in the kitchen area showing interest up

16   towards the ceiling, which is an indicator to me he's

17   smelling human odor coming from up top.  We didn't locate

18   anybody on the ground area of the restaurant.

19       Q.   When you say he was "showing interest up towards

20   the ceiling," what exactly was he doing?

21       A.   He basically air scents.  Like, he will walk in

22   and he will lift his head up, look towards the ceiling, and

23   start taking deeper breaths than he normally would.   In

24   addition to that, he would jump a little bit just so that

25   he could get a little bit higher and get more air.

1    Q.   So after K-9 Titan doesn't locate anyone, what

2    did the officers do?

3    A.   At that point, I believe the decision was made by

4    the lieutenant --

5    MS. GOERNER:   Objection, Your Honor, as to

6    hearsay and the form of the question.

7    THE COURT:   Sustained as to hearsay.

8    BY MR. MATERA:

9    Q.   What did the officers do after K-9 Titan did not

10   locate anyone?

11   A.   At that point, Clear Out was deployed inside the

12   building, which is basically a tear gas.  That's just the

13   brand name that it goes by is Clear Out.

14   Q.   Unsuccessful?  Didn't locate anyone?

15   A.   Unsuccessful.  Didn't locate anyone.

16   Q.   Eventually after this search goes on for a while,

17   is an encounter made with a subject in the bathroom?

18   A.   Yes.

19   Q.   Towards the outside of the bathroom?

20   A.   Yes.

21   Q.   Describe to the jury what you observed at the

22   outside of the bathroom.

23   A.   Due to all the gas in the building, I backed out

24   for a moment to let K-9 Titan get some fresh air.  As I was

25   standing right by the front entry door, which would go into

1   the lobby cashier area of the Perkins, I observed Officer

2   Morgan begin to raise her gun up towards the men's restroom

3   and began to yell loud verbal commands to get on the

4   ground.

5       Q.  At that point, what did you do?

6       A.  At that point, I reentered the building with K-9

7   Titan still on lead.  I had full control over him and his

8   harness.  I began to give loud commands to a male that was

9   coming out of the bathroom with his hands up, kind of like

10   this.  And you could tell there was what appeared to be a

11   cutting item or tool cupped in one hand and a smaller

12   object, which we determined to be a flashlight, in the

13   other.  I gave a loud K-9 command at that point.

14       Q.  What was the K-9 command that you gave at that

15   point?

16       A.  "Police K-9.  Get on the ground.  Put your hands

17   behind your back or you will be bit by the dog."

18       Q.  At that point, did that subject listen to your

19   command?

20       A.  The subject did not comply at that point and

21   began to take a couple steps forward.  At that point, that

22   put me in fear for Officer Morgan's life and my own life

23   that he may be coming at her with either, A, trying to get

24   away, or attack her.  And I gave K-9 Titan his command to

25   apprehend.

1    Q.   And when you say you gave the K-9 the command to

2  apprehend, what did you do?

3    A.   Basically, at that point where I give him his

4  command, I let go of his harness and I let K-9 Titan move

5  forward, at which time he bit the -- one of the lower legs.

6  I don't know exactly which one offhand.

7    Q.   That's okay.

8         When he bit the leg, what did -- what happened

9  next?

10   A.   As K-9 Titan made the apprehension, the defendant

11  made a throwing motion with both hands and immediately

12  reached down grabbing K-9's Titan's face, hitting him,

13  attempting him -- attempting to get him off.

14   Q.   What did you do at that point?

15   A.   I gave more verbal commands at that point to stop

16  resisting, to put his hands behind his back.  Not

17  effective.  Didn't listen.  Continued to fight with the

18  dog.

19         K-9 Titan briefly came off his body as he was

20  being struck in the face and reengaged again on the leg.

21   Q.   And he reengaged for what reason?

22   A.   Still aggressive resistance by the suspect at

23  that point.

24   Q.   Was the defendant -- or excuse me.

25         That person that you saw walking towards Officer

1    Morgan aggressively, you recognize that person in the

2    courtroom?

3         A.   I do.  Yes, sir.

4         Q.   Will you please point to him and describe an

5    article of clothing that he's wearing?

6         A.   A gray long-sleeve shirt at the defense table.

7              MR. MATERA:  Your Honor, may the record reflect

8         the witness has identified the defendant?

9              THE COURT:  The record will so reflect.

10   BY MR. MATERA:

11        Q.   You stated that you observed the defendant make a

12   sort of a throwing motion.  Does that appear to be from the

13   impact?

14        A.   Potentially, yes, sir.

15        Q.   Did you observe the direction of where the object

16   went flying?

17        A.   At that point, I did not.  I was focused on the

18   dog and the apprehension.

19        Q.   Did you lead any crime scene tech to a knife that

20   you observed fly from the defendant's hand?

21        A.   I did.  Yes, sir.

22        Q.   Okay.

23             MR. MATERA:  I don't believe I have any other

24        questions, Judge.

25             THE COURT:  Any questions from the defense?

1          **MS. GOERNER:**  Yes, Your Honor.

2          May I proceed?

3          **THE COURT:**  Yes.

4                    **CROSS-EXAMINATION**

5    BY MS. GOERNER:

6      Q.   Good morning.

7      A.   Good morning, ma'am.

8      Q.   Still morning.

9          You said that when you initially arrived on scene

10   you went to the parking lot of the Dunkin Donuts?

11     A.   Correct.

12     Q.   Just across the street?

13     A.   Same side of the street, about a business down.

14     Q.   And you observed the roof from about 60 to 70

15   yards away?

16     A.   Correct.  Yes, ma'am.

17     Q.   You said you observed a black male in a hoodie

18   going back and forth between some of the units?

19     A.   An air-conditioning unit and what appeared to be

20   a roof hatch.  Yes, ma'am.

21     Q.   You didn't see that person doing anything to the

22   units, though, did you?

23     A.   Just making movements towards the unit with his

24   hands as he was standing there.

25     Q.   And you couldn't see his hands from where you

                        Ninth Judicial Circuit
                        Court Reporting Services

1    were standing, could you?

2        A.    I could see his hands.  I couldn't tell what he

3    was doing with the air-conditioning unit, though.

4        Q.    And you didn't see anything in that person's

5    hands, did you?

6        A.    Not from that distance.  No, ma'am.

7        Q.    And back up or shortly after you made that

8    observation from the Dunkin Donuts?

9        A.    Yes, ma'am.

10       Q.    Within a couple minutes?

11       A.    I would imagine so, yes.

12       Q.    And that would have been Officer Wilson and

13   Morgan?

14       A.    Correct.

15       Q.    Okay.  And from that point, you-all went towards

16   the building to try to look for the suspect?

17       A.    As soon as the building was surrounded by

18   officers, yes, ma'am.

19       Q.    And that was fairly quickly, as well?

20       A.    Yes, ma'am.

21       Q.    Within minutes?

22       A.    Yes.

23       Q.    You indicated that when you approached the

24   building you saw a door that had been forced open?

25       A.    Upon my initial inspection, yes.

1       Q.   And that was the one near the roof hatch?

2       A.   Yes, ma'am.

3       Q.   Where the ladder was coming down?

4       A.   Correct.

5       Q.   Now, you don't know how long that door had been

6    opened, correct?

7       A.   I do not.

8       Q.   And you indicated that it was a door that had

9    a -- some kind of Padlock that had been broken off?

10      A.   Correct.

11      Q.   And you were aware this was an abandoned

12   building?

13      A.   Yes, ma'am.

14      Q.   And closed business that had been closed for a

15   while?

16      A.   Yes.  Still owned and maintained, though.  Yes,

17   ma'am.

18      Q.   Well, it's since been demolished, right?

19      A.   Yes, it has.

20      Q.   You are familiar that homeless people frequented

21   that area and nearby area?

22      A.   I wouldn't say they frequented that direct area.

23   But, around, yes, ma'am.

24      Q.   Within a block or so -- isn't there, like, a park

25   of some kind of woods nearby that the homeless people live

1    in?

2         A.   I don't know.

3         Q.   And when you first walked into -- you walked into

4    that door near the roof hatch?

5         A.   I did.  I walked directly up to it.

6         Q.   And as you walked up to that door, you noticed

7    the steak knife on the ground next to the door, didn't you?

8         A.   I did, just inside of the threshold of the door.

9         Q.   Do you remember whether that knife had a handle

10   or no?

11        A.   I don't.  No, ma'am.

12        Q.   You didn't collect it?

13        A.   I did not.  No, ma'am.

14        Q.   You didn't check it for prints?

15        A.   I did not.

16        Q.   You never saw Mr. Washington with it, though, did

17   you?

18        A.   No, ma'am.

19        Q.   Now, I guess shortly thereafter you made some

20   kind of -- you made the announcement, "I know you're on the

21   roof.  Come down or you will be bit by the dog"?

22        A.   Correct.

23        Q.   You made that announcement several times, right?

24        A.   Yes, ma'am.  I did.

25        Q.   And he didn't come down?

1      A.   He did not.  No, ma'am.

2      Q.   And that's when you let K-9 Titan go ahead and go

3  through the building to look for him?

4      A.   After we determined that there was nobody any

5  longer on the roof, we made entry into the side door.  Yes,

6  ma'am.

7      Q.   And determining that there was nobody any longer

8  on the roof, that was when -- was it Officer Pollock got

9  into the fire truck bucket and went up to look and see on

10  top of the roof?

11      A.   Yes, ma'am.

12      Q.   Because, at that point, you couldn't see the roof

13  from where you were?

14      A.   I could not.  No, ma'am.

15      Q.   Now, you had never been on that roof of the

16  building before, correct?

17      A.   No, I have not.

18      Q.   On this particular day, did you go up onto the

19  roof to look for the suspect?

20      A.   I did not, no.

21      Q.   So then you are not aware of what condition the

22  air handlers were in prior to that day, correct?

23      A.   No, ma'am.

24      Q.   And on that particular day when you saw the

25  person moving back and forth between the two units, you

1    couldn't -- you couldn't see the condition of the air

2    handlers or yes?

3        A.   Partially, yes.

4        Q.   And could you see whether they had been

5    dismantled at that point or not?

6        A.   From the side I was on, they were not.  He was

7    moving back and forth from pretty much the west side of the

8    unit back to the roof hatch, which I could not completely

9    see that side of the air unit.

10       Q.   Okay.  And you were on which side of the

11   building?

12       A.   The north.

13       Q.   You were on the north side of the building?

14       A.   The north initially when I arrived on scene, and

15   then the northeast corner when I went to the open door.

16       Q.   Okay.  So when you were in the parking lot of the

17   Dunkin Donuts, you could just see the north side of the

18   building?

19       A.   I could see the north and east and part of the

20   west side of the building.

21       Q.   I'm sorry.  The north side of the roof?

22       A.   Yes, ma'am.

23       Q.   Okay.  And how many A/C units could you see from

24   where you were on that north side of the building?

25       A.   I don't recall at this point.

1     Q.    Now, you never saw Mr. Washington with any tools,

2  did you, meaning a saw?

3     A.    I did not, no.

4     Q.    You never saw Mr. Washington with any bolt

5  cutters?

6     A.    No, ma'am.

7     Q.    And other than the small flashlight you described

8  seeing in Mr. Washington's hands after he came down in the

9  bathroom area, you didn't see him with any other

10  flashlights, right?

11     A.    No other flashlights to my knowledge.  No, ma'am.

12     Q.    After K-9 Titan bit Mr. Washington, did you see

13  where that flashlight went?

14     A.    It dropped directly almost next to the ground

15  next to him.

16     Q.    Do you know what happened to that flashlight?

17     A.    I do not.  No, ma'am.

18     Q.    Did you ever see Mr. Washington with a backpack?

19     A.    Not to my knowledge, no.

20     Q.    Did you ever see Mr. Washington near a backpack?

21     A.    No, ma'am.

22     Q.    Did you ever see Mr. Washington stripping any

23  copper from the building?

24     A.    Not that I could tell from my vantage point, no.

25     Q.    Did you ever see Mr. Washington in possession of

1    any copper?

2         A.   No.

3         Q.   You had mentioned earlier when you deployed K-9

4    Titan to go through the building looking for the suspect,

5    that Mr. -- that K-9 Titan was to smell for fear odor, a

6    human odor?

7         A.   A human odor.

8              Typically, when somebody's adrenaline is pumping

9    or either running or hiding from the police, their body

10   will create more of an odor.  We call that a fear odor.

11        Q.   That's what you meant by "fear odor"?

12        A.   Yes, ma'am.

13        Q.   That was my question to explain what a fear odor

14   is.

15        A.   Yes, ma'am.

16        Q.   Okay.  Thank you.

17             Now, you mentioned also that Titan was pretty

18   much focusing on the kitchen area with his nose up towards

19   the ceiling implying there was a human odor above the

20   kitchen area?

21        A.   Yes, ma'am.

22        Q.   Was there any other areas that Titan was hitting

23   on like that, or was he pretty much focused on the kitchen?

24        A.   Mainly in the kitchen area.

25        Q.   And that's on the north side of the building or

1    the south side?

2         A.    That is the north, more towards the east.

3         Q.    And when K-9 Titan bit Mr. Washington, you said

4    that you observed both the knife and the flashlight fly out

5    of -- or the cutting object fly out of Mr. Washington's

6    hand, and the flashlight fly out of Mr. Washington's hand?

7         A.    Yes, ma'am.

8         Q.    But you didn't see which direction the cutting

9    object went in?

10        A.    I could tell it went off to his right, which was

11   the hand it came out of.  I didn't follow with my eyes.  I

12   was focused on him at the time.

13        Q.    Now, you didn't go back and collect that item of

14   evidence, did you?

15        A.    I did not.  I just showed the crime scene

16   investigator where it was.

17        Q.    Okay.  And you didn't take pictures of it?

18        A.    I did not.  No, ma'am.

19        Q.    And you didn't check it for prints?

20        A.    No, ma'am.

21        Q.    And would it be fair to say that the flashlight

22   was laying in the same area near the knife?

23        A.    No, ma'am.  They were on opposite ends.  Probably

24   the knife blade ended up being, I would guesstimate,

25   approximately 10 feet away from where Mr. Washington was.

1      Q.    Did you write a report in this case?

2      A.    I did.  Yes, ma'am.

3      Q.    And one of the reasons for writing a report in

4    this case is to make sure to help you recall things later?

5      A.    Yes.

6      Q.    And, of course, this happened, what, almost two

7    years ago?

8      A.    Yes, ma'am.

9      Q.    Okay.  Would it refresh your recollection if I

10   show you the report?

11     A.    I believe my report says directly next to the

12   area where he was taken down, if I'm correct.

13     Q.    Can I show you your report?  Would that refresh

14   your recollection?

15     A.    Yes, ma'am.  Absolutely.

16     Q.    Just one moment.  I'm showing the prosecutor.

17     A.    Okay.

18     Q.    Does that refresh your recollection?

19     A.    Yes, ma'am.

20     Q.    And, in fact, the knife was laying on the ground

21   in the same area in which Mr. Washington made the throwing

22   motion, which was also close to the flashlight; is that

23   correct?

24     A.    Within the same area, yes, ma'am.

25     Q.    Okay.  So it's something that the crime scene

1    technician would have seen or should have picked up on?

2        A.   I don't know.  I brought her in to the knife.  I

3    don't believe I showed her where the flashlight was.

4        Q.   They were within feet of each other, though,

5    correct?

6        A.   In the same area.  Yes, ma'am.

7            MS. GOERNER:  One moment.

8            I have no further questions.

9            THE COURT:  Any redirect?

10                      REDIRECT EXAMINATION

11   BY MR. MATERA:

12       Q.   Officer Brillant, when you brought the crime

13   scene tech back into the building, fair to say you were

14   more concerned about the knife?

15       A.   I was.  Yes, sir.

16       Q.   The knife as a cutting tool?

17       A.   Correct.

18       Q.   You were in fear of that knife as opposed to in

19   fear that Officer Morgan was going to get struck with that

20   knife?

21       A.   Correct.

22           MR. MATERA:  No further questions.

23           THE COURT:  Members of the jury, do you have any

24       questions of the witness?  If so, please raise your

25       hand.

# D

1        THE COURT:  So, okay.  I'm just trying to figure

2   out if the witness has a flight at 3:30.

3        MR. MATERA:  Yes.

4        THE COURT:  Means he has to be at the airport by

5   2:30.

6        MR. MATERA:  Maybe I should call him before

7   lunch.

8        Okay.  I will call him before lunch.

9        THE COURT:  We don't have to stop right at noon.

10   I'm just --

11        MR. MATERA:  Yeah, I will call him after I call

12   this witness.

13        THE COURT:  Okay.  That's a fine.

14        MR. MATERA:  That makes sense.

15        (The following was in open court.)

16        THE COURT:  Good morning, sir.

17        THE WITNESS:  Good morning, ma'am.

18        THE COURT:  Please raise your right hand to be

19   sworn.

20              DOUGLAS A. COTE

21   was called as a witness and, having first been duly sworn,

22   testified as follows:

23        THE WITNESS:  I do.

24        THE COURT:  You may be seated.

25        Would you please tell us your name.

1          THE WITNESS:  My name is Douglas A. Cote, and

2      spelled C-O-T-E.

3          THE COURT:  Thank you.

4          You may inquire.

5                    DIRECT EXAMINATION

6  BY MR. MATERA:

7      Q.   Officer Cote, please introduce yourself to the

8  jury.

9      A.   Hi.  My name is Officer Cote with the Orlando

10  Police Department.  I've currently been employed there for

11  nine years.

12      Q.   Before you were employed at the Orlando Police

13  Department, where did you work?

14      A.   I was a police officer in Richmond, Virginia, for

15  five years.

16      Q.   Do you have any military background?

17      A.   I served in the Army and Marine Corps for 18 and

18  a half years.

19      Q.   Do you recall an incident occurring at 5705

20  LaCosta Drive on December 31st of 2014?

21      A.   Yes, I do.

22      Q.   Is that in the morning?

23      A.   Morning.

24      Q.   Yeah.

25      A.   Towards the afternoon.

1     Q.   When you arrived at 5705 LaCosta Drive, what were

2  you responding there for?

3     A.   It was for a person that was on top of the roof.

4     Q.   All right.   When you arrived, where did you go?

5     A.   When I arrived, I parked, it would be the

6  south -- north -- northeast corner of the building.

7     Q.   And after you parked on the northeast corner of

8  the building, what did you do?

9     A.   I went to cover for Officer Brillant and his K-9.

10  They were at the rear door to go up to the ladder.

11     Q.   All right.   And what did you observe K-9 Brillant

12  do?

13     A.   He was giving commands.   You know, he was

14  announcing that, "Orlando Police K-9."

15     Q.   Did a suspect ever come down from the roof?

16     A.   No, he did not.

17     Q.   So after the suspect did not come down from the

18  roof, where did you go?

19     A.   We made entry into the building on which would be

20  the north side of the building.

21     Q.   And when you made entrance into the building,

22  tell the jury what happened at that point.

23     A.   We disbursed an amount of chemical agent in the

24  building, made numerous commands by way of our police car.

25  At that point, we just waited for him to respond to our

1    commands.

2        Q.   Did any officers go up into the ceiling area?

3        A.   Into the drop ceiling, like panels that hang down

4    from the ceiling.

5        Q.   Were you one of those officers?

6        A.   No, I was not.

7        Q.   Where did you stay?

8        A.   I stayed on the -- in the restaurant itself.

9        Q.   What was the purpose of you staying downstairs?

10       A.   To provide coverage for the guys that were up in

11   the ceiling tiles.

12       Q.   At any point while you were on the floor, do you

13   see anyone in the ceiling?

14       A.   I ended up seeing somebody in the vents.

15       Q.   The vents.

16            Describe to the jury what you saw in the vents.

17       A.   There was a -- a prep area in the kitchen.   And

18   inside the vent, I could see partial of his face, one side

19   of his face.

20       Q.   And when you saw one side of the suspect's face,

21   what did you do at that time?

22       A.   I started yelling commands, telling him to let me

23   see his hands.

24       Q.   Were you in full uniform?

25       A.   Yes, I was.

1    Q.   Were you in a suit, correct?

2    A.   My full department-issued uniform.

3    Q.   Your issued uniform have "Orlando Police" on it?

4    A.   It has two patches, one on each shoulder.

5    Q.   When you issued your firearm, explain the

6    commands you were giving to the suspect.

7    A.   I told him let me see his hands, not to move.

8    Q.   And what happened at that point?

9    A.   At that point, Officer James came to assist me.

10   The officer starts converging.  At that point, the suspect

11   went towards the east side of the building.

12   Q.   When he went towards the east side of the

13   building, where did you go?

14   A.   I stayed kind of in the kitchen and followed

15   behind just a little bit.

16   Q.   What were you staying back in the kitchen for?

17   A.   Just in case the suspect came back towards me.

18   Q.   As you stayed in the kitchen, what did you do?

19   A.   At one point I heard, like, a crash through the

20   ceiling.  And I didn't know if it was officers going

21   through the ceiling after the suspect or what.  But then

22   Officer Morgan then apparently came with -- or made contact

23   with the suspect.

24   Q.   Were you there when the contact was made with the

25   suspect?

1    A.   Not the initial contact, no.

2    Q.   Were you there when he was apprehended?

3    A.   Yes.  I came around from the kitchen.

4    Q.   What did you observe when you came around?

5    A.   The suspect was laying on the ground then.

6    Q.   Did you see him handcuffed?

7    A.   I think he was handcuffed at that point.

8    Q.   He was handcuffed already?

9         MR. MATERA:  No further questions.

10        THE COURT:  Any questions from the defense?

11        MS. GOERNER:  Yes, Your Honor.

12                    CROSS-EXAMINATION

13   BY MS. GOERNER:

14        Q.   Were you one of the first officers to arrive on

15   scene or in the backup group?

16        A.   I was probably in the middle of the group.

17        Q.   Okay.  And when you arrived, you said you parked

18   on the northeast side of the building --

19        A.   Yes, ma'am.

20        Q.   -- to backup K-9 Officer Brillant?

21        A.   Yes, sir -- ma'am.

22        Q.   And that when you-all went towards the building,

23   or was Officer Brillant already --

24        A.   Officer Brillant was already at the building.

25        Q.   And so when you joined Officer Brillant -- before

1    you joined Officer Brillant, did you see any movement on

2    the roof?

3        A.   No, ma'am.

4        Q.   Now, when you parked, did you park at the Dunkin

5    Donuts parking lot or where?

6        A.   No.  I was actually on the Perkins property.

7        Q.   Okay.  And you were aware that had been a closed

8    business?

9        A.   Yes.  It's been closed for some time at that

10   point.

11       Q.   It had been abandoned for a while?

12       A.   Yeah.

13       Q.   More than a year?

14       A.   I'm not too sure on that exact date.

15       Q.   It had been --

16       A.   It's been a while.

17       Q.   A while meaning a long time, like more than a

18   month?

19       A.   More than a month, yes.

20       Q.   More than six months?

21       A.   I couldn't say at this point.

22       Q.   Do you remember mentioning that it had been for

23   at least two years at that point?

24       A.   I'm not too sure of the time.  I know it was

25   closed.

1      Q.   Okay.  And this was an area that you regularly

2   patrol?

3      A.   Yes, ma'am.

4      Q.   So you are familiar with the homeless population

5   in that area --

6      A.   Yes, ma'am.

7      Q.   -- that was near the building?

8      A.   Not near the building.  It's in the vicinity,

9   yes.

10      Q.   Meaning, like a block or two?

11      A.   Yes, about that.

12      Q.   And when you went with Officer Brillant inside --

13   you went inside the building?

14      A.   Yes, I did.

15      Q.   And was that by the ladder, roof, hatch door?

16      A.   I did not go in that way.  I went through the

17   door on the north side of the building.

18      Q.   Okay.  So you went in through a different door?

19      A.   Yes, ma'am.

20      Q.   Now, did Officer Brillant go in that door with

21   you?

22      A.   He brought his dog around to the other side when

23   I opened up the door so he could bring his dog in.

24      Q.   So are you the one who opened the door?

25      A.   Yes, ma'am.

1      Q.   So you are the one that pried it open with a

2   crowbar?

3      A.   Yes, ma'am.

4      Q.   And when you-all went inside the door, you-all

5   went inside the building?

6      A.   Yes, ma'am.

7      Q.   Looking for the suspect?

8      A.   Yes, ma'am.

9      Q.   And didn't find him?

10      A.   No, we did not.

11      Q.   And you didn't go up onto the roof, correct?

12      A.   No, I did not.  After -- I did go up after he was

13   detained to take pictures.

14      Q.   Okay.  So you didn't go up onto the roof looking

15   for the suspect?

16      A.   No, I did not.

17      Q.   And you never saw the suspect or Mr. Washington

18   up on the roof?

19      A.   No, I did not.

20      Q.   You never saw Mr. Washington with any kind of

21   saw?

22      A.   No, I did not.

23      Q.   Any kind of bolt cutters?

24      A.   No, I did not.

25      Q.   You never saw Mr. Washington with any knife?

1      A.   No, I did not.

2      Q.   You never saw Mr. Washington with any kind of

3   copper?

4      A.   No, I did not.

5      Q.   You ever see Mr. Washington near any copper?

6      A.   No, I did not.

7      Q.   Now, you hadn't been up on that roof before that

8   day, correct?

9      A.   No, I had not.

10      Q.   So when you went up on the roof after the fact to

11   take photographs, you saw the condition of the

12   air-condition units?

13      A.   Yes, I did.

14      Q.   You didn't know when that damage occurred to

15   those you units, do you?

16      A.   No, I do not.

17      Q.   You don't know if that damage occurred prior to

18   December 31, 2014, do you?

19      A.   No.

20      Q.   I imagine one of the pictures that you -- I guess

21   you saw a pile of copper near one of the units?

22      A.   Yes, ma'am.

23      Q.   You don't know when that pile of copper was cut

24   away, do you?

25      A.   No, I do not.

1       Q.   Now, let me go back to the point where you

2   mention hearing a crash through the ceiling.

3            That was over on the bathroom area?

4       A.   In that area, yes.

5       Q.   And that's when you went over towards that area?

6       A.   I didn't start moving in until I heard people

7   yell.

8       Q.   When you heard the yelling, you went over to that

9   area?

10      A.   Yes, ma'am.

11      Q.   And you saw Mr. Washington?

12      A.   He was laying on the ground, yes.

13      Q.   And did you see anything in his hands at that

14  point?

15      A.   No.  He was already detained at that point.

16      Q.   Did you see Mr. Washington wearing any gloves?

17      A.   No.

18      Q.   You didn't see a backpack on Mr. Washington, did

19  you?

20      A.   No, I did not.

21      Q.   You didn't see a backpack near Mr. Washington,

22  did you?

23      A.   No, I did not.

24           MS. GOERNER:  One moment.

25           I have no further questions.

1           THE WITNESS:  Thank you.

2           MR. MATERA:  Judge, may I approach with defense

3      counsel?

4           THE COURT:  Yes.

5           (Sidebar conference held on the record.)

6           MR. MATERA:  Officer Cote, I neglected to ask him

7      the question I wanted to ask him.  Can I recall him a

8      second?

9           THE COURT:  Yeah.  That's fine.

10          (The following was in open court.)

11          THE COURT:  Okay.  Members of the jury,

12     Mr. Matera is gonna recall Officer Cote for just one

13     or two quick questions before we break for lunch.

14          Okay.  Welcome back, sir.

15          THE WITNESS:  Yes, ma'am.

16                    DOUGLAS COTE

17     was recalled as a witness and, having previously been duly

18     sworn, testified as follows:

19          THE COURT:  You remain under oath to tell the

20     truth.

21          Tell us your name.

22          THE WITNESS:  Officer Douglas Cote.

23          THE COURT:  You may inquire.

24

25

DIRECT EXAMINATION

2  BY MR. MATERA:

3      Q.   Officer Cote, you previously testified that you

4  went onto the roof of the building?

5      A.   Yes, I did.

6      Q.   You observed tools on the building?

7      A.   Yes, I did.

8      Q.   Did you collect those tools and give them to the

9  CST in this case?

10     A.   Yes.  She gave me a bag to collect them.

11     Q.   All right.  And what's her name?

12     A.   Officer -- CST Styer.

13         MR. MATERA:  No further questions.

14         THE COURT:  Any questions from the defense?

15         MS. GOERNER:  Just briefly.

CROSS-EXAMINATION

17  BY MS. GOERNER:

18     Q.   When you collected those tools, were you wearing

19  gloves?

20     A.   Yes, I was.

21     Q.   And that was to protect any kind of contamination

22  in case the tools has prints on them, correct?

23     A.   Yes, ma'am.

24         MS. GOERNER:  No further questions.

25         THE COURT:  Any redirect?

# E

1            Do we have all the jurors?

2            **COURT DEPUTY:**  Yes, ma'am.

3            **THE COURT:**  Mr. Matera, you ready to proceed with

4      your next witness?

5            **MR. MATERA:**  Yes Your Honor.

6            **THE COURT:**  Let's bring the jury in.

7            **COURT DEPUTY:**  Jury entering.

8            (The jury enters the courtroom.)

9            **THE COURT:**  All right.  Welcome back, everyone.

10     You may be seated.

11           State, you may call your next witness.

12           **MR. MATERA:**  State would call Ms. Styer to the

13     stand.

14                         **CHANTAL STYER**

15     was called as a witness and, having first been duly sworn,

16     testified as follows:

17           **THE WITNESS:**  Yes, I do.

18           **THE COURT:**  Hello, Miss.  You may be seated.

19           Please tell us your name.

20           **THE WITNESS:**  Yes, ma'am.  My name is Chantal

21     Styer.  C-H-A-N-T-A-L.  Last name, S-T-Y-E-R.

22           **THE COURT:**  Thank you.

23           You may inquire, Mr. Matera.

24

25

1                       DIRECT EXAMINATION

2    BY MR. MATERA:

3        Q.    Please introduce yourself to the jury.

4        A.    My name is Chantal Styer.  I'm a crime scene

5    investigator with the Orlando Police Department.

6        Q.    How long have you been a crime scene

7    investigator?

8        A.    Eleven years.

9        Q.    Explain to the jury what a crime scene

10   investigator is.

11       A.    As a crime scene investigator, it's my job to

12   respond to all types of crime scenes.  We document the

13   crime scene using photographs.  We also collect evidence

14   and process evidence.

15       Q.    Were you working on December 31, 2014, in the

16   morning, early afternoon hours?

17       A.    Yes, I was.

18       Q.    Were you called out to a scene of 5705 LaCosta

19   Drive?

20       A.    Yes.

21       Q.    Were you called there to take photographs,

22   collect any evidence, process the scene?

23       A.    Yes.

24       Q.    Did you take photographs at the scene?

25       A.    Yes, I did.

1     Q.   Did you also collect evidence?

2     A.   Yes.

3     Q.   Did you collect a red and black backpack that

4 contained tools?

5     A.   Yes.

6     Q.   And other personal items?

7     A.   Yes, I did.

8          MR. MATERA:  May I approach the witness?

9          THE COURT:  Yes.   .

10        MR. MATERA:  Showing the witness what's been

11    marked as State's R for identification purposes.

12 BY MR. MATERA:

13    Q.   Ms. Styer, do you recognize this box and

14 packaging?

15    A.   Yes, I do.

16    Q.   How do you recognize it?

17    A.   This is the backpack I collected.  It's in my

18 handwriting, and my initials are on the tape.

19    Q.   Why don't you crack the box open?  Don't remove

20 what's in the box.  Crack it open.  Look inside and let me

21 know if you recognize what's inside.

22    A.   Yes, I do.

23    Q.   Do you recognize what's inside of that box?

24    A.   Yes.

25    Q.   What's -- is it the red and black backpack that

```
 1    you collected with tools inside of it?

 2        A.    Yes, it is.

 3            MR. MATERA:  May I approach the witness?

 4            THE COURT:  Yes.

 5            MR. MATERA:  At this time, State would move

 6    State's R into evidence.

 7            THE COURT:  Any objection?

 8            MS. GOERNER:  Just the objection of relevance,

 9    Judge.

10            THE COURT:  Overruled.

11            State's Exhibit R for identification will be

12    received as the State's next numbered exhibit.

13            Are we at 14?

14            THE CLERK:  Yes, ma'am.

15            THE COURT:  Fourteen.

16            (State's Exhibit No. 14 was received in

17    evidence.)

18            MR. MATERA:  May I approach the clerk?

19            THE COURT:  Yes.

20            MR. MATERA:  May I approach the witness?

21            THE COURT:  Yes.

22            MR. MATERA:  How about -- can the witness step

23    down, please?

24            THE COURT:  Sure.

25
```

1    BY MR. MATERA:

2        Q.   Go ahead and take the backpack out and open it

3    and show the jury the contents, please.

4        A.   Want me to remove the contents?

5        Q.   No.   Just open it and show them.

6        A.   (Complying.)

7        Q.   Open the backpack, please.

8        A.   (Complying.)

9        Q.   Now, did you recover tools from inside of the

10   backpack?

11       A.   The tools are inside the backpack now.

12           MS. GOERNER:   May I approach so I can look

13       inside?

14           THE COURT:   Sure.   Of course.

15   BY MR. MATERA:

16       Q.   And what type of tools did you locate in the

17   backpack?

18       A.   There are some screws, some wrenches, a box

19   cutter, some miscellaneous or small items.

20       Q.   Okay.   So is the screwdriver -- I'm showing you a

21   screwdriver that's been removed from the backpack.

22       A.   Yes.

23       Q.   And I am showing you a -- appears to be -- I

24   don't know what this is.

25       A.   A wrench.

1      Q.   Looks like a wrench.

2           Is this a wrench that was inside the backpack?

3      A.   Yes.

4      Q.   And is this a --

5      A.   A box cutter.

6      Q.   -- box cutter?

7           Bottle of water here, too?

8      A.   Yes.

9      Q.   Some deodorant was inside the bag, too?

10     A.   Yes.

11     Q.   Glove inside of the bag?

12     A.   Yes.

13     Q.   Familiar with what that item is?

14     A.   I believe they're wire clippers.

15     Q.   You can sit back down.

16          Were tools from the roof brought down to you?

17     A.   Yes.

18     Q.   And you weren't on the roof, right?

19     A.   No.

20     Q.   Why weren't you on the roof?

21     A.   I have a terrifying fear of heights.

22     Q.   Someone brought you the tools?

23     A.   Yes.

24     Q.   Did you package them into evidence?

25     A.   Yes, I did.

1          **MR. MATERA:**  Showing defense what's been marked

2     as State's Q for identification.

3          May I approach the witness?

4          **THE COURT:**  Yes.

5          **MR. MATERA:**  Showing the witness what's been

6     marked as State's Q for identification purposes.

7  **BY MR. MATERA:**

8     Q.   Ms. Styer, do you recognize this box and

9  packaging?

10    A.   Yes, I do.

11    Q.   How do you recognize it?

12    A.   These are the tools that were collected from the

13 roof.  It's in my handwriting, and my initials are on the

14 seal.

15    Q.   Why don't you go ahead and put that a little

16 lower and crack it open and let me know if you recognize

17 what's inside of the box.

18    A.   Yes, I do recognize them.

19    Q.   Do you recognize those to be the tools that were

20 brought to you by another officer that were recovered from

21 the roof?

22    A.   Yes.

23         **MR. MATERA:**  At this time, Judge, State would

24    move what's been marked as State's Q for

25    identification purposes into evidence.

1          THE COURT:  Any objection?

2          MS. GOERNER:  Objection as to relevance.

3          THE COURT:  The objection will be overruled.

4          State's Exhibit Q for identification will be

5     received as State's No. 15.

6          (State's Exhibit No. 15 was received in

7     evidence.)

8          MR. MATERA:  May I approach the clerk?

9          THE COURT:  Yes.

10          MR. MATERA:  May I publish the exhibit to the

11     jury?

12          THE COURT:  Yes.

13          MR. MATERA:  I am showing the jury what's been

14     marked as State's Exhibit 15.

15          (The exhibit was published to the jury.)

16     BY MR. MATERA:

17          Q.   Did you also collect a knife -- a knife blade

18     from the scene?

19          A.   Yes, I did.

20          Q.   Brought there by Officer Brillant?

21          A.   Yes.

22          MR. MATERA:  Showing the witness what's been

23     marked as State's -- excuse me.

24          Showing the defense what's been marked as State's

25     P for identification purposes.

1          May I approach the witness?

2          THE COURT:  Yes.

3  BY MR. MATERA:

4     Q.   Did you enter that blade into evidence?

5     A.   Yes, I did.

6          MR. MATERA:  Showing the witness what's been

7     marked as State's P for identification purposes.

8  BY MR. MATERA:

9     Q.   Do you recognize that package?

10    A.   Yes, I do.

11    Q.   And how do you recognize that packaging?

12    A.   Oh, this is the knife blade that I collected.

13 And my handwriting and my initials are on the seal.

14    Q.   Okay.  Go ahead and crack it open.  Look inside

15 and let me know if you recognize it.

16    A.   Yes, I do recognize it.

17    Q.   Is that the blade that you recovered from the

18 scene that Officer Brillant brought to you?

19    A.   Yes.

20         MR. MATERA:  May I approach the witness?

21         THE COURT:  Yes.

22         MR. MALAK:  At this time, State moves what's been

23    marked as State's P into evidence.

24         THE COURT:  Any objection?

25         MS. GOERNER:  Did we open the bag and see what it

Ninth Judicial Circuit
Court Reporting Services

1        looks like?

2               MR. MATERA:  She did.

3               MS. GOERNER:  Can I see it?

4               No objection.

5               THE COURT:  State's Exhibit P for identification

6        will be received as State's Exhibit 16.

7               (State's Exhibit No. 16 was received in

8        evidence.)

9               MR. MATERA:  May I approach the witness?

10              THE COURT:  You may.

11              MR. MATERA:  Showing the witness what's been

12       marked as State's P for identification purposes.

13   BY MR. MATERA:

14       Q.   Will you open this, CST Styer?

15       A.   It's in a safety tube.

16              MR. MATERA:  I'm just gonna publish to the jury,

17       Judge.

18              THE COURT:  That's fine.

19              (The exhibit was published to the jury.)

20   BY MR. MATERA:

21       Q.   Did you process the scene within the building as

22       you tried to locate the fingerprints?

23       A.   Yes.

24       Q.   And did you get any fingerprints from the scene?

25       A.   No, I did not.

1       Q.   Did you send the backpack to FDLE to test for

2   DNA?

3       A.   No.

4       Q.   Why did you not do that?

5       A.   This was a property crime, and our State lab only

6   accepts touch DNA cases on violent crimes.

7            MR. MATERA:   No further questions.

8            THE COURT:   Any questions from the defense?

9            MS. GOERNER:   Yes, Your Honor.

10           THE COURT:   You may proceed.

11                       CROSS-EXAMINATION

12   BY MS. GOERNER:

13      Q.   Good afternoon.

14      A.   Good afternoon.

15      Q.   You had indicated that you responded out to the

16   scene, and that part of your job in documenting the scene

17   is to take photographs, correct?

18      A.   Yes.

19      Q.   And you took 73 photographs -- or between you and

20   some other officers you took 73 total photographs?

21      A.   Yes, ma'am.

22      Q.   I want to talk to you about those photographs.

23   When you came on the scene, did you encounter a door that

24   was opened near the roof access to the building where there

25   was a ladder coming down from the building?

1     A.   Yes.

2     Q.   And did you take photographs of that door?

3     A.   Yes.

4     Q.   Did you notice the lock on that door to be a

5   busted lock?

6     A.   Yes.

7     Q.   And did you take pictures of the busted lock?

8     A.   Of the outside of it, yes.

9     Q.   I'm gonna ask you --

10         MS. GOERNER:   Your Honor, may I approach the

11   witness?

12         THE COURT:   Yes.

13   BY MS. GOERNER:

14     Q.   I'm gonna ask you to thumb through the exhibits

15   that have been introduced into evidence so far and to tell

16   us whether or not you see a photograph of that busted lock.

17     A.   There's a red door that has damage that I

18   photographed.

19          Is that the door you're referring to?

20     Q.   I'm asking you about the door that's by the roof

21   hatch where the ladder was coming down.

22     A.   I do not have a close up of the lock, no.

23     Q.   Okay.  And is that the lock that you observed?

24   Was it a Padlock that was busted off?

25     A.   I don't recall.

1      Q.   Did you document whether or not it was a Padlock

2    that was busted off the door?

3      A.   No, I did not.

4      Q.   Did you collect any Padlock that was busted off

5    the door?

6      A.   No.

7      Q.   Now, the picture that you're referring to where

8    there's damage to the door, can you hold that up for us,

9    please?

10     A.   That would be some pry marks.

11     Q.   Okay.  Now, you are aware that law enforcement

12   had to actually use a crowbar and break into one of the

13   doors, correct?

14     A.   Yes, I am aware.

15     Q.   Okay.  So you don't know which door that is?

16     A.   No.

17     Q.   Okay.  And taking photographs -- let me ask --

18   when you came into that -- that door where the roof hatch

19   access is where the ladder is, did you notice a knife on

20   the ground by that door as you were entering?

21     A.   No.

22     Q.   Did you notice any kind of knife on the circuit

23   board -- the electronic panel that was next to that door?

24   Did you recognize that next to the ladder?

25     A.   Yes.

```
 1        Q.   Did you notice a knife on the electrical panel --

 2   the circuit breaker?

 3        A.   No.

 4        Q.   Did you -- when you went into -- and you never

 5   went up on the roof, right?

 6        A.   Correct.

 7        Q.   When you collected that backpack, was it -- it

 8   was down on the first floor by the door?

 9        A.   Yes.

10        Q.   And it was by the door where the roof hatch was?

11        A.   Yes.

12        Q.   You don't know how that backpack got there, do

13   you?

14        A.   No.

15        Q.   You never saw the defendant, Mr. Washington, with

16   that bag?

17        A.   No.

18        Q.   You never saw Mr. Washington with any of those

19   tools that were brought down from the roof to you, correct?

20        A.   Correct.

21        Q.   I notice in this backpack that there were a

22   number of tools.

23             MS. GOERNER:  May I approach the witness?

24             THE COURT:  Yes.

25
```

1   **BY MS. GOERNER:**

2       Q.   Actually.  I'm sorry.  Let me rephrase that.

3            In this box that was introduced as State's

4   Exhibit 15 --

5            **MS. GOERNER:**  May I approach the witness?

6            **THE COURT:**  Yes.

7   **BY MS. GOERNER:**

8       Q.   I'm just gonna ask you to look into that for a

9   moment.  I want to pull out one of the photographs of the

10  scene.

11           Now, it was Officer Cote who took pictures of the

12  tools on the roof, correct?

13      A.   Yes, ma'am.

14      Q.   And he turned that over to you for your report?

15      A.   Yes, he did.

16      Q.   I want to show you what's previously been marked

17  and entered into evidence as State's Exhibit No. 10.  I'm

18  gonna ask you to take a look at that.

19      A.   Okay.

20      Q.   So these are the tools that Officer Cote brought

21  down to you as representing as having been the tools that

22  he collected from the roof, correct?

23      A.   Yes.

24      Q.   And so inside this box is this particular tool,

25  correct?

1      A.    Correct.

2      Q.    And that tool was, in fact, in one of the -- this

3    photograph, State's Exhibit 10?

4      A.    Yes, it is.

5      Q.    Inside that box is this yellow saw, correct?

6      A.    Yes.

7      Q.    And that is depicted in Photograph No. 10,

8    correct?

9      A.    Yes.

10      Q.    Inside that box is also -- appears to be this

11    object with green handles?

12      A.    Yes.

13      Q.    Some kind of cutting object?

14      A.    Yes.

15      Q.    And that's also in Exhibit No. 10?

16      A.    Yes, ma'am.

17      Q.    Inside this box is this particular item, correct?

18      A.    Yes.

19      Q.    And that is not depicted in this photograph in

20    State's Exhibit 10?

21      A.    No, it is not.

22      Q.    Did you have that depicted in any of the

23    photographs that you took?

24      A.    Not that I took.

25      Q.    Inside this box is a hammer, correct?

1      A.   Yes.

2      Q.   You don't see that photograph -- that hammer in

3   this photograph as State's Exhibit No. 10, correct?

4      A.   Correct.

5      Q.   You don't see that hammer in any of the

6   photographs that were turned over to you, correct?

7      A.   Correct.

8      Q.   You have no idea where those other two items came

9   from?

10      A.   I was just told they came from the roof.

11      Q.   Okay.  You have no idea how long those items from

12   the roof had been there, correct?

13      A.   That's correct.

14      Q.   You have no idea who put those items there on the

15   roof, correct?

16      A.   Correct.

17      Q.   Did anybody ever bring to you a pile of copper

18   from the roof?

19      A.   No.

20      Q.   Going back to these tools that were in this box I

21   just showed you, you never processed any of those tools for

22   prints, did you?

23      A.   The ones from the roof, we did not.

24      Q.   With respect to the backpack, inside that

25   backpack was a bottle of water, correct?

1     A.   Yes.

2     Q.   And there was also a stick of deodorant, correct?

3     A.   Yes.

4     Q.   Now, nobody ever advised you that they saw

5   Mr. Washington in possession of this backpack, correct?

6     A.   That's correct.

7     Q.   Nobody ever said that they saw Mr. Washington

8   near the backpack, correct?

9     A.   Correct.

10    Q.   Now, the bottle of water could have been

11  processed for DNA; is that correct?

12    A.   Yes.

13    Q.   The stick of deodorant could have been processed

14  for DNA; is that correct?

15    A.   Yes, that's correct.

16    Q.   And that would have helped to establish whether

17  or not that backpack was linked to Mr. Washington, right?

18    A.   Correct.

19    Q.   In fact, there was no identification in that

20  backpack that links that backpack to Mr. Washington,

21  correct?

22    A.   Correct.

23    Q.   No wallet?

24    A.   No.

25    Q.   No ID?

1        A.    No, ma'am.

2        Q.    His name wasn't on any of the items in the

3    backpack?

4        A.    No.

5        Q.    You never sent that bottle of water to the

6    Florida Department Of Law Enforcement for DNA testing, did

7    you?

8        A.    No.

9        Q.    You never sent the deodorant stick to the Florida

10   Department Of Law Enforcement for DNA testing, correct?

11       A.    Correct.

12       Q.    So -- strike that.

13             And you are aware that this was an abandoned

14   business?

15       A.    Yes.

16       Q.    It had been closed for a while?

17       A.    Yes.

18       Q.    So you don't know whether any of the items that

19   were collected were present in that building before

20   December 31, 2014?

21       A.    No, I do not.

22       Q.    Now, you were aware that there was a

23   confrontation between Mr. Washington and law enforcement

24   and a K-9 downstairs when he was apprehended, correct?

25       A.    Yes.

1        Q.   In fact, you photographed some droplets of blood

2    from where Mr. Washington had been bit by the dog?

3        A.   Yes.

4        Q.   In that area, you collected, I believe, that

5    knife blade that you just showed to the jury?

6        A.   Yes, ma'am.

7        Q.   Did you collect the -- a small flashlight in that

8    area?

9        A.   I don't recall, no.

10       Q.   Did anybody point out a small flashlight to you

11   in that area?

12       A.   No.

13       Q.   Did you ever photograph a small flashlight in

14   that area?

15       A.   No.

16       Q.   Did you ever photograph any flashlight on the

17   property?

18       A.   No.

19       Q.   Did you ever collect any flashlight on the

20   property?

21       A.   The only flashlight was inside the backpack.

22       Q.   Okay.  But this backpack was the backpack that

23   was down by the front door?

24       A.   Yes.

25       Q.   And is this the flashlight you are talking about?

1        A.    Yes.   There might be others in there, as well.

2        Q.    Okay.   But nothing was actually collected on the

3   floor sprawled out in the area of the knife blade?

4        A.    No.

5        Q.    Those are also a package of razor blades in the

6   backpack?

7        A.    Yes.

8        Q.    And they could have also been sent off to FDLE

9   for testing, correct?

10       A.    Yes, they could.

11       Q.    And that didn't happen?

12       A.    No.

13       Q.    Now, you photographed the downstairs area of the

14   building yourself, correct?

15       A.    Yes.

16            MS. GOERNER:   I'm sorry, Your Honor.   Just one

17       moment.

18            THE COURT:   That's fine.

19            MS. GOERNER:   May I approach the witness?

20            THE COURT:   Yes.

21   BY MS. GOERNER:

22       Q.    I'm going to show you what's previously been

23   marked as State's KK for identification, and ask you to

24   take a look at that.

25            Do you recognize that?

1        A.    Yes, I do.

2        Q.    What is it?

3        A.    It's a shot from inside the restaurant business.

4        Q.    And is that in the same or substantially the same

5    as it was on December 31, 2014, when you took that

6    photograph?

7        A.    Yes.

8        Q.    Showing you what's previously been marked as

9    Defense Exhibit AB for identification.

10           Do you recognize that?

11       A.    Yes.

12       Q.    Is that another photograph you took of the

13   downstairs area of the restaurant?

14       A.    Yes, ma'am.

15       Q.    And is that in the same or substantially the same

16   representation of what the restaurant looked like on

17   December 31, 2014?

18       A.    Yes, this is.

19       Q.    In one of those photographs, there is a shopping

20   cart, Defense Exhibit AK.

21           You observed a shopping cart?

22       A.    Oh, yes.  Yes.  I'm sorry.

23       Q.    Okay.  And you have no idea how that shopping

24   cart got there?

25       A.    No.

1       Q.   Do you have any idea when that shopping cart got

2    there?

3       A.   No.

4       Q.   You have any idea how long that shopping cart had

5    been there?

6       A.   No.

7       Q.   And the photographs of Mr. Washington, they're

8    not photographs that you took, correct?

9       A.   Correct.

10      Q.   Those photographs that somebody else took?

11      A.   Yes.

12      Q.   Did you actually see Mr. Washington on that day

13   on December 31st?

14      A.   No, ma'am.

15           MS. GOERNER:  May I approach?

16           May I have one moment?

17           THE COURT:  Yes.

18           MS. GOERNER:  I have no additional questions.

19           THE COURT:  Any redirect?

20           MR. MATERA:  No, Your Honor.

21           THE COURT:  Members of the jury, do you have any

22      questions of the witness?  If so, please raise your

23      hand.

24           All right.  Thank you, ma'am.  You're free to

25      leave.



# F

1          (The following was in open court.)

2          THE COURT:  All right.  Members of the jury, we

3    are gonna be recessing a little bit earlier than I

4    anticipated.  We are going to proceed here until about

5    3:45, 3:50, and then we're gonna take our recess.  So

6    State's gonna call its first witness.  If we do not

7    finish with the testimony of this witness today,

8    that's fine, we will have the witness come back

9    tomorrow at 8:30 to finish the testimony.  Okay?

10         You may call your first witness.

11         MR. MATERA:  State would call Officer Nicole

12   Morgan to the stand.

13                       NICOLE MORGAN

14   was called as a witness and, having first been duly sworn,

15   testified as follows:

16         THE WITNESS:  I do.

17         THE COURT:  Hello, Miss.  You may be seated.

18         THE WITNESS:  Thank you.

19         THE COURT:  You can move the microphone.

20         And please tell us your name.

21         THE WITNESS:  Officer Nicole Morgan.

22         THE COURT:  You may inquire.

23                    DIRECT EXAMINATION

24   BY MR. MATERA:

25         Q.   Officer Morgan, please spell your first and last

1    name for the court reporter.

2        A.   First name Nicole, N-I-C-O-L-E.  Last name

3    Morgan, M-O-R-G-A-N.

4        Q.   Where do you work?

5        A.   The Orlando Police Department.

6        Q.   How long have you been working there?

7        A.   I have been working with the Orlando Police

8    Department little over two years.

9        Q.   On December 31, 2014, how long had you been

10   working for the Orlando Police Department?

11       A.   Five months.

12       Q.   Five months.

13           So you were a fairly new officer at the time?

14       A.   Yes.

15       Q.   As part of your training, how do you go about

16   training on the field?  Do you have a field training

17   officer?

18       A.   Yes.

19           So first we do a five to six-month program with

20   the academy.  After that, you have to graduate with a

21   certain percentage.  From there, you go through orientation

22   where you learn policies and protocol.  Then you do a

23   field-training program, which is about an additional four

24   and a half months.

25       Q.   And what is a field-training officer?

1     A.   A field-training officer is an officer that rides

2  with me for the days I'm scheduled to work.  We go to call

3  to call together.  He documents how I handle calls, what I

4  do.  If it's somebody I've never seen before, he tells me

5  what we look for, what we do, spells it all out for

6  whatever the crime is.

7     Q.   Who was your training -- field-training officer

8  on December 31, of 2014?

9     A.   Officer Stephen Wilson.

10     Q.   Were you with Officer Stephen Wilson on

11  December 31, 2014?

12     A.   Yes.

13     Q.   Do you recall an incident occurring in the

14  evening at 5705 LaCosta Drive?

15     A.   Yes.

16     Q.   And what were you called out there for?

17     A.   We were called for initially as a building check

18  because a passerby, who insisted on remaining anonymous,

19  called stating that somebody was on the roof --

20        MS. GOERNER:  Objection as to hearsay.

21        THE COURT:  Sustained.

22  BY MR. MATERA:

23     Q.   When you -- did you go to that location?

24     A.   Yes.

25     Q.   And when you arrived at that location, what did

1    you see?

2        A.    Officer Brillant was already there.

3        Q.    Does Officer Brillant have a K-9?

4        A.    Yes.

5        Q.    Okay.   And when you say "Officer Brillant was

6    already there," did you encounter him?

7        A.    Yes.

8        Q.    Where did you encounter him?

9        A.    Right on the side of the building.

10       Q.    All right.   And after you encountered Officer

11   Brillant, where did you go?

12       A.    We went to an area of the building where a door

13   was open.

14       Q.    All right.   Were photos of that door taken?

15       A.    Yes.

16       Q.    And within that door, what did you encounter?

17       A.    It's an electrical room, so it's a very tiny

18   room, and a ladder that went -- that was attached to the

19   wall that went to a hatch to the roof.

20       Q.    And was a photo taken of that ladder, as well?

21       A.    Yes, sir.

22             MR. MATERA:   May I approach the witness?

23             THE COURT:   Yes.

24             MR. MATERA:   Showing the witness what's been

25       marked as State's M for identification purposes.   It's

1       a composite.

2   BY MR. MATERA:

3       Q.   To the first picture, do you recognize that

4   photograph, Officer Morgan?

5       A.   Yes.

6       Q.   And as to the second photograph, do you recognize

7   that photograph?

8       A.   Yes, sir.

9       Q.   Are those fair and accurate depictions of the

10   door leading to that door that you just described?

11       A.   Yes, sir.

12       Q.   Is that a fair depiction -- fair and accurate

13   depiction of the ladder you just described?

14       A.   Yes.

15       MR. MATERA:   Your Honor, at this time, the State

16       would move what's been marked as State's M into

17       evidence.

18       THE COURT:   N as in Nancy, or M as in Mary?

19       MR. MATERA:   M as in Mary, Judge.

20       THE COURT:   Any objection?

21       MS. GOERNER:   Let me see because it's a

22       composite.

23       I don't have an objection to the second

24       photograph in the composite.  I do have an objection

25       as to the first.

1          THE COURT:  Counsel approach, then.

2          (Sidebar conference held on the record.)

3          THE COURT:  What's the objection?

4          MS. GOERNER:  It doesn't show that that's the

5     door leading to this room, so -- from what I have,

6     that doesn't seem quite accurate.  I mean, I don't

7     know what she just said, but --

8          THE COURT:  The objection is overruled.  You can

9     point that out on cross.

10         (The following was in open court.)

11         THE COURT:  All right.  State's Exhibit M for

12    identification will be received as State's No. 1.

13         (State's Exhibit No. 1 was received in evidence.)

14         MR. MATERA:  May I publish to the jury, Judge?

15         THE COURT:  You may.

16         Members of the jury, all of the items that are

17    marked as exhibits will be made available to you for

18    your inspection when you deliberate.  The evidence

19    goes back with you.  The lawyers are permitted to

20    publish or show you these exhibits here in court, as

21    well.

22         You may proceed, Mr. Matera.

23         (The exhibit was published to the jury.)

24   BY MR. MATERA:

25         Q.   When you encountered that ladder, what did you

1    do?

2         A.    Myself, Officer Brillant, and Officer Stephen

3    Wilson were at the foot of the ladder.

4         Q.    Was the hatch to the roof open?

5         A.    Yes.

6         Q.    All right.  Now, proceed when you were at the

7    ladder.

8               What did you do?

9         A.    Officer Brillant yelled at the hatch where the

10   door was open, that whoever was up there to come down and

11   to walk out to us with their hands up.  The command was

12   about given twice to three times when the door was shut on

13   us.

14        Q.    After the door was shut on you, what did you do?

15        A.    By that time, an emergency channel was

16   established, which an emergency channel --

17        Q.    Tell the jury what you --

18        A.    Emergency channel is a channel that is

19   specifically for officers on a scene where they can talk

20   freely amongst themselves without getting in the way of

21   other radio traffic from other spots.

22        Q.    And what did you do next?

23        A.    More officers arrived on scene and surrounded the

24   building.  By then, myself, because I was the smallest one

25   there, was climbing the ladder that was depicted.  And in

1   the meantime, Officer Seth James and his recruit were

2   coming onto the roof from the other side.

3       Q.   Was there an officer in a tub from the fire

4   department, one of those things that pulls you up where you

5   can look out onto the roof?

6       A.   Yes.

7       Q.   And how was Officer James and his recruit, Seth

8   Smith, getting onto the roof?

9       A.   The fire department responded.  They went right

10  across the street from the building.  We have one officer

11  in, like, their cherry picker, and then they provided a

12  ladder for Officer Seth James and his recruit to use on the

13  opposite side of the building where I was coming out from.

14      Q.   Were you able to make it to the --

15      A.   Yes.

16      Q.   And when you got on the roof, was there anyone up

17  there?

18      A.   Officer Seth James and his recruit were.

19      Q.   Were there any other individuals up there?

20      A.   No.

21      Q.   At that point, what did you do?

22      A.   We -- at that point, we came down from the ladder

23  and we made entry into the building.

24      Q.   How did you make entry into the building?

25      A.   All the doors to the actual building were locked

1    from the inside.  So what we had to do was take a crowbar

2    and a camera from the fire department, go to one of the

3    doors and bust the lock in order to get inside the

4    building.

5         Q.   Did you take any photographs of that door that

6    you guys had to bust open?

7         A.   Yes, sir.  We did.

8              MR. MATERA:  May I approach the clerk?

9              THE COURT:  Yes.

10             MR. MATERA:  Showing defense counsel what has

11        been marked as State's J for identification purposes.

12             May I approach the witness?

13             THE COURT:  Yes.

14             MR. MATERA:  Showing the witness what's been

15        marked as State's J for identification purposes.

16   BY MR. MATERA:

17        Q.   Officer Morgan, take a look at those photographs

18   and let me know if you recognize them.

19        A.   I do.

20        Q.   Are those a fair and accurate depiction of the

21   door you guys had to break to get in?

22        A.   Yes.

23             MR. MATERA:  Judge, at this time, the State would

24        move State's J into evidence.

25             THE COURT:  Any objection?

1          MS. GOERNER:  No objection.

2          THE COURT:  State's Exhibit J for identification

3      will be received as State's Identification No. 2.

4          (State's Exhibit No. 2 was received in evidence.)

5          MR. MATERA:  After it's marked, may I publish it

6      to the jury?

7          THE COURT:  Yes.

8          (The exhibit was published to the jury.)

9  BY MR. MATERA:

10         Q.   You said, Officer, that all the doors were locked

11     from the inside?

12         A.   Yes.

13         Q.   After not being able to locate anyone, what did

14     you do?

15         A.   Once we entered the building, we searched the

16     dining room area, the kitchen, anything that had doors,

17     just to see if anybody was standing in the interior of the

18     building.  Once -- oh, I'm sorry.

19         Q.   Was anyone located?

20         A.   No.

21         Q.   All right.  Then what did you do?

22         A.   From there, we started back at the kitchen and we

23     started looking at the ceiling.  The reason why we were

24     looking at the ceiling was because next to that ladder was

25     an opening that gave you access to the rafters in the

1   ceiling.

2       Q.   Okay.  Before that, was a PA system used?

3       A.   Yes.

4       Q.   When -- explain to the jury what a PA system is.

5       A.   A PA system is a thing with a mic attached to a

6   box.  You can control the volume inside our vehicle.  What

7   we do is turn the volume up and we go into the PA system.

8   We state, "We are the Orlando Police Department.  We have

9   the place surrounded.  Come out with your hands up."  And

10  we continuously repeat that over and over again until we

11  get a response.

12      Q.   Did you do that before what you were just

13  describing when you went into the building?

14      A.   Yes.

15      Q.   All right.  Was a form of Clear Out used in this

16  case?

17      A.   Yes.

18      Q.   When was the Clear Out used?

19      A.   Clear Out was used when some of the officers in

20  the kitchen looked up -- and it was very delapidated

21  inside.  Some ceiling tiles were missing.  And they were

22  able to see a man in the rafters.

23      Q.   And this was after you guys went in and started

24  looking inside the building?

25      A.   Yes.

1    Q.   So go back to when you went in to start looking

2    inside of the building.   Explain to the jury what happened

3    next.

4    A.   So after we started --

5    Q.   Yes, when you started searching the building.

6    A.   Okay.   So when we go in to search a building, we

7    first focus on doors that are closed, something like that,

8    in case someone is behind there.   At that point, once we

9    don't find anyone standing anywhere in the general vicinity

10   inside the building, we start looking at the ceiling,

11   simply because there's tiles missing and there was

12   available access to the ceiling.   That is when we spotted a

13   gentleman in the ceiling and Clear Out started being used.

14   Q.   When the gentleman was spotted in the ceiling,

15   were commands given for him to come down?

16   A.   Yes.

17   Q.   Go ahead.

18   A.   Multiple commands are given for him to come down,

19   to show his hands, to stop resisting, to come down, to come

20   down.   We continuously stated that a good 10, 20 times.

21   Q.   Did that person come down?

22   A.   No.

23   Q.   At that point, what did you guys do?

24   A.   Two officers used our department-issued Sabre

25   Red, or as many people consider it, pepper spray.   They

1    administered the pepper spray to the man that was in the

2    ceiling.  The guy continued away from us traveling

3    throughout the ceiling, and we lost visual of him for a

4    short moment of time.

5         Q.   Was the -- did you describe it as Sabre Red?

6         A.   Yes.  It's called Sabre Red.

7         Q.   Tell the jury what Sabre Red is.

8         A.   It's pepper spray.

9         Q.   Was this when he was up in the roof in the tile?

10       A.   In the ceiling, yes.

11       Q.   Was Sabre Red used before or after the Clear Out?

12       A.   Before.

13       Q.   All right.  Did that individual that was sprayed

14    with Sabre Red comply and come down?

15       A.   No.

16       Q.   After he did not comply with the Sabre Red spray,

17    what happened next?

18       A.   We used Clear Out, something that we use for --

19    to disburse large crowds, or if we have somebody who at

20    this instance would barricade themselves inside a building,

21    something a little bit stronger than pepper spray, it makes

22    you have a difficult time breathing, and it makes you want

23    to come down because it rises very quickly.

24       Q.   Was that deployed?

25       A.   Yes.

1       Q.    And how many times was that deployed?

2       A.    I believe four to five cans were disbursed

3    through the ceiling.

4       Q.    After you disbursed the Clear Out, do you exit

5    the building?

6       A.    No.

7       Q.    Okay.  Do you guys have gas masks on?

8       A.    Yes.

9       Q.    Did anyone come down from the ceiling at that

10   time?

11      A.    No.

12      Q.    Then after the Clear Out was used, what happened

13   next?

14      A.    We still had a negative result.  We couldn't get

15   anyone to come down from the ceiling.  Because of a large

16   amount of ceiling tiles were still in place, Officer Seth

17   James used a tool to remove ceiling tiles from the ceiling

18   in order to get a visual of the subject that was in the

19   roof.

20      Q.    Did some of the officers go up into the roof at

21   that point?

22      A.    Yes.  About four officers went into the ceiling

23   and took it by grids and searched each grid together to see

24   if we can get whoever was in the ceiling to come down.

25      Q.    Was anyone located?

1     **A.**   No.

2     **Q.**   At that point, what happens next?

3     **A.**   At that point, the officers came out of the

4    ceiling.  They went and started back at the kitchen because

5    that was where we first initially saw him in the ceiling

6    where Officer Cote spotted the subject in an A/C duct.

7     **Q.**   When Officer Cote spotted the suspect in an A/C

8    duct, what happened next?

9     **A.**   They gave him multiple commands.  I was at the

10    front of the building.  I heard multiple commands of "Come

11    out.  Show me your hands.  Come out.  Show me your hands."

12    And the subject did not.

13     **Q.**   What happened next after that?

14     **A.**   However he got into the A/C duct is how he got

15    out.

16        **MS. GOERNER:**  Your Honor, I'm gonna object as to

17      hearsay.

18        **THE COURT:**  Sustained as to any hearsay.

19  **BY MR. MATERA:**

20     **Q.**   Where did you go next?

21     **A.**   I went back into the kitchen.

22     **Q.**   And when you went back into the kitchen, what

23    happened?

24     **A.**   I observed the subject going from rafter to

25    rafter from the kitchen.

1       Q.    Then where did you go?

2       A.    I went to the front.

3       Q.    Okay.  And after going to the front, did you ever

4    have an encounter with the individual?

5       A.    Yes.  It took a little bit of time.  I was almost

6    exactly next to the front door.  I looked up, and the

7    subject was staring right down at me.

8       Q.    Was he still in the roof at that time?

9       A.    Still in the ceiling, yes.

10      Q.    Did you proceed to watch him at that point?

11      A.    Yes.  I went on my radio, informed my partners

12   that he was at the front of the building, and ordered him

13   to come down.

14      Q.    Did he comply?

15      A.    No.

16      Q.    At that point, where did you go?

17      A.    I tried to maintain visual, so I followed him as

18   he continued traveling through the rafters.  I lost visual

19   when I approached the bathroom, and I heard a thump.

20      Q.    And when you heard the thump, where did you go?

21      A.    I stayed outside of the bathroom.  I informed my

22   partners that I heard a thump coming from the restroom and,

23   possibly, that he had fallen from the ceiling.

24      Q.    And did you go towards that area?

25      A.    I was already there.

1      Q.   All right.  And what did you see?

2      A.   I had asked the K-9 to come back in because he

3   gave the dog a little bit of break because the gas affects

4   their skin, makes them agitated.  So he comes to my right.

5   There was a little wall between us, a little about this

6   high.  And as I have him come up to me, I watched the

7   bathroom door open, and the subject is walking towards me.

8      Q.   The person that began to walk towards you, do you

9   recognize him in the courtroom today?

10     A.   Yes.

11     Q.   Will you please point to him and describe an

12  article of clothing that he's wearing?

13     A.   The male sitting next to the defense attorney

14  wearing a gray shirt, long-sleeve collard shirt.

15          MR. MATERA:  Your Honor, may the record reflect

16      the witness identified the defendant?

17          THE COURT:  The record will so reflect.

18  BY MR. MATERA:

19     Q.   Is that the individual you also saw in the

20  rooftop?

21     A.   Yes.

22     Q.   And at that point, what did the defendant do?

23     A.   He continued to walk towards me.  At that point,

24  I drew my weapon.  I told him to get on the ground and to

25  open his hands.  His hands were clenched and he

1      continuously walked towards me ignoring my commands to tell

2      him to get on the ground.

3           Q.   At that point, were you in fear?

4           A.   Yes.

5           Q.   Why?

6           A.   I have never had that situation before.

7                MS. GOERNER:   Objection as to relevance.

8                THE COURT:   Overruled.

9                THE WITNESS:   And throughout the building, we did

10          find two other knives.   I was afraid he was armed

11          again.

12     BY MR. MATERA:

13          Q.   At that point, what happened?

14          A.   The K-9 officer observed me yelling at somebody

15     to get on the ground.   He observed the male continuously

16     coming towards me ignoring my commands and deployed his

17     dog.

18          Q.   Did you observe the dog latch on to the

19     defendant?

20          A.   Yes.

21          Q.   Describe to the jury what happened at that time.

22          A.   The dog grabbed his lower leg around the shin.

23     At that point, a small flashlight came out of one hand.

24     And at the time, an unknown object flew out of the other

25     hand.   The subject constantly was yelling, "Get him off me.

1    Get him off me."  And started striking and punching the K-9

2    dog.

3         Q.    At that point, what happened?

4         A.    At that point, I -- the other officers came to

5    join me, and I attempted to try to handcuff him.  He

6    refused he put his hands underneath himself and

7    continuously tried to kick at the dog.  The dog let go of

8    him.  But because of the subject constantly trying to kick

9    at him, relatched on again to the same leg.

10        Q.    And then at that point, was he handcuffed?

11        A.    Yes, he was able to be handcuffed.

12        Q.    Was the dog removed from him?

13        A.    Yes.

14        Q.    Where was the defendant taken after that?

15        A.    The defendant was escorted outside.  He was

16   automatically treated by Orlando Fire Department Rescue,

17   and then they wrapped his wounds, flushed him out, and then

18   transported him to Florida Hospital East.

19        Q.    Were you present with him at the Florida

20   Hospital?

21        A.    Yes.

22        Q.    Were photos taken of the defendant at the Florida

23   Hospital?

24        A.    Yes.

25              MR. MATERA:  Showing defense counsel what has

1       been marked State's G for identification purposes.

2              THE COURT:  Mr. Matera?

3              MR. MATERA:  Oh, I'm sorry.  Thank you.

4              May I approach the witness?

5              THE COURT:  Yes, sir.

6              MR. MATERA:  Showing the witness what's been

7       marked as State's G for identification purposes.

8   BY MR. MATERA:

9       Q.   Officer Morgan, take a look at those photos and

10      let me know if you recognize them, please.

11      A.   (Complying.)

12             MR. MATERA:  May I approach the witness?

13             THE COURT:  Yeah.

14  BY MR. MATERA:

15      Q.   Are these photographs that I just showed you in

16      State's Exhibit G a fair and accurate depiction of the

17      defendant being hospitalized for his injuries?

18      A.   Yes.

19             MR. MATERA:  Judge, at this time, the State would

20      move what's been marked as State's G into evidence.

21             THE COURT:  Any objection?

22             MS. GOERNER:  No objection.

23             THE COURT:  State's Exhibit G for identification

24      will be received as State's No. 3.

25             (State's Exhibit No. 3 was received in evidence.)

1     THE COURT:  That's fine.

2     MR. MATERA:  All right.  Thanks.

3     THE COURT:  Is she in possession of it?

4     MR. MATERA:  Yeah.

5     THE COURT:  That's fine.  You can have the clerk

6   mark it and take care of the it.

7     MR. MATERA:  Thank you.

8     (Court was adjourned at 3:50 p.m.)

9     (September 14, 2016; 8:40 a.m.)

10     THE COURT:  All right.  Let's proceed with Case

11   No. 2014-CF-17252, State versus James Edward

12   Washington.  Mr. Washington is present with his

13   lawyer, Ms. Goerner.  Mr. Matera is here for the

14   State.  And we do have all of our jurors.

15     Mr. Matera, is the State ready?

16     MR. MATERA:  Yes, Your Honor.

17     THE COURT:  Ms. Goerner, is the defense ready?

18     MS. GOERNER:  I just need about two seconds to

19   set up and I'll be.

20     THE COURT:  Mr. Matera, could you ask the witness

21   to come back in who was on the stand from yesterday?

22     MR. MATERA:  Yes, Your Honor.

23     THE COURT:  Thank you.

24     Welcome back, Officer Morgan.

25     THE WITNESS:  Thank you, Your Honor.

1        **THE COURT:**  You may be seated.

2        Okay.

3        **COURT DEPUTY:**  Jurors are entering.

4        (The jury enters the courtroom.)

5        **THE COURT:**  Welcome back, everyone.  You may be

6    seated.

7        Members of the jury, good morning.  I hope that

8    you-all had a pleasant evening.  We are ready to

9    proceed.  You will recall that when we left yesterday,

10   Officer Morgan was testifying.

11       And, Officer Morgan, if you would just raise your

12   right hand to be sworn.

13                    **NICOLE MORGAN**

14   was recalled as a witness and, having previously been duly

15   sworn, testified as follows:

16       **THE WITNESS:**  I do.

17       **THE COURT:**  You may be seated.

18       And if you would again state your name for the

19   court reporter.

20       **THE WITNESS:**  Officer Nicole Morgan.

21       **THE COURT:**  Mr. Matera, you may continue.

22       **MR. MATERA:**  May it please the Court?

23       **THE COURT:**  Yes.

24            **DIRECT EXAMINATION (CONTINUED)**

25

1      BY MR. MATERA:

2          Q.   Officer Morgan, yesterday when you were

3      testifying, the date you were testifying about was

4      December 31st of 2014; is that accurate?

5          A.   Correct.

6          Q.   And when you left off yesterday, we introduced

7      photographs of the defendant at the hospital; is that

8      right?

9          A.   Correct.

10         Q.   I want to take a step back for a moment to the

11     apprehension of the defendant.   Tell me where you last saw

12     the defendant before he proceeded to the bathroom.

13         A.   In the front of the building.

14         Q.   And when you proceeded from the front of the

15     building, how did you see him?

16         A.   I was standing inside the dining room area.

17     Above me was the subject looking down at me.

18         Q.   Did you look up and see him?

19         A.   Yes.

20         Q.   When you looked up and saw him, was he looking at

21     you?

22         A.   Yes.

23         Q.   When he saw you, what did he do?

24         A.   He turned around and started heading to the

25     direction of the bathroom.

1    Q.   Did he ever say at that time "I give up"?

2    A.   No.

3    Q.   Did he ever say at that time "Take the dog

4    outside and I'll come down"?

5    A.   No.

6    Q.   Did he ever express to you any sort of fear about

7    the K-9 being let go?

8    A.   No.

9    Q.   When the defendant proceeded towards the

10   bathroom, where did you go?

11   A.   I headed towards the bathroom, as well.

12   Q.   And when you headed towards the bathroom, what

13   happened at that point?  Can you say that clearly to the

14   jury?

15   A.   I was outside the bathroom door approximately the

16   distance between here and this wall right here, and I heard

17   a thump.  At that point, I got on the radio, stated to my

18   partners that I believe that the subject exited from the

19   ceiling into the bathroom.

20   Q.   And you encountered him at that point?

21   A.   Correct.

22   Q.   And describe the demeanor of the defendant at

23   that point.

24   A.   As I was standing by the door, the defendant came

25   out looking straight at me, two hands clenched in front of

Ninth Judicial Circuit
Court Reporting Services

22   A.   Yes.

23   Q.   And after the K-9 bit him -- as the K-9 was

24   biting him, what did you see the defendant do?

25   A.   I saw two objects.  One flew out of one hand.

Ninth Judicial Circuit
Court Reporting Services

1    him.

2        Q.   Could you see what was in his hands at that

3    point?

4        A.   No.

5        Q.   Continue.

6        A.   He started walking towards me not once breaking

7    eye contact from me.  I drew my weapon, stated to him to

8    open his hands and to get on the ground.  I stated that

9    multiple times.  He continued to advance on me, and that's

10   when K-9 Officer Brillant deployed his K-9.

11       Q.   How far away were you from him at that point when

12   you were ordering him to get on the ground?

13       A.   Maybe three feet.

14       Q.   And what were you wearing at that time?

15       A.   I was wearing my marked Orlando Police

16   Department-issued uniform, my vest, and my gas mask.

17       Q.   What is your uniform setting?

18       A.   Orlando Police Department, and it's got two

19   patches, one on each sleeve.

20       Q.   When you made the announcements, did you announce

21   that you're from the Orlando Police Department?

22       A.   Yes.

23       Q.   And after the K-9 bit him -- as the K-9 was

24   biting him, what did you see the defendant do?

25       A.   I saw two objects.  One flew out of one hand.

1      One flew out of the other.  One was a small flashlight.

2      The other one was not identified until after he was

3      apprehended.

4          Q.   When did you go to determine what the other

5      object was?

6          A.   Once he was handcuffed.

7          Q.   After he was handcuffed -- first off, did you

8      take photographs -- or were photographs taken of the

9      bathroom that he fell from?

10         A.   Yes.

11             MR. MATERA:  Showing the defense what's been

12         marked as State's N for identification purposes.

13             May I approach the witness, Judge?

14         THE COURT:  Yes.

15             MR. MATERA:  Showing the witness what's been

16         marked as State's N for identification purposes.

17     BY MR. MATERA:

18         Q.   Officer Morgan, take a look at those photos and

19     let me know if you recognize them, please.

20         A.   I do.

21             MR. MATERA:  May I approach the witness?

22         THE COURT:  Yes.

23     BY MR. MATERA:

24         Q.   Are these photographs a fair and accurate

25     depiction of the bathroom that the defendant fell from?

1     A.    Yes.

2          MR. MATERA:   Judge, at this time, the State would

3     move what's been marked as State's N into evidence.

4          THE COURT:   Any objection?

5          MS. GOERNER:   No objection.

6          THE COURT:   State's Exhibit N for identification

7     will be received as State's No. 4.

8          MR. MATERA:   May I approach the clerk?

9          THE COURT:   Yes.

10         MR. MATERA:   May I publish to the jury after

11    they're marked?

12         THE COURT:   Yes.

13         I did get some instructions yesterday on how to

14    use the ELMO if you want to use that.   It's up to you.

15         MR. MATERA:   Thank you, Judge.

16         THE COURT:   That's fine.

17         MR. MATERA:   May I approach the jury?

18         THE COURT:   Yes.

19         MR. MATERA:   May I publish to the jury?

20         THE COURT:   Yes.

21         (The exhibit was published to the jury.)

22         MR. MATERA:   May the witness step down, Judge?

23         THE COURT:   Yes.

24         MR. MATERA:   Showing the jury through Officer

25    Morgan State's N, the first photograph.

1    BY MR. MATERA:

2        Q.   Officer Morgan, what does this photograph depict?

3        A.   That is the insulation on the ceiling.

4            MR. MATERA:  And showing the other photograph

5        within State's N, Judge.

6    BY MR. MATERA:

7        Q.   What does this photograph depict?

8        A.   This is the ceiling.  This is one of the rafters.

9        Q.   And, lastly, what does this photograph depict?

10       A.   This is showing the insulation that was coming

11   from that hole.

12       Q.   And is that hole from where the defendant fell?

13       A.   Yes.

14           MR. MATERA:  Your Honor, may I approach the

15       clerk?

16           THE COURT:  Yes.

17   BY MR. MATERA:

18       Q.   The building that you entered and subsequently

19   apprehended the defendant in, were there "No Trespassing"

20   signs on the building?

21       A.   Yes.

22       Q.   Were photographs taken of those "No Trespassing"

23   signs on the building?

24       A.   Yes.

25           MR. MATERA:  Showing defense what's been marked

1        as State's S for identification.

2            May I approach the witness?

3            THE COURT:  Yes.

4            MR. MATERA:  Showing the witness what's been

5        marked as State's S for identification purposes.

6  BY MR. MATERA:

7        Q.  Officer Morgan, take a look at those photographs

8  and let me know if you recognize them.

9        A.  I do.

10       Q.  Are those a fair and accurate depiction of the

11  "No Trespassing" signs on the building that you encountered

12  the defendant in?

13       A.  Yes.

14          MR. MATERA:  Your Honor, at this time, State

15  would move what's been marked as State's S into

16  evidence.

17          THE COURT:  Any objection?

18          MS. GOERNER:  No objection.

19          THE COURT:  State's Exhibit S for identification

20  will be received as State's No. 5.

21          (State's Exhibit No. 5 was received in evidence.)

22          MR. MATERA:  May I approach the clerk?

23          THE COURT:  Yes.

24          MR. MATERA:  May I publish to the jury?

25          THE COURT:  Yes.

1          (The exhibit was published to the jury.)

2          MR. MATERA:  May I approach the jury?

3          THE COURT:  Yes.

4     BY MR. MATERA:

5          Q.   Were photographs taken of the kitchen area where

6     the officers located the defendant, as well?

7          A.   Yes.

8          Q.   Not subsequently, but throughout encounter with

9     him?

10         A.   Yes.

11         MR. MATERA:  Showing defense counsel what's been

12         marked as State's K for identification.

13         May I approach the witness?

14         THE COURT:  Yes.

15         MR. MATERA:  Showing the witness what's been

16         marked as State's K for identification purposes.

17    BY MR. MATERA:

18         Q.   Officer Morgan, take a look at those photographs

19    and let me know if you recognize them.  And keep them down

20    there when you're looking.

21         A.   Yes.

22         Q.   Are those photographs a fair and accurate

23    depiction of the kitchen?

24         A.   Yes.

25         Q.   And is that an accurate depiction after the

1    events of that day?

2         A.   Yes.

3              MR. MATERA:  Judge, at this time, State moves

4    State's K into evidence.

5              THE COURT:  Any objection?

6              MS. GOERNER:  Your Honor, I would object as to

7    relevance.

8              THE COURT:  May I see the photographs, please?

9              Okay.  The objection is overruled.  State's

10   Exhibit K for identification will be received as

11   State's No. 6.

12             (State's Exhibit No. 6 was received in evidence.)

13             MR. MATERA:  May I publish to the jury, please?

14             THE COURT:  Yes.

15             MR. MATERA:  May I approach the clerk?

16             THE COURT:  Yes.

17             MR. MATERA:  Showing defense counsel what's been

18   marked as State's I for identification purposes.

19             May I approach the witness?

20             THE COURT:  Yes.

21             MR. MATERA:  Showing the witness what's been

22   marked as State's Identification I for identification

23   purposes.

24   BY MR. MATERA:

25        Q.   First off, did you take photographs of the dining

1    room of that building?

2         A.   Yes.

3         Q.   Take a look at those photos and let me know if

4    you recognize them.

5         A.   I do.

6         Q.   Are those a fair and accurate depiction of the

7    dining room area at the Perkins after the incident of the

8    defendant?

9         A.   Yes.

10             MR. MATERA:  May I approach the witness?

11             THE COURT:  Yes.

12             MR. MATERA:  Your Honor, at this time, State

13        would move what's been marked as State's I into

14        evidence.

15             THE COURT:  Any objection?

16             MS. GOERNER:  Your Honor, may I voir dire the

17        witness, please?

18             THE COURT:  Yes.

19                          -      -      -

20                     VOIR DIRE EXAMINATION

21   BY MS. GOERNER:

22        Q.   Ms. Morgan?

23        A.   Yes, ma'am.

24        Q.   You didn't take any of these pictures, did you?

25        A.   I did not, no.

1    Q.    Someone else took these photographs?

2    A.    Yes.

3    Q.    You had not been in that building prior to

4    December 31st of 2014, had you?

5    A.    Correct.

6    Q.    So you don't know what kind of damage was in that

7    building before you got there on December 31, 2014?

8    A.    I can only compare to what it was before when we

9    first entered to how it ended up.

10    Q.    On that day?

11    A.    Yes.

12    Q.    And, in fact, a bit of damage that we're looking

13    at in these pictures was actually caused by law

14    enforcement; isn't that correct?

15    A.    Yes.

16         MS. GOERNER:  Your Honor, my objection is, again,

17    as to relevance and lack of foundation.

18         THE COURT:  Okay.  The objection is overruled.

19         State's Exhibit I for identification will be

20    received as State's Exhibit No. 7.

21         (State's Exhibit No. 7 was received in evidence.)

22              **DIRECT EXAMINATION (CONTINUED)**

23    BY MR. MATERA:

24    Q.    And the damage that you were making in these

25    photographs were trying to apprehend the defendant, right?

1      A.   Yes.

2      Q.   Who was crawling around in the ceiling, right?

3      A.   Correct.

4           MR. MATERA:   May I approach the jury?

5           THE COURT:   Yes.

6   BY MR. MATERA:

7      Q.   All the events that you described to and

8   yesterday, did those all occur in Orlando?

9      A.   Yes.

10     Q.   In Orange County, Florida?

11     A.   Yes.

12          MR. MATERA:   One moment, Judge, please.

13   BY MR. MATERA:

14     Q.   Can you describe -- as you were handcuffing the

15   defendant, as he was being handcuffed, can you describe his

16   actions at that point?

17     A.   He was resisting.

18     Q.   When you say, "He was resisting," describe to the

19   jury what he was doing.

20     A.   Once the dog was deployed and had latched on to

21   his lower leg, he, obviously, fell to the ground.  I

22   attempted to handcuff him, and he -- I got his right wrist,

23   but after that, he put his arms underneath his body.  And I

24   kept saying, "Give me your hands.  Put your hands behind

25   your back.  Put your hands behind your back."  And he held

1   area, correct?

2   A.   I was new to that area.   I was only on my second

3   or third day in that area.

4   Q.   Okay.   So you were not aware of the homeless

5   situations surrounding that building?

6   A.   No.

7   Q.   And the homeless population that lived in the

8   woods nearby?

9   A.   No.

10  Q.   When you got to the scene, Officer Brillant was

11  already on the scene?

12  A.   Yes.

13  Q.   In fact, you arrived about two minutes after him,

14  right?

15  A.   Correct.

16  Q.   And Officer Brillant had the dog out with him?

17  A.   Not at first.

18  Q.   When -- he took the dog out?

19  A.   Not at first.

20  Q.   Okay.   But I'm not asking about at first.   At

21  some point, Officer Brillant --

22  A.   Oh, yes.

23  Q.   -- took the dog out, right?

24  A.   Yes.

25  Q.   Pretty quickly after you got there?

1    A.   Yes.

2    Q.   And he started walking around the building with

3    the dog?

4    A.   We went straight to the open door.

5    Q.   With the dog?

6    A.   Yes.

7    Q.   To look for the suspect?

8    A.   Yes.

9    Q.   Okay.  Now, you said when you got on the scene --

10   I don't know if you can clarify whether this was -- when

11   you first got on the scene, or as you were walking around

12   with Officer Brillant, you encountered the door with a

13   busted lock?

14   A.   Yes.

15   Q.   Now, you don't know if that door was wide open or

16   was it closed?

17   A.   It was open.

18   Q.   And you don't know how long that door had been

19   standing open, do you?

20   A.   No.

21   Q.   You don't know how the lock got busted?

22   A.   No.

23   Q.   You didn't see Mr. Washington bust the lock on

24   the door?

25   A.   No.

1       Q.   And which door was this on the building?   I

2    believe you indicated there was a door that you had to

3    force open, and there was another door?

4       A.   Uh-huh.  The door that was open is the door that

5    was to a small, sort of like electrical room that had the

6    ladder to the roof hatch.

7       Q.   Okay.  So I believe that was State's Exhibit 2.

8    So let me see if I can find it.

9            I'm gonna show you what's previously been

10   identified as State's Exhibit 1 in evidence.

11           Is that this door you're talking about?

12      A.   Yes, ma'am.

13      Q.   That was already open?

14      A.   Yes, ma'am.

15      Q.   Okay.  And in that picture, can you see any

16   damage to the lock on the door?

17      A.   Not in that picture, no.

18      Q.   You know if anybody took a picture of the door

19   with the damage to the lock?

20      A.   I do not.

21      Q.   And you didn't take a picture?

22      A.   No, I did not.

23      Q.   And you didn't check that door for prints, did

24   you?

25      A.   No.

1      Q.   Now, you are aware this is a closed business?

2      A.   What you mean by "closed"?

3      Q.   It was out of business?

4      A.   Yes.

5      Q.   It had been abandoned?

6      A.   Yes.

7      Q.   It had been abandoned for a while?

8      A.   I have no idea.

9      Q.   You don't know whether it had been abandoned for

10   a year?

11     A.   No.

12     Q.   Or two years?

13     A.   No.

14     Q.   Or three years?

15     A.   No.

16     Q.   Do you know -- or are you aware whether there had

17   been other burglaries reported at that building?

18     A.   I do not.

19     Q.   Now, at some point, you mentioned you were going

20   around inside the building looking at the ladder in the

21   roof hatch area, and you said you saw the person up in the

22   roof area?

23     A.   Yes.  The roof hatch was open.

24     Q.   And you called for him to come down?

25     A.   Yes.

1      Q.   And he didn't respond?

2      A.   Correct.

3      Q.   Now, you indicated that, I guess, he shut the

4  door on you?

5      A.   Correct.

6      Q.   You don't mean like he physically shut the door

7  on your person, right?

8      A.   Not -- like, he didn't touch me.

9      Q.   Okay.

10      A.   No.

11      Q.   He just shut the door?

12      A.   Yeah.  He pushed the hatch closed.

13      Q.   So you were standing on the ground?

14      A.   Yes.

15      Q.   He was up in the roof?

16      A.   Yes.

17      Q.   Okay.  And he didn't say anything?

18      A.   No.

19      Q.   Okay.  At that point, could you see his face?

20      A.   No.

21      Q.   Now, you had indicated previously on yesterday

22  that the building was quite delapidated, right?

23      A.   Yes.

24      Q.   So there was already a lot of damage to the

25  building before you entered?

1        A.    Yes.

2        Q.    And you don't know how much of that damage was

3    there before December 31, 2014?

4        A.    No, I do not.

5        Q.    And did you ever actually go up on the roof

6    yourself?

7        A.    I did for a very minimal time.

8        Q.    And you saw damage to some A/C units on the roof?

9        A.    My -- I was not focused on the A/C.  I was simply

10   looking for a person.  Because by the time I made the roof,

11   two officers were already on the roof, and I only had a

12   small corner that was yet to be cleared.

13       Q.    Okay.  But you could see the A/C units, correct?

14       A.    Yes.

15       Q.    They're pretty big units?

16       A.    Yes.

17       Q.    And did you see the damage to the A/C units?

18       A.    I didn't look at them like that.

19       Q.    Okay.  So if there was damage, you don't know if

20   it got there prior to December 31, 2014?

21       A.    No.

22       Q.    You never saw the defendant actually --

23   Mr. Washington damaging the units, did you?

24       A.    No.

25       Q.    You didn't see Mr. Washington stripping any

1    copper off of the units?

2         A.   No.

3         Q.   In fact, you never saw Mr. Washington with any

4    kind of cutting bolt cutters, did you?

5         A.   No.

6         Q.   Or screwdrivers?

7         A.   No.

8         Q.   Or saws?

9         A.   No.

10        Q.   Now, in looking for Mr. Washington in the

11   building, who you later identified to be Mr. Washington,

12   your agency -- you guys were ripping out ceiling tiles?

13        A.   Yes.

14        Q.   Pulling up benches to the chairs that were with

15   the tables inside?

16        A.   Yes.

17        Q.   Looking for Mr. Washington in there?

18        A.   Yes.

19        Q.   Did you ever see a backpack on the roof?

20        A.   No.

21        Q.   Did you ever see a water bottle?

22        A.   No.

23        Q.   Did you ever see a backpack at all?

24        A.   No.

25        Q.   Okay.   You mentioned yesterday that you saw at

1   least two knives in the building when you guys were

2   searching, right?

3        A.   Yes.

4        Q.   Where did you see those knives?

5        A.   The first one was right on the floor on the door

6   that was opened.  And the second one was later identified

7   when it came out of his hand.

8        Q.   Okay.  So you didn't see two knives prior to

9   Mr. Washington coming down out of the bathroom ceiling?

10       A.   Two knives coming out of his hand.

11       Q.   Yesterday you testified -- do you recall that you

12  testified that you saw two knives prior to Mr. Washington

13  coming out of the bathroom ceiling?

14       A.   I did not testify to that.  No, I did not.

15       Q.   So the one that was on the floor by the door that

16  was opened, that was the same one in Exhibit 1 that I just

17  showed you?

18       A.   You didn't show me a knife.

19       Q.   I'm sorry.  Let me rephrase that question.

20            In Exhibit 1, is this the door where you saw the

21  knife by?

22       A.   Yes.

23       Q.   When you walked in?

24       A.   Yes.

25       Q.   You know if anybody took a picture of that knife?

1      A.   I do not.

2      Q.   And you didn't take a picture of that knife?

3      A.   I did not.

4           MS. GOERNER:   One moment, Your Honor.

5  BY MS. GOERNER:

6      Q.   And the knife that you observed by the door when

7  you came in, you didn't know when it got there?

8      A.   No.

9      Q.   You didn't know who put it there?

10     A.   No.

11     Q.   You don't know how long it had been there?

12     A.   No.

13     Q.   You didn't collect it?

14     A.   No.

15     Q.   You didn't check it for prints?

16     A.   No.

17     Q.   Now, when Mr. Washington came down out of the

18  ceiling tile in the bathroom, you said his fists were

19  clenched, correct?

20     A.   Once he came out of the door from the bathroom.

21     Q.   Okay.  All right.  So when -- so when he came out

22  of the door from the bathroom, you were standing in the

23  kitchen or dining room?

24     A.   In the dining room right by the door.

25     Q.   And the ceiling tiles, they were still up in that

1    area or no?

2        A.    In the --

3        Q.    The dining room area where you were standing?

4        A.    Most were gone.  But right by the bathroom there

5    were tiles there, yes.

6        Q.    And you could see the bathroom from where you

7    were?

8        A.    The bathroom door.

9        Q.    Just the door?

10       A.    Yes.

11       Q.    So when Mr. Washington came out, you said both of

12   his fists were clenched?

13       A.    Yes.

14       Q.    And you could see a small flashlight in one hand?

15       A.    Yes.

16       Q.    And you didn't know or could tell if he had

17   something in the other hand?

18       A.    All I saw that it was clenched.

19       Q.    Okay.  Now, did you collect that flashlight?

20       A.    I did not personally, no.

21       Q.    Did you ever see that flashlight after he was

22   bitten by the dog?

23       A.    No.

24       Q.    Did you ever take a picture of that flashlight?

25       A.    I personally did not.

1     Q.   Now, you said that when you heard the thud coming

2  out of the bathroom area, you were still wearing your gas

3  mask, correct?

4     A.   Yes.

5     Q.   The law enforcement officers that were in the

6  building, were officers still wearing gas masks?

7     A.   Some were.  Some were not.

8     Q.   When Mr. Washington came down, the effects of

9  Clear Out were still in the building?

10     A.   It depends on the person.  I am very sensitive to

11  it, so, therefore, I have my mask on a lot longer than some

12  other officers where they are not as affected by it as I

13  am, and they were able to walk around with no masks.

14     Q.   But my question to you was, were the effects of

15  the Clear Out still in the building?

16     A.   Yes.

17     Q.   And the purpose of the Clear Out was to do what?

18     A.   The purpose of the Clear Out is when someone is

19  refusing to come out, we put it into the ceiling tiles

20  because that was where we saw him.  And it is very strong,

21  and it makes you want to come down from where the gas is

22  because if you stay in there, it's difficult to breathe.

23     Q.   Okay.  So make breathing difficult?

24     A.   Yes.

25     Q.   Does that cause you to have bloodshot eyes?

1      A.   Yes.

2      Q.   Does -- is it irritating to the skin?

3      A.   Yes.

4      Q.   Does it cause a person to be disoriented if

5  they've inhaled it?

6      A.   No.

7      Q.   When you saw Mr. Washington, his eyes were

8  bloodshot, correct?

9      A.   Yes.

10     Q.   And Mr. Washington appeared -- or he seemed to be

11  scared to you, too, didn't he?

12     A.   He -- scared of me?

13     Q.   No.  Scared.

14     A.   Yes.

15     Q.   When you saw Mr. Washington coming out of the

16  ceiling tiles, he wasn't wearing any gloves, was he?

17     A.   I can't remember.

18     Q.   Did you collect any gloves?

19     A.   Me personally, no.

20     Q.   Take any pictures of any gloves?

21     A.   No.

22     Q.   You never saw Mr. Washington stripping any copper

23  from the building?

24     A.   I did not.

25     Q.   You never saw him in possession of any copper,

1    did you?

2         A.   I did not.

3              **MS. GOERNER:**  One moment.

4              I have no further questions.

5              **THE COURT:**  Any redirect?

6              **MR. MATERA:**  Yes, Your Honor.  May it please the

7         Court?

8    **BY MR. MATERA:**

9         Q.   Officer Morgan, when you went onto the roof, what

10   was your focus?

11        A.   A person being on the roof.

12        Q.   Were you attempting to locate that person?

13        A.   Yes.

14        Q.   Was it your job to collect evidence?

15        A.   No.

16        Q.   Whose job was it to collect evidence at the

17   scene?

18        A.   Once the subject is secured, it's either ours,

19   depending on the type of crime, or the CSTs, or known as

20   the CSIs.

21        Q.   Was a CST assigned to this case?

22        A.   Yes.

23        Q.   What was her name?

24        A.   CST Styer.

25        Q.   Are you assigned to take photographs?  Is it your

1    job to take photographs of the scene, or is that the CTS's

2    job?

3         A.    That's the CST's.

4         Q.    Throughout this encounter with the defendant,

5    multiple cans of Clear Out were used, correct?

6         A.    Correct.

7         Q.    And aside from the time when he fell from the

8    bathroom, it never had any -- never made him come down?

9         A.    It did not.

10        Q.    You just testified that he appeared scared.  What

11   did you mean by that when --

12        A.    That when he was above me in the ceiling, he saw

13   me and he turned around and quickly went towards the

14   bathroom.

15        Q.    Okay.  So when you were just testifying what

16   Ms. Goerner asked you about him being scared, you were not

17   referring to the fact when he was in the bathroom, is what

18   you're saying?

19        A.    Correct.

20        Q.    Okay.  When you encountered him in the bathroom,

21   what was his demeanor?

22        A.    Right outside the bathroom.

23        Q.    Right outside the bathroom.  Excuse me.

24              When you encountered him right outside the

25   bathroom, what was has demeanor like?

1       A.   Determined.  He came right at me.

2       Q.   Did he appear scared to you?

3       A.   No.

4       Q.   Was the K-9 in the vicinity of you at that point?

5       A.   Yes.

6       Q.   Did he appear to be frightened by the K-9?

7       A.   No.

8       Q.   Did he say, "Oh, my God.  Get the K-9 away from

9    me"?

10      A.   No.

11          MR. MATERA:  No further questions.

12          THE COURT:  Members of the jury, do you have any

13    questions of the witness?  If so, please raise your

14    hand.

15          All right.  I see no hands.

16          Thank you.  You are free to leave.

17          State, you may call your next witness.

18          MR. MATERA:  State would call Officer Stephen

19    Wilson to the stand.

20          THE COURT:  I'm sorry.  I didn't hear the last

21    name.

22          MR. MATERA:  Wilson.

23          THE COURT:  Wilson?

24          MR. MATERA:  Yes.

25

1        THE COURT:  The record will so refract.

2        MR. MATERA:  No further questions.

3        THE COURT:  Members of the jury, do you have any

4    questions of the witness?  If so, please raise your

5    hand.

6        All right.  I see no hands.

7        Thank you, sir.  You're free to leave.

8        THE WITNESS:  Thank you.

9        THE COURT:  Mr. Matera, anything else from the

10   State?

11       MR. MATERA:  One final thing, Judge.  I would

12   like to recall Officer Morgan briefly.

13       THE COURT:  Okay.  Recall Officer Morgan.

14       MR. MATERA:  May it please the Court?

15       THE COURT:  Yes.

16       Welcome back.

17       THE WITNESS:  Thank you.

18                    NICOLE MORGAN

19   was recalled as a witness and, having previously been duly

20   sworn, testified as follows:

21       THE COURT:  Please tell us your name.

22       THE WITNESS:  Officer Nicole Morgan.

23       THE COURT:  Okay.  Officer Morgan, you were

24   previously sworn to tell the truth this morning.  You

25   remain under oath.

1           THE WITNESS:  Correct.

2           THE COURT:  You may proceed.

3                    DIRECT EXAMINATION

4    BY MR. MATERA:

5       Q.   Yesterday when I was asking you questions, I

6    asked if this event occurred in the evening of

7    December 31st.

8            Did this event occur in the morning of

9    December 31, 2014?

10      A.   Yes.

11      Q.   All right.  At the conclusion of your encounter

12   with the defendant, did you go to where an object was

13   thrown from his hand?

14      A.   Yes.

15      Q.   You observed -- what did you observe at that

16   point?

17      A.   A knife blade that was on the floor.

18           MR. MATERA:  May I approach the witness?

19           THE COURT:  Yes.

20   BY MR. MATERA:

21      Q.   Showing the witness what's been marked as State's

22   O for identification purposes.

23           Do you recognize those two photos?

24      A.   Yes, I do.

25      Q.   Are those the photographs that you were just

```
1    describing?

2         A.   Yes.

3         Q.   Fair and accurate depiction of those?

4         A.   Yes.

5         Q.   Of the knife --

6         A.   Yes.

7         Q.   -- blade?

8              MR. MATERA:  Your Honor, at this time, the State

9         would move what's been marked as State's O into

10        evidence.

11             THE COURT:  Any objection?

12             MS. GOERNER:  No objection.

13             THE COURT:  State's Exhibit O will be received as

14        the next State's next numbered exhibit.

15             MR. MATERA:  Permission to publish?

16             THE CLERK:  State's 16.

17             THE COURT:  State's 16.

18             You may.

19             THE CLERK:  I'm sorry, Judge.  Corrected.

20        State's 17.

21             THE COURT:  State's 17.

22             (State's Exhibit No. 17 was received in

23        evidence.)

24             (The exhibit was published to the jury.)

25             MR. MATERA:  Nothing further, Judge.
```

1          THE COURT:  Any questions from the defense?

2          MS. GOERNER:  Briefly.

3                    CROSS-EXAMINATION

4    BY MS. GOERNER:

5      Q.   That knife blade was about five or six inches in

6    length?

7      A.   It was about a normal size knife blade.

8          MS. GOERNER:  May I approach the witness?

9          THE COURT:  Yes.

10   BY MS. GOERNER:

11     Q.   Showing you what's previously been introduced

12   into evidence as State's Exhibit 16.

13         THE CLERK:  Seventeen.

14         MS. GOERNER:  The actual knife itself.

15         THE CLERK:  I'm sorry.

16   BY MS. GOERNER:

17     Q.   This is about five or six inches in length.  You

18   would agree?

19     A.   Yes.

20     Q.   And this was the object that you said you saw in

21   Mr. Washington's hands?

22     A.   Yes.

23     Q.   In fact, you said when you first saw him you

24   couldn't tell what he had in his hands?

25     A.   Correct.



THE LAW OFFICES OF
JAMES S. PURDY
PUBLIC DEFENDER
SEVENTH JUDICIAL CIRCUIT
444 SEABREEZE BLVD, SUITE 210
ATTN: KATHRYN ROLLISON RADTKE
DAYTONA BEACH, FLORIDA 32118

DEAR MS. RADTKE:

I AM WRITING TO GIVE YOU THE INFORMATION YOU NEED TO PREPARE THE BEST POSSIBLE APPEAL. THE ORANGE COUNTY JUDICIAL SYSTEM CONSPIRED TOGETHER TO PROTECT THE OFFICERS WHO TAMPERED WITH EVIDENCE THEN DESTROYED THE BODY CAMERA EVIDENCE TO CONCEAL THEIR ILLEGAL CONDUCT. DURING THEIR SEARCH FOR ME, I SAW THEM FIND AND RELOCATE EVIDENCE TO MAKE IT SEEM I HAD DONE MORE THAN I ACTUALLY DID. I ACKNOWLEDGE BEING GUILTY OF TRESPASSING AND RESISTING ARREST WITHOUT VIOLENCE. I DID NOT COME OUT WHEN THE OFFICER CALLED. WHEN THEY DECIDED TO COME IN AFTER ME, I WAS NOT GIVEN THE OPPORTUNITY TO GIVE UP. IT WAS A STRICTLY SEEK AND DESTROY MISSION. I WAS RUNNING FOR MY LIFE BECAUSE CERTAIN OFFICERS HAD PLOTTED TO SHOOT ME DEAD IF THEY GOT THE RIGHT SHOT AT THE FRONT PART OF MY BODY. I COULDN'T STOP THEM FROM SHOOTING ME BUT I COULD PREVENT THEM FROM SHOOTING ME WHERE THE SHOT COULD BE JUSTIFIED. THAT IS ALL I DID. I KNEW I COULDN'T GET AWAY, SO I PROTECTED MYSELF THE BEST WAY I COULD. WHEN I SAW AN OPPORTUNITY TO GET IN THE POSITION SO MY APPREHENSION COULD BE WITNESSED BY MORE THAN JUST THE OFFICERS WITHIN THE BUILDING, I JUMPED THROUGH THE SHEET ROCK CEILING AND RAN FOR THE OUTSIDE DOOR. OFFICER MORGAN BLOCKED MY EXIT AND OFFICER JAMES, IN ADDITION TO OTHER OFFICERS, GRABBED ME FROM BEHIND TO PULL ME BACK AWAY FROM THE DOOR SO NO ONE COULD SEE WHAT THEY INTENDED TO DO. I WAS HIT IN THE KIDNEY AREA SEVERAL TIMES BEFORE I WAS HELD DOWN IN A POSITION THAT SEEMED TO EXPRESS THE SACRIFICE OF CHRIST. THE K-9 OFFICER BRILLIANT INSTALLED THESE KNIFE CANINE DENTURES INSIDE THE DOG'S MOUTH. I STARTED TALKING TO OFFICER JAMES WHEN IT BECAME APPARENT THEY INTENDED TO KILL ME. I SAID, "YALL FIXING TO KILL ME." HE SAID, "YOU SHOULD HAVE CAME WHEN I CALLED YOU." I SAID, "THAT MEANS I GOTTA DIE." HE SAID, "YOUR KIND DESERVES TO DIE." I MADE MY PEACE WITH GOD AND EXPECTED TO BE KILLED. I WAS HELD DOWN BY OFFICERS WITH THIS DOG GROWLING AT ME WITH THESE KNIFE EXTENTIONS HANGING FROM IT'S MOUTH. I COULDN'T DO ANYTHING. THEY ALL STARTED CHANTING STOP RESISTING OVER AND OVER UNTIL THE CHANT PROVOKED THE DOG TO BITE ME. OFFICER BRILLIANT HAD THE DOG'S LEASH SHORT-COLLARED SO HE COULD DIRECT THE BITE. HE POINTED THE DOG'S HEAD TOWARDS MY THIGH WHERE THE RIGHT BITE WOULD CAUSE ME TO BLEED TO DEATH. I THOUGHT I WAS GOING TO DIE; THEY THOUGHT I WAS GOING TO DIE. GOD SPARED ME. WHEN I DIDN'T DIE, THEY DID WHAT THEY HAD TO DO TO PROTECT THEMSELVES AT MY EXPENSE. WITHOUT THAT BODY CAMERA EVIDENCE, I DON'T HAVE THE IRREFUTABLE PROOF THAT THEY RELOCATED EVIDENCE BEFORE AND AFTER THEY DECIDED TO TRY TO KILL ME. OFFICER JAMES HAD ON THE BODY CAMERA FROM THE BEGINNING TO THE END OF THE INCIDENT. THE CRIME SCENE INVESTIGATOR STYER PHOTOGRAPHED EVIDENCE IN DIFFERENT

PUBLIC DEFENDER/KATHRYN ROLLISON RAATKE
SEVENTH JUDICIAL CIRCUIT
444 SEABREEZE BLVD; SUITE 210
DAYTONA BEACH, FLORIDA 32118

LOCATIONS THAN WHAT WAS WRITTEN IN THEIR CASE NARRATIVES. SHE
TESTIFIED TO NOT TESTING FOR LATENT PRINTS BUT I ENCLOSED HER
CASE NARRATIVE WHERE SHE STATES THAT SHE DID. OFFICER COTE
TESTIFIED THAT HE RELOCATED THE EVIDENCE ON THE WITNESS STAND BUT
FAILED TO WRITE THAT IN HIS REPORT. BOTH OF THEIR CASE NARRATIVE
WERE SUBMITTED AS SUPPLIMENTAL DISCOVERIES 15 MONTHS AFTER MY
ARREST IN AN EFFORT TO EXPLAIN THE DISCREPANIES I HAD LISTED
IN THE MOTIONS TO SUPPRESS AND MOTION TO DISMISS RULED ON JAN 27,
2016 AND MARCH 9, 2016. A FUNDAMENTAL ERROR HAS BEEN COMMITTED. THE
BODY CAMERA EVIDENCE IS NO LONGER AVAILABLE. OFFICER JAMES TESTIFIED
THAT HE DESTROYED THE EVIDENCE. I DIDN'T HAVE A FAIR TRIAL AND IT IS
IMPOSSIBLE FOR ME TO HAVE A FAIR TRIAL WITHOUT THE BODY CAMERA EVIDENCE.
A FUNDAMENTAL ERROR IN A CRIMINAL CASE MAY BE CORRECTED IN A DIRECT APPEAL
EVEN IF THE ISSUE HAS NOT BEEN PRESERVED FOR APPELLATE REVIEW BY A TIMELY
MOTION OR OBJECTION IN THE TRIAL COURT. THE PROSECUTOR ALLOWED MS STYER
AND MR. COTE TO TESTIFY TO STATEMENTS INCONSISTENT WITH STATEMENTS
PROVIDED IN THEIR CASE NARRATIVES. I NEVER WAS PROVIDED WITH A COPY OF THEIR
DEPOSITIONS BUT BASED ON THEIR TESTIMONY COMPARED TO THEIR CASE NARRATIVES,
A GIGLIO VIOLATION OCCURRED. TO MAKE MY SITUATION MORE DIFFICULT, JUDGE EGAN
IMPLIED THAT HE WOULDN'T ENFORCE THE SUBPOENAS TO COMPEL MY WITNESSES
TO TESTIFY. HE SAID IN COURT ON MARCH 16, 2016, THAT MY WITNESSES MIGHT NOT
SHOW UP. THE ONLY WAY THEY DID NOT HAVE TO SHOW UP IS FOR HIM TO NOT ENFORCE
HIS SUBPOENAS. THE NEXT TIMES I WAS IN HIS COURTROOM, HE SAID I WOULD
HAVE TO DO MORE THAN NOTIFY HIM AND THE CLERK OF COURT IN THE COURTROOM
FOR MY WITNESSES TO SHOW UP. HE DENIED ME COMPULSORY PROCESS AND FORCED
ME TO ACCEPT A LAWYER I DID NOT WANT THAT HE COULD CONTROL. HE DID
EVERYTHING IN HIS POWER TO KEEP ME FROM INTRODUCING ENCLOSED STINGRAY
PHONE TRACKER EVIDENCE ALONG WITH THE TESTIMONY OF MR. JOHN SAWICKI
IN ADDITION TO THE 26 OTHER WITNESSES I HAD ON MY WITNESS LIST. IT
WOULD BE HELPFUL FOR YOU TO OBTAIN THE C.D.s OF THE COURT PROCEEDINGS
HE CONDUCTED BEFORE HE ALLOWED JUDGE JULIE O'KANE TO FINISH WHAT
HE STARTED. I ENCLOSED THE FOLLOWING TO BETTER ASSIST YOU IN MY APPEAL:

① Case narrative of Officer James
② Case narrative of Officer Styer
③ Case narrative of Officer Cote
④ Complaint to the Judicial Qualifications Commission
⑤ Letters from the Judicial Qualifications Commission
⑥ Stingray phone tracker information from Wikipedia
⑦ Stingray information from wired.com

PLEASE CONTACT ME IF YOU THINK YOU NEED ANYTHING I MAY BE ABLE TO PROVIDE.
KEEP ME INFORMED AS TO THE PROGRESS OF MY CASE. YOUR ASSISTANCE WILL BE
GREATLY APPRECIATED.

SINCERELY,

James Edward Washington
JAMES EDWARD WASHINGTON

Orlando Police Department 8.11
Supplement Report

Case Number  . . : 2014-536652
Supplement Number:   3

Page:    1
Date Of Supplement: 01/02/2015

Date/Time Reported: 12/31/14  8:51 Hrs.
Location Occurred : 5705 LA COSTA DR
Reporting Officer :     30287  MORGAN,NICOLE,E,
Primary Unit Assigned to Investigate: E Property
Assigned Investigators:

Narrative Name: NARRATIVE SUPPLEMENT 1/2/2015 8:47 AM
On 12/31/2014 at 0851 hours, I, Officer James (12869) and Officer S. Smith (30580) responded to 5705 La Costa Drive, to assist Officer Morgan and Officer Wilson with the commercial burglary. Upon our arrival, I was informed of the suspect`s description and last known location on the roof. We completed a search of the roof and were unable to locate the suspect.

On the roof, I observed a red and black in color back pack sitting beside one of the overhead air conditioning units. A knife and other tools, along with a water bottle were also observed in this area. Several of the buildings air conditioning units and vent were dismantled and a pile of copper was located beside the buildings roof access hatch, which is also where the suspect was last observed. After we completed a search of the roof, as we exited, I observed recent damage to the wall and exposed insulation pieces, which had been moved from their original position.

During this search numerous voice and public announcement commands were given telling the suspect to exit the building or to make his position known. I utilized my department issued body worn camera, to look and attempt to locate the suspect but this met with negative results. After numerous attempts to make contact, and with no answer from inside, it was determined for officer safety, that Clear out would be deployed inside the building. With the assistance of other Orlando Police Officers, 20 cans were deployed inside. after allowing time dispense, we attempted again to locate the suspect. Once the suspect was located, I assisted Officer Morgan and Officer Wilson in handcuffing the suspect.

At this time, I escorted the suspect to Florida Hospital East. Acting Supervisor, Officer Conroy (17711)  was notified of this incident. This report is to document my involvement in this incident.

Orlando Police Department 8.11
Supplement Report

Case Number . . : 2014-536652                          Page:    1
Supplement Number:   7                 Date Of Supplement: 01/20/2015

Date/Time Reported: 12/31/14  8:51 Hrs.
Location Occurred : 5705 LA COSTA DR
Reporting Officer :    30287  MORGAN,NICOLE,E,
Primary Unit Assigned to Investigate: PatrolSvcs
Assigned Investigators:
          11757     HOWARD,ANDRE,,
          30287     MORGAN,NICOLE,E,

------------------------------------------------------------------------

EVIDENCE COLLECTED INFORMATION

The following Evidence Information was added to this case.
          Knife

The following Evidence Information was added to this case.
          Miscellaneous Articles

The following Evidence Information was added to this case.
          Tools Used

Narrative Name: NARRATIVE SUPPLEMENT 1/20/2015 10:14 AM
     On December 31, 2014 at 1315 hours, I, CSI Styer (#14857) responded
     to 5705 La Costa Drive, in reference to a commercial burglary.  Upon
     my arrival, I met and was briefed by Officer Cote (#16904).  After my
     briefing, I took digital color photographs, depicting gray card with
     date and case number, location, overall views of the exterior east
     side of the business, with close up views of an open utility door,
     and close up views of a red/white/black backpack on the ground in the
     doorway.  Ofc. Cote then utilized my camera to take photographs of
     the damage on the roof, and close up views of tools left on the roof.
     He collected those tools and turned them over to my custody.

     I then proceeded to take overall photographs inside the business,
     with close up views of damage inside.  Directly inside the front
     doors, I was directed to photograph suspected bloodstains on the
     ground, as well as a knife blade, missing its handle.

     Lastly, I took photographs of damage to the outside of the building,
     as well as a close up view of a `No Trespassing` sign affixed to the
     window on the south side of the business.

     I processed the scene for latent prints with negative results.  I
     collected the tools, backpack containing tools and other personal
     items, as well as the knife blade as evidence.

     I departed the scene at 1430 hours.

     Upon my arrival at OPH, 73 photographs were downloaded and are on