

**STATE OF FLORIDA**

# JUDICIAL QUALIFICATIONS COMMISSION

POST OFFICE BOX 14106

TALLAHASSEE, FLORIDA 32317

(850) 488-1581

HON. KRISTA MARX
CHAIR

HON. JAMES A. RUTH
VICE - CHAIR

MICHAEL L. SCHNEIDER
EXECUTIVE DIRECTOR
GENERAL COUNSEL

ALEXANDER J. WILLIAMS
ASSISTANT GENERAL COUNSEL

January 25, 2017

James Edward Washington
DC# 197574-E21365
Madison Corr. Inst.
382 S.W. MCI Way
Madison, Fl 32340

***Re:   Docket No. 17-040; Egan***

Dear Mr. Washington:

The Commission has received your complaint. The Investigative Panel of the Commission meets approximately every six weeks. At the next meeting, the Panel will evaluate your complaint to determine whether your concerns fall within the Commission's jurisdiction, and if so, whether they merit further review.

Thank you for bringing this matter to the Commission's attention.

Sincerely yours,

Alexander J. Williams
Assistant General Counsel

AJW/mc

*Inquiries by the Commission are confidential pursuant to Art. V, Sec 12(a)(4) of the Florida Constitution and Rule 2.420, Florida Rules of Judicial Administration.*



HON. KRISTA MARX
CHAIR

HON. JAMES A. RUTH
VICE - CHAIR

## STATE OF FLORIDA
## JUDICIAL QUALIFICATIONS COMMISSION
POST OFFICE BOX 14106
TALLAHASSEE, FLORIDA 32317
(850) 488-1581

MICHAEL L. SCHNEIDER
EXECUTIVE DIRECTOR
GENERAL COUNSEL

ALEXANDER J. WILLIAMS
ASSISTANT GENERAL COUNSEL

February 27, 2017

James Edward Washington
DC# 197574-E21365
Madison Corr. Inst.
382 S.W. MCI Way
Madison, Fl 32340

**Re:   *Docket No. 17-040; Egan***

Dear Mr. Washington:

The Investigative Panel of the Commission has completed its review of your complaint in the above matter and has determined, at its most recent meeting, that the concerns you have expressed are not allegations involving a breach of the Code of Judicial Conduct warranting further action by the Commission but are matters for review through the normal court process.

The purpose of the Commission is to determine the existence of judicial misconduct and disability as defined by the Constitution and the laws of the State of Florida. If such misconduct or disability is found, the Commission can recommend disciplinary action to the Florida Supreme Court.  The Commission has found no basis for further action on your complaint that therefore has been dismissed.

Sincerely yours,

Alexander J. Williams
Assistant General Counsel

AJW/mc

*Inquiries by the Commission are confidential pursuant to Art. V, Sec 12(a)(4) of the Florida Constitution and Rule 2.420, Florida Rules of Judicial Administration.*

# Stingray phone tracker

From Wikipedia, the free encyclopedia

The **StingRay** is an IMSI-catcher, a controversial cellular phone surveillance device, manufactured by Harris Corporation.[2] Initially developed for the military and intelligence community, the StingRay and similar Harris devices are in widespread use by local and state law enforcement agencies across the United States and possibly covertly in the United Kingdom. **Stingray** has also become a generic name to describe these kinds of devices.[3]



A Stingray device in 2013, in Harris's trademark submission.[1]

## Contents

- 1 Technology
    - 1.1 Active mode operations
    - 1.2 Passive mode operations
    - 1.3 Active (cell site simulator) capabilities
        - 1.3.1 Extracting data from internal storage
        - 1.3.2 Writing metadata to internal storage
        - 1.3.3 Forcing an increase in signal transmission power
        - 1.3.4 Forcing an abundance of signal transmissions
        - 1.3.5 Tracking and locating
        - 1.3.6 Denial of service
        - 1.3.7 Interception of communications content
    - 1.4 Passive capabilities
        - 1.4.1 Base station (cell site) surveys
- 2 Usage by law enforcement
    - 2.1 In the United States
    - 2.2 Outside the United States
- 3 Secrecy
- 4 Criticism
    - 4.1 Counter "StingRay" and Anti-spy devices
- 5 See also
- 6 References
- 7 Further reading

## Technology

The StingRay is an IMSI-catcher with both passive (digital analyzer) and active (cell site simulator) capabilities. When operating in active mode, the device mimics a wireless carrier cell tower in order to force all nearby mobile phones and other cellular data devices to connect to it.[4][5][6]

The StingRay family of devices can be mounted in vehicles,[5] on airplanes, helicopters and unmanned aerial vehicles.[7] Hand-carried versions are referred to under the trade name **KingFish**.[8]

## Active mode operations

1. Extracting stored data such as International Mobile Subscriber Identity ("IMSI") numbers and Electronic Serial Number ("ESN"),[9]
2. Writing cellular protocol metadata to internal storage
3. Forcing an increase in signal transmission power,[10]
4. Forcing an abundance of radio signals to be transmitted
5. Interception of communications content
6. Tracking and locating the cellular device user,[4]
7. Conducting a denial of service attack
8. Encryption key extraction.[11]
9. Radio jamming for either general denial of service purposes[12] or to aid in active mode protocol rollback attacks

## Passive mode operations

1. conducting base station surveys, which is the process of using over-the-air signals to identify legitimate cell sites and precisely map their coverage areas

## Active (cell site simulator) capabilities

In active mode, the StingRay will force each compatible cellular device in a given area to disconnect from its service provider cell site (e.g., operated by Verizon, AT&T, etc.) and establish a new connection with the StingRay.[13] In most cases, this is accomplished by having the StingRay broadcast a pilot signal that is either stronger than, or made to appear stronger than, the pilot signals being broadcast by legitimate cell sites operating in the area.[14] A common function of all cellular communications protocols is to have the cellular device connect to the cell site offering the strongest signal. StingRays exploit this function as a means to force temporary connections with cellular devices within a limited area.

### Extracting data from internal storage

During the process of forcing connections from all compatible cellular devices in a given area, the StingRay operator needs to determine which device is a desired surveillance target. This is accomplished by downloading the IMSI, ESN, or other identifying data from each of the devices connected to the StingRay.[9] In this context, the IMSI or equivalent identifier is not obtained from the cellular service provider or from any other third-party. The StingRay downloads this data directly from the device using radio waves.

In some cases, the IMSI or equivalent identifier of a target device is known to the StingRay operator beforehand. When this is the case, the operator will download the IMSI or equivalent identifier from each device as it connects to the StingRay.[15] When the downloaded IMSI matches the known IMSI of the desired target, the dragnet will end and the operator will proceed to conduct specific surveillance operations on just the target device.[16]

In other cases, the IMSI or equivalent identifier of a target is not known to the StingRay operator and the goal of the surveillance operation is to identify one or more cellular devices being used in a known area.[17] For example, if visual surveillance is being conducted on a group of protestors,[18] a StingRay can be used to download the IMSI or equivalent identifier from each phone within the protest area. After identifying the phones, locating and tracking operations can be conducted, and service providers can be forced to turn over account information identifying the phone users.

## Writing metadata to internal storage

## Forcing an increase in signal transmission power

Cellular telephones are radio transmitters and receivers much like a walkie-talkie. However, the cell phone only communicates with a "repeater" inside a nearby cell tower installation. At that installation, the devices take in all cell calls in its geographic area and repeat them out to other cell installations which repeat the signals onward to their destination telephone (either by radio or land-line wires). Radio is used also to transmit a caller's voice/data back to the receiver's cell telephone. The two-way duplex phone conversation then exists via these interconnections.

To make all that work correctly, the system allows automatic increases and decreases in transmitter power (for the individual cell phone and for the tower repeater, too) so that only the minimum transmit power is used to complete and hold the call active, "on," and allows the users to hear and be heard continuously during the conversation. The goal is to hold the call active but use the least amount of transmit power, mainly to conserve batteries and be efficient. The tower system will sense when a cell phone is not coming in clearly, and will order the cell phone to boost transmit power. The user has no control over this boosting; it may occur for a split second or for the whole conversation. If the user is in a remote location, the power boost may be continuous. In addition to carrying voice or data, the cell phone also transmits data about itself automatically, and that is boosted or not as the system detects need.

Coding of all transmissions allows two nearby cell user users no cross talk or interference between the two (this coding is not encryption, which is another, different coding). The boosting of power, however, is limited by the design of the devices to a maximum setting. The standard systems are not "high power" and thus can be overpowered by clandestine systems using much more boosted power that can then take over a user's cell phone. If overpowered that way, a cell phone will not indicate the change due to the clandestine radio being programmed to hide itself from normal detection. The ordinary user can not know if their cell phone is captured via overpower boosts or not. (There are other ways of clandestine capture that need not overpower, too.)

Just as a person shouting drowns out someone whispering, the boost in RF watts of power into the cell telephone system can overtake and control that system—in total or only a few, or even only one, conversation. This strategy only requires more RF watts of power, and thus it is more simple than other types of clandestine controls. Power boosting equipment can be installed anywhere there can be an antenna, including in a vehicle, perhaps even in a vehicle on the move. Once a clandestine boosted system takes control, any manipulation is possible from simple recording of the voice or data to total blocking of all cell phones in the geographic area.

## Forcing an abundance of signal transmissions

6/1/2016                          Stingray phone tracker - Wikipedia, the free encyclopedia

## Tracking and locating

A StingRay can be used to identify and track a phone or other compatible cellular data device even while the device is not engaged in a call or accessing data services.

## Denial of service

The FBI has claimed that when used to identify, locate, or track a cellular device, the StingRay does not collect communications content or forward it to the service provider.[19] Instead, the device causes a disruption in service.[20] Under this scenario, any attempt by the cellular device user to place a call or access data services will fail while the StingRay is conducting its surveillance.

## Interception of communications content

By way of software upgrades,[11][21] the StingRay and similar Harris products can be used to intercept GSM communications content transmitted over-the-air between a target cellular device and a legitimate service provider cell site. The StingRay does this by way of the following man-in-the-middle attack: (1) simulate a cell site and force a connection from the target device, (2) download the target device's IMSI and other identifying information, (3) conduct "GSM Active Key Extraction"[11] to obtain the target device's stored encryption key, (4) use the downloaded identifying information to simulate the target device over-the-air, (5) while simulating the target device, establish a connection with a legitimate cell site authorized to provide service to the target device, (6) use the encryption key to authenticate the StingRay to the service provider as being the target device, and (7) forward signals between the target device and the legitimate cell site while decrypting and recording communications content.

The "GSM Active Key Extraction"[11] performed by the StingRay in step three merits additional explanation. A GSM phone encrypts all communications content using an encryption key stored on its SIM card with a copy stored at the service provider.[22] While simulating the target device during the above explained man-in-the-middle attack, the service provider cell site will ask the StingRay (which it believes to be the target device) to initiate encryption using the key stored on the target device.[23] Therefore, the StingRay needs a method to obtain the target device's stored encryption key else the man-in-the-middle attack will fail.

GSM primarily encrypts communications content using the A5/1 call encryption cypher. In 2008 it was reported that a GSM phone's encryption key can be obtained using $1,000 worth of computer hardware and 30 minutes of cryptanalysis performed on signals encrypted using A5/1.[24] However, GSM also supports an export weakened variant of A5/1 called A5/2. This weaker encryption cypher can be cracked in real-time.[22] While A5/1 and A5/2 use different cypher strengths, they each utilize the same underlying encryption key stored on the SIM card.[23] Therefore, the StingRay performs "GSM Active Key Extraction"[11] during step three of the man-in-the-middle attack as follows: (1) instruct target device to use the weaker A5/2 encryption cypher, (2) collect A5/2 encrypted signals from target device, and (3) perform cryptanalysis of the A5/2 signals to quickly recover the underlying stored encryption key.[25] Once the encryption key is obtained, the StingRay uses it to comply with the encryption request made to it by the service provider during the man-in-the-middle attack.[25]

## Passive capabilities

In passive mode, the StingRay operates either as a digital analyzer, which receives and analyzes signals being transmitted by cellular devices and/or wireless carrier cell sites, or as a radio jamming device, which transmits signals that block communications between cellular devices and wireless carrier cell sites. By "passive mode," it is meant that the StingRay does not mimic a wireless carrier cell site or communicate directly with cellular devices.

### Base station (cell site) surveys

A StingRay and a test phone can be used to conduct base station surveys, which is the process of collecting information on cell sites, including identification numbers, signal strength, and signal coverage areas. When conducting base station surveys, the StingRay mimics a cell phone while passively collecting signals being transmitted by cell sites in the area of the StingRay.

Base station survey data can be used to further narrow the past locations of a cellular device if used in conjunction with historical cell site location information ("HCSLI") obtained from a wireless carrier. HCSLI includes a list of all cell sites and sectors accessed by a cellular device, and the date and time each access was made. Law enforcement will often obtain HCSLI from wireless carriers in order to determine where a particular cell phone was located in the past. Once this information is obtained, law enforcement will use a map of cell site locations to determine the past geographical locations of the cellular device.

However, the signal coverage area of a given cell site may change according to the time of day, weather, and physical obstructions in relation to where a cellular device attempts to access service. The maps of cell site coverage areas used by law enforcement may also lack precision as a general matter. For these reasons, it is beneficial to use a StingRay and a test phone to map out the precise coverage areas of all cell sites appearing in the HCSLI records. This is typically done at the same time of day and under the same weather conditions that were in effect when the HCSLI was logged. Using a StingRay to conduct base station surveys in this manner allows for mapping out cell site coverage areas that more accurately match the coverage areas that were in effect when the cellular device was used.

# Usage by law enforcement

## In the United States

The use of the devices has been frequently funded by grants from the Department of Homeland Security.[26] The Los Angeles Police Department used a Department of Homeland Security grant in 2006 to buy a StingRay for "regional terrorism investigations". However, according to the Electronic Frontier Foundation, the "LAPD has been using it for just about any investigation imaginable."[27]

In addition to federal law enforcement, military and intelligence agencies, StingRays have in recent years been purchased by local and state law enforcement agencies. According to the American Civil Liberties Union, 42 law enforcement agencies in 17 states own StingRay technology. In November 2014, *Slate* reported that at least 46 state and local police departments, from Sunrise, Florida, to Hennepin County, Minnesota, use cell-site simulators, with a price-tag of US$16,000 to more than US$125,000 for each

unit.[28] In 2015, it was reported that the Baltimore Police Department's frequency in using the device was "inexplicably high".[29] In some states, the devices are made available to local police departments by state surveillance units. The federal government funds most of the purchases with anti-terror grants.

In 2006, Harris employees directly conducted wireless surveillance using StingRay units on behalf the Palm Bay Police Department — where Harris has a campus[30] — in response to a bomb threat against a middle school. The search was conducted without a warrant or Judicial oversight.[31][32][33][34]

### Outside the United States

Privacy International and *The Sunday Times* reported on the usage of StingRays and IMSI-catchers in Ireland, against the Irish Garda Síochána Ombudsman Commission (GSOC), which is an oversight agency of the Irish police force Garda Síochána.[35][36]

On June 10, 2015 the BBC reported on an investigation by Sky News[37][38] about possible false mobile phone towers being used by the London Metropolitan Police. Commissioner Bernard Hogan-Howe refused comment.

# Secrecy

The increasing use of the devices has largely been kept secret from the court system and the public.[29] In 2014, police in Florida revealed they had used such devices at least 200 additional times since 2010 without disclosing it to the courts or obtaining a warrant.[2] The American Civil Liberties Union has filed multiple requests for the public records of Florida law enforcement agencies about their use of the cell phone tracking devices.[39]

Local law enforcement and the federal government have resisted judicial requests for information about the use of stingrays, refusing to turn over information or heavily censoring it.[40] In June 2014, the American Civil Liberties Union published information from court regarding the extensive use of these devices by local Florida police.[41] After this publication, United States Marshals Service then seized the local police's surveillance records in a bid to keep them from coming out in court.[42]

In some cases, police have refused to disclose information to the courts citing non-disclosure agreements signed with Harris Corporation.[40][43][44] The FBI defended these agreements, saying that information about the technology could allow adversaries to circumvent it.[43] The ACLU has said "potentially unconstitutional government surveillance on this scale should not remain hidden from the public just because a private corporation desires secrecy. And it certainly should not be concealed from judges."[2]

In 2015 Santa Clara County pulled-out of contract negotiations with Harris for StingRay units, citing onerous restrictions imposed by Harris on what could be released under public records requests as the reason for exiting negotiations.[45]

# Criticism

In recent years, legal scholars, public interest advocates, legislators and several members of the judiciary have strongly criticized the use of this technology by law enforcement agencies. Critics have called the use of the devices by government agencies warrantless cell phone tracking, as they have frequently been used without informing the court system or obtaining a warrant.[2] The Electronic Frontier Foundation has called the devices "an unconstitutional, all-you-can-eat data buffet."[46]

In June 2015, WNYC Public Radio published a podcast with Daniel Rigmaiden about the StingRay device.[47]

## Counter "StingRay" and Anti-spy devices

In the wake of StingRay's reveal to the public on 2016, a counter government movement by cyber privacy and security professionals began to look into ways to working against the StringRay and it's functions.

John McAfee, a pioneer to Cyber security and an architect to the first commercial anti-virus program may have lead a team to developing the first device that is capable of thwarting the StringRay's capability on targeted phones. As mentioned in his team's webpage and app description section (D-Vasive (https://play.google.com/store/apps/details?id=com.Dvasive&hl=en)) "D-Vasive helps protect your privacy from invasive apps by alerting you when an application is trying to spy on you using your phone's camera, microphone, bluetooth or WiFi connections. D-Vasive also lists running and installed apps that have access to tracking your location. D-Vasive also allows you to lock down your device's hardware to prevent other apps from accessing your hardware without your knowledge."

It is expected for a wider range of cyber privacy and civil security development teams to release more or similar counter devices against the stingray and similar operations.

## See also

- Cellphone surveillance
- Mobile phone tracking
- *Kyllo v. United States* (lawsuit re thermal image surveillance)
- *United States v. Davis (2014)* found warrantless data collection violated constitutional rights, but okayed data use for criminal conviction, as data collected in good faith
- Evil Twin Attack

## References

1. "Notice, Acceptance, Renewal". Harris/US PTO. Retrieved 23 January 2016.
2. Zetter, Kim (2014-03-03). "Florida Cops' Secret Weapon: Warrantless Cellphone Tracking". *Wired.com*. Retrieved 2014-06-23.
3. Gallagher, Ryan (September 25, 2013). "Meet the machines that steal your phone's data". *Ars Technica* (Condé Nast). Retrieved August 22, 2014.
4. Valentino-Devries, Jen (Sep 22, 2011). "'Stingray' Phone Tracker Fuels Constitutional Clash". *The Wall Street Journal*. Retrieved Aug 22, 2014.
5. Harris WPG (November 29, 2006). "StingRay Cell Site Emulator Datasheet". Archived from the original (PDF) on August 29, 2014. Retrieved August 29, 2014.
6. Harris WPG (November 29, 2006). "StingRay Cell Site Emulator Datasheet". Archived from the original on August 29, 2014. Retrieved August 29, 2014.

7. Harris WPG. (Aug. 25, 2008). Harris Wireless Products Group catalog, available at https://www.documentcloud.org/documents/1282631-08-08-25-2008-harris-wireless-products-group.html [PDF p. 4] (last accessed: Aug. 29, 2014), archived from original at http://egov.ci.miami.fl.us/Legistarweb/Attachments/48000.pdf [PDF p. 4] (last accessed: Mar. 8, 2011) (Airborne DF Kit CONUS for StingRay)

8. Harris WPG. (Nov. 29, 2006). KingFish, KingFish GSM S/W, Pocket PC GSM S/W & Training Sole Source Justification for Florida, available at https://www.documentcloud.org/documents/1282625-06-11-29-2006-harris-kingfish-sole-source.html [PDF p. 1] (last accessed: Aug. 29, 2014), archived from original at http://egov.ci.miami.fl.us/Legistarweb/Attachments/34768.pdf [PDF p. 1] (last accessed: Aug. 29, 2014) ("The KingFish system is the only man-portable battery powered CDMA & GSM Interrogating, Active Location, and Signal Information Collection system currently available.").

9. United States v. Rigmaiden, CR08-814-PHX-DGC, Dkt. #0674-1 [Declaration by FBI Supervisory Agent Bradley S. Morrison], ¶ 5, p. 3 (D.Ariz., Oct. 27, 2011), available at https://www.documentcloud.org/documents/1282619-11-10-17-2011-u-s-v-rigmaiden-cr08-814-phx-dgc.html [PDF p. 3] (last accessed: Aug. 30, 2014) ("During a location operation, the electronic serial numbers (ESNs) (or their equivalent) from all wireless devices in the immediate area of the FBI device [(i.e., the StingRay)] that subscribe to a particular provider may be incidentally recorded, including those of innocent, non-target devices.").

10. Florida v. James L. Thomas, No. 2008-CF-3350A, Suppression Hearing Transcript RE: Harris StingRay & KingFish [testimony of Investigator Christopher Corbitt], p. 17 (2nd Cir. Ct., Leon County, FL, Aug. 23, 2010), available at https://www.documentcloud.org/documents/1282618-10-08-23-2010-fl-v-thomas-2008-cf-3350a.html [PDF. p. 17] (last accessed: Aug. 30, 2014) ("[O]nce the equipment comes into play and we capture that handset, to make locating it easier, the equipment forces that handset to transmit at full power.")

11. Drug Enforcement Administration. (Aug. 29, 2007). FY2011 FEDERAL APPROPRIATIONS REQUESTS [Sole Source Notice of Harris StingRay FishHawk GSM encryption key extraction and intercept upgrade], available at https://www.documentcloud.org/documents/1282642-07-08-29-2007-dea-purchase-of-stingray-fishhawk.html [PDF p. 1] (last accessed: Aug. 30, 2014), archived from original at https://www.fbo.gov/index?s=opportunity&mode=form&id=9aa2169a324ae7a1a747c2ca8f540cb3&tab=core&_cview=0 (last accessed: Aug. 30, 2014). ("The Harris StingRay system w/FishHawk GSM Intercept S/W upgrade is the only portable standard + 12VDC powered over the air GSM Active Key Extraction and Intercept system currently available.")

12. Hennepin County, MN. (Feb. 2, 2010). FY2011 FEDERAL APPROPRIATIONS REQUESTS [Cellular Exploitation System (Kingfish) - $426,150], available at https://www.documentcloud.org/documents/1282634-10-02-02-2010-kingfish-appropriations-request.html [PDF p. 6] (last accessed: Aug. 30, 2014), archived from original at http://board.co.hennepin.mn.us/sirepub/cache/246/5hnnteqb5wro1fl4oyplzrqo/1062800830201401524.3634.PDF [PDF p. 6] (last accessed: Aug. 30, 2014) ("The system acts as a mobile wireless phone tower and has the capability to... deny mobile phones service.").

13. Florida v. James L. Thomas, No. 2008-CF-3350A, Suppression Hearing Transcript RE: Harris StingRay & KingFish [testimony of Investigator Christopher Corbitt], p. 12 (2nd Cir. Ct., Leon County, FL, Aug. 23, 2010), available at https://www.documentcloud.org/documents/1282618-10-08-23-2010-fl-v-thomas-2008-cf-3350a.html [PDF. p. 12] (last accessed: Aug. 30, 2014) ("In essence, we emulate a cellphone tower. so just as the phone was registered with the real verizon tower, we emulate a tower; we force that handset to register with us.").

14. Hardman, Heath (May 22, 2014). "THE BRAVE NEW WORLD OF CELL-SITE SIMULATORS". Albany Law School: 11–12. doi:10.2139/ssrn.2440982. Retrieved Aug 24, 2014. "For a cell-site simulator operator to induce a cellphone to camp on his or her cell-site simulator (CSS), all he or she needs to do is become the strongest cell in the target cellphones preferred network."

15. Florida v. James L. Thomas, No. 2008-CF-3350A, Suppression Hearing Transcript RE: Harris StingRay & KingFish [testimony of Investigator Christopher Corbitt], p. 13 (2nd Cir. Ct., Leon County, FL, Aug. 23, 2010), available at https://www.documentcloud.org/documents/1282618-10-08-23-2010-fl-v-thomas-2008-cf-3350a.html [PDF. p. 13] (last accessed: Aug. 30, 2014) ("The equipment will basically decode information from the handset and provide certain unique identifying information about the handset, being a subscriber identity and equipment identity.... We compare that with the information provided from Verizon to insure that we are looking at the correct handset.").

16. Id., p. 14 ("And as the equipment is evaluating all the handsets in the area, when it comes across that handset -- the one that we're looking for, for the information that we put into the box -- then it will hang onto that one and allow us to direction find at that point.").

17. In the Matter of The Application of the United States of America for An Order Authorizing the Installation and Use of a Pen Register and Trap and Trace Device, 890 F. Supp. 2d 747, 748 (S.D. Tex. 2012) (Law enforcement sought to use StingRay "to detect radio signals emitted from wireless cellular telephones in the vicinity of the [Subject] that identify the telephones (e.g., by transmitting the telephone's serial number and phone number)..." so the "[Subject's] Telephone can be identified." (quoting order application)).

18. Eördögh, Fruzsina (Jun 13, 2014). "Are Chicago Police Spying on Activists? One Man Sues to Find Out". *Mother Jones*. Retrieved Aug 24, 2014. "Martinez, who works in the software industry, first wondered about police surveilling his phone in 2012 while he was attending the NATO protests. 'I became suspicious because it was really difficult to use our phones[.]'"

19. United States v. Rigmaiden, CR08-814-PHX-DGC, Dkt. #0674-1 [Declaration by FBI Supervisory Agent Bradley S. Morrison], ¶ 4, p. 2-3 (D.Ariz., Oct. 27, 2011), available at https://www.documentcloud.org/documents/1282619-11-10-17-2011-u-s-v-rigmaiden-cr08-814-phx-dgc.html [PDF pp. 2-3] (last accessed: Aug. 30, 2014) ("[T]he [][StingRay] used to locate the defendant's aircard did not capture, collect, decode, view, or otherwise obtain any content transmitted from the aircard, and therefore was unable to pass any information from the aircard to Verizon Wireless.").

20. United States v. Rigmaiden, CR08-814-PHX-DGC, Doc. #723, p. 14 (D.Ariz., Jan. 5, 2012) (Noting government concession that the StingRay "caused a brief disruption in service to the aircard.").

21. Harris WPG. (Aug. 25, 2008). Harris Wireless Products Group catalog, available at https://www.documentcloud.org/documents/1282631-08-08-25-2008-harris-wireless-products-group.html [PDF p. 4] (last accessed: Aug. 29, 2014), archived from original at http://egov.ci.miami.fl.us/Legistarweb/Attachments/48000.pdf [PDF p. 4] (last accessed: Mar. 8, 2011) (GSM Software Intercept Package for StingRay and StingRay II)

22. Green, Matthew. "On cellular encryption". *A Few Thoughts on Cryptographic Engineering*. Retrieved Aug 29, 2014.

23. Barkan, Elad; Biham, Eli; Keller, Nathan. "Instant Ciphertext-Only Cryptanalysis of GSM Encrypted Communications" (PDF): 12–13.

24. Schneier, Brude. "Cryptanalysis of A5/1". *Schneier on Security*. Retrieved Aug 29, 2014.

25. Id.

26. "Police use cellphone spying device". Associated Press. 2014-05-30. Retrieved 2014-06-23.

27. Campbell, John (2013-01-24). "LAPD Spied on 21 Using StingRay Anti-Terrorism Tool". *LA Weekly*. Retrieved 2014-06-23.

28. Klonick, Kate (2014-11-10). "Stingrays: Not Just for Feds!". *Slate Magazine* (The Slate Group, a Graham Holdings Company). Retrieved 2014-11-13.

29. Fenton, Justin (April 20, 2015). "Baltimore Police say Stingray phone tracking use exceeds 25,000 instances". *The Baltimore Sun*. Retrieved April 20, 2015. "David Rocah, a staff attorney with the American Civil Liberties Union of Maryland, said the 25,000 figure seemed "inexplicably high.""

30. Nail, Derrol (23 February 2015). "Harris Corporation opens new tech center in Palm Bay". *myfoxorlando.com*. WOFL, Fox Broadcasting Company. Retrieved 4 April 2015.

31. Farivar, Cyrus (25 February 2015). "Powerful "stingrays" used to go after 911 hangup, ATM burglary". Ars Technica. Retrieved 25 March 2015. "...Palm Bay Police Department simply borrowed a stingray directly from its manufacturer, the Harris Corporation—located down the road in Melbourne, Florida—to respond to a 2006 bomb threat at a school, absent any judicial oversight."

32. Detective M. J. Pusatere. "03.05.2014 PBPD Stingray Records (Bates Stamped) redacted" (PDF). *aclu.org*. Palm Bay Police Department, American Civil Liberties Union. p. 3. Retrieved 24 March 2015.

33. Aaronson, Trevor (23 February 2015). "ACLU Releases Florida StingRay Documents". *fcir.org*. Florida Center for Investigative Reporting. Retrieved 4 April 2015.

34. Rivero, Daniel (18 March 2015). "It's now a trend: third court orders the release of phone-tracking Stingray documents". *fusion.net*. Fusion. Retrieved 4 April 2015.

35. Mooney, John (9 February 2014). "GSOC under high-tech surveillance". The Sunday Times.

Case 6:18-cv-01915-GKS-KRS   Document 13-2   Filed 11/07/18   Page 12 of 162 PageID 479

36. Tynan, Dr. Richard (15 February 2014). "Beirtear na IMSIs: Ireland's GSOC surveillance inquiry reveals use of mobile phone interception systems". Privacy International.
37. "Mass snooping fake mobile towers uncovered in UK". British Broadcasting Corporation. 10 June 2015.
38. Cheshire, Tom (10 June 2015). "Fake Mobile Phone Towers Operating In The UK". Sky News.
39. Wessler, Nathan Freed. "U.S. Marshals Seize Local Cops' Cell Phone Tracking Files in Extraordinary Attempt to Keep Information From Public". *American Civil Liberties Union*. Retrieved 2014-06-23.
40. Gillum, Jack (2014-03-22). "Police keep quiet about cell-tracking technology". News.yahoo.com. Retrieved 2014-06-23.
41. Wessler, Nathan Freed (2014-06-03). "Transcription of Suppression Hearing (Complete)" (PDF). American Civil Liberties Union. Retrieved 2014-06-23.
42. Zetter, Kim (2014-06-03). "U.S. Marshals Seize Cops' Spying Records to Keep Them From the ACLU". *Wired.com*. Retrieved 2014-06-23.
43. "A Police Gadget Tracks Phones? Shhh! It's Secret". *The New York Times*. March 15, 2015.
44. Florida Department of Law Enforcement; Harris Corporation (8 June 2010). "FDLE non-disclosure agreement with the Harris Corporation" (PDF). American Civil Liberties Union. Retrieved 28 March 2015.
45. Farivar, Cyrus (7 May 2015). "In rare move, Silicon Valley county gov't kills stingray acquisition". Ars Technica. Retrieved 9 May 2015. "What happened was, we were in negotiations with Harris, and we couldn't get them to agree to even the most basic criteria we have in terms of being responsive to public records requests"
46. Timm, Trevor (2013-02-12). "As Secretive "Stingray" Surveillance Tool Becomes More Pervasive, Questions Over Its Illegality Increase". *Electronic Frontier Foundation*. Retrieved 2014-06-23.
47. Zomorodi, Manoush (2015-06-19). "When Your Conspiracy Theory Is True". *WNYC*. Retrieved 2015-07-03.

# Further reading

- Lye, Linda (2014). StingRays: The Most Common Surveillance Tool the Government Won't Tell You About. (https://www.aclunc.org/sites/default/files/StingRays_The_Most_Common_Surveillance_Tool _the_Govt_Won%27t_Tell_You_About_0.pdf) ACLU of Northern California.

Retrieved from "https://en.wikipedia.org/w/index.php?title=Stingray_phone_tracker&oldid=721578125"

Categories: Telecommunications equipment | Surveillance | Mobile security | Telephone tapping | Telephony equipment | Law enforcement equipment

- This page was last modified on 22 May 2016, at 20:00.
- Text is available under the Creative Commons Attribution-ShareAlike License; additional terms may apply. By using this site, you agree to the Terms of Use and Privacy Policy. Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a non-profit organization.

Turns Out Police Stingray Spy Tools Can Indeed Record Calls | Wired

KIM ZETTER   SECURITY   10.28.15   3:00 PM

# TURNS OUT POLICE STINGRAY SPY TOOLS CAN INDEED RECORD CALLS



GETTY IMAGES

**THE FEDERAL GOVERNMENT** has been fighting hard for years to hide details about its use of so-called stingray surveillance technology from the public.

The surveillance devices simulate cell phone towers in order to trick nearby mobile phones into connecting to them and revealing the phones'

locations.

Now documents recently obtained by the ACLU confirm long-held

SUBSCRIBE

intercepting the content of voice and text communications. The documents also discuss the possibility of flashing a phone's firmware "so that you can intercept conversations using a suspect's cell phone as a bug."

The information appears in a 2008 guideline prepared by the Justice Department to advise law enforcement agents on when and how the equipment can be legally used.

The American Civil Liberties Union of Northern California obtained the documents (.pdf) after a protracted legal battle involving a two-year-old public records request. The documents include not only policy guidelines, but also templates for submitting requests to courts to obtain permission to use the technology.

The DoJ ironically acknowledges in the documents that the use of the surveillance technology to locate cellular phones "is an issue of some controversy," but it doesn't elaborate on the nature of the controversy. Civil liberties groups have been fighting since 2008 to obtain information about how the government uses the technology, and under what authority.

Local law enforcement agencies have used the equipment numerous times in secret without obtaining a warrant and have even deceived courts about the nature of the technology to obtain orders to use it. And they've resorted to extreme measures to prevent groups like the ACLU from obtaining documents about the technology.

Stingrays go by a number of different names, including cell-site simulator, triggerfish, IMSI-catcher, Wolfpack, Gossamer, and swamp box, according to the documents. They can be used to determine the location of phones,

computers using open wireless networks, and PC wireless data cards, also known as air cards.

The devices, generally the size of a suitcase, work by emitting a stronger signal than nearby towers in order to force a phone or mobile device to connect to them instead of a legitimate tower. Once a mobile device connects, the phone reveals its unique device ID, after which the stingray releases the device so that it can connect to a legitimate cell tower, allowing data and voice calls to go through. Assistance from a cell phone carrier isn't required to use the technology, unless law enforcement doesn't know the general location of a suspect and needs to pinpoint a geographical area in which to deploy the stingray. Once a phone's general location is determined, investigators can use a handheld device that provides more pinpoint precision in the location of a phone or mobile device—this includes being able to pinpoint an exact office or apartment where the device is being used.

In addition to the device ID, the devices can collect additional information.

"If the cellular telephone is used to make or receive a call, the screen of the digital analyzer/cell site simulator/triggerfish would include the cellular telephone number (MIN), the call's incoming or outgoing status, the telephone number dialed, the cellular telephone's ESN, the date, time, and duration of the call, and the cell site number/sector (location of the cellular telephone when the call was connected)," the documents note.

In order to use the devices, agents are instructed to obtain a pen register/trap and trace court order. Pen registers are traditionally used to obtain phone numbers called and the "to" field of emails, while trap and trace is used to collect information about received calls and the "from" information of emails.

When using a stingray to identify the specific phone or mobile device a suspect is using, "collection should be limited to device identifiers," the DoJ document notes. "It should not encompass dialed digits, as that would

entail surveillance on the calling activity of all persons in the vicinity of the subject."

The documents add, however, that the devices "may be capable of intercepting the contents of communications and, therefore, such devices must be configured to disable the interception function, unless interceptions have been authorized by a Title III order."

Title III is the federal wiretapping law that allows law enforcement, with a court order, to intercept communications in real time.

Civil liberties groups have long suspected that some stingrays used by law enforcement have the ability to intercept the content of voice calls and text messages. But law enforcement agencies have insisted that the devices they use are not configured to do so. Another controversial capability involves the ability to block mobile communications, such as in war zones to prevent attackers from using a mobile phone to trigger an explosive, or during political demonstrations to prevent activists from organizing by mobile phone. Stingray devices used by police in London have both of these capabilities, but it's not known how often or in what capacity they have been used.

The documents also note that law enforcement can use the devices without a court order under "exceptional" circumstances. Most surveillance laws include such provisions to give investigators the ability to conduct rapid surveillance under emergency circumstances, such as when lives are at stake. Investigators are then to apply for a court order within 24 hours after the emergency surveillance begins. But according to the documents, the DoJ considers "activity characteristic of organized crime" and "an ongoing attack of a protected computer (one used by a financial institution or U.S. government) where violation is a felony" to be considered an exception, too. In other words, an emergency situation could be a hack involving a financial institution.

"While such crimes are potentially serious, they simply do not justify

bypassing the ordinary legal processes that were designed to balance the government's need to investigate crimes with the public's right to a government that abides by the law," Linda Lye, senior staff attorney for the ACLU of Northern California, notes in a blog post about the documents.

Another issue of controversy relates to the language that investigators use to describe the stingray technology. Templates for requesting a court order from judges advise the specific terminology investigators should use and never identify the stingray by name. They simply describe the tool as either a pen register/trap and trace device or a device used "to detect radio signals emitted from wireless cellular telephones in the vicinity of the Subject that identify the telephones."

The ACLU has long accused the government of misleading judges in using the pen register/trap and trace term—since stingrays are primarily used not to identify phone numbers called and received, but to track the location and movement of a mobile device.

Investigators also seldom tell judges that the devices collect data from all phones in the vicinity of a stingray—not just a targeted phone—and can disrupt regular cell service.

It's not known how quickly stingrays release devices that connect to them, allowing them to then connect to a legitimate cell tower. During the period that devices are connected to a stingray, disruption can occur for anyone in the vicinity of the technology.

Disruption can also occur from the way stingrays force-downgrade mobile devices from 3G and 4G connectivity to 2G if they are being used to intercept the concept of communications.

In order for the kind of stingray used by law enforcement to work for this purpose, it exploits a vulnerability in the 2G protocol. Phones using 2G don't authenticate cell towers, which means that a rogue tower can pass

itself off as a legitimate cell tower. But because 3G and 4G networks have fixed this vulnerability, the stingray will jam these networks to force nearby phones to downgrade to the vulnerable 2G network to communicate.

"Depending on how long the jamming is taking place, there's going to be disruption," Chris Soghoian, chief technology for the ACLU has told WIRED previously. "When your phone goes down to 2G, your data just goes to hell. So at the very least you will have disruption of internet connectivity. And if and when the phones are using the stingray as their only tower, there will likely be an inability to receive or make calls."

Concerns about the use of stingrays is growing. Last March, Senator Bill Nelson (D—Florida) sent a letter to the FCC calling on the agency to disclose information about its certification process for approving stingrays and any other tools with similar functionality. Nelson asked in particular for information about any oversight put in place to make sure that use of the devices complies with the manufacturer's representations to the FCC about how the technology works and is used.

Nelson also raised concerns about their use in a remarkable speech on the

Senate floor. The Senator said the technology "poses a grave threat to consumers' cellphone and Internet privacy," particularly when law enforcement agencies use them without a warrant.

The increased attention prompted the Justice Department this month to release a new federal policy on the use of stingrays, requiring a warrant any time federal investigators use them. The rules, however, don't apply to local police departments, which are among the most prolific users of the technology and have been using them for years without obtaining a warrant.

#CELLPHONES #GOVERNMENT SURVEILLANCE #SPYING #STINGRAYS

VIEW COMMENTS

## SPONSORED STORIES



**BUSINESS INSIDER**
The sweatshirt designed by an Apple engineer that's bring manufacturing back to America.



**TECHIE FANS**
Now you can track your car using your smartphone



**INSTANT CHECKMATE**
Type in your name or anyone's, this site is addicting

Orlando Police Department 8.11
Supplement Report

Case Number . . : 2014-536652                    Page:    2
Supplement Number:  7              Date Of Supplement: 01/20/2015

file with the Forensic Imaging Lab.  The collected items were secured
in a locker in the Forensic Lab for processing and packaging on a
later date.

Between 01/01/15 and 01/16/15, I processed the collected items for
latent prints with negative results.  All items were then packaged
and entered into Property and Evidence under #DE7169A.

Cost of Investigation =$86.00

**************************************************************

| I Swear or affirm the above statements | Officer Name/ID# (Print) |
| are correct and true. | |
| (Signature)_____ | |
| Sworn to and subscribed before me, the undersigned Authority, | |
| This_____Day of _____,20____. | |
| Notary Public |_| Law Enforcement Officer |_| Emp# ____ Orlando PD |

END OF SUPPLEMENT NUMBER   7

Orlando Police Department 8.11
Supplement Report

Case Number  . . : 2014-536652
Supplement Number:   4

Page:    1
Date Of Supplement: 01/05/2015

Date/Time Reported: 12/31/14  8:51 Hrs.
Location Occurred : 5705 LA COSTA DR
Reporting Officer :    30287  MORGAN,NICOLE,E,
Primary Unit Assigned to Investigate: E Property
Assigned Investigators:

Narrative Name: NARRATIVE SUPPLEMENT 1/5/2015 9:48 AM
On December 31, 2014 I Officer Cote (16904) responded to the S
Semoran Blvd and LaCosta Dr in reference to officers on scene needing
more officers. When I arrived on scene I took became the cover
officer for the K9 officer. After we deployed clear out and officers
checked the drop ceiling I rechecked the kitchen vents and that is
where I came in contact with the suspect that was in the vent over
the food prep area. The suspect was inside the duct work lying still
trying not to be detected. I could only see the suspects left side oh
his face.

I gave the suspect multiple orders to LET ME SEE YOUR HANDS and DO
NOT MOVE, that he did not follow. The suspect was later sprayed in
the rear of the building with chemical agent by other officers that I
did not witness.

**************************************************************************

| I Swear or affirm the above statements | Officer Name/ID# (Print) |
| are correct and true. | |
| (Signature)_____ | |
| | |
| Sworn to and subscribed before me, the undersigned Authority, | |
| This_____Day of _____,20____. | |
| Notary Public |_| Law Enforcement Officer |_| Emp# ____ Orlando PD |

END OF SUPPLEMENT NUMBER    4

January 20, 2017

Judicial Qualification Commission
P.O. Box 14106
Tallahassee, FL 32317

Dear Sirs:

The Orlando Police Department lynched me after I was detained for an alledged burglary. They intended to kill me by holding me down to let this K-9 bite me with these specially designed knife capstone dentures attached to his teeth. The K-9 officer directed the dog's bite at a location where a deep cut would sever my femoral artery, causing me to bleed to death. When I survived, they rearranged the alledged crime scene to enhance my criminal intent to justify their actions. I saw them do all this and one of their officers had on a body camera that recorded everything I alledge. I had four public defenders who refused to compel the police to provide that body camera evidence; consequently, I went Pro Se to compel the court only to find out that the evidence was no longer available. When it became apparent that I knew enough to be a threat to the case being prepared against me, the Department of Corrections and Judge Robert John Egan conspired together to restrict my access to the courts and deny me the right to compel witnesses. Judge Egan forced me to accept court-appointed counsel that I didn't want when he said he would not enforce the subpoenas for my witnesses to appear to testify. Ms. Donna M. Goerner told me that Judge Egan would not allow her to hire an investigator or obtain evidence and/or witnesses in my behalf. She did nothing to help me under Judge Egan's instructions. When I wrote the bar association to formalize my complaint against Ms. Goerner, the Department of Corrections intercepted my letter and informed Judge Egan

1 of 2

January 20, 2017

Judicial Qualification Commission
P.O. Box 14106
Tallahassee, FL 32317

of the complaint I had against him. The next time I was allowed to go to court, Judge Julie O'Kane was presiding in his place in his courtroom. Ms. Goerner defended me based on tampered evidence provided by the prosecutor. She did exactly what Judge Egan told her to do and I couldn't do anything about it besides complain afterwards. I enclosed copies of the following documents to help support my argument:

① Citizen's Complaint Form
② Police Department's reply from Dwain Rivers
③ Letter from the Fla. Bar dated May 19, 2015
④ E-mail response from Linda Ridge of the Orlando Police Dept.
⑤ Motion to Suppress prepared March 8, 2016
⑥ Order Denying Motion to Dismiss
⑦ Order Denying Motion to Suppress and Motion in Limine
⑧ Order Directing Transcription of Proceedings
⑨ Letter from the Fla. Bar dated July 28, 2016
⑩ Letter from the Fla. Bar dated January 4, 2017

Judge Robert Egan set the stage for me to be prosecuted under the most unfavorable condition possible. My Due Process rights were violated and I want to file a formal complaint.

Sincerely,

James E. Washington

2 of 2



### ORLANDO POLICE DEPARTMENT
### INTERNAL AFFAIRS SECTION

# CITIZEN'S COMPLAINT FORM

Complainant: _JAMES EDWARD WASHINGTON_

Address: _951 CHELSEA WAY; LAKE WALES, FLA 33853_

Telephone #: Home: _____ Other: _____ E-mail: _____

Complaint Against: _OFFICERS JAMES, COTE, ZAMBITO, ROBERTSON, WILSON, BRILLANT_
(Name of Employee)

Employee #: _12869, C8904, 16220, 17291_
_10246, 16077_     Vehicle # _SEVERAL UNKNOWN VEHICLE #_

Complaint Information:

Date of Incident: _DECEMBER 31, 2014_

Time of Incident: _BETWEEN 8:30 to 11:30 AM_

Location of Incident: _5705 LA COSTA DRIVE_

Nature of Complaint:

_THE POLICE DEPARTMENT USED ILLEGAL WIRE TAPPING AND CELL TOWER TRACKING PROCESS TO TRACK ME TO A BUILDING THEN HELD ME DOWN TO ALLOW K9 TITAN TO MAUL MY LEGS. AFTERWARDS, I WAS STRIPPED OF EYE GLASSES/CASE, PHONE, AND WALLET._

I, _JAMES E. WASHINGTON_, do hereby swear (or affirm) that the facts stated above in this Citizen's Complaint are, to the best of my knowledge, true and based on fact.

_James E. Washington_
(Complainant's Signature)

Subscribed and sworn before me
this _19_ day of _March_ 20_15_

_____
Notary Public, State of Florida
at Large. My commission expires:

WOLANDA SMITH
MY COMMISSION # EE 179137
EXPIRES: March 13, 2016
Bonded Thru Notary Public Underwriters
(Notarial Seal)

Page _1_ of _2_

**CITIZEN'S COMPLAINT FORM (CONTINUED)**

OVER THE LAST COUPLE OF YEARS, I'VE NOTICED HOW O.P.D. SOMEHOW SHOWED UP NUMEROUS TIMES AT VARIOUS LOCATIONS WHERE I SOMETIMES LIVED DURING PERIODS OF HOMELESSNESS. MY LAST TWO COURT CASES BEGAN A PATTERN WHERE WITNESSES AND THE PHONE CALLS REPORTING CRIMES WERE NOT CONNECTED. THE DISCREPANCY ALLOWED ME TO ARRANGE ACCEPTABLE PLEA AGREEMENTS TO OBTAIN DRUG TREATMENT TO ALLEVIATE THE ROOT CAUSE OF MY LEGAL ISSUES. UNFORTUNATELY, THE TREATMENT CENTER RELEASED ME HOMELESS WHICH MADE IT POSSIBLE FOR ME TO BE IN AN UNOCCUPIED PLACE WHERE I SHOULD NOT HAVE BEEN. I KNOW THIS SITUATION WAS INTENTIONAL. NO OTHER CLIENT OF THE TREATMENT CENTER WAS EVER RELEASED AFTER COMPLETION WITHOUT SOME SORT OF TRANSITIONAL HOUSING. THEIR RECORDS WILL INDICATE THAT. AS A CONSEQUENCE OF MY HOMELESSNESS THE POLICE USED ILLEGAL MEANS TO TRAP ME IN A PLACE TO ASSAULT ME WITH THEIR K9 TITAN. I WAS FORCEFUL- LY HELD DOWN WHILE THE LISTED OFFICERS CHANTED STOP RESISTING OVER AND OVER UNTIL THE CHANT PROVOKED THE DOG TO VICIOUSLY BITE ME SEVERAL TIMES BEFORE OFC BRILLIANT DISLODGED HIM FROM MY LEG. AFTERWARDS, I WAS STRIPPED OF MY PHONE, WALLET, EYE GLASSES & CASE TO LIMIT MY ACCESS TO INFO TO COMPLAIN ABOUT THE INCIDENT.

James E. Washington
**Complainant's Signature**

**Page 2 of 2**

 

# CITY OF ORLANDO

## POLICE DEPARTMENT

May 28, 2015

Mr. James E Washington
#14045588
P O Box 4970
Orlando, Florida 32802

Mr. Washington:

I have received your complaint in regard to an incident which occurred on 12/31/2014. Based on a review of the testimony and source documents in this case, it was determined officers were dispatched to your location as you were suspected of committing a Commercial Burglary. The State Attorney's office has formally charged with you with Armed Burglary of a Structure with a Dangerous Weapon as well as several other charges. Your arrest by Orlando Police Department Officers on 12/31/2014 was based on a violation of Florida Statutes.

It was determined the actions taken by the officers were a direct response to your level of resistance. Their actions did not violate any Orlando Police Department's Regulations or Policies. A separate review of the Response to your Resistance was conducted and approved in this matter.

There was no video of your encounter with officers. Your complaint regarding your Public Defender, the Department of Corrections, and the treatment center that released you prior to this incident must be addressed by the individual agencies.

This case is considered closed. However, your complaint will remain on file in Internal Affairs. If you have any questions regarding the disposition of your complaint please do not hesitate to call me at 407-246-2352.

Sincerely,

Dwain Rivers
Orlando Police Department
Internal Affairs Section Manager

---

**INTERNAL AFFAIRS**
P.O. BOX 913 • ORLANDO, FL 32802-0913
PHONE 407.246.2352 • FAX 407.246.3916 • CITYOFORLANDO.NET

IN THE CIRCUIT COURT OF THE
NINTH JUDICIAL CIRCUIT, IN AND FOR
ORANGE COUNTY, FLORIDA

STATE OF FLORIDA

               Plaintiff,

vs.

CASE NO:  48-2014-CF-017252-O

DIVISION:  19

JAMES EDWARD WASHINGTON

             Defendant.

_____/

## NOTICE OF SUPPLEMENTAL DISCOVERY

COMES NOW, the State of Florida, by and through the undersigned Assistant State Attorney and hereby makes the following information available to the defense and states as follows:

EMAIL RESPONSE FROM LINDA RIDGE OF ORLANDO POLICE DEPT
(TO BE MAILED TO DEFENDANT).

Copies of items listed will be provided under separate cover.

I DO CERTIFY that a copy (copies) hereof (has) (have) been furnished to JAMES EDWARD WASHINGTON, (pro se), P O Box 4970, (OCJ - Inmate #14045588), Orlando, FL 32802 by (delivery) (mail) (fax) **(e-mail)** on this 18th day of June, 2015.

Jordan Michael Ostroff
Assistant State Attorney
Florida Bar # 99590
Division19@sao9.org
PO Box 1673, 415 N Orange Ave
Suite 400
Orlando, FL 32802-1673
(407)836-2188

This is the defendant who is pro se, can you please have this email sent to him at the jail.

**From:** Linda Ridge [mailto:opdphotolab@cityforlando.net]
**Sent:** Wednesday, June 17, 2015 8:35 AM
**To:** Ostroff, Jordan
**Cc:** OPD Photo Lab; Hamilton, Donald J (ORPD); Cail, William T (ORPD); James, John Seth (ORPD)
**Subject:** WASHINGTON, JAMES EDWARD, Court Case No: 48-2014-CF-017252-O, Agency Case No: ORPD 14-536652

Good Morning Jordan Ostroff,

I have searched Evidence.com, specifically under Ofc. Seth James account. I found only one upload for 12/31/14 @ 08:54 of a traffic stop. Nothing matches what the report states for this case. I also searched a couple months past the date of the incident, just to make sure it didn't get uploaded at a later time.

Thanks, Linda

---------- Forwarded message ----------
From: "Ostroff, Jordan" <JOstroff@sao9.org>
Date: Jun 16, 2015 2:39 PM
Subject: FW: Out of town Re: Defendant: WASHINGTON, JAMES EDWARD, Court Case No: 48-2014-CF-017252-O, Agency Case No: ORPD 14-536652
To: "Cail, William T (ORPD)" <william.cail@cityforlando.net>, "nicole.morgan@cityforlando.net" <nicole.morgan@cityforlando.net>
Cc:

Officer,

On this case, during the deposition of Officer James, he was talking to us about his body camera, but he didn't know if it had saved from that night (it's been over 6 months now). The defendant is currently Pro Se and filed a motion to compel the camera footage, but none of us even know if it still exists. Is there anyway to check? Please let me know.

Thank you!

Jordan Ostroff
Assistant State Attorney
State Attorney's Office, Ninth Circuit
Circuit Court, Divisions 17/19
P 407-836-1175



IN AND FOR ORANGE COUNTY, FLORIDA

JAMES EDWARD WASHINGTON
*Defendant*
VS
STATE OF FLORIDA
*Plaintiff*

CASE NO: 48-2014-CF-017252-0
DIVISION: 19
AGENCY: ORPD, 14-536652

# MOTION TO SUPPRESS

**COMES NOW** JAMES EDWARD WASHINGTON PURSUANT TO THE FLA RULES OF CRIMINAL PROCEDURE 3.190(h)&(g), SOLICITS THIS HONORABLE COURT TO SUPPRESS ALL THE LISTED PHYSICAL EVIDENCE IN ADDITION TO THE 911 TAPE BASED ON THE FOLLOWING:

## MEMORANDUM IN SUPPORT

DUE PROCESS PROHIBITS THE SUPPRESSION BY THE GOVERNMENT OF EVIDENCE FAVORABLE TO THE ACCUSED OR DISCREDITING ITS OWN CASE. UPON DEFENDANT'S REQUEST, THE GOVERNMENT MUST DISCLOSE ALL SUCH INFORMATION. **BRADY V. MARYLAND** 373 U.S. 83, 83 S. CT. 1194, 10 L. ED. 2D 215 (1963). THIS REQUIREMENT OF DISCLOSURE INCLUDES ANY INFORMATION WHICH CONCERNS WITNESSES' CREDIBILITY AS WELL AS MATTERS CONCERNING GUILT OR INNOCENCE OF THE DEFENDANT. **GIGLIO V. UNITED STATES** 405 U.S. 150, 92 S. CT. 763, 31 L. ED. 2D 104 (1967). **NAPUE V. ILLINOIS** 360 U.S. 264, 79 S. CT. 1173, 3 L. ED. 2D 1217 (1959) AS OBSERVED BY THE SUPREME COURT IN NAPUE V. ILLINOIS: "THE JURY'S ESTIMATE OF THE TRUTHFULNESS AND RELIABILITY OF A GIVEN WITNESS MAY WELL BE DETERMINATIVE OF GUILT OR INNOCENSE, AND IT IS UPON SUCH SUBTLE FACTORS AS THE POSSIBLE INTEREST OF THE WITNESS IN TESTIFYING FALSELY THAT A DEFENDANT'S LIFE OR LIBERTY MAY DEPEND." 360 U.S. AT 269. IN BRADY, THIS COURT HELD "THAT THE SUPPRESSION BY THE PROSECUTION OF EVIDENCE FAVORABLE TO AN ACCUSED UPON REQUEST VIOLATES DUE PROCESS WHERE THE EVIDENCE IS MATERIAL EITHER TO GUILT OR TO PUNISHMENT, IRRESPECTIVE OF THE GOOD OR BAD FAITH OF THE PROSECUTION." 373 U.S., AT 87, 83 S. CT. 1194. WE HAVE SINCE HELD THAT THE DUTY TO DISCLOSE SUCH EVIDENCE IS APPLICABLE EVEN THOUGH THERE HAS BEEN NO REQUEST BY THE ACCUSED, **UNITED STATES V. AGURS**, 427 U.S. 97, 107, 96 S. CT. 2392, 491. ED. 2D. 342 (1976), AND THAT DUTY ENCOMPASSES IMPEACHMENT EVIDENCE AS WELL AS EXCULPATORY EVIDENCE, **UNITED STATES V. BAGLEY** 473 U.S. 667, 676, 105 S. CT. 3375, 87L. ED. 2D. 481 (1985) SUCH EVIDENCE IS MATERIAL "IF THERE IS A REASONABLE PROBABILITY THAT HAD THE EVIDENCE BEEN DISCLOSED TO THE DEFENSE, THE RESULT OF THE PROCEEDING WOULD HAVE BEEN DIFFERENT." I.D. AT 682, 105 S. CT. 3375; SEE ALSO **KYLES V. WHITLEY**, 514 U.S. 419, 433-434, 115 S. CT. 1555, 131 L. ED. 2D 490 (1995). MOREOVER, THE RULE ENCOMPASSES EVIDENCE "KNOWN ONLY TO POLICE INVESTIGATORS AND NOT TO THE PROSECUTOR." I.D. AT 438, 115 S. CT. 1555. IN ORDER TO COMPLY WITH BRADY, THEREFORE, "THE INDIVIDUAL PROSECUTOR HAS A DUTY TO LEARN OF ANY FAVORABLE EVIDENCE KNOWN TO THE OTHERS ACTING ON THE GOVERNMENT'S BEHALF IN THIS CASE, INCLUDING THE POLICE." KYLES 514 U.S., AT 437, 115 S. CT. 1555.

RULE 3.220(n)(1) OF THE FLORIDA RULES OF CRIMINAL PROCEDURE ADDRESSES THE CONCERN OF PROCEDURAL HARM CAUSED BY DISCOVERY RULE NONCOMPLIANCE. IN ADDITION TO THE COURT ORDERING THE PARTY TO COMPLY WITH THE DISCOVERY OR INSPECTION OF MATERIALS NOT PREVIOUSLY DISCLOSED OR PRODUCED, GRANTING A CONTINUANCE, GRANTING A MISTRIAL, OR PROHIBITING THE PARTY FROM CALLING A WITNESS NOT DISCLOSED OR INTRODUCED INTO EVIDENCE THE MATERIAL NOT DISCLOSED, OR ENTER SUCH OTHER ORDER AS IT DEEMS JUST UNDER THE CIRCUMSTANCES. RULE 3.220 (n)(1) IS ACTUALLY A SHORTHAND REFERENCE TO THE DECISION OF THE FLORIDA SUPREME COURT IN **RICHARDSON V. STATE**, 246 SO. 2D 771 (FLA.1971). THE CONTROLLING DECISION PRESCRIBING THE PROCEDURES AND REMEDIES WHICH APPLY TO AVOID PROCEDURAL PRE-JUDICE AS A CONSEQUENCE OF THE PROSECUTION'S FAILURE TO DISCLOSE TO THE DEFENSE THE NAME OF A PERSON WITH KNOWLEDGE OF THE CIRCUMSTANCES OF THE CRIME CHARGED. WHEN A DISCOVERY

## MOTION TO SUPPRESS (CONTINUATION)

VIOLATION BY THE PROSECUTION IS PROMPTLY BROUGHT TO THE TRIAL JUDGE'S ATTENTION AND NO RICHARDSON HEARING IS CONDUCTED, THE TRIAL JUDGE'S FAILURE TO CONDUCT A RICHARDSON HEARING WILL REQUIRE A REVERSAL OF ANY ENSUING CONVICTION UNLESS THE APPELLATE COURT CAN CONCLUDE THAT THE FAILURE TO CONDUCT A RICHARDSON HEARING WAS HARMLESS BECAUSE IT IS APPARENT BEYOND AND TO THE EXCLUSION OF A REASONABLE DOUBT FROM AN EXAMINATION OF THE RECORD, EVEN WITHOUT THE BENEFIT OF A RICHARDSON HEARING THAT THE DEFENDANT WAS NOT MATERIALLY HINDERED IN HIS TRIAL PREPARATION OR STRATEGY BY THE DISCOVERY VIOLATION, ONCE PUT ON NOTICE OF A VIOLATION, THE TRIAL COURT HAS AN AFFIRMATIVE OBLIGATION TO CONDUCT A HEARING WITHOUT THE DEFENDANT SPECIFICALLY REQUESTING A HEARING.

ACCORDING TO THE **90.802 HEARSAY RULE**, EXCEPT AS PROVIDED BY STATUE, HEARSAY EVIDENCE IS INADMISSIBLE. THE MAIN OBJECTION TO THE INTRODUCTION OF HEARSAY TESTIMONY IS THE LACK OF AN OPPORTUNITY FOR THE ADVERSE PARTY TO CROSS-EXAMINE THE DECLARANT. THE HEARSAY STATEMENT IS USUALLY NOT UNDER DATE, AND THE JURY DOES NOT HAVE THE OPPORTUNITY TO OBSERVE THE DEMEANOR OF THE WITNESS.

### CONCLUSION

OFFICER JOHN SETH JAMES COMMITTED A 3RD DEGREE FELONY BY DELETING OR FAILING TO TURN IN THE BODY CAMERA EVIDENCE OBTAINED BEFORE AND AFTER MY ARREST ON 12/31/2014. HE TAMPERED WITH EVIDENCE TO ELIMINATE THE IRREFUTABLE PROOF TO IMPEACH THE ARRESTING OFFICERS' TESTIMONY AND CONCEAL EXCULPATORY EVIDENCE. THE BODY CAMERA RECORDED THINGS AS THEY WERE INSTEAD OF HOW EVIDENCE WAS REARRANGED TO BE SOMEWHAT CONSISTENT WITH THE ARRESTING OFFICERS' CASE NARRATIVES. UNFORTUNATELY FOR THE PROSECUTION, SOME OF THE EVIDENCE WAS RELOCATED TO DIFFERENT AREAS INCONSISTENT WITH THE DISCOVERY CRIME SCENE PHOTOGRAPHS. THE CASE NARRATIVES OF OFFICER MORGAN-30287/WILSON-10246 AND OFFICERS JAMES-12869/SMITH-30580 HAS A KNIFE AND A RED/BLACK BACK PACK LISTED AMONG THE ITEMS OBSERVED ON THE ROOF OF THE BUILDING. CSI VANDERBERG LATER PHOTOGRAPHED THE KNIFE ON A TILE FLOOR AND THE BACKPACK AT THE ENTRANCE TO A DOOR. COINCIDENTALLY, THERE ARE NO PHOTOGRAPHS OF A KNIFE OR A BACKPACK ON THE ROOF NOR ANY PHOTOGRAPHS OF THE FLASHLIGHT OFFICER MORGAN ALLEGE I THREW DOWN AFTER BEING BIT BY THE DOG. ONCE A PARTY PRODUCES EVIDENCE OF TAMPERING, PROPONENT OF PHYSICAL EVIDENCE IS REQUIRED TO ESTABLISH A PROPER CHAIN OF CUSTODY OR SUBMIT OTHER EVIDENCE THAT TAMPERING DID NOT OCCUR. ALL PHOTOGRAPHS OF PHYSICAL EVIDENCE SHOULD BE SUPPRESSED BECAUSE THE DISCREPANCY BETWEEN THE PHOTOGRAPHS AND THE CASE NARRATIVES PROVES EVIDENCE TAMPERING. IN ADDITION, THE 911 TAPE WAS ALLEGEDLY RECORDED ON 12/31/2014. IT SHOULD HAVE BEEN INCLUDED WITH THE ORIGINAL DISCOVERY ALONG WITH THE NAME OF THE WITNESS AND THE 911 OPERATOR. IF THAT WITNESS WOULD HAVE BEEN AVAILABLE, HE WOULD AND SHOULD HAVE BEEN ON THE FIRST STATE'S WITNESS LIST. THE 911 TAPE'S INTRODUCTION 10 MONTHS AFTER MY ARREST IS A DISCOVERY VIOLATION AND I REQUEST A RICHARDSON HEARING TO SEE THAT THE NECESSARY SANCTION BE IMPOSED. THE 911 TAPE SHOULD BE SUPPRESSED BECAUSE IT IS HEARSAY THAT DON'T FIT IN ANY EXCEPTION.

*James Edward Washington*
JAMES EDWARD WASHINGTON

### CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** THAT A COPY OF HEREOF WILL BE MAILED TO THE STATE ATTORNEY AT 415 N. ORANGE AVE, P.O. BOX 1673, ORLANDO, FLA 32801 OR HAND DELIVERED IN COURT THIS 8TH DAY OF MARCH 2016.

IN THE CIRCUIT COURT OF THE
NINTH JUDICIAL CIRCUIT, IN AND
FOR ORANGE COUNTY, FLORIDA

CASE NUMBER: 2014-CF-017252-A-O

DIV 19

STATE OF FLORIDA

      Plaintiff,

vs.

JAMES EDWARD
WASHINGTON

a/k/a

      Defendant.

_____/

## ORDER DENYING MOTION TO DISMISS

      THIS CAUSE, having come on to be heard before the Court upon the MOTION
TO DISMISS and the Court having reviewed the pleading and being otherwise duly advised in
the premises, hereby

      **ORDERS AND ADJUDGES** as follows:

1.    The MOTION TO DISMISS is hereby **DENIED**.

      DONE AND ORDERED in chambers, at Orlando, Orange County, Florida this ____
day of _____, 20_____.

Original Signed

_____
Honorable Robert J Egan
Circuit Court Judge

JAN 27 2016

ROBERT J. EGAN
CIRCUIT JUDGE

Page 1 of 2

2014-CF-017252-A-O

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the forgoing was furnished to the Office of State Attorney, 415 North Orange Avenue, Orlando, Florida, 32801 & James Edward Washington, # 14045588, Orange County Jail, P.O. Box 4970, Orlando, Florida 32802, on this _____ day of _____, 20___.

_____
Lynn Harasti
Judicial Assistant

Conformed and Mailed

JAN 27 2016

LYNN HARASTI
Judicial Assistant

2014-CF-017252-A-O

STATE OF FLORIDA
VS.

IN THE CIRCUIT COURT OF THE
NINTH JUDICIAL CIRCUIT IN AND
FOR ORANGE COUNTY, FLORIDA

CASE NUMBER: 2014-CF-017252-A-O
DIVISION: Egan, Robert J

JAMES EDWARD WASHINGTON, Defendant

DOB: 2/19/1965

## ORDER

**DEFENDANT APPEARANCE:**

JAMES EDWARD WASHINGTON  was present

**COUNSEL APPEARANCE:**

Counsel:  was not present

Asst State Attorney Present: JOSEPH MATERA

This case coming before the Court to be heard, and you, the defendant JAMES EDWARD
WASHINGTON, having:

| Count: 001 | ARMED BURGLARY OF STRUCTURE WITH EXPLOSIVES OR DANGEROU WEAPON | 810.02(2)(B) | First Degree - Punishable By Life |
| --- | --- | --- | --- |
| Count: 002 | POSSESSION OF BURGLARY TOOLS | 810.06 | Third Degree - Felony |
| Count: 003 | OFFENSE AGAINST POLICE DOG, FIRE DOG OR POLICE HORSE | 843.19(3) | First Degree - Misd |
| Count: 004 | CR-RESISTING OFFICER WITHOUT VIOLENCE | 843.02 | First Degree - Misd |
| Count: 005 | PETIT THEFT | 812.014(3)(A) | Second Degree - Misd |
| Count: 006 | CR-CRIMINAL MISCHIEF | 806.13(1)(B)(1) | Second Degree - Misd |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

**COURT ORDERS:**
Court Minutes

DEFENSE MOTION IN LIMINE IS HEREBY
MOOT.

DEFENSE MOTION TO SUPPRESS IS HEREBY
DENIED.

TRIAL SET FOR MARCH 22, 2016 AT 9AM,
COURTROOM 18-D.

DONE, ORDERED and FILED in

Page 1 of 2

Open Court on March 9, 2016

**Honorable Judge** _____
                        Robert J Egan

_____
JAMES EDWARD WASHINGTON
Deputy Clerk in Attendance:  JE
Office of Tiffany M. Russell, Orange County Clerk of the Circuit and County Courts

| Defendant.Name____ | 951 CHELSEA WY LAKE WALES, FL, 33853 | (Bondsman)_____ | ASA____ | Dockets____ | |
|---|---|---|---|---|---|
| Atty _____ | Prob____ | ACS____ | CFSC____ | IMR___ | Other_____ |

IN THE CIRCUIT COURT OF THE NINTH JUDICIAL CIRCUIT, IN AND FOR ORANGE
COUNTY, FLORIDA.

JAMES WASHINGTON,
        Defendant/Appellant,
vs.

CASE NO.: 48-2014-CF-017252-O
APPEAL NO.:

STATE OF FLORIDA.
        Plaintiff/Appellee
_____/

## ORDER DIRECTING TRANSCRIPTION OF PROCEEDINGS

THIS CAUSE having come on to be considered on the Defendant's Motion, and the

Defendant having filed an Affidavit of Insolvency for purposes of appeal, and this court having

previously found the Defendant to be an insolvent person, it is therefore

ORDERED AND ADJUDGED:

1.  That the Court Reporter be, and is hereby directed to transcribe the proceedings in

said cause as follows:

    a)    The trial proceedings in this cause held on September 13-14, 2016 including

           voir dire (jury selection) before Judge Julie O'Kane in courtroom 9-D,

           Orange County Courthouse.

    b)    The sentencing proceedings in this cause held on October 31, 2016 before

           Judge Julie O'Kane in courtroom 9-D, Orange County Courthouse.

2.  That the Office of the Public Defender has previously been appointed to

represent said Defendant/Appellant in effecting his appeal in said cause.

3.  That the cost of transcribing said proceedings and the appeal of said

Defendant be, and the same shall be borne by The State of Florida.


CLIENT COPY

14 CF 17252

DONE AND ORDERED in Chambers in Orlando, Orange County, Florida this
15th day of November, 2016.

/S/ JULIE H. O'KANE

_____
Circuit Court Judge

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing has been furnished to the Office of the State Attorney, 415 North Orange Avenue, Post Office Box 1673, Orlando, Florida 32802 (Division19@sao9.org), The Office of the Attorney General, 444 Seabreeze Blvd., Suite 500, Daytona Beach, FL 32118 (Crimappdab@myfloridalegal.com), The Court Reporter, Orange County Courthouse, 425 N. Orange Ave., Orlando, FL 32801 (Ctrpnp1@ocnjcc.org and ctrpjd1@ocnjcc.org) and via U.S. mail delivery JAMES WASHINGTON, Inmate number 14045588, M-1C, P.O. Box 4970, Orlando, Florida 32802-4970 on this 16th day of November, 2016.

_____
/S/
Judicial Assistant or other designee



# The Florida Bar

**651 East Jefferson Street**
**Tallahassee, FL 32399-2300**

John F. Harkness, Jr.
Executive Director

850/561-5600
www.FLORIDABAR.org

July 28, 2016

Ms. Donna M Goerner
with Damore, Delgado, Romanik & Rawlins PLC
283 Cranes Roost Blvd Ste 111
Altamonte Springs, FL 32701-3437

Re:    James Edward Washington; RFA No.  17-1194

Dear Ms. Goerner:

The Attorney/Consumer Assistance Program (ACAP) of The Florida Bar has received a Request for Assistance from the above indicated client.  The nature of the request suggests that there may have been a lack of communication with your office which, if substantiated, could constitute a violation of certain Rules Regulating The Florida Bar, and could lead to disciplinary action by the Bar.

No disciplinary file has been opened at this time, but ACAP is requesting that you contact this client by August 11, 2016, in order that this matter might be resolved without a disciplinary file being opened and investigated.

By copy of this letter to Mr. Washington, I am advising that should I fail to hear anything further from either of you within thirty days of the date of this letter, I will assume that the matter has been resolved.  Pursuant to the Bar's records retention schedule, the computer record and file will be disposed of one year from the date of closing.

Thank you in advance for your efforts in assisting an expeditious and amicable resolution of this matter.

Sincerely,

Theodore P. Littlewood Jr., Bar Counsel
Attorney Consumer Assistance Program
ACAP Hotline 866-352-0707

cc:    Mr. Washington



# The Florida Bar

**651 East Jefferson Street**
**Tallahassee, FL 32399-2300**

John F. Harkness, Jr.
Executive Director

850-561-5600
www.FLORIDABAR.org

January 4, 2017

Mr. James Edward Washington
Central Florida Reception Center - Main
7000 H. C. Kelley Road
Orlando, FL 32831-2518

Re:   Donna M Goerner; RFA No. 17-1194

Dear Mr. Washington:

Your letter dated December 14, 2016 is the first correspondence we have received from you regarding Ms. Goerner following our letter to her dated July 28, 2016.

Your question regarding Judge Egan is being addressed by separate correspondence. Be advised that under Article V, Section 12 of the Florida Constitution, complaints against sitting judges are within the exclusive jurisdiction of the Judicial Qualifications Commission, P.O. Box 14106 Tallahassee, FL 32317.

Sincerely,

Theodore P. Littlewood Jr., Bar Counsel
Attorney Consumer Assistance Program
ACAP Hotline 866-352-0707

# H



LAW OFFICES OF
# PUBLIC DEFENDER
### SEVENTH JUDICIAL CIRCUIT
**FLAGLER, PUTNAM, ST. JOHNS & VOLUSIA COUNTIES**

JAMES S. PURDY
Public Defender

February 16, 2017

Mr. James Edward Washington
DC# 197574 – E21365
Madison Correctional Institution
382 S.W. MCI Way
Madison, FL 32340

Re: DCA Case Number 5D16-3743

Dear Mr. Washington:

I just received your letter. Thank you for the interesting research on police use of Sting Ray equipment. I note that your letter includes a court order from the March 9, 2016 hearing on your motion in limine and motion to suppress. I was already on it. Last week I asked the Court to supplement with transcripts of various hearings in your case, and those supplements were granted.

I expect it to take about a month before I receive the transcripts. Once I receive them, I will have to read and research the issues argued and presented to the trial court. I already have the trial transcript and the record prepared by the circuit clerk of court. I hope you received the motion to supplement and the supplemental designations we sent.

I have enclosed a copy of the Order granting supplementation. As you can see from the order, appellate attorneys can only raise on appeal matters that were actually considered by the trial court. Also, appellate attorneys do not receive any "discovery." Anything the trial attorneys may have received that was not made part of the record in the circuit court can't be considered on appeal. Once I have all the supplements that were approved, I will research and brief the case.

An appeal can be a long process. Your case involves a trial and numerous hearings, so it could be six months to a year after the briefs are all filed before the appeal is decided. This will require a lot of patience on your part, but I will keep you informed of all developments and you will receive a copy of all briefs filed by this Office or the Attorney General's office.

Page 2
February 16, 2017

Do not hesitate to write if you have any questions.

Sincerely,

Kathryn Rollison Radtke
Assistant Public Defender

KRR/lw

Enclosure

I

**Orange County** — **ICJIS Arrest Affidavit**

Arrested ☑ At-Large ☐ JRA ☐ Document #: 641487 Division #: WCW 22

Document Date: 12/31/2014 Court Case #: 48-2014-CF-017252-A-O

| | | | |
|---|---|---|---|
| Location of Defendant Vehicle: A & A TOWING - (407) 275-9808 | Date-Time Booked: 12/31/2014 17:00 | Agency Case Number: 201400536652 | |
| (ORI) : FL0480400 | Agency Name: ORLANDO POLICE DEPT | FCIC/NCIC Check: ☑ | Date-Time of Arrest: 12/31/2014 14:48 |
| Address of Arrest: 5705 LA COSTA DRIVE | | | |

**DEFENDANT** Adult ☑ Juvenile ☐ Jacket Number: Inmate Number: 14045588 Language: ENGLISH

| | | | | | | |
|---|---|---|---|---|---|---|
| NAME (L,F,M): WASHINGTON, JAMES EDWARD | A.K.A: | | Race: B | Sex: M | DOB: 02/19/1965 | Age: 49 |
| Height: 5'07" | Weight: 150 | Hair: BLK | Eyes: BRO | POB City: CAROL | POB State: | POB Country: GEORGIA |
| RES Street#: 951 CHELSEA WY | | | | | | Citizenship: US |
| City: LAKE WALES | State: FL | Zip: 33853 | Home Phone: | | | Other Phone: |
| Scars/Tattoos: | | | | | | Ethnicity: NON HISPANIC |
| Driver's License/State ID No: W252445650590 | State: FL | Year Expires: 2021 | | | | SSN #: |
| Business and Occupation: | | | | | | Bus Phone: |
| Bus Street#: | City: | | | State: FL | Zip: | |
| Next of Kin Name: | | | | | | Phone: |
| Next of Kin Street #: FL | City: | | | State: FL | Zip: | |

**AGGRAVATORS:** Firearm ☐ Weapon ☐ Mask ☐ Vest ☐ Convicted Sex Batterer ☐ Hate Crime ☐ Special Victim: Domestic Violence? N

**OFFENSES:** Felony ☑ Misd. ☐ ORD. ☐ Traffic ☐ Out of County ☐ Court Location: CIRCUIT Originating State/County: ORLANDO/FL

| No. | GOC Code | Description | | Count | Bond Amt $ / Status | FSS/ORD | FDLE Rec# | Drug Name | Citation Number |
|---|---|---|---|---|---|---|---|---|---|
| 1 | | BURGLARY OF STRUCTURE | 810.02(4)(A) | 1 | 3,500.00 | 810.02.4a | 6266 | | |
| 2 | | POSSESSION OF BURGLARY TOOLS | 810.06 | 1 | 150.00 | 810.06 | 2769 | | |
| 3 | | THEFT OF COPPER / OTHER NONFERROUS METALS | 812.145(2) | 1 | 150.00 | 812.145.2 | 6498 | | |
| 4 | | RESISTING OFFICER WITHOUT VIOLENCE | 843.02 | [illegible] | 500.00 | 843.02 | 3143 | | |
| 5 | | INTERFERING WITH OR OBSTRUCTING POLICE DOG | 843.19(3) | 1 | 100.00 | 843.19.3 | 5863 | | |

DCF Notified? N By Whom? On Probation? N Miranda Warning? Y By Whom? WILSON STEPHEN Invoked? N

Sworn to and subscribed before me, this 31 day of December year 2014

Notary Public ☑ Law Enforcement or Corrections Officer ☐ Personally Known ☐ Produced Identification ☐ Type of Identification

Notary Signature [signature] NOTARY PUBLIC STATE OF FLORIDA

CASON, LAURA M — Notary Name

FF139388 /07/07/2018 — Notary Commission # / Exp. Date

I swear or affirm the above statements are correct and true

Officer's Signature – [signature]

(407) 246-2470 — Officer's Bus. Phone No.

MORGAN, NICOLE / 30287 — Officer's Name/ID

[illegible]

1001 (09/12)

| Orange County | ICJIS Arrest Affidavit (continued) | |
|---|---|---|
| Arrested ☑  At-Large ☐  JRA ☐ | Document #: 641487 | Division #: WCW |
| Document Date: 12/31/2014 | | Court Case #: 48-2014-CF-017252-A-O |
| Defendant's Name | WASHINGTON, JAMES EDWARD | Agency Case Number: 201400536652 |

**NARRATIVE:** The undersigned has probable cause to believe the above-named defendant on the ___31___ of ___December 2014___ at __8:51__ at 5705 LA COSTA DRIVE (Zone: __18__ ) in Orange County did

On 12/31/14 I, Officer Morgan (30287) and Officer Wilson (10246) were dispatched to a business check at 5705 La Costa Drive, a vacant structure (Formerly Perkins Restaurant). Upon arrival K9 Officer Brillant (16077) was already on scene and stated he saw the suspect on the roof who dropped behind the A/C unit once he saw the officers arriving on scene. The suspect was later identified at the hospital as James Edward Washington.

At this time an emergency channel was established and back up units arrived, setting a perimeter around the building. Once the perimeter was established, I and Wilson covered Officer Brillant to a door that had been forcibly entered on the north east side of the structure. The door led to an electrical room which had a ladder that led to the roof. We came upon a hatch door at the top of the ladder that led to the roof where Officer Brillant had observed Washington.

Officer Brillant, Officer Wilson and I positioned ourselves at the bottom of the ladder where Officer Brillant made his announcement of, "This is the Orlando Police Department. We have the building surrounded. Come down from the roof and walk out to us immediately with your hands up." There was no response from Washington, the command was made a second time and Washington was observed walking up to the hatch and closing the door at the top of the ladder.

OFD was called and was staged across the parking lot by the Dunkin Donuts. OFD Tower 11 was used by Officer M. Pollock (#14392), to provide over-watch of the roof for officer safety reasons in order to try and maintain a visual of the suspect on the roof.

Officer Wilson and I climbed up the ladder onto the roof, along with Officer James (12869) and Officer Smith (30580). We saw on the roof a pile of copper that was being collected from the A/C units, as well as a backpack, water bottle and tools which include: knife, screw driver, and bolt cutters. We cleared the roof and noticed the suspect had found a way inside of the business. We then came down from the roof and joined back at the perimeter.

At that point, multiple announcements were made using the police patrol car PA speaker ordering Washington to exit the business immediately or officers would enter and deploy Clear Out in a effort to flush the suspect from the structure. Once again Washington failed to obey the lawful orders to exit the business and for this reason multiple cans of Clear Out were deployed above the ceiling tiles in the crawl space where Washington was believed to be.

After the announcements were made and Clear Out deployed, Officers James (12869), Cote (16904), Zambito (16220), Robertson (17291), Wilson (10246) and I cleared the entire main floor of the structure without locating Washington. For this reason Officers Wilson, James, Zambito and Robertson climbed up into the crawl space and conducted a grid search of the space between the first floor ceiling and the roof. This initial search of the crawl space was met with negative results due to the fact that Washington had concealed himself in an A/C unit ventilation duct. After the four officers exited the ceiling area Washington exited the A/C ventilation duct and attempted to sneak across the ceiling in the crawl space. Officers James and Wilson deployed two cans of Clear Out where the suspect was seen. Washington was able to evade the Clear Out and headed east through the crawl space in a effort to elude officers.

At this point Officer Wilson, Cote and Hamilton observed Washington in the crawl space through ceiling panel areas where we had removed ceiling panels. Officer Cote yelled at Washington, "Come down here and put your hands in the air. Stop resisting!" Washington still refused to obey orders and for this reason, Officer Wilson and Officer Hamilton sprayed Washington with their department issued Sabre Red. Washington continued to attempt to evade officers and moved to the south end of the building through the crawl space, and climbed down into the woman's restroom. As he exited the woman's restroom into the main dining area I observed the suspect and immediately yelled at the suspect, "Let me see your hands, Get on the ground now!" I repeated this command multiple times. As I was yelling this, K9 Officer Brillant was also ordering the suspect to get on the ground. Washington refused to obey our orders and continued to walk towards me, carrying a

| | | |
|---|---|---|
| Sworn to and subscribed before me , | I swear or affirm the above statements are correct and true | (407) 246-2470 |
| this __31__ day of __December__ year __2014__ | | Officer's Bus. Phone No. |
| Notary Public ☑  Law Enforcement or Corrections Officer ☐ | Officer's Signature _____ | MORGAN, NICOLE / 30287 |
| Personally Known ☐  Produced Identification ☐ | | Officer's Name/ID |
| Type of Identification _____ | | |
| Notary Signature _____ | NOTARY PUBLIC - STATE OF FLORIDA | CASON, LAURA M  Notary Name | FF139388 / 07/07/2018  Notary Commission # / Exp. Date |

1001 (09/12)

Page 2 of 4

| Orange County | ICJIS Arrest Affidavit (continued) | |
|---|---|---|
| Arrested ☑ At- Large ☐ JRA ☐ | Document #: 641487 | Division #: WCW |
| Document Date: 12/31/2014 | | Court Case #: 48-2014-CF-017252-A-O |

small flashlight in one hand and a knife in the other. Brillant then deployed his police K9 partner Titan who bit Washington in the lower left leg/shin area. This caused Washington to throw the items in his hands. Brillant then deployed his police K9 partner Titan who bit Washington in the lower left leg/shin area. Washington still refused to obey orders and began to reach down striking K9 Titan with a closed fist in the snout yelling "Get him off of me".

Officer Brillant again began giving loud commands for the suspect to stop fighting the dog, and to roll over and put his hands behind his back. The suspect resisted these commands and continued battering K9 Titan as we pulled him out into the center of the room where we could go· hands on more safely. K9 Titan briefly came off his bite, and re-engaged on the suspects left thigh area as the suspect continued striking him and grabbing his face in an attempt to get him off the bite.

I then attempted to handcuff Washington. While yelling, "Get your hands behind your back," I grabbed Washington's right wrist and placed one handcuff on his right wrist. I attempted to pull Washington's left hand back behind his back as well, but he pulled it away and tried to lay on it to prevent me from handcuffing him. Officer Wilson grabbed Washington's left wrist and pulled it behind his back where I· was able to fully handcuff him. Washington was then escorted from the building.

In the parking lot, Washington was treated by OFD Station #11 for the injuries sustained to his leg from the dog bite. He was then transported to Florida Hospital East for treatment. While at Florida Hospital East, OPD CSI Venderberg (#15246) responded to photograph Washington's injuries. CSI Styer (#14857) responded to the scene for photograph's and processing.

Washington was given Miranda at the hospital before being transported to BRC by Officer Wilson. Washington refused to answer any of Officer Wilson's questions.

After treatment at Florida Hospital East, Washington was transported to BRC, charged with Commercial Burglary, Possession of Burglary Tools, Battery on a Police K9, and five counts of Resisting Arrest without violence.

| Sworn to and subscribed before me , | I swear or affirm the above statements are correct and true | |
|---|---|---|
| this __31__ day of __December__ year __2014__ | | (407) 246-2470 |
| Notary Public ☑ Law Enforcement or Corrections Officer ☐ | Officer's Signature _Nick M_ | Officer's Bus. Phone No. |
| Personally Known ☐ Produced Identification ☐ | | MORGAN, NICOLE / 30287 |
| Type of Identification | | Officer's Name/ID |
| Notary Signature | NOTARY PUBLIC STATE OF FLORIDA | |
| | CASON, LAURA M | FF139388 /07/07/2018 |
| | Notary Name | Notary Commission #/ Exp. Date |

1001 (09/12)



IN THE CIRCUIT COURT OF THE
NINTH JUDICIAL CIRCUIT, IN AND FOR
ORANGE COUNTY, FLORIDA

STATE OF FLORIDA

     Plaintiff,

vs.

JAMES EDWARD WASHINGTON

     Defendant.

_____/

CASE NO:  48-2014-CF-017252-O

DIVISION:  19

## NOTICE OF SUPPLEMENTAL DISCOVERY

  COMES NOW, the State of Florida, by and through the undersigned Assistant State

Attorney and hereby makes the following information available to the defense and states as

follows:

  3 CD'S CONTAINING 911 CALL, DEPOSITIONS AND HEARING FROM
6/16/15, ALONG WITH SUPP STATE'S WITNESS LIST, LATENT PRINT
REPORT AND NOTICE OF HEARING MAILED TO DEFENDANT AT
ORANGE CO. JAIL.

  Copies of items listed will be provided under separate cover.

I DO CERTIFY that a copy (copies) hereof (has) (have) been furnished to JAMES

EDWARD WASHINGTON, (pro se), P O Box 4970, (OCJ - Inmate #14045588), Orlando, FL

32802 by (delivery) (mail) (fax) (e-mail) on this ___1___ day of October, 2015.


/s/
Joseph A. Matera
Assistant State Attorney
Florida Bar # 0098014
Division19@sao9.org
PO Box 1673, 415 N Orange Ave
Suite 400
Orlando, FL 32802-1673
(407)836-2188



Filing # 46129856 E-Filed 09/07/2016 12:01:27 PM

IN THE CIRCUIT COURT OF THE NINTH
JUDICIAL CIRCUIT, IN AND FOR
ORANGE COUNTY, FLORIDA

STATE OF FLORIDA
        Plaintiff,

vs.

JAMES EDWARD WASHINGTON
        Defendant.

_____/

CASE NO:   48-2014-CF-017252-O

DIVISION:   19

## STATE'S RESPONSE TO DEFENDANT'S MOTION FOR DISCLOSURE OF IMPEACHING INFORMATION AND EVIDENCE FAVORABLE TO DEFENDANT

COMES NOW the State of Florida, by and through the undersigned Assistant State Attorney, and hereby responds to Defendant's Motion for Disclosure of Impeaching Information and Evidence Favorable to Defendant as follows:

1.  Law Enforcement arrested Defendant for a multitude of charges on December 31, 2014.

2.  Defendant has moved for a continuance on multiple occasions in this case.

3.  Defendant has been represented by competent counsel from the Public Defender's Office and twice by Donna Goerner.

4.  Defendant discharged Donna Goerner originally.

5.  The Public Defender's Office was appointed, and Defendant discharged the Public Defender's Office.

6.  Now, Donna Goerner is back on the case as the attorney of record.

7.  During the pendency of the instant case, the State also requested Defendant be evaluated for competency.

8.  Defendant was evaluated for competency and found to be competent.

9.  On August 22, 2016, the defense filed the aforementioned motion requesting the State disclose a *myriad* of information relating to, *inter alia*, witnesses' criminal histories, body camera videos, and dash camera videos.

10. This case is currently set for trial on September 12, 2016 at 8:30 AM.

I.    **Response to Section 1 of Defense's Motion (Criminal Records of Proposed Witnesses)**

1. **MEMORANDUM OF LAW**

The Supreme Court of Florida has heard similar arguments levied by defense counsel in the instant case. In *Medina v. State*, 466 So.2d 1046 (Fla. 1985), the defense claimed the trial court erred when it failed to require the State to disclose the criminal records of several State witnesses. *See Medina*, 466 So.2d 1046, at 1049. The defense counsel's argument was that because the State had "access" to the criminal records, they should obtain them and disclose them. *See id.* However, the Court disagreed and held, "[that the trial] court granted the motion to the extent of information contained in the state's files, but properly held that the defense *has the initial burden of trying to discover such evidence and that the state is not required to prepare the defense's case.*" *See id. See also State v. Counce*, 392 So.2d 1029 (FL Fourth DCA 1981) ("...The state has no duty to obtain information for the defense that the defense is able to obtain by means other than production by the state"); *Yanetta v. State*, 320 So.2d 23 (FL Third DCA 1975) ("A defendant should not be permitted to employ the pretrial discovery procedures for disclosure of information or documents which by the exercise of due diligence are readily available to him by subpoena or deposition"); *State v. Wright*, 803 So. 2d 793, 794 (FL Fourth DCA 2001) (*holding* "[b]efore requiring the state to secure this information for defense counsel, the trial court should have first ascertained whether the defendants could have obtained the requested criminal records from other sources through due diligence and determined whether the defendants had exerted their own efforts and resources and exhausted other available means to procure the information.").

2. **ARGUMENT**

The theme of these cases cited to is "one shall not do for another, what one can do for itself." Defense counsel from both the Public Defender's Office and Ms. Goerner have both had

the opportunity to depose twelve (12) State witnesses in this case. From the State's recollection, neither counsel asked any witness about their criminal history. Nor is there anything in the defense's motion suggesting the defense subpoenaed any criminal records from any criminal agency. It appears now in retrospect the defense wants the State to do the defense's job for the defense. This is not the State's job.

## II.  <u>Response to Section 2 of Defense's Motion (Internal Affairs Investigations)</u>

There is nothing in the Florida Rules of Criminal Procedure that requires the State to actively seek out evidence for defense counsel. Internal Affairs Investigations are conducted by police agencies and not the State Attorney's Office. Moreover, the defense has deposed (12) State witnesses. One deponent stated during the deponent's deposition that there was a "Response Resistance Report," created in this case. On September 6, 2016, the State received a copy of that report and sent it to the defense.

Also, Defendant in this case filed a "Use of Force" complaint which in turn lead to an "Internal Affairs Investigation." If the defense believes that there are relevant material within that Internal Affairs Investigation then the defense should have subpoenaed those records. If the Defense believes there have been other Internal Affairs Investigations conducted against any State witness regarding another case, then the defense can subpoena those internal affairs records from the appropriate Police Department. *See Armstrong v. State*, 862 So.2d 705, 714 (Fla. 2003) (noting "*As a result of the public records productions*, the Defendant received internal affairs records from the Plantation Police Department...." However, in an abundance of caution, the State has obtained the Administrative Investigation Management Program Report for this "Use of Force" complaint. On September 2, 2016, the State sent the defense a copy of this report.

### III. <u>Response to Section 3 of Defense's Motion (Threats to Government Witnesses of Prosecution)</u>

The State is unaware of the status of, any threats, express or implied, made to a proposed State witness as to a criminal investigation; prosecution or potential prosecution which is pending or could be brought against the witness; any probationary, parole or deferred prosecutions pending or which could be initiated against the witness; or any tax, immigrations, administrative, or judicial claim or dispute which may be instituted against the witness by the Government or any state. Again, the defense has had the opportunity to depose twelve (12) state witnesses. For whatever reason, the defense chose not to ask any witness a question pertaining to this information sought. In addition, the defense has elected not to depose certain witnesses.

### IV. <u>Response to Section 4 of Defense's Motion (Refusal to Testify)</u>

The only instances the State is aware of where a State witness for this case has testified in regards to this case is during their depositions. The State is unaware of any occasion where a State witness in regards to this case has refused to testify before any court, grand jury or other body in regards to this case. The State is also unaware of any instance where a State witness in this case has testified or refused to testify before any court or grand jury in regards to another case. Again, the defense has had the opportunity to depose twelve (12) state witnesses. For whatever reason, the defense chose not to ask any witness a question pertaining to this information sought.

### V. <u>Response to Section 5 of Defense's Motion ("Arguably" Probative Evidence and Records that Minimize involvement of Defendant)</u>

To the State's knowledge, all of the discovery in the State's possession has been disclosed to the defense. Whatever records and information which "arguably" could be beneficial or useful to the State is contained within the discovery the State has provided to the defense via e-mail and personal delivery. The State is unaware of any such records or

information that minimizes Defendant's involvement in this crime other than any information

contained within the discovery that was provided to the defense.

### VI.  Response to Section 6 of Defense's Motion (Records of Non-Witness or Declarant)

Other than the 911 caller, at this time, the State does not intend on using any other

statement by a "Non-Witness or Declarant" as evidence during trial.  The State's response to this

request is the same as contained within sections A through E of this Response.

### VII.    Response to Section 7 of Defense's Motion (Inconsistent Documented Evidence)

To the State's knowledge, the defense has all of the discovery that the State has in

regards to this case.  Thus, it is unaware of any other documentary evidence that the defense does

not have that is inconsistent with the expected testimony.

### VIII.   Response to Section 8 of Defense's Motion (Written or Oral Statements made by State Witness)

To the State's knowledge, the defense has all of the discovery that the State has in

regards to this case.  This discovery includes *inter alia*, police reports, photographs, and a 911

call.  The state is unaware of any written, audio recorded, video recorded, video surveillance or

oral statement in existence that the State has that the defense does not have.

### IX.  Response to Section 9 of Defense's Motion (Dash Cam or Body Cam)

The State does not have any surveillance video; dash cam video; or body camera video of

this incident in its file.  However, Officer John James does indicate in his deposition that he did

have a body camera during this incident.  The State has inquired about this body camera video.

This issue has been discussed at length in Court on multiple occasions.  The State has informed

this Court and Defendant and defense counsel that the Orlando Police Department does not have

a recording of this body camera video.

Initially, for officer safety purposes, the body camera was removed from Officer James's

person and placed on a poll outside of the building to determine if the suspect, later determined

to be Defendant, was on the roof of the building. The body camera video was removed from the poll and the footage was viewed. The footage did not show any suspect on the roof of the building. From there, the body camera was returned to Officer James and Officer James determined the body camera to be operational. Officer James participated in the search for Defendant in the ceiling rafters. He was crawling in the rafters. During the search, the body camera either became unplugged or was not properly connected. The Orlando Police Department's policy states that body camera video footage is destroyed after thirty (30) days if the video contains no evidentiary value and a request is not made to maintain it for documentation. Since the initial footage did not show any person on the roof, and the body camera was not functioning properly while Officer James was in the ceiling rafters and during the apprehension of Defendant, the body camera video was destroyed.

X. **Response to Section 10 of Defense's Motion (*Inter alia* Search Warrant Records relating to a Joint Law Enforcement effort)**

To the State's knowledge, the defense has all of the discovery that the State has in regards to this case. The State is unaware of any other reports in existence in regards to this case. To the State's knowledge no other suspect was developed in regards to this case given Defendant was found in the building during the criminal episode.

XI. **Response to Section 11 of Defense's Motion (Burglaries in the Area)**

Again, the State is *not required to prepare* the defense's case for Defendant. *See Medina v. State*, 466 So.2d, at 1049. There is nothing in the Florida Rules of Criminal Procedure that requires the State to actively seek out evidence for defense counsel. Moreover, there is nothing in the Florida Rules of Criminal Procedure that requires or even suggests that the State produce for the defense a list or a report detailing burglaries to the address listed in the Information. The defense is seeking to use a certain theory of defense. It is not the State's job to assist the defense in making its theory stronger. The defense may choose to make a Public Records Request with

the appropriate police agency if it chooses.

     I CERTIFY that a copy hereof has been furnished to Donna M. Goerner, donna@thejusticelawoffice.com, 283 Cranes Roost Blvd., Suite 111, Altamonte Springs, FL 32701 by e-mail on this 7th day of September, 2016.

JEFFREY L. ASHTON, State Attorney
Ninth Judicial Circuit of Florida

By: _____
     Joseph A. Matera
     Assistant State Attorney
     Florida Bar # 0098014
     Division19@sao9.org
     PO Box 1673, 415 N Orange Ave
     Suite 400
     Orlando, FL 32802-1673
     407-836-2188



2014 CF 17252

James Washington

Psychological Evaluation

Dr. Tressler

12·16·2015

FILED IN OPEN COURT
THIS 4 DAY OF January 16

# CENTER FOR PSYCHOLOGY

761 Maitland Avenue
Altamonte Springs, Florida 32701
Phone: (407)740-0208
Fax:    (407)740-0242

Daniel P. Tressler, Psy.D.                                              Susan K. Daniel, Psy.D.

IN THE CIRCUIT COURT OF THE
NINTH JUDICIAL CIRCUIT,
IN AND FOR ORANGE COUNTY, FLORIDA

CASE:      38-2014-017252-O
DIVISION:  19
JUDGE:     Hon. Robert Egan
EXAMINER:  Daniel P. Tressler, Psy.D.

STATE OF FLORIDA,

    vs.

JAMES EDWARD WASHINGTON

## FORENSIC PSYCHOLOGICAL EVALUATION

NAME:    James Edward Washington          DATE:  December 16, 2015
AGE:     50
D.O.B.:  2/19/1965

## EVALUATION ISSUES

Mr. Washington is a 50-year-old male evaluated to assess competency to proceed, pursuant to order by Judge Egan. Evaluation took place at the Orange County Jail. Evaluation procedures included clinical interview, structured competency interview, the Mini Mental State Examination and review of records. The purpose and distribution of the report was explained. Mr. Washington was advised that this evaluation is not treatment-related, is not confidential and will be reported to the Court, State and Defense. Mr. Washington consented to the evaluation and participated willingly.

## BACKGROUND INFORMATION

**Documents reviewed:**

    Arrest Affidavit
    Defendant Letter to the Court
    Florida Bar Complaint
    Letter from the Florida Bar
    Orange County Jail Medical Records

**The alleged offense:** Mr. Washington is accused of burglary of a structure, possession of burglary tools theft of copper, resisting arrest without violence and interfering with the police

dog. The offense is alleged to have occurred on or about December 31, 2014. According to police reports, Mr. Washington is charged with stealing copper from a vacant building. The police report shows that Mr. Washington was sprayed with mace and that a police dog was deployed. The dog bit him on the leg. Mr. Washington was treated at Florida Hospital before being booked.

**Medical and psychological:** On April 30, the defendant he reportedly told Alma Thomas, ARNP that he should be on psychotropic medications in spite of having no psychiatric treatment history. Ms. Thomas prescribed the antidepressant citalopram. The defendant was calm, cooperative, made good eye contact and was coherent. Ms. Thomas diagnosed mood disorder, NOS AND polysubstance dependence. On May 19 2014 Mental Health Specialist Oscar Pendleton found the defendant to be angry but stable. On July 16, Ms. Thomas notes that the defendant complained of depression and sleep disturbance but denied any psychotic symptoms. On January 20, 2015, jail medical records show that Mr. Washington received treatment for his dog bite after being booked.   On January 20, 2015 mental health specialist Jerilyn Riddle notes that the defendant was complaining of pain in his leg because of nerve damage associated with the dog bite. He was considered to be logical and coherent. On April 6, 2015, mental health specialist Oscar Pendleton found the defendant to be calm, depressed, appropriate, logical and coherent. On November 11, 2015, Ms. Thomas found him to be depressed, calm and appropriate.

**Personal History:** Mr. Washington reports that he was born in Georgia and raised in Georgia and Alabama. He was raised by his mother and stepfather because his father was in prison. Mr. Washington says that in 9th grade, after his father's release, he went to live with his father. Mr. Washington reports that he is high school educated and that he served 3 years in the Army from 1986 to 1988. Mr. Washington says he attended college on the G.I. Bill, but did not graduate. He wryly notes that he was having too much fun. He has worked in construction and in warehouses. Mr. Washington is single, has never married and has no children.

Mr. Washington admits to a history of cocaine and alcohol use. He reports that he began with cocaine hydrochloride and eventually turned to crack cocaine. He says that he has used alcohol on a daily basis, at moderate amounts. He was vague as to those amounts.

**Legal history:**  Mr. Washington's arrest record was not available for review Mr. Washington reports been arrested 75-100 times on various charges and has been convicted of burglary, theft instruction materials and theft from warehouses. Mr. Washington estimates that he has been to prison 7 times for a total of 14-15 years.

## PSYCHOLOGICAL ASSESSMENT

**Mental Status and Behavior:**    Mr. Washington presented as a normally developed 50-year-old African-American male. Physically, Mr. Washington appeared to be approximately his stated age. Mr. Washington was well mannered soft-spoken. Behavior was calm, subdued and fully appropriate. Speech was intelligible in quality and reflective of approximately normal intellectual ability. Mr. Washington's subjective mood was described as depressed and angry. Affect, or demonstrated mood was congruent with situation, Mr. Washington matter and thought content. The level of depression to which he gave voice was consistent with his circumstances.

Thought processes were logical and coherent. Mr. Washington used analogies, irony and metaphor. He demonstrated a sense of humor. He denies experiencing any hallucinations or delusions. Mr. Washington produced a score of 26/30 on the MMSE, which is a normal limits performance reflecting intact cognitive functioning. Thought content was vaguely paranoid to the extent that he describes behavior on the part of the State and police to conspire against him for purposes of criminal prosecution. There was no evidence of any organized delusional belief systems.

**Reliability and validity of results:** Mr. Washington did not claim to experience any bizarre or improbable symptoms. Malingering is not suspected. With respect to the issue of possible underreporting of symptoms, I did not see evidence of any subtle signs of psychosis, such as loose associations or tangentiality. His paranoid thinking does not appear to be connected to any organized delusional beliefs which Mr. Washington is failing to report. Based on these factors, it is the examiner's opinion that Mr. Washington's presented mental status on this date was a representative sample of his actual mental state.

## COMPETENCY ISSUES

I questioned Mr. Washington specifically with regard to the criteria outlined in the Florida Rules of Criminal Procedure. Mr. Washington's understanding of why he was being evaluated was excellent.  In this case, the State moved for evaluation to determine competency. This was on the basis of his having discharged counsel. A Nelson hearing was held. He wrote a letter to the Court in which he alleges that he was held down by 2 police officers when the dog was released to attack him. He described it like a *satanic ritual*. Mr. Washington has filed a bar complaint against a prior Assistant State Attorney on the case. It alleges that a body camera reported his arrest but has not been provided to the defense. These factors caused the State to believe that Mr. Washington is paranoid.

Mr. Washington believes that the State's motion is based on his act of discharging his attorney following a Nelson hearing September 11, 2015. He says he was frustrated by his attorney's unwillingness to actively pursue certain legal strategies, including discovery of a body camera. Mr. Washington says he was inappropriately bitten by the dog and that the officer's actions were recorded by a body camera. He says that this camera mysteriously disappeared in the early stages of the case and has never been produced. He says this violates his right to due process under the 14th amendment. He accuses the Orlando Police Department of destroying evidence and cites a Chicago case in which he says similar actions led to a dismissal of charges. Mr. Washington acknowledges that it is in his general best interest to have a lawyer, but believes that he will not be able to obtain the services of a lawyer who will be as committed to his acquittal as he is. Mr. Washington says he understands he is taking a risk and that he is willing to assume that risk.

**Capacity to appreciate the charges:** Mr. Washington understands that he's charged with armed burglary and resisting arrest. He understands that he's accused of resisting arrest when he says he was held down by officers and was bitten by a police dog.

**Capacity to appreciate the range of possible penalties:** Mr. Washington understands that he faces a theoretical life sentence, on the basis of his criminal record. He understands that

downward departure is possible but unlikely. Asked about the plea bargaining process, he says he has been offered 15 years but believes it is worth the risk to take the case to trial. Mr. Washington is fully oriented to time. He understands various units of time and is able to compare sentences expressed in months and years.

**Capacity to understand the adversary nature of the legal process:** Mr. Washington is aware that he's seeking to represent himself in spite of his right to be represented by counsel. Mr. Washington adds: "I know the risk I take... I have passion. I am fighting for my life." Mr. Washington adds "I know I am no match for a lawyer". Questioned as to whether he would accept the assistance of standby counsel, he notes that he has had that before and says "it seems good in theory... But it doesn't work". He believes that going to trial with a lawyer who does not want to fight for him is like "going to a gunfight with a knife". Mr. Washington understands that he could be tried by a jury of citizens who would decide whether he is guilty. He understands that the Judge presides over case. Mr. Washington does not include the Judge in a paranoid conspiracy. His arguments concern the Police Department, state and his former counsel. He believes he can get a fair trial in front of a neutral judge.

**Ability to cooperate with counsel and disclose pertinent facts:** Mr. Washington has adequate verbal skills, memory functioning and intellectual ability to communicate with counsel. If he does not do so, it is a matter of conscious choice. I did not find evidence of a mental illness that would cause him unable to be cooperate with counsel.

**Ability to manifest appropriate behavior in the courtroom:** Mr. Washington has demonstrated appropriate behavior during his incarceration. Not see evidence of a condition that might cause him involuntarily behave in an appropriate behavior.

**Capacity to testify relevantly:** Mr. Washington has adequate skills to testify on his own behalf. I did not see evidence of any organized delusional belief systems or other psychotic symptoms that might interfere with his testimony. He points out the absurdity of his testifying on his own behalf, saying "what am I going to do ask questions of myself and then answer? How's that going to work?" Mr. Washington understands that he has the right to testify and that he cannot be compelled to testify.

**FINDINGS**

I find Mr. Washington to be an individual of roughly that normal intellectual ability who has been treated for depression, but has not demonstrated symptoms of any major mental illness that would account for any of the behavior that has been brought to the examiner's attention. Mr. Washington has a lengthy criminal history and significant experience dealing with the legal system. He does voice an understanding the risks associated with self-representation. He does not purport to be able to function fully as a lawyer, but believes that he can compensate for this by the passion that he brings to his own defense. The examiner does not have an opinion regard to the wisdom of his choice to represent himself, but can state that this choice is not the product of a major mental illness that causes him to grossly misinterpret reality. He may believe there is a body camera when there is not. He may be correct in saying that there was a body camera and that he is suspicious of the State's inability to produce it. I do not have an opinion in that regard.

It certainly makes for an interesting legal argument. Mr. Washington appears to relish the opportunity to advocate on his own behalf, citing his 14th amendment rights. He is capable of exaggeration, denial and fabrication, just as he is capable of giving a truthful account, if he so chooses.

Mr. Washington has an understanding of his charges. He understands the penalties that he faces and the process by which his case will be resolved. He understands the risk that he is assuming in pro se representation. If he were to have legal representation, he is capable of communicating necessary information. Counsel may not like the fact that Mr. Washington believes he knows the law as well as he believes he knows it. Again, this is not the product of delusions of grandeur or persecution. If Mr. Washington were to testify, he would be capable of doing so relevantly and truthfully and ironically noted the absurdity of him examining himself on the witness stand.

**DSM-5 Diagnosis:**

> Other Personality Disorder with Paranoid and Antisocial Features
> Cocaine Use Disorder in Remission in a Controlled Environment
> Alcohol Use Disorder, in Remission in a Controlled Environment
> Adjustment Disorder with Depressed Mood, Chronic

Regarding the issue of competency to proceed, it is my opinion that Mr. Washington has sufficient present ability to consult with counsel with a reasonable degree of rational understanding. It is my opinion that Mr. Washington is competent to proceed to hearing, plea, trial or sentencing.

In my opinion, Mr. Washington does not meet criteria for involuntary hospitalization.

**RECOMMENDATIONS**

I make no specific recommendations, in order for Mr. Washington to remain competent at the time hearing, plea, trial or sentencing.

It is not necessary that Mr. Washington be removed from the jail setting to receive any mental health services that might be indicated. I do not consider hospitalization to be necessary.

**I declare that the above narrative is the work product of the undersigned and is based on information available at the time of report preparation.**

*/S/Daniel P Tressler, PsyD*

Daniel P. Tressler, Psy.D.
Psychologist PY0003621

Edited    12.22.15

(This report was electronically transmitted.    A hard copy will be mailed only on request.)

# M

1
2
3                                   IN THE CIRCUIT COURT OF THE
                                    NINTH JUDICIAL CIRCUIT, IN AND
                                    FOR ORANGE COUNTY, FLORIDA
                                    CRIMINAL JUSTICE DIVISION

4       STATE OF FLORIDA,

5              Plaintiff,

6       vs.                         CASE NO.: 48-2014-CF-17252-A-O

                                    DIVISION NO.: 19
7       JAMES WASHINGTON,

8              Defendant./

9

10                                      HEARING

11                                      BEFORE

12                      THE HONORABLE ROBERT J. EGAN

13                                  In the Orange County Courthouse
                                    Courtroom 18D
14                                  Orlando, Florida 32801
                                    July 21, 2015
15                                  Christine Lively, CER, CET

16

17      A P P E A R A N C E S :

18      JORDAN OSTROFF, ESQUIRE
        Office of the State Attorney
19      415 North Orange Avenue
        Building B
20      Orlando, Florida 32801
        On behalf of the State

21

        JOANNA OPATO, ESQUIRE
22      Office of the Public Defender
        435 North Orange Avenue
23      Suite 400
        Orlando, Florida 32801

24

25

```
 1                    -     -     -

 2                P R O C E E D I N G S

 3          (The following proceedings commenced on

 4   July 21, 2015, at 1:38 p.m.)

 5          THE CLERK:  State of Florida vs.

 6   James Edward Washington.  Case No. 2014-CF-17252.

 7          THE COURT:  Okay.  And good afternoon,

 8   Mr. Washington.

 9          THE DEFENDANT:  How you doing, sir?

10          THE COURT:  Doing well.  Thank you.

11          We had you brought over here today for a pretrial

12   conference.  I know you're set for trial coming up

13   next month.  And right now we still have you

14   representing yourself.  Is that right?

15          THE DEFENDANT:  Yes, sir.

16          THE COURT:  Mr. Ostroff, anything you want to --

17          MR. OSTROFF:  Yes, Your Honor.  A couple things

18   to address.

19          Firstly, I know we made sure that Ms. Opato was

20   here.  She's standby counsel for the Defense.  Last

21   time we were here, which I believe I sent the audio --

22   or at least I filled Ms. Opato in on what happened --

23   was the defendant's motion to compel, or the first

24   motion to compel.

25          THE COURT:  Uh-huh.
```

1    MR. OSTROFF:  So I sent the defendant an e-mail

2    response that I got that there was nothing uploaded by

3    that officer on that night, or it had a range of a

4    couple days before and after.  But there was nothing

5    uploaded from this, so there would be no body camera

6    footage that anybody could find for this case.

7         I know, subsequent to that, the defendant made

8    another filing that was initially rejected because it

9    was still showing he was represented by the PD, so I

10   was hoping we could address that motion today.  I

11   don't know if Your Honor has a copy.  If not, I can

12   pull it up.

13   THE COURT:  Okay.  It's a -- let me see -- motion

14   to compel.

15        Let's see.  June 29th?

16   MR. OSTROFF:  That sounds about right.  I know

17   I -- I contacted your JA when I got the -- when I got

18   back, that it had been denied, and then was told the

19   earliest we'd have would be today, because of being in

20   the trial period.  So I was hoping we could just

21   address that motion filed by the defendant.

22   THE COURT:  Well, this one lists six things.

23        No. 1, official documentation of the chain of

24   custody of the body camera.

25        2, official policy on how, when and where to

1    destroy body camera evidence.

2         3, list of cases where body camera evidence was

3    destroyed or tampered with during prosecution.

4         4, a list of cases involving K9 dog bites over

5    the last year, and the types of injuries sustained.

6         5, employment records for police officers

7    involved at arrest.

8         And 6, criminal records --

9         **MR. OSTROFF:**  Correct.  For, I believe two other

10   cases.

11        **THE COURT:**  Discovery of criminal records of

12   Orlando Police Department or law enforcement

13   agencies -- yes.  And -- no, that's it.

14        **MR. OSTROFF:**  And I believe I -- I believe, for

15   the most part, I don't have a position on any of

16   those.  Those would have to be public records requests

17   through OPD.  Many of those documents, we don't have

18   access to in any way, shape or form.

19        And then in regards to any body camera footage or

20   chain of custody on this case, it won't exist, because

21   at least I can't find any body camera footage for this

22   case.

23        So I believe in terms of any sort of hearing

24   further, there would have to be notice to OPD,

25   coordinated with whoever over there would handle this

```
 1        thing so that they know who to bring in to answer

 2        those questions.  Unfortunately, me as the prosecutor,

 3        is not in a position to present any evidence of the

 4        OPD procedures.

 5             THE COURT:  Okay.  Mr. Washington, the things

 6        that you requested are the sorts of things that

 7        typically would be done by either an attorney or

 8        investigator.  They're not necessarily evidence

 9        that's -- the State would disclose in this case.

10        It's -- you'd either take a deposition of a records

11        custodian or a police officer, or make a public

12        records request, or have an investigator to go do some

13        legwork on -- on your behalf.

14             I know it's difficult for you because you're

15        currently incarcerated, but I would deny the motion to

16        compel.  I don't think that it's -- what you've

17        requested, some of it makes some sense, but it would

18        not be subject to -- to the type of things that we

19        would require the State to compel.  They're things

20        that you would investigate on your own.

21             I would like to talk to you more about whether

22        you -- you still think representing yourself is a good

23        idea.

24             THE DEFENDANT:  Well, sir --

25             THE COURT:  You're welcome to do that, of course;
```

1    we've talked about that.  We've talked about the

2    difficulty for anyone to do that in a case like this,

3    let alone someone who's currently incarcerated.

4        So have you given that some thought?

5        **THE DEFENDANT:**  Sir, my problem is that I feel

6    like a Richardson hearing should be conducted, because

7    they're hiding evidence that they got written in their

8    reports.  They wouldn't have never wrote it in their

9    reports if they never did have it.  By them denying

10   it, it don't mean it never did exist.  They saying,

11   they can't find it.  If they found they don't have

12   evidence that's favorable to me and they don't

13   disclose it, I got the right to have the case

14   dismissed.

15       So it should be determined, one way or another,

16   whether or not they got the evidence or they destroyed

17   it in order to conceal what actually transpired.

18       I was lynched.  They held me down and let the dog

19   bite me and had it recorded and got rid of the

20   evidence.  That's what I -- I was there.  I was the

21   one held down, being bit by a dog while I was in

22   custody.

23       **THE COURT:**  Well, I'm --

24       **THE DEFENDANT:**  And I heard them record it.

25       **THE COURT:**  I'm being told that video was not

1    uploaded.  And that's the extent of what I know.  I

2    know as much as you do now.  But --

3         THE DEFENDANT:  But -- and then another thing,

4    sir, they -- I got a letter form one of the -- the

5    inmates saying that Department of Corrections don't

6    allow CDs, and they didn't allow me the tape that he

7    sent for me to review, to listen to --

8         THE COURT:  Uh-huh.

9         THE DEFENDANT:  -- a deposition.  And I finally,

10   after a couple of weeks, got access to the tape at

11   3:00 o'clock in the morning to find out it wasn't a

12   deposition, it was a copy of the pretrial conference

13   we had last on the -- on the 16th.

14        THE COURT:  Okay.

15        THE DEFENDANT:  I never heard a deposition up

16   until this day.  I don't know what's on it.  And -- to

17   also be threatening me about being overburdened about

18   trying to get access to material that, if it was

19   written in the form of a transcript, I wouldn't have

20   to ask for officers to give me access to a recorded

21   tape that they got in their possession.  I never had

22   that in my possession.  And according to this letter,

23   the Public Defender's Office knew that I couldn't have

24   got that.  They told Opato that the state attorney

25   knew I wouldn't be able to get that CD also.  Now I

1    find out it's not even what we requested.  It's a

2    pretrial conference.  I still don't know what's on the

3    deposition.

4    **THE COURT:**  Okay.

5    **MR. OSTROFF:**  Can I address that issue?

6    **THE COURT:**  Sure.

7    **MR. OSTROFF:**  So the last time we were in court,

8    the issue of the depositions came up.  And I said that

9    the Public Defender's Office had them, I had copies,

10    and then I e-mailed copies to Your Honor because there

11    was no other way for me to get them to the defendant.

12    I then, after that, found out that we can, in fact,

13    send disks to the jail.  So at the last hearing, I had

14    the audio pulled, sent that to you.  And I believe

15    sent a copy to Ms. Opato, so that she was caught up.

16    I'm not certain about that one.  And then I got

17    contacted by the -- somebody at the Orange County Jail

18    to make sure that was intentional, that they would

19    give him access to something to listen to the disk

20    with.

21    I believe we talked last time about possibly

22    having Your Honor issue an order to transcribe the

23    depo, so that way the defendant can just have the

24    transcription, because of how difficult it is to get

25    disks to him.  However, from the last hearing, I had

1    no interest in transcribing it, so that's why I just

2    double-checked that he could get an audio copy.  In

3    terms of when they give him access to, I have no

4    control over that.

5         **THE COURT:**  What was on the disk?

6         **MR. OSTROFF:**  The disk was the last hearing we

7    had.  As --

8         **THE COURT:**  Okay.  And he -- Mr. Washington is

9    looking for a deposition.

10        **MR. OSTROFF:**  Correct.

11        **THE COURT:**  Okay.

12        **MR. OSTROFF:**  And so last time we were here, the

13   last PTC, I sent a copy to Your Honor and -- and I

14   know we briefly discussed possibly just having

15   Your Honor order a transcription made of it.  I don't

16   have a problem with that.  Otherwise, I can't e-mail

17   him a copy of the depositions.  I can put them on disk

18   and send them.  But, again, we're going to run into

19   the same problem that he's having if they're not going

20   to let him use the computers until 3:00 o'clock in the

21   morning.

22        **THE DEFENDANT:**  And that's one time since I got

23   it on the 3rd of June.  And every other time, they be

24   confrontational on me to the point where I feel

25   threatened about asking about stuff that I wouldn't

1   have to ask for if it was in written form instead of

2   video or audio.  It's like they going out their way to

3   try to do something that --

4       THE COURT:  I'm not going to have audiotapes

5   transcribed for you.  We do not have the resources to

6   do that.  Okay?

7       THE DEFENDANT:  But, sir, I hadn't even got a

8   deposition yet.

9       THE COURT:  Well, that's what we're going to try

10  to find out right now.  You -- you -- you don't

11  need -- he got the transcript of the hearing.

12      MR. OSTROFF:  Correct.

13      So the way it works is that when -- the

14  depositions were held at the Public Defender's Office.

15      THE COURT:  Right.

16      MR. OSTROFF:  At -- I believe it's once a week or

17  once every few days, it uploads from their system and

18  gets automatically put into our system.  So what I can

19  do, if this is the easiest thing, is I can copy it

20  from our system to a disk and send the disk to him.  I

21  have no control over what Corrections does --

22      THE COURT:  Right.

23      MR. OSTROFF:  -- and how often he gets access to

24  it or anything along those lines.

25      THE COURT:  But is that what you sent me, the

1     audio of the depositions?

2          **MR. OSTROFF:**  Yes, Your Honor.

3          **THE COURT:**  Because I don't remember getting --

4     Ms. Opato, in -- did you -- whatever you had, did you

5     give it over to Mr. Washington?

6          **MS. OPATO:**  Yes, Judge.  The -- and my position

7     would be the same as Ostroff's.  I checked with my

8     supervisor because I knew as soon as I was taken off

9     this case, that that would be the biggest hurdle --

10          **THE COURT:**  Uh-huh.

11          **MS. OPATO:**  -- is the depositions.  My

12     understanding is, is I can provide a disk and then,

13     you know, Corrections has to allow him the opportunity

14     to listen to those depositions on the disk.

15          **THE COURT:**  And --

16          **MS. OPATO:**  But I -- I'm -- I was -- I was

17     actually told I was not to order transcripts through

18     my office.

19          **THE COURT:**  Uh-huh.

20          **MS. OPATO:**  If that was something the Court did,

21     then, you know, that was . . .

22          **THE COURT:**  But, I mean, I don't -- that's not

23     tied in to the -- our official court reporters --

24     if -- I can have something transcribed that was done

25     in this room, but I don't think a deposition taken

1    outside of the courthouse -- so . . .

2        MR. OSTROFF:  On 6/16 of 2015 at 2:33 p.m. and

3    2:34 p.m., I e-mailed copies of the two depositions to

4    Your Honor.

5        THE COURT:  June 16th?  Let me see.

6        MR. OSTROFF:  I can -- I mean, I can re-email

7    them.  That's fine.  I just -- in terms of the only

8    other option I have is to burn them to a CD and have

9    them sent to the jail.

10        THE COURT:  Okay.  Well, I think it's probably

11    the easiest way to do it, is -- is get them to you on

12    a CD, Mr. Washington.  But it still comes down to

13    whether you want to represent yourself.

14        THE DEFENDANT:  Sir, they got 24-hour access to a

15    CD that the Department of Corrections can use it to

16    deny me access to the same CD they can use and observe

17    and listen to any time they see fit.  Why constrain me

18    to the --

19        THE COURT:  You are incarcerated, sir.

20        THE DEFENDANT:  I understand that.  But there --

21        THE COURT:  Okay.  There are significant

22    limitations to your ability to represent yourself.

23    There's nothing I can do about that.  Okay?  I can let

24    Corrections know they are to give you access to a tape

25    recorder, but they also have security concerns that,

1    frankly, I'm not going to be able to do anything

2    about.

3         We've talked about the decision and how wise or

4    unwise it is for you to represent yourself.  Okay?

5    And the constraints on you, being currently

6    incarcerated, make it much more difficult.  I

7    understand that.  But you chose to do this.  Every

8    time I see you, I give you a choice -- an option to

9    change your mind and give you a chance to do it again

10   today.  If you want to represent yourself, that's

11   fine, but you're going to have to live with the rules

12   that we're all dealing with.  And you are currently

13   incarcerated in the Orange County Jail.  Nothing I can

14   do about that.

15        So we can get these disks to you.  I can let the

16   chief down there know that you are to have access to a

17   player, a recording, some way to play those.  But

18   again, it may be at a weird time of night.  I don't

19   know.  But you think it's a good idea to represent

20   yourself.  We're have your trial in the next few

21   weeks.

22        **THE DEFENDANT:**  I know it ain't a good idea, sir,

23   but it wasn't a good idea having these people

24   represent me that I know is trying to sabotage my

25   defense.  And that's what they showing.  They should

1    have been -- had the motion to compel, and wouldn't

2    have to go through this -- what I'm going through;

3    uncertainty about the type of people that trying to

4    represent my best interest.  They done show up and

5    they not trying to represent my best interest.  It's

6    slamming against me.  The Department of Corrections,

7    they threaten me every time I come out that cell to

8    get the information that would be more readily

9    accessible to me if it was in written form.

10        **THE COURT:**  Are you ready for trial?

11        **MR. OSTROFF:**  Yes, Your Honor.

12        **THE COURT:**  Okay.  So, Mr. Washington, we're

13   going to get the disks to you that have the audio of

14   the depositions you've been looking for.  We've denied

15   your motion to compel.

16        Anything else you want me to consider?

17        **THE DEFENDANT:**  No, sir.

18        (Pause in proceedings.)

19        **THE COURT:**  So, Mr. Washington, we're putting in

20   your court minutes that the county jail is to give you

21   access to equipment to -- for you to play the DVD

22   [sic] that  Mr. Ostroff is going to be providing to

23   you.  Okay?

24        **THE DEFENDANT:**  So, Judge, what if they decide to

25   give me access to it the day before trial, and that's

1    the only day that they feel like, would that secure

2    some kind of concern that I'm only getting one day to

3    listen to a tape that going to be something that

4    determines the rest of my --

5        THE COURT:  Well, if you come over here on the

6    day of trial and you don't think you're sufficiently

7    prepared, you can ask me for a continuance and I

8    can -- would consider that.  Okay?  But we'll just

9    have to see how that plays out.

10       THE DEFENDANT:  All right, sir.

11       THE COURT:  Is there anything else you wanted to

12   talk about today?

13       But we can set Mr. Washington for a --

14       THE DEFENDANT:  Sir, I would like to motion for a

15   Nelson -- a Richardson hearing, 'cause I honestly know

16   that it was a tape of what actually transpired.  You

17   get them officers to acknowledge or really -- don't --

18   get interviews on record about what actually

19   transpired during that incident.  Let's not totally

20   ignore the fact that it's a tape is not being

21   accounted for.

22       THE COURT:  Okay.  The request has been made for

23   a Richardson hearing.  We can have that.  I don't know

24   if I know whether --

25       MR. OSTROFF:  I don't have it to turn over.  It's

1    not something -- it's not late disclosure --

2        THE COURT:  Well --

3        MR. OSTROFF:  -- it's not --

4        THE COURT:  We know that, so the motion to compel

5    is denied.  I think the -- the suggestion is that

6    evidence -- evidence has been spoiled.

7        MR. OSTROFF:  And that wouldn't be proper for a

8    Richardson hearing.  There would be other hearings

9    that could be filed.  There's a Youngblood hearing,

10   which would require proof by the Defense of the

11   intentional destruction of evidence.  But from a

12   Richardson --

13       THE COURT:  I don't know.  Why wouldn't a

14   Richardson hearing -- I mean, if it existed at one

15   time and wasn't -- I'm not saying it was or wasn't.  I

16   don't know.

17       MR. OSTROFF:  Right.

18       THE COURT:  It was not disclosed or turned over,

19   why wouldn't that be Richardson?

20       MR. OSTROFF:  Because a Richardson hearing would

21   govern items that are in possession of the State that

22   are not turned over to Defense or turned over too late

23   or turned over incorrectly.  And I don't have it to

24   turn it over.  I wish -- I wish I had more

25   information.  I wish we did have the video.  I wish we

1    knew what was going on, but I don't.  And everything

2    that I'm hearing is that there was never a video.

3        So if the -- if Mr. Washington believes that the

4    video was intentionally destroyed to -- for OPD to

5    cover themselves, that's not a Richardson hearing.

6    And that would require -- that would put the burden on

7    the Defense to show that it was intentionally

8    destroyed with asking -- I -- I don't even know where

9    you would start to figure out who might have done

10    this.

11    **THE COURT:**  Well, what was said about the camera

12    at the officer's deposition?

13    **MR. OSTROFF:**  The officer said that the camera is

14    worn on his lapel, that for some period of time, he

15    took the camera off his lapel, attached it to a

16    fireman's pole with the battery pack and some tape,

17    stuck it up into the ceilings of the building to see

18    if they could find Mr. Washington.  At no point were

19    they able to find Mr. Washington on that video

20    footage.  So then they decided to use Clear Out, I

21    think is the proper -- is the name of the chemical.

22    But basically it's like a -- it's basically like mace,

23    put a -- and then that officer is the grenadier, which

24    means he's the one in charge of doing that.  So he

25    then put on a flack jacket that says, grenadier, OPD,

1  or whatever it is that has all the cannisters on it,

2  which would cover the camera anyway.

3       So he didn't have the camera on.  And even if

4  he'd still had the camera on, it wouldn't show any of

5  this.  At which point, the video footage not showing

6  that there was the defendant because they never found

7  him with the camera footage, that's why he didn't know

8  if it was ever uploaded or not, because it would be

9  from his standpoint, nonessential.  And I understand

10  that that may not be the best policy, but ultimately,

11  nobody can find that video in any way, shape or form

12  to show whether or not it does show the defendant or

13  it has sound or -- et cetera.

14       So I don't have the video to present.  Your Honor

15  can -- can suppress the evidence that I don't have.

16  And Mr. Washington, or whoever represents him, is free

17  to cross-examine the officer, same as was done in the

18  deposition, that hey, there was this video, where is

19  it.  And that's something that could be argued for

20  reasonable doubt.  But at the end of the day,

21  unfortunately, there's nothing for me to turn over, or

22  at least as of right now, from what I've been told by

23  everybody that I've asked.  Because I've tried to get

24  this video.

25            THE DEFENDANT:  Sir, Judge, I got Officer James'

1    narrative supplement where it on -- it -- I can read

2    it word for word, it say, on the roof, I observed a

3    red and black backpack and a knife and other tools and

4    stuff.  And I got all pictures.  That's why I've been

5    adamant with the State and Ms. Opato about the

6    evidence they turned over as pictures.  And I got a

7    lot of pictures.  And none of them show a backpack on

8    a roof.  And this guy had on the camera at the time

9    that he was on the roof.  The backpack that I see is

10    inside of a building.  And the knife that they say

11    that was on the roof is inside the building.  But I

12    don't have any pictures of what they said was on the

13    roof.

14        So if he had on the camera, which he did at the

15    time that he was on the roof, that would show that

16    that crime scene had been tampered with.  So they

17    destroyed evidence that was favorable to me by getting

18    rid of it.

19    **THE COURT:**  No one has established that anyone's

20    destroyed anything.  Okay?  I mean, these things come

21    out during effective cross-examination.  If somebody

22    wrote somebody -- something in a report that's

23    inconsistent with what they're doing, that's what

24    lawyers do.

25        So the things you seem to be concerned about,

1    Mr. Washington, are fine.  And -- but they're the type

2    of things that I think are best addressed with --

3    through cross -- effective cross-examination of the

4    witnesses that you're concerned about; in this case,

5    you know, law enforcement officers.  So I think it's

6    probably best addressed at trial.  Okay?

7        THE DEFENDANT:  Sir, and we never did, like, get

8    into, like, explaining how they were going about

9    getting the depositions done and how we're going to be

10   provided with transcripts or a copy of the CD once

11   they're done --

12       THE COURT:  Well, we're going to get you the CD

13   out there this week.  Okay?

14       THE DEFENDANT:  I'm talking about the future

15   depositions of the officers and my defense list

16   witness, Mr. John Sawicki.

17       THE COURT:  What do you want me to do about

18   Mr. Sawicki?

19       THE DEFENDANT:  Well, I'm saying -- I'm saying I

20   would like -- he say he's going to coordinate when

21   those depositions be done and the -- and the CD of

22   those depositions be provided to me at the jailhouse

23   also.

24       THE COURT:  Well, if you want to take a

25   deposition, you're going to have to do it yourself.

1          THE DEFENDANT:  But, sir, I'm not -- I don't have

2     any means of having access to the coordinator without

3     writing them.  I don't have access to a phone.

4          THE COURT:  Well, if you want me to instruct the

5     Clerk of the Court to issue a subpoena -- but there

6     are security concerns, you know, which goes back to

7     whether it's a good idea for you to be representing

8     yourself.

9          But you're telling me you want to do a lot of

10    things.  I don't really have a specific request from

11    you, what you would like me to do.  Okay?

12         There's been insufficient discussion today that

13    there's been a Richardson violation.  Okay?  When we

14    take testimony at trial and you want to renew that

15    request, we can have a Richardson hearing in the

16    middle of the trial.  We excuse the jury.  We'll talk

17    about it.  But right now, we -- we would deny the

18    request for a Richardson hearing.  Okay?  You're

19    talking about depositions you want to take, but -- and

20    I know a name of Mr. Sawicki.  But what would you like

21    me to do about that?

22         THE DEFENDANT:  I would like to coordinate a

23    deposition for that witness, sir.

24         MR. OSTROFF:  For Mr. John Sawicki?

25         THE DEFENDANT:  Yes, sir.

1        MR. OSTROFF:  That would be a Defense witness.

2    And I believe that's a -- would be a expert witness

3    called by the Defense.  I spoke with Mr. Sawicki.  He

4    explained that he had received some mail from

5    Mr. Washington, but had not had any direct contact.

6    And I believe Mr. Sawicki charges for his time.  I

7    don't want to depose him.  If we want to issue a

8    subpoena for him for trial, then that's a -- a

9    separate issue that would have to be dealt with.  But

10   in my discussion of -- of him, I don't know what he

11   has that's relevant to this case.

12        I believe he gave some sort of presentation or

13   news story regarding body camera footage and it being

14   mishandled in other cases.  I -- I believe that's what

15   he would be called to testify.  I'm not really sure.

16   But he'd be a Defense witness.

17        (Pause in proceedings.)

18        THE COURT:  Mr. Washington, if -- if I . . .

19        (Pause in proceedings.)

20        I presume there's been a previous waiver of

21   speedy.

22        MR. OSTROFF:  There's been several waivers of

23   speedy trial.  Yes.

24        (Pause in proceedings.)

25        THE COURT:  Okay.  Mr. Washington, what we're

1    going to do is I'm going to continue your trial.

2    We're going to appoint the Office of Regional Conflict

3    Counsel to represent you.  Ms. Goerner, presumably,

4    G-o-e-r-n-e-r will be in touch with you.  Okay?

5    You're simply not equipped to do -- to represent

6    yourself effectively.

7         I'm not making any finding that the

8    Office of the Public Defender did anything wrong,

9    'cause I don't think they did.  But to avoid more

10   trouble than we're already having, we will appoint

11   conflict counsel to represent you.  If you still

12   absolutely want to represent yourself, that's fine.

13   We'll see you Monday, August the 8th.

14        But if I appointed another office to represent

15   you, is that something you would like me to do?

16        **THE DEFENDANT:**  Yes, sir.

17        **THE COURT:**  Okay.  So we're going to continue

18   this case.  We'll move it to the September 29th

19   pretrial at 8:30.  That's an October 12th trial date.

20   We are appointing the Office of Regional Conflict

21   Counsel to represent Mr. Washington.  And Ms. Goerner

22   will be in touch with you during one of her upcoming

23   visits to the county jail.  Okay?

24        **THE DEFENDANT:**  Yes, sir.

25        **THE COURT:**  Okay, Mr. Washington.  And you can

1        raise the concerns you have with her.  She can take

2    whatever depositions she feels is necessary and we'll

3    go from there.

4            THE DEFENDANT:  Sir, can I get a contact

5    information of the person that you just appointed?

6            THE COURT:  We wrote that on -- on his paperwork.

7        It will be on -- it'll be on your paperwork --

8    okay -- that you'll get today.

9            THE DEFENDANT:  All right.

10           THE COURT:  Okay.  Thank you, sir.

11           Anything from the State?

12           MR. OSTROFF:  So just to be clear, Your Honor

13   is -- is finding that -- not that the

14   Public Defender's Office did anything wrong, just that

15   Mr. Washington is now going to be appointed RCC and he

16   has requested RCC.

17           THE COURT:  Yes.

18           MR. OSTROFF:  Okay.  No problem.

19           And then -- so we'll be back on the 9/29 PTC?

20           THE COURT:  Yes, sir.

21           Okay?  Thank you.

22           THE DEFENDANT:  Sir, and my next court date is

23   what, September --

24           THE COURT:  September 29th.  Okay?

25           THE DEFENDANT:  -- 29th?

1          THE COURT:  And Ms. Goerner will be able to

2    advise you from this point going forward.  Okay?

3          THE DEFENDANT:  All right.

4          THE COURT:  All right.  Thank you, sir.

5          (These proceedings were concluded at 2:05 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        C E R T I F I C A T E

2

3            I, Christine Lively, being a Digital Court

4    Reporter of the Ninth Judicial Circuit as authorized by Rule

5    2.535(h)(3), Florida Rules of Judicial Administration, and

6    the Administrative Order of the Ninth Judicial Circuit

7    numbered 07-98-43, certify that the foregoing transcription

8    is true and correct.

9

10           WITNESS my hand this 27th day of February,

11   2017, in the City of Orlando, County of Orange, State

12   of Florida.

13

14

15           s/Christine Lively, CER, CET

16           CHRISTINE LIVELY, CER, CET

17

18

19

20

21

22

23

24

25



1                                    IN THE CIRCUIT COURT OF·THE
                                     NINTH JUDICIAL CIRCUIT, IN AND
2                                    FOR ORANGE COUNTY, FLORIDA
                                     CRIMINAL JUSTICE DIVISION      .
3

4    STATE OF FLORIDA,

5         Plaintiff,
                                     CASE NO.: 48-2014-CF-17252-A-O
6    vs.
                                     DIVISION NO.: 19
7    JAMES WASHINGTON,

8         Defendant./

9

10          PRETRIAL CONFERENCE AND MOTION TO COMPEL

11                         BEFORE

12             THE HONORABLE ROBERT J. EGAN

13                             In the Orange County Courthouse
                               Courtroom 18D
14                             Orlando, Florida 32801
                               June 16, 2015
15                             Christine Lively, CER, CET

16

17

18

19

20   A P P E A R A N C E S:

21   JORDAN OSTROFF, ESQUIRE
     Office of the State Attorney
22   415 North Orange Avenue
     Building B
23   Orlando, Florida 32801
     On behalf of the State

24

25

```
1                    —    —    —

2                 P R O C E E D I N G S

3           (The following proceedings commenced on

4    June 16, 2015, at 11:32 a.m.)

5           THE CLERK:  What about Washington?

6           MS. OPATO:  He's pro se.  So he would have to

7    be --

8           UNIDENTIFIED SPEAKER:  Who?

9           MS. OPATO:  James Washington.

10          THE COURT:  Is he here?  Is Mr. Washington --

11          MS. OPATO:  He's in custody, Judge.

12          THE COURT:  Oh, he is?

13          MS. OPATO:  He's the gentleman that --

14          THE COURT:  Oh.  Okay.

15          MS. OPATO:  Yeah.

16          (The Court briefly handled unrelated matters,

17   after which the proceedings were as follows:)

18          THE COURT:  But Mr. Washington . . .

19          MS. OPATO:  I would say he probably needs to be

20   maybe transported over for a status tomorrow -- or

21   really his own pretrial.  And I'm not sure if the

22   deputies want to make note of it, but because he is

23   pro se, he would have to be here for everything.

24          THE COURT:  I know.

25          MS. OPATO:  Just so he's --
```

1          THE COURT:  You're right.

2          MR. OSTROFF:  Can we transport him over at 1:30

3     today with Mr. Miranda?

4          THE COURT:  Manny, is that enough time?  Can you

5     get Mr. Washington here today?

6          THE COURT DEPUTY:  We're getting what, two?

7          THE COURT:  We could do it -- we could do it

8     tomorrow morning, but -- but can he get here this

9     afternoon?

10         THE COURT DEPUTY:  Yes, we can.

11         THE COURT:  All right.  1:30 this afternoon.

12         We'll do the pretrial of James Washington at 1:30

13     this afternoon.  Okay?

14         (The Court handled unrelated matters from

15     11:34 a.m. until 2:04 p.m., after which the proceedings

16     were as follows:)

17         THE CLERK:  State of Florida vs.

18     James Edward Washington, Case No. 2014-CF-17252.

19         THE COURT:  Okay.  Mr. Washington, good

20     afternoon.

21         THE DEFENDANT:  How you doing, sir?

22         THE COURT:  I'm doing well.  Thank you.

23         The record will reflect that we have

24     Mr. Washington here, who's currently representing

25     himself.

1           This is a pretrial conference.  Okay?

2      **THE DEFENDANT:**  Yes.

3      **THE COURT:**  Okay.  And Mr. Ostroff is here for

4  the State.

5           Mr. Washington, has anything changed about your

6  wishes, whether you want to represent yourself or do

7  you want to reconsider asking us to reappoint the

8  Public Defender's Office?  Or you want to go it alone?

9      **THE DEFENDANT:**  As of right now, sir, I've

10  prepared a motion to compel to get information that I

11  requested concerning the body camera that

12  Officer James had at the time that I was -- I was

13  arrested, that had been provided to us before, so I

14  already -- I prepared it and submit it to Court right

15  now.

16      **THE COURT:**  You've got some paperwork there?

17      **THE DEFENDANT:**  Yes, sir.

18      **THE COURT:**  Okay.

19      **THE DEFENDANT:**  And, sir, I would like to also

20  bring to attention the fact that on the 17th of April,

21  there was depositions that -- conducted by Ms. Opato,

22  and I would like the Court to order me a transcript of

23  those depositions -- those depositions, sir, 'cause

24  State and Public Defender's Office had it transcribed,

25  but I don't -- or I need to have some type of idea of

1    what was said during those depositions.

2         MR. OSTROFF:  I just want to correct something.

3    We -- it's never been transcribed.  It was an audio

4    recording.  There should be an audio file that the

5    Public Defender's Office has access to.  I'm not sure

6    if they're able to get that to the jail or through

7    what means.

8         (Pause in proceedings.)

9         THE COURT:  Okay.  So let's deal with a couple of

10   things here, Mr. Washington.

11        Let me ask Mr. Ostroff, we're just looking at

12   your motion to compel for the first time.  I want to

13   give the State a chance to take a look at that.  These

14   are narrative supplements, as well as video of body

15   cam.

16        So if there were -- what do you mean by narrative

17   supplement, Mr. Washington?

18        THE DEFENDANT:  The -- just -- the police

19   department conducted an investigation and they have a

20   list of officers -- I have a list right here -- where

21   they've provided their investigative report and some

22   officers provided and some didn't.  Like the

23   Public Defender's Office, they've been providing me

24   bits and pieces of my discovery, instead of the whole

25   thing at one time.  So I was, like, wondering, was it

1   possible for me to just review the prosecutor's copy

2   of the -- of the discovery because I'm not sure that I

3   have everything, 'cause I'm not getting everything at

4   one time.  I'm finding out later on --

5     **THE COURT:**  Uh-huh.

6     **THE DEFENDANT:**  -- this look like a witness list

7   that I didn't have when she provided me --

8   Ms. Opato -- copies of pictures that was taken.  And

9   I'm not certain whether or not all of the pictures

10   that I have is all the pictures that the prosecutor

11   has to present against me to use in trial.  So I was

12   wondering, like, they had a opportunity to review what

13   he has in his discovery but not me.  I'm not certain

14   that they've provided everything that I needed.  So --

15     **THE COURT:**  Do -- did Ms. Opato represent or tell

16   you that she gave you everything that the Public

17   Defender's Office had?

18     **THE DEFENDANT:**  No.  She just gave me pictures.

19   I had four lawyers, sir.  Four lawyers, and all of

20   them gave me part but never all of one thing at one

21   time.  So I'm not certain, is it a complete discovery.

22     **THE COURT:**  Yes, sir.

23     **MR. OSTROFF:**  As to that fact, that's correct.

24   The way that it would take place is that the officer

25   who actually arrested Mr. Washington would fill out an

1    arrest affidavit.  That could be turned over to

2    Mr. Washington at IAs, depending upon how that plays

3    out.  Then, once he creates a case packet, that would

4    come over to our office.  We would then send the case

5    packet as part of discovery.  And then if there were

6    any tasking requests or supplemental narratives that

7    came in after that, those would be updated.

8         Specifically, I can tell you that there was a

9    notice of supplemental discovery that went out on

10   June 10th.  And I believe a copy of the actual item

11   that was from that discovery was then sent to

12   Mr. Washington in the jail.  Before that, though,

13   everything would have been tasked through Ms. Opato.

14        In terms of what's on his motion to compel, I do

15   not have any of those seven items that he listed.

16   There is no supplemental report that I have for any of

17   those officers.  They would be referenced in other

18   officers' supplemental reports, but they themselves,

19   as far as I know, did not do a specific supplement.

20        **THE COURT:**  So all of those officers prepared an

21   initial report and the State is saying they did not do

22   any supplement to that report?  No?

23        **MR. OSTROFF:**  No, Your Honor.

24        **THE COURT:**  No.  Oh.

25        **MR. OSTROFF:**  Officer Morgan did the initial

1    report, the actual booking affidavit for the

2    defendant.

3         **THE COURT:**  Okay.

4         **MR. OSTROFF:**  There's a number of supplemental

5    reports, basically, from the partners of these

6    officers or other officers who would have covered the

7    entirety of the involvement of these officers.  As

8    this case did -- or did play out over the span of

9    three to four hours and did involve, at least towards

10    the end, some news media and the -- and a fire truck

11    being used.  Basically everybody at OPD was there at

12    one point or another, it's just a matter of who did

13    enough to file a supplemental report and who was just

14    walking behind somebody, and their involvement is

15    contained in that specific report.  That's why I

16    believe Ms. Opato did set depositions with several

17    officers to kind of flush out whether or not there

18    were other items, or based upon what was contained in

19    the narrative supplements or the initial report for

20    those officers' involvement.  But not because an --

21    because an officer is on-scene, does not necessarily

22    mean they will file a narrative in every instance.

23         **THE COURT:**  So as far as you know, all of the

24    written reports of every officer who wrote one has

25    been turned over either to the PD or Mr. Washington?

1          MR. OSTROFF:  That's correct.  And I went through

2     and there is not a single report that I have that --

3     from any of the first six officers listed.  There are

4     references to them made in other officers' reports,

5     but not a specific narrative supplement from that

6     officer.

7          THE COURT:  So Smith, Wilson, Brilliant [sic],

8     Conroy, Pollock and Jewell?

9          MR. OSTROFF:  Correct.

10          THE COURT:  Okay.  So, Mr. Washington, it's being

11     represented that all of the written reports have been

12     given to either to you or Ms. Opato.  Do you have any

13     reason to believe that the State did not do that?

14          THE DEFENDANT:  Yes, sir, because the guy who

15     acted with -- was most involved in the incident, I'm

16     pretty certain he should have been -- been one of the

17     first ones to prepare a report.  That's the K9

18     officer -- Officer Brilliant.

19          THE COURT:  Uh-huh.

20          THE DEFENDANT:  And as -- what Ms. Opato told

21     that he didn't show up for his deposition.  That's the

22     main guy who I need to get his deposition before I get

23     anybody's deposition.

24          THE COURT:  I'm sorry.  Officer who?

25          THE DEFENDANT:  Brilliant.

1          **THE COURT:**  Oh, Brilliant.  Gotcha.  Okay.

2          Did he -- does he have a written report?

3      Brilliant, do you know?

4          **MR. OSTROFF:**  Not -- not that I know of,

5      Your Honor.  Like I said, I went through every report

6      that I have.  Obviously, based upon the first four

7      with a number afterwards, their ID, they're referenced

8      in other officers' reports as -- than listing that

9      officer's ID.

10         **THE COURT:**  And Officer Nicole Morgan, she wrote

11     the initial narrative?

12         **MR. OSTROFF:**  Correct.

13         **THE COURT:**  Okay.

14         **MR. OSTROFF:**  And then there are supplementals

15     from Officer James and another four or five officers.

16         **THE COURT:**  You know, Mr. Washington, generally

17     what happens, if the State is telling us they've

18     turned everything over, we accept that.  If it comes

19     out at trial that there is a report that you weren't

20     given, we would have to address that at that time, and

21     there would be remedies.  But if the State is saying

22     that they've given you every written report or

23     Ms. Opato, then I think one through six, they're not

24     denied, 'cause the State is required to give you

25     everything that they have --

1          THE DEFENDANT:  Yes, sir.

2          THE COURT:  -- but they're moot.  They're telling

3     me they've complied.  Okay?

4          THE DEFENDANT:  Yes, sir.

5          THE COURT:  So we're not going to require the

6     State to do anything in addition on one through six.

7          I do want to ask Mr. Ostroff, there's been talk

8     before about a body camera and whether there exists

9     footage or film of the body camera.

10         MR. OSTROFF:  Correct.  And that came out during

11    the deposition of Officer James.  That was the first

12    that I heard about the actual existence of a body

13    camera involved in this case.  And I know briefly -- I

14    don't remember if Mr. Washington was in the courtroom

15    for this, but basically what Officer James said is

16    that the body camera is on his lapel, and at the point

17    that he put on the vest with the Clear Out or the

18    chemical substance that was dropped, that would cover

19    the body camera.  So he took the body camera off.  But

20    there are some points when the body camera was

21    attached to a fireman's pole and sucked up in the

22    rafters of the Perkins, but that at no point were --

23    did it ever see you or anybody else on the camera.  It

24    would just be dark or of the roof, showing nothing.

25         So based upon that, he did not know if the body

1    camera had been saved or if it was determined it

2    didn't have evidence because it didn't show anything.

3    So he was going to look into that.  I haven't had a

4    chance to follow up.  Last time this was called up, he

5    was the one whose son was going in for the open heart

6    surgery.

7         **THE DEFENDANT:**  Well, sir, despite whether or not

8    it had video coverage, it had audio.  And a lot of

9    audio would prove and disprove what the officers said

10   and what I said, knowing the incident in which I was

11   arrested.  Because what they said is totally false.

12        **THE COURT:**  And we did talk about, I guess,

13   already, you were in the -- you were here when we

14   talked about the vest --

15        **THE DEFENDANT:**  Yes, sir.

16        **THE COURT:**  -- covering the camera.  Okay.

17        **THE DEFENDANT:**  And he had -- he had the camera

18   on prior to going inside the building, 'cause I

19   seen -- based on his investigative report, he had went

20   on to the roof and had coverage before he went into

21   the building.  So all of the video is not so you cant

22   use what actually was taking place.  So there's no

23   reason why it shouldn't be available to me to review

24   if it -- to my ability.  And I would just like --

25   trying to find out how it can be tracked down, or who

1       recorded it, who turned it in --

2            **THE COURT:**  Right.

3            **THE DEFENDANT:**  -- who -- like the chain of

4       custody, 'cause I'm pretty certain there's something

5       on there that going to be to my benefit.

6            **THE COURT:**  Well, if there's sound, I would

7       agree, you need to hear it.

8            I guess, Mr. Ostroff, you haven't been able to

9       verify whether -- you know, I'd like to know, sort of

10      procedurally, when an -- a police officer's wearing a

11      body camera, is the stuff stored digitally?  If it is,

12      how long is it kept?  Did it exist and has it been

13      erased or did it exist and it still exists?  Those are

14      the things, I guess, we need to know.  Even if it's

15      just sound, I do think Mr. Washington would have a

16      right to -- to hear it.  You know --

17           **MR. OSTROFF:**  Certainly.  I mean, if I had it, I

18      would turn it over.  If it existed, I would -- I would

19      get it and turn it over.  The thing I -- I don't know,

20      to be honest with you, and in terms of how they are

21      stored and for how long they are stored, as of, I

22      believe it was a week and a half ago now, maybe two

23      and a half weeks ago, there was a meeting between OPD,

24      Jeff Ashton, Bob Wesley to talk about the process

25      because the body camera usage is so new.  And so I

1    until we have the necessary -- an evidentiary hearing

2    to find out, did he put a vest on?  Maybe he has the

3    vest here he can demonstrate.  I don't know, but it's

4    not an issue that I can resolve, I think, absent

5    hearing the testimony of that.

6         And who is -- that's not Officer Brilliant.  Who

7    actually had the vest?

8         **MR. OSTROFF:**  Officer James.

9         **THE COURT:**  James.  Officer James did.  And he

10   was in court that one day; is that right?

11        **MR. OSTROFF:**  He was -- he was here for

12   deposition, which is how this issue came to light.

13        **THE COURT:**  Okay.  Okay.  But he was not in

14   court.  He didn't --

15        **MR. OSTROFF:**  Correct.

16        **THE COURT:**  Okay.

17        **MR. OSTROFF:**  He has not been -- he has not been

18   in court as far as this case.

19        **THE COURT:**  You know, 'cause -- here's what I

20   would do.  I mean, if -- if there's anything related

21   to the body cam, even if it's black footage, sound and

22   it exists, yeah, I agree, I'll grant the motion,

23   require -- require the State to give it go you.  But

24   if the State tells us it doesn't exist --

25        **THE DEFENDANT:**  But, sir, if I -- if it doesn't

Ninth Judicial Circuit
Court Reporting Services

Page 616

1    exist, it should have a policy about how they go about

2    getting rid of what is considered to be a public

3    record, shouldn't they?

4        THE COURT:  Well, and that's where a lawyer would

5    be helpful to you.  You know, that's an issue that

6    will probably come up in the middle of trial.  Now,

7    I'm going to have to figure out how to deal with it.

8    But, you know, we would instruct you to turn over

9    anything by Friday, if you have it.  And if you don't,

10    you don't.

11        But then when that officer takes the stand, I

12    imagine we'll probably have to excuse the jury and

13    talk about -- depending on what he says -- what the

14    officer says -- talk about whether there's been any

15    discovery violations.  I don't know.

16        MR. OSTROFF:  Then what I'm going to do right

17    now, I'm going e-mail the officer and ask if he's had

18    a chance to follow up on if the body camera footage

19    exists.  Period.  I mean, I think the first issue,

20    that would be first -- from the terms of a Richardson

21    hearing, the existence of it, or it being in the

22    possession of the State, whether actively or

23    constructively, would be the first question, as of

24    right now.

25        THE COURT:  And at any time.  I mean, are these

1    things kept and saved?  And if so, if it has since

2    been discarded or erased, that would be an issue we

3    would need to address, why.  But yes, to the extent it

4    ever existed at all, you're entitled to it.  We're

5    trying to figure out whether it existed at all.

6         THE DEFENDANT:  Sir --

7         THE COURT:  You're telling me it did, Mr. Ostroff

8    says, I don't know.

9         THE DEFENDANT:  Sir, it's written -- it's written

10   in his report that it existed.

11        THE COURT:  That he had a body -- I don't

12   think -- that doesn't seem to be in dispute that he

13   was wearing a body cam.  What is in dispute, whether

14   it was covered up and whether it has sound, right?

15        MR. OSTROFF:  I -- I believe the dispute is

16   whether it still exists.  He did say that the camera

17   was used.  He did say how they used it.  He did

18   explain that it is stored, he believes, for 30 days.

19   He doesn't know if it was flagged for evidentiary

20   value or not, because it did -- they never found the

21   defendant when he had the camera out.  It was only

22   after the camera was covered and put away, and, in

23   essence, they were almost ready to leave, that they

24   ever found the defendant.

25        THE COURT:  Okay.  And those are legal issues

1    that arise in what I believe would be called a

2    Richardson hearing.  And then I would have to make

3    some determinations about whether there is a discovery

4    violation, whether it was material, whether there's

5    prejudice, whether it was willful.  And that would

6    require a hearing.  Sometimes you do those hearings

7    right in the middle of a trial.  You send the jury out

8    and you talk about it.

9        So it comes down to, Mr. Washington, are you

10    ready to go to trial on June the 29th, which is a week

11    from Monday?

12    **THE DEFENDANT:**  No, sir, I hadn't -- like, I had

13    got a witness coordinator phone number, but I don't

14    have a witness coordinator address so I can, like,

15    have, like, subpoenas through the Clerk of Courts sent

16    out for the witnesses that I want to subpoena to

17    testify for a deposition.  So I got a number but I

18    don't have a address.

19    **THE COURT:**  Well, what would you like me to do?

20    I'm showing you have speedy trial -- it would expire

21    this month.

22    **MR. OSTROFF:**  Your Honor, no, there was a --

23    there's a motion to continue by Defense on the 27th.

24    That put us at PTC for 6/16.

25    **THE COURT:**  Uh-huh.

1          **MR. OSTROFF:**  When Your Honor discharged the

2     public defender, we then called Mr. Washington back in

3     the next day.

4          **THE COURT:**  Oh.

5          **MR. OSTROFF:**  The State was ready for trial.  At

6     that point, he requested a continuance.  And

7     Your Honor briefed him on that means he would waive

8     speedy trial.

9          **THE COURT:**  Okay.  Good.  It is there.

10         (Pause in proceedings.)

11         And, Mr. Washington, before we start the trial, I

12    would go through the same questions I did before.  I'm

13    not required today to make sure you're doing a --

14    knowing, informed decision about representing

15    yourself.  We talked about it before.  Every stage, I

16    need to redo it again.  And the next material stage, I

17    think, would be jury selection.  And we'll go through

18    the same questions again.

19         But I would ask you to reconsider.  You're

20    charged with -- Count 1 is punishable by life in

21    prison.  I'm not so sure it's a good idea to represent

22    yourself.  We talked about that before.  If you want

23    to, you can do it.

24         **THE DEFENDANT:**  Sir, I don't feel like it's a

25    good idea, but my -- the officers -- the lawyers I had

1     representing me, they knew to file a motion to compel

2     and a public records request back in January.  I

3     notified them everything that I've notified the Court,

4     and it seemed like they just made every effort to make

5     it possible for the tape that I know that can clear me

6     to become a possibility.  It was like a sure thing

7     within the first 20, 30 days, and I was writing

8     letters every day explaining my situation.  So I'm

9     like, I need representation, but I know it's not the

10    best that I'm getting.  I'm like -- I feel like they

11    just representing me in a way that would set me up for

12    the prosecutor.  That's what it seemed like because

13    I'm asking them -- this is what happened and this was

14    recorded.  And now it's a debate as to whether or not

15    it even exists.

16         Man, it just -- it's just -- I did all I could to

17    try to provide assistant to my representation, and

18    it's just like I'm falling short.  And I guess it's

19    hard for me to trust somebody else to do something

20    that I know that it'll take a little time.  I'll

21    figure out how to do it just as good myself.  I'm just

22    not trying to get rushed in a trial situation where

23    I'm not prepared because I don't have access to the

24    legal information that he has.  I don't have the

25    knowledge and experience, but I don't have the trust

1    and the -- and the support of the lawyer that has been

2    representing me so far.  So I'm -- up until I see

3    where it's to my best interest to trust another

4    lawyer, I'm saying I'd rather do it by myself.

5        **THE COURT:**  Well, I think under the circumstances

6    and the work that you need to do, we're going to have

7    to continue your trial.  Okay?  Which we'll do.  And

8    if you need us to instruct the clerk to issue trial

9    subpoenas, we can do that.  But we're going to have to

10   move your trial to a pretrial on August the 25th.

11       **MR. OSTROFF:**  Is it possible to move this one to

12   July, Your Honor?  Because the only contact I can have

13   is when we're in court.  And so this way at least I

14   can update Mr. Washington a little bit faster about

15   what steps I've taken to see if the body camera still

16   exists, or the results of that.  Otherwise, all I can

17   do is mail stuff to him at the jail and hope that he

18   gets it.

19       **THE COURT:**  Well, if -- if body cam exists, you

20   know, we do grant the motion.  We've just given you a

21   continuance -- or we will.  At least, let's talk about

22   the day in a second.  We'll give you ten days.

23   That's -- gets you into next week.  If it exists, you

24   got to get it to him within ten days.

25       **MR. OSTROFF:**  For the body camera?

1          **THE COURT:**  Yeah.

2          **MR. OSTROFF:**  I can -- I will -- I e-mailed the

3    officer now.  Once I know, I'll update and I can

4    definitely get it sent as soon as possible.  I don't

5    now how long it takes to get screened and to him at

6    the jail.  So I can't guarantee he'll get it within

7    ten days, but I will definitely do everything I can to

8    get it to him as soon as possible, if it still exists.

9          **THE COURT:**  Okay.  And that is No. 7, I believe,

10   of the motion to compel --

11         **THE DEFENDANT:**  Sir.

12         **THE COURT:**  -- would be granted to the extent

13   that it exists.  State has ten days to provide the

14   videotape evidence of the body camera.  Okay?

15         We can set you for pretrial on July the 21st.  We

16   should do it at 1:30 in the afternoon.  Pretrials are

17   very hectic in the morning.  We'll just get you

18   brought over here in the afternoon on July the 21st at

19   1:30 to -- to deal with your pretrial.  And that's a

20   trial date of August the 3rd.  Okay?

21         So that's your new time frame.

22         **THE DEFENDANT:**  Yes, sir.

23         And then I would like to bring up the

24   deposition -- the transcript of the -- Officer James.

25   Is it possible that I be provided with a transcript of

1       that deposition?

2               THE COURT:  Whose depositions were taken?

3       Officer James?  Who else?

4               MR. OSTROFF:  Officer Zambito, Officer James.

5       And I do not see any other notes.  There might have

6       been other depositions, but those are the only two

7       that I see notes for.

8               In terms of trial subpoenas, if Mr. Washington

9       can let me know, as long as they are officers involved

10      in this case, I already have them under subpoena and I

11      will keep them, or have them available here, whether I

12      call them or not, as long as I know who it is.  If

13      it's people that aren't on my witness list, then

14      that'll be a different issue.

15              THE COURT:  Then, Mr. Washington, do you have

16      anyone other than police officers involved in the case

17      that you would -- that you might be wanting to call to

18      testify?

19              THE DEFENDANT:  Yes, sir.  This -- a lawyer who

20      had been -- his name -- you can get his contact

21      information off of this.  Like, his name

22      John Sawicki.  Like --

23              THE COURT:  But I can instruct the Clerk of the

24      Court to issue a trial subpoena, but I would need, at

25      a minimum, their name and address.

1          THE DEFENDANT:  I got it right here, sir.

2          THE COURT:  Address?

3          THE DEFENDANT:  Yes, sir.

4          THE COURT:  Okay.  So it's John Seth James and

5     Michael Zambito.  And Officer Brilliant was -- he was

6     noticed.  Did his deposition go forward?

7     Officer Brilliant?

8          MR. OSTROFF:  If he's saying that the --

9     Ms. Opato told him that Officer Brilliant never showed

10    up, then I agree with that.

11         THE COURT:  Okay.

12         MR. OSTROFF:  I don't see a note that he did.

13         (Pause in proceedings.)

14         And is there a phone number on that as well?

15         THE COURT:  Yes, sir.

16         MR. OSTROFF:  Okay.  Then I'll -- I'll accept

17    that as a Defense witness list.  I don't have a

18    problem with that, as long as I can get that

19    information myself.

20         THE COURT:  John Sawicki, S-a-w-i-c-k-i.

21         MR. OSTROFF:  Is it possible that I can just make

22    a copy of it?

23         THE COURT:  Yeah.

24         MR. OSTROFF:  Okay.

25         THE COURT:  He's in Tallahassee, but . . .

1          **MR. OSTROFF:**  And I just got an automated

2     response back from Officer James.  He's out of town

3     until June 30th.  I don't know if that has to do with

4     his son or not.  It has the contact info for his

5     sergeant.  So I'll call his sergeant --

6          **THE COURT:**  Okay.

7          **MR. OSTROFF:**  -- when we're done in court today

8     and see if I can get some information.

9          **THE COURT:**  Okay.  Thank you.

10         **MR. OSTROFF:**  May I approach and --

11         **THE COURT:**  Yes, sir.

12         This guy's in Tallahassee.

13         Mr. Washington, I'm going to instruct the court

14    reporters to transcribe those two depositions of

15    Officer James and Officer Zambito, and have them

16    deliver to you when they get it transcribed.  I don't

17    know how -- I'll let them know when the pretrial is

18    and the new trial date and let them know that they

19    should get those to you before that time.

20         **MR. OSTROFF:**  Have -- has the Public Defender's

21    Office filed those with the Court?

22         **THE COURT:**  You told me they haven't been

23    transcribed.  We got to --

24         **MR. OSTROFF:**  Right.  But there -- there would be

25    an audio recording that's -- the Public Defender's

1      Office has.  I don't believe they ever would have

2      been -- it wasn't like they were in court or the court

3      can just transcribe them.

4          **THE COURT:**  Right.  But was there a court

5      reporter there?

6          **MR. OSTROFF:**  No.

7          **THE COURT:**  It's just audio?

8          **MR. OSTROFF:**  The Public Defender's Office has an

9      agreement with the State to keep down costs --

10         **THE COURT:**  Okay.

11         **MR. OSTROFF:**  -- that we just go through their

12     stack system to make recordings.  So there is no court

13     reporter.

14         **THE COURT:**  If someone needs a written transcript

15     of one of those, they -- you don't get it through

16     court . . .

17         **MR. OSTROFF:**  I -- I have no idea.  I've never

18     done it.  I can -- I can send a copy to Your Honor of

19     the audio.

20         **THE COURT:**  I'm going to have to ask some

21     questions to figure out how to do that.

22         Yeah, if you can, you can shoot it to me.

23         And I'm going to figure out, if they can be

24     transcribed, and if so, you're going to get them.

25     But -- and then on -- when we reconvene for pretrial,

1          I will get instructions to the clerk to have Mr.

2     Sawicki served with a subpoena to be at trial.  Okay?

3          **MR. OSTROFF:**  And I e-mailed Your Honor, the only

4     audio that I see in my system on depositions are just

5     the two officers we spoke about --

6          **THE COURT:**  Okay.

7          **MR. OSTROFF:**  -- Zambito and James.

8          **THE COURT:**  Excellent.  Thank you.

9          Mr. Washington, anything else you wanted to talk

10    about today?

11         **THE DEFENDANT:**  No, sir, as of right now.

12         **THE COURT:**  Okay.

13         **THE DEFENDANT:**  (Indiscernible words) the day

14    that I can get a --

15         **THE COURT:**  Trials are difficult things.  They're

16    tricky things.  I know you're not happy with your

17    lawyer.  I made a ruling on that.  But a lot of stuff

18    happens at trial.  There are rules of evidence that

19    are difficult, rules of procedure that are difficult,

20    strategies that are difficult.  I'm sure you're good

21    at a lot of stuff, but if you didn't go to law school,

22    it would be hard for anybody to do a trial correctly.

23    So I want you to consider -- continue to think about

24    what we talked about the last time I saw you.  If you

25    want to reconsider, I would reappoint the public

1    defender to represent you and we'll go from there.

2    But as of right now, are you representing yourself.

3    We've got you set for a pretrial at 1:30 p.m. on

4    July 21st.  And that's the next time I'll see you.

5    Okay?

6         **THE DEFENDANT:**  All right, sir.

7         **THE COURT:**  Mr. Ostroff, how about you?  Anything

8    else from the State?

9         **MR. OSTROFF:**  Not that I know of as far as I

10   know.  Oh, the only question would be if

11   Mr. Washington did receive mail with some more

12   discovery within the last week or so ---

13        **THE DEFENDANT:**  The supplemental discovery with

14   my criminal history and -- and my appealing record.

15        **MR. OSTROFF:**  Okay.

16        **THE DEFENDANT:**  Yes, sir.

17        **MR. OSTROFF:**  All right.  So, what's -- I'm going

18   to do the same thing.  If I get any other discovery

19   that comes in, I'll have it mailed directly to you.

20        **THE COURT:**  It will go to you.  And I am going to

21   leave myself a note.  And I will probably see

22   Ms. Opato tomorrow.  I'm just going to remind her that

23   she was to send everything they had to you.  She told

24   me she did that.  I want to make sure that you have

25   everything that she had.  Okay?  And then we ought to

```
1        be where we need to be.  We've asked Mr. Ostroff to

2        look into the body cam.  We've got Mr. Sawicki's

3        address.  And I think that's it.  Okay?

4               All right.  Thank you both very much.

5               (These proceedings were concluded at 2:36 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1               C E R T I F I C A T E

2

3          I, Christine Lively, being a Digital Court

4    Reporter of the Ninth Judicial Circuit as authorized by Rule

5    2.535(h)(3), Florida Rules of Judicial Administration, and

6    the Administrative Order of the Ninth Judicial Circuit

7    numbered 07-98-43, certify that the foregoing transcription

8    is true and correct.

9

10          WITNESS my hand this 27th day of February,

11    2017, in the City of Orlando, County of Orange, State

12    of Florida.

13

14

15          s/Christine Lively, CER, CET

16          CHRISTINE LIVELY, CER, CET

17

18

19

20

21

22

23

24

25



Filing # 53044254 E-Filed 02/27/2017 06:36:43 PM

1

1
2
3                                    IN THE CIRCUIT COURT OF THE
                                     NINTH JUDICIAL CIRCUIT, IN AND
                                     FOR ORANGE COUNTY, FLORIDA
                                     CRIMINAL JUSTICE DIVISION

4    STATE OF FLORIDA,

5         Plaintiff,

6    vs.                              CASE NO.: 48-2014-CF-17252-A-O

                                      DIVISION NO.: 19
7    JAMES WASHINGTON,

8         Defendant./

9

10                           HEARING

11                           BEFORE

12              THE HONORABLE ROBERT J. EGAN

13                           In the Orange County Courthouse
                             Courtroom 18D
14                           Orlando, Florida 32801
                             March 9, 2016
15                           Christine Lively, CER, CET

16

17

18

19

20   A P P E A R A N C E S:

21   JOSEPH MATERA, ESQUIRE
     Office of the State Attorney
22   415 North Orange Avenue
     Building B
23   Orlando, Florida 32801
     On behalf of the State

24

25

                    Ninth Judicial Circuit
                   Court Reporting Services

                        Page 573

1                    —     —     —

2                    P R O C E E D I N G S

3            (The following proceedings commenced on

4    March 9, 2016, at 1:47 p.m.)

5            THE CLERK:  State of Florida vs.

6    James Edward Washington, Case No. 2014-CF-17252.

7            MR. MATERA:  Joe Matera for the State.

8            THE COURT:  Okay.  And there's -- Mr. Washington

9    is with us in the box, who is representing himself

10   currently.

11           (Pause in proceedings.)

12           Okay.  And, Mr. Washington, I had intended to

13   have you come here yesterday and there was some mixup

14   in communication, so we reset you for today.  Sorry

15   about that.  But we're here for a pretrial conference.

16   Okay?  We've got you set for trial and our -- coming

17   up the docket that begins March 21st.  That's right,

18   Mr. Matera?

19           MR. MATERA:  Yes, sir.

20           THE COURT:  Okay.  Mr. Washington, are you ready

21   for trial?

22           THE DEFENDANT:  Yes, sir.  I want to discuss,

23   like, yesterday, I got a package in the -- in the jail

24   concerning some case narratives that I thought didn't

25   exist, 'cause, you know, I had the motion to compel on

1     the 20 -- on the 16th of June last year, states that

2     they didn't have any more case narratives so -- when I

3     had requested the body camera. And he sent in some

4     case narratives that basically mimic what I wrote in

5     the motion to dismiss that you denied in January. So

6     I -- I filed the motion that I want to present to the

7     Court.

8          THE COURT: Okay. Is that a copy that -- have

9     you seen what he's talking about?

10         MR. MATERA: A -- the motion to dismiss or what I

11    sent him?

12         THE COURT: I think it's a motion -- this is a

13    motion you prepared?

14         THE COURT DEPUTY: Sit down.

15         THE DEFENDANT: Yes.

16         THE COURT: Okay. That's fine. And --

17         THE DEFENDANT: Yes, sir. It's his copy in the

18    court file.

19         THE COURT: There's two copies? Okay. Thank

20    you.

21         THE DEFENDANT: One of the --

22         THE COURT: We'll take a look at what it is.

23    Okay?

24         (Pause in proceedings.)

25         Thank you.

1    (Pause in proceedings.)

2    Okay.  And then you referenced the case

3  narratives.  Are these police -- supplemental police

4  reports?

5    Mr. Matera, do you know what those are?

6  **MR. MATERA:**  Yes, Judge.  Again, I followed up,

7  asked the police department one more time if there was

8  any mixup, if there are any more statements out there

9  that exist that I can give to Mr. Washington, because

10  he's entitled to them.  At this time, I was sent some

11  statements.  I was puzzled when I reviewed the case

12  multiple times that Officer Brilliant hadn't wrote a

13  report because he would be the crux of the issue with

14  the K9 officer and Mr. Washington.  So this has

15  puzzled me for quite some time.  So I asked her, any

16  statements that exist?  And I received the same as I

17  already had, but I also received additional

18  statements; one from Officer Brilliant, who's the K9

19  officer in this case, detailing what happened in this

20  case.

21    I also received another statement from CSI Styer.

22  She's the CSI for OPD that took photos of the scene of

23  the offense.

24    I also received a statement from Officer Wilson.

25  Officer Wilson is the FTO or field training officer of

1     Nicole Morgan, who was the lead officer that wrote the

2     original long case narrative.

3         And then Officer Zambito wrote a statement dated

4     this year, March 2nd, 2016.  He misunderstood what I

5     was requesting.  I was just asking him if any

6     statements that he previously wrote could be sent to

7     me.  But he actually typed up a new statement, and

8     that statement was sent to the defendant.

9         I also added two new witnesses in this case,

10    Officer Haddock from the Orlando Police Department and

11    Officer Whited from the Orlando Police Department.

12    This is a trial strategy addition in the case.  I

13    added these witnesses in the event that Mr. Washington

14    decides to make the focal point of our case the use of

15    force.  We intend on introducing evidence through

16    Officer Haddock of -- detailing how everything that

17    the police department did in this case was completely

18    justified given the defendant's actions in this case.

19        Officer Whited would also talk about the

20    procedure when a individual files a use of force

21    complaint with the Orlando Police Department.  He will

22    detail the steps the police departments -- takes.  And

23    Officer Haddock will explain how officers are trained

24    to handle situations where they're encountered by

25    defendants, like Mr. Washington, that refuse to comply

1       with the lawful commands of officers.

2             THE COURT:  Mr. Washington, regarding the motion,

3       I can tell you this.  Police reports are not admitted

4       into evidence.  The jury will not see them.  Okay?  So

5       from that perspective, these will not be admitted into

6       evidence.  Okay.  I think they were provided to you

7       because Mr. Matera found them.  It's his obligation to

8       disclose information to you that relates to your case.

9       And you're certainly welcome to question the officers,

10      when the time comes, about what they did or didn't do.

11      But I think to answer your question, the motion is

12      okay, it's fine, but it's not really relevant because

13      police reports aren't admitted into evidence anyway.

14      Okay?

15            THE DEFENDANT:  All right, sir.  That was my

16      concern.

17            THE COURT:  So I -- so I think, just to be clear,

18      the motion in limine seeks to exclude these case

19      narratives or case summaries that have been provided

20      by the State.  They can be used, they just won't -- in

21      the typical fashion, they won't be admitted into

22      evidence.  So --

23            THE DEFENDANT:  That was my concern, judge,

24      since --

25            THE COURT:  Okay.

1    THE DEFENDANT:   -- since they not going to be

2    admitted into evidence, I'm okay with them then.

3    But --

4    THE COURT:   Okay.   And -- and the motion itself

5    is -- is just moot because it's asking me to comply

6    with the law, which I am going to do my best to do.

7    Okay?   Thank you.

8    THE DEFENDANT:   And then I -- I need her again.

9    I filed a motion to suppress.

10    Ma'am?

11    UNIDENTIFIED SPEAKER:   Over there?

12    (Pause in proceedings.)

13    THE COURT:   Okay.

14    (Pause in proceedings.)

15    MR. MATERA:   Judge, just briefly, by looking at

16    the cases cited, I believe these are discovery rule

17    cases here.   I don't see what constitutional law --

18    what constitutional amendment the defendant is stating

19    has been violated.   So I'll just leave that up to you,

20    Judge.   I just -- it doesn't seem to be a motion to

21    suppress despite the fact that it's -- it's titled as

22    such.   I think it's just alleging a discovery

23    violation.

24    (Pause in proceedings.)

25    THE COURT:   Okay.   So, Mr. Washington, I'm seeing

1     this for the first time, but the -- the point you're

2     making, again, relates to the State telling us that

3     there is no body camera footage.  And that's the

4     primary basis for your -- this motion that you're

5     calling a motion to suppress.  Is that accurate?  Am I

6     right?

7          **THE DEFENDANT:**  I'm filing the motion to suppress

8     based on, they got evidence written in their case

9     there, saying that they got a book bag and a knife

10    that's not photographed, and they're located at --

11    it's written in, in the case narrative, photograph in

12    different locations, like, I mean, instead of being on

13    the roof, they photographed the knife that's inside

14    the building.  And the book bag is just on the ground,

15    and they said in the case narrative it's on the roof.

16    So they -- I'm saying that they tampered with -- with

17    the crime scene, so I'm trying to get the whole

18    evidence.

19         **THE COURT:**  Well, did -- you know, the -- those

20    issues may or may not be relevant when cross-examining

21    these witnesses.  Irregularities in the crime scene

22    would not typically be a basis to suppress evidence.

23    It might be relevant to the weight a jury gives to

24    that evidence.  So I'm not saying these concerns

25    you've raised are not at all relevant, they simply are

1    not a basis to exclude evidence.  Okay?

2         So the suppression motion as written here is

3    denied, 'cause I think I would agree with Mr. Matera,

4    this isn't your typical suppression where you're

5    alleging a constitutional -- a violation of your

6    constitutional rights, such as an illegal search and

7    seizure, which I don't think we have here.  So,

8    respectfully, the motion to suppress is denied.

9         **THE DEFENDANT:**  And another thing, sir, in that

10   911 tape, I got, like, mentioning in the motion, they

11   never did give me access to a 911 tape.  The person

12   gave me the opportunity to cross-examine the person

13   who made the call on the 911 tape, she just introduced

14   the tape in October.  But, you know, it was, like,

15   kept in a position where I had never had access to the

16   information that was on the tape until that time.

17   Like -- it's like (indiscernible words).

18        **MR. MATERA:**  At this time, Judge, I don't know

19   how to get in touch with that 911 caller.  I actually

20   wanted the 911 caller in my case in chief, because

21   that 911 caller sees the defendant on the roof.  So

22   obviously I would want that witness to testify.

23        I've tried to obtain that person's information,

24   but OPD does not have the information and that person

25   did not stay at the scene to meet with officers.  So I

1   don't know who that person is.

2        THE COURT:  Okay.  Is there any intention, do you

3   know at this point, to introduce statements made on a

4   911 call?

5        MR. MATERA:  Legally, I'm not sure if I can.  I

6   know there are some exceptions to the hearsay rule.

7   My recollection of the 911 call, it could be a present

8   sense impression.  However, I think there are possible

9   confrontation clause issues with that.  So I'm not

10  sure I can introduce it at this time.

11       THE COURT:  Mr. Washington, the way I think we

12  would deal with this, is if the State intends to

13  introduce that 911 call, we would take a break and

14  you'd be able to listen to it and have some time to --

15  to consider it.  It appears that that State may not

16  even be intending to use the statements made on the

17  911 call.  If that changes, we'll give you time to

18  hear it outside the presence of the jury.  Okay?

19       THE DEFENDANT:  Yes, sir.

20       THE COURT:  Okay.

21       THE DEFENDANT:  And I have this supplemental

22  defense witness list.  I've got one for the State.

23       MR. MATERA:  Thank you.

24       THE COURT:  Thank you, sir.

25       (Pause in proceedings.)

```
1        And another thing, Judge, you give the
2    corrections department the job of taking me to listen
3    to the CD that got my discovery on, but they never
4    take me -- it been more than two months since the last
5    time I had the opportunity to review the information
6    that's on those CDs.  So I was wondering, is there any
7    kind of way that I can have them be forced to try to
8    get me information -- access to that information and
9    information that I know I went correct channels to try
10   to get access.  It seems like I got a grievance
11   concern and I got questions that I need to direct to
12   certain witnesses based on my medical record.  They
13   don't give me access to my own medical record.
14        When -- when the doctor had the examination for
15   the mental evaluation, he got free access to my
16   medical record, but I can't get access to my own
17   medical record through the Department of Corrections.
18   And I was wondering, how can I go about it?  I did
19   everything possible concerning the procedures they got
20   in place at that institution to try to get access to
21   my medical record.  They just still -- I wanted to try
22   to introduce those into evidence today.  But I just
23   need to get access to it so I can cross-examine
24   witnesses concerning the medical condition I was -- I
25   was in at the time that I was arrested.
```

1          **THE COURT:**  Yeah.  We can talk about it.  I mean,

2     the -- review the witness list.

3          Is there any problem or objection from the State

4     to the supplemental Defense witness list?

5          **MR. MATERA:**  No, Judge.

6          **THE COURT:**  Okay.  Then this will be filed in

7     open court.

8          And, Mr. Washington, you know, we -- we have

9     similar conversations every time I see you.  And

10    the -- the concerns you raise just demonstrate to me

11    why you shouldn't be representing yourself.  All the

12    questions and concerns you have, a lawyer could do

13    that for you.  A lawyer can subpoena records if

14    necessary.  Lawyers can make telephone calls.  Lawyers

15    can listen to CDs and play them for you during a visit

16    at the jail.  They can summarize for you what's on the

17    CDs.  I know I've talked to you about this many, many,

18    many times.  But you're talking about the seriousness

19    of your charges, but you always demonstrate to me how

20    difficult it is to represent yourself, especially when

21    you're in jail.

22         If these things are important to you, I think you

23    ought to consider -- reconsider your decision to

24    represent yourself.  Because a lawyer would have

25    access to all of this stuff much more easily than you

1      do.  I mean, you understand what I'm saying?

2              **THE DEFENDANT:**  I understand it clearly, sir.

3              **THE COURT:**  Okay.

4              **THE DEFENDANT:**  I don't envy my situation, you

5      know?  It ain't the best situation, but I feel like,

6      under the circumstances, I just gotta roll with it.

7              **THE COURT:**  Well, I mean, you -- you're --

8      you're -- you know, your dissatisfaction with the

9      attorneys seem to relate back to this body camera

10     situation.  That -- those images simply don't exist.

11     Or if they do exist, they're not here and you don't

12     have a lawyer who can even take a deposition to maybe

13     explore that a little more.  But that issue has come

14     and gone.  And so if that's -- was the hangup, there's

15     nothing we can do about that now.  You've raised all

16     these other concerns.  You wanted -- have a theory of

17     your defense and you're entitled to that.  I want you

18     to do that.  But I just think you're really doing

19     yourself a disservice by trying to do it yourself.

20              And I'm happy to appoint counsel for you.  I'm

21     required to make that offer to you every time I see

22     you.  I know you understand that you're entitled to a

23     lawyer and that State of Florida will pay for one if

24     you can't afford that, right?  We've talked about that

25     before?

1                THE DEFENDANT:  Yes, sir.

2                THE COURT:  Okay.  And we've talked about the

3        advantages and, well, primarily the disadvantages of

4        representing yourself.  And you do understand that as

5        well, right?

6                THE DEFENDANT:  Yes, sir.

7                THE COURT:  And I presume you've never picked a

8        jury before?

9                THE DEFENDANT:  I -- I went through trials

10       anyway, you know what I'm saying?  Everything, you

11       know, I'm learning as I go.  But I -- like you said, I

12       -- my dissatisfaction with how I was represented up

13       until this point got me to the point where I just --

14       well, whatever happened, I'm just let it happen

15       without having not to trust lawyers who I feel like

16       not going to be working in my best interest.  So, it

17       don't work out for me, I live with the consequences.

18               THE COURT:  And if found guilty on Count 1 alone,

19       that's punishable by up to life in prison, the armed

20       burglary of a structure.  We've talked about that

21       before.  You understand that you're facing a potential

22       life sentence; you know that?

23               MR. MATERA:  No.  Judge, it's -- it would be

24       mandatory.

25               THE COURT:  A mandatory life sentence.  I think

1     he's corrected me on that before.  I keep forgetting

2     that.  But --

3          MR. MATERA:  He's a prison releasee reoffender.

4          THE COURT:  Okay.  Because you've been to prison

5     before within the specified time frame.  If you're

6     found guilty on Count 1, I would have no choice but to

7     send you to prison for life.  You understand?

8          THE DEFENDANT:  Yes, sir.

9          THE COURT:  Okay.  Mr. Washington, anything else

10    you want to talk about today?

11         THE DEFENDANT:  No, sir.  We covered it.

12    Besides, like, when I get ready to explain myself to

13    the jury, I might like to have access to shorts.  I

14    got shorts inside my unit that I want to be able to

15    explain my injuries and stuff, so I can explain it to

16    them.  But at -- at the facility they not willing to

17    let me transport stuff other than what I basically got

18    on.  So if I want -- can I get that cleared from you?

19         THE COURT:  Well, we're going to get you some

20    civilian clothing, okay?

21         THE DEFENDANT:  All right.  I know I want -- I

22    know I'm going to have civilian clothes, but I want to

23    be able to have shorts also so I can explain my

24    injuries and stuff on my -- on my leg and stuff from

25    the dog bite --

1          THE COURT:  Uh-huh.

2          THE DEFENDANT:  -- 'cause everything is not like

3     what it seems.  It was more than what it was recorded.

4     So -- so my injuries would pretty much explain

5     themselves.

6          THE COURT:  Okay.  Well, if -- if that happens,

7     and I don't know the circumstances yet and there -- I

8     don't know if there would be an objection to that or

9     not, but what -- where are they located on your --

10    they're on your legs, right?

11         THE DEFENDANT:  Yes, sir.

12         THE COURT:  Up high or down low?

13         THE DEFENDANT:  Middle of my thigh, all the way

14    down.

15         THE COURT:  Okay.  And, Mr. Matera, how about

16    you?  Anything the State wanted to talk about?

17         I'm contemplating doing you guys first.

18         MR. MATERA:  Fine by me.  I would just need to --

19    if you're doing the first day as, you know, the --

20         THE COURT:  Tuesday.

21         MR. MATERA:  -- quasi case management, I have an

22    individual that I need to fly in from out of state.

23    That individual -- 'cause this -- this building was

24    vacant.  A corporation owned it.  The individual that

25    would be testifying is from Texas.  I told you that

1     before -- in this case.  So --

2          THE COURT:  So you want a certain date of when

3     we'd -- we would begin it?  And I'm thinking Tuesday,

4     the 22nd to actually begin jury selection.

5          MR. MATERA:  Okay.  If I learn from now until the

6     22nd that the witness I'm flying in or another

7     critical witness has an issue with -- on that day,

8     I'll let you know ahead of time so --

9          THE COURT:  Okay.  Thank you.

10         MR. MATERA:  -- I could tell you.

11         Is the defendant saying he's ready for trial?

12         THE COURT:  He told me he was before.

13         Mr. Washington, you ready to go?

14         THE DEFENDANT:  Yes, sir.

15         THE COURT:  Okay.

16         THE DEFENDANT:  I'm sorry.  Another thing I need

17    to bring up, my CDs that I have and the equipment they

18    got for me to use in case I needed to -- to impeach

19    the witness.  Could it be arranged for it to be

20    brought here so I can have it so I can set it up in

21    here?

22         THE COURT:  Now, you got a CD --

23         THE DEFENDANT:  I got a CD --

24         THE COURT:  -- of recorded statements.  Are --

25    were there depositions taken?

1          **MR. MATERA:**  I think he's referring to

2     depositions of a couple officers.  He has depositions

3     of -- I'm not -- I don't remember off the top of my

4     head which ones, but he does have a couple.  It is of

5     Michael Zambito and John James.  I don't believe

6     anyone else has been --

7          **THE COURT:**  Okay.  Well, what I can tell you is,

8     Mr. Washington, that there will be equipment to -- to

9     play a CD or a DVD in the event we allow -- in the

10    event it's appropriate from an evidentiary perspective

11    to allow the jury to hear it, there will be equipment

12    here.

13         We need to talk about ground rules for jury

14    selection and questioning of witnesses.

15    Mr. Washington is -- is going to have shackles on his

16    feet.

17         Manny, I'll probably need to get with you and

18    Corporal Bustamante or the sergeant to talk about

19    this.

20         But my thought is -- Mr. Matera, my thought is,

21    everyone is going to have to conduct themselves

22    from -- seated at the table.

23         **MR. MATERA:**  Okay.

24         **THE COURT:**  Unless we can affix -- and it's okay

25    with the court security -- to have a Band-It in place

1       around Mr. Washington's ankle, which would at least

2       allow both sides to stand at the podium to give an

3       opening statement.  But -- but we should anticipate,

4       certainly, jury selection seated behind the table,

5       questioning of witnesses seated at -- at counsel table

6       as well.

7           Although I am open to suggestions.  But that's my

8       thought.

9           **MR. MATERA:**  I don't know if him deciding to

10      represent himself and -- and, you know, would -- I

11      understand why you would want me to sit there so it

12      doesn't look like he's disrespecting the jury as

13      compared to me.  But I don't think I should be

14      precluded from doing my -- my normal routine, Judge.

15      You know, I tend to walk around a little bit during

16      opening and closing and during voir dire.  I don't --

17      I don't see how requiring me, I guess, to sit during

18      questioning of witnesses --

19           **THE COURT:**  Look.  It --

20           **MR. MATERA:**  I just -- I guess I just don't

21      follow.

22           **THE COURT:**  Well, it's -- this is cumbersome to

23      say the least, but the fact of the matter remains is

24      that even though I have very strong feelings about

25      what -- Mr. Washington's decision, he's absolutely

1    entitled to represent himself.  He currently carries a

2    presumption of innocence.  He's going to be shackled

3    because that's the requirement of the rules, nothing

4    he has done -- he's accused of these crimes, I

5    understand that, but with the presumption of

6    innocence.  Him choosing to represent himself, I -- I

7    just think he needs to -- the ground rules need to be

8    the same.  I don't know any other way to do it.

9         **MR. MATERA:**  Okay.  And just when I introduce

10   evidence, obviously, I can stand, you know --

11        **THE COURT DEPUTY:**  Well, he'll be able to move

12   around, Judge, with -- if you want me to put the

13   Band-It on him.

14        **THE COURT:**  Okay.  And I just wanted to run

15   that -- this may be --

16        **THE COURT DEPUTY:**  Want me to explain it to him

17   what it entails?

18        **THE COURT:**  Okay.  But --

19        **THE COURT DEPUTY:**  The risk of it.

20        **THE COURT:**  We may need to have a shackle

21   hearing, but we'll run it by the sergeant.  But one

22   possible solution is to have Mr. Washington wear a --

23   a ankle bracelet that would allow the court deputies

24   to give you a remote shock that would disable you in

25   the event there's disruption.  You understand?

1          THE DEFENDANT:  I done had one of those --

2          THE COURT:  Okay.

3          THE DEFENDANT:  -- those devices.  Another trial

4     there was a wristband or something that --

5          THE COURT:  This will be on your ankle in the

6     event you go where you're not supposed to go.

7          THE DEFENDANT:  I know.  I --

8          THE COURT:  They would shock you from a distance

9     and you'd fall to the ground.  But --

10         THE DEFENDANT:  Yeah.  I'd prefer that.

11         THE COURT:  But I'd need to make sure this is the

12    appropriate case for that.  And, frankly, that's a

13    call that I need the input of the court deputies.

14         But, Mr. Matera, if that is acceptable, then I

15    think that might solve the problem of moving around

16    the courtroom --

17         MR. MATERA:  Okay.

18         THE COURT:  -- if we can affix him with the

19    Band-It.  And we'll -- we'll get on that starting

20    today.  And we've got next week to work out the kinks

21    as well.

22         Mr. Washington, is there anything I can do to get

23    you to change your mind?

24         THE DEFENDANT:  No, sir.

25         THE COURT:  And, Mr. Matera, remind me again,

1          is -- is the offer right now life in prison?

2               MR. MATERA:  No, it was 15 years, Your Honor.

3               THE COURT:  Fifteen years.  Okay.

4               MR. MATERA:  Yes.

5               THE COURT:  And you -- that's right.  You

6          understand that offer, Mr. Washington?

7               THE DEFENDANT:  Yes, sir.

8               THE COURT:  Okay.  And if you're found guilty,

9          it's mandatory life.  And a lawyer certainly would be

10         able to advise you if -- if this plea would be in your

11         best interest.  A lawyer can be able to tell you if

12         you have a good case or a defensible case or not.  A

13         lawyer have -- has the experience to help you work

14         with Mr. Matera, maybe to try to bargain for different

15         terms.  A lawyer can tell you the advantages or

16         disadvantages of what is appropriate to tell -- to

17         tell me in court or to tell a jury during a trial.

18              We've talked about this before, but do you

19         understand how necessary a lawyer is in how he or she

20         would be able to help you?

21              THE DEFENDANT:  Yes, sir.  I know it would be, in

22         theory, just the lawyer that I got access, I don't

23         feel like going to be able to -- enough with -- pretty

24         close to the same result if I did it by myself, so I

25         prefer to go this route, sir.

```
 1              THE COURT:  And we previously have had

 2     Mr. Washington reviewed by a mental health provider.

 3     He's found to be competent.  I know I've previously

 4     asked him, he's able to read.

 5              You have a high school education; is that right?

 6              THE DEFENDANT:  Yes, sir.

 7              THE COURT:  Has a high school education.  He's

 8     always behaved in here with me.  So I will permit --

 9     continue to permit the pro se representation.  I think

10     Mr. Washington understands the pitfalls, but still

11     chooses to do it on his own.

12              Mr. Washington, I'm going to be in touch with the

13     jail.  I'm going to let them know that you're going to

14     be needing to do some trial preparation, to have

15     access to a device to listen.

16              Did we appoint Ms. Goerner to be standby counsel?

17     Do you remember?

18              UNIDENTIFIED SPEAKER:  Um-hmm.

19              THE DEFENDANT:  Nobody was appointed as standby

20     counsel, Judge.

21              THE COURT:  You said you didn't want it, right?

22              MR. MATERA:  Yeah.  He denies --

23              THE COURT:  Okay.

24              MR. MATERA:  -- standby counsel --

25              THE COURT:  Okay.
```

1     **MR. MATERA:**  -- on September 11th, 2015.  My

2     notes indicate that.  I don't see anything else where

3     he -- where it was asked of him under standby --

4         **THE COURT:**  Well, I'd want to also make· sure --

5     and, you know, Mr. Washington, it's typically not my

6     job to -- to do these things, but I also want to have

7     a -- a clean trial, a fair trial.  I need to make sure

8     you're dressed appropriately, or at least have access

9     to clothing.

10        Do you know if you have access to civilian

11    clothing that --

12        **THE COURT DEPUTY:**  They used to.  Not no more.

13        **THE DEFENDANT:**  I don't have access even of the

14    clothes I had.  They cut them off.

15        **THE COURT:**  Okay.  Well, I mean, there's -- if

16    you were represented by the public defender or

17    Ms. Goerner's office, they would bring clothes to you,

18    even a necktie.  Okay?

19        **THE DEFENDANT:**  Um-hmm.

20        **THE COURT:**  So I'll -- I'll look into that to see

21    what our options are with respect to getting you

22    some -- some civilian clothing.  Okay?

23        Mr. Matera, anything else from the State?

24        **MR. MATERA:**  My witness list -- I filed a

25    supplemental witness list that had a David Haddock as

1    an expert witness.  I'm going to file an amended one,

2    just removing the expert.  It shouldn't -- shouldn't

3    be --

4           THE COURT:  Okay.

5           MR. MATERA:  -- expert witness.  Just so he knows

6    that.

7           But in any event, we did send him the curriculum

8    vitae of that witness anyways.

9           THE COURT:  Okay.  So right now, Mr. Washington,

10   we're planning to start your trial Tuesday morning,

11   March the 22nd.  We will get a jury panel up here and

12   we'll begin.

13          I told you before that I'm not allowed to show

14   you any favoritism or treat you any differently than I

15   would a trained lawyer.  You understand that as well,

16   right?

17          THE DEFENDANT:  Yes, sir.

18          THE COURT:  Okay.  And that if you do something

19   that's inappropriate, the State is going to make an

20   objection.  And if it's a proper objection, I'm going

21   to sustain it, which means you gotta move on.  Okay?

22   You understand that?

23          THE DEFENDANT:  Yes, sir.

24          THE COURT:  Okay.  Likewise, if you ask a

25   question that isn't appropriate from the perspective

1       of our rules of evidence and the State objects, I

2       won't allow you to ask the question or won't allow the

3       witness to answer.  You understand that, right?

4            **THE DEFENDANT:**  Yes, sir.

5            **THE COURT:**  Okay.  Same thing for evidence.  If

6       you seek to have evidence admitted and you do it

7       improperly or the State otherwise objects because of

8       some other basis, such as relevance, I'm not able to

9       coach you on how to get stuff in properly.  You

10      understand that, right?

11           **THE DEFENDANT:**  Yes, sir.

12          **THE COURT:**  Okay.  Okay.  Mr. Washington, then if

13      we have anything else we need you here for, we'll get

14      you here next week.  I will be in touch with the

15      people at the jail to remind them that you have a

16      trial coming up and you are representing yourselves --

17      yourself, and I'll ask them to give you access to

18      the -- you want the tape player -- the DV -- the CD

19      player?  Is that what you want access to?

20          **THE DEFENDANT:**  Yes, sir.

21          **THE COURT:**  Okay.  And I'll -- I'll get in touch

22      with them.  I'll also ask if there's any clothing

23      available for you and I'll try to figure that out.

24      Okay?

25          **THE DEFENDANT:**  All right.

1          **THE COURT:**  All right.  Then we will see you on

2     the 22nd, if not sooner.

3          And, Mr. Matera, probably see you tomorrow, I

4     imagine.

5          **MR. MATERA:**  Yes, sir.

6          **THE COURT:**  Okay.  And you'll get the court

7     records from today.  Okay?

8          **THE DEFENDANT:**  All right.  Thank you.

9          (These proceedings were concluded at 2:20 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **C E R T I F I C A T E**

2

3          I, Christine Lively, being a Digital Court

4    Reporter of the Ninth Judicial Circuit as authorized by Rule

5    2.535(h)(3), Florida Rules of Judicial Administration, and

6    the Administrative Order of the Ninth Judicial Circuit

7    numbered 07-98-43, certify that the foregoing transcription

8    is true and correct.

9

10              WITNESS my hand this 27th day of February,

11        2017, in the City of Orlando, County of Orange, State

12        of Florida.

13

14

15              s/Christine Lively, CER, CET

16               CHRISTINE LIVELY, CER, CET

17

18

19

20

21

22

23

24

25



West's Florida Statutes Annotated
  Title XLVII. Criminal Procedure and Corrections (Chapters 900-999) (Refs & Annos)
    Chapter 918. Conduct of Trial (Refs & Annos)

West's F.S.A. § 918.13

918.13. Tampering with or fabricating physical evidence

Currentness

(1) No person, knowing that a criminal trial or proceeding or an investigation by a duly constituted prosecuting authority, law enforcement agency, grand jury or legislative committee of this state is pending or is about to be instituted, shall:

(a) Alter, destroy, conceal, or remove any record, document, or thing with the purpose to impair its verity or availability in such proceeding or investigation; or

(b) Make, present, or use any record, document, or thing, knowing it to be false.

(2) Any person who violates any provision of this section shall be guilty of a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

**Credits**
Laws 1972, c. 72-315, § 2.

Notes of Decisions (48)

West's F. S. A. § 918.13, FL ST § 918.13
Current through the 2015 1st Reg. Sess. and Special A Session of the Twenty-Fourth Legislature

© 2015 Thomson Reuters. No claim to original U.S. Government Works.





DSC_0004_0.JPG

SAO S Browning Div 22 2014-536652





DSC_0002_0.JPG

SAO S Browning Div 22 2014-536652



DSC_0001_0.JPG

SAO S Browning Div 22 2014-536652



DSC_0039_0.JPG

SAO S Browning Div 22 2014-536652







DSC_0013_0.JPG

SAO S Drowning Div 22 2014-536652



DSC_0012_0.JPG

SAO S Drowning Div 22 2014-536652



SA0 S Browning DIv 22 2914-536652

DSC_6816_8.JPG







S

152 So.3d 737
District Court of Appeal of Florida,
Fourth District.

Anthony COSTANZO, Appellant,

v.

STATE of Florida, Appellee.

No. 4D13–3344.   |   Dec. 3, 2014.
|   Rehearing Denied Dec. 29, 2014.

Synopsis
**Background:** Defendant was convicted in the Seventeenth Judicial Circuit Court, Broward County, Michael A. Robinson, J., of evidence tampering. Defendant appealed.

[Holding:] The District Court of Appeal, Gross, J., held that defendant could not be convicted for deleting from his work cellular phone a video he had already shown, texted, and e-mailed to others.

Reversed and remanded.

**Attorneys and Law Firms**

*737 Rhea P. Grossman of Rhea P. Grossman, P.A., Fort Lauderdale, for appellant.

Pamela Jo Bondi, Attorney General, Tallahassee, and Angela E. Noble, Assistant Attorney General, West Palm Beach, for appellee.

**Opinion**

*738 GROSS, J.

Appellant was a detective at the Broward Sheriff's Office. Following a jury trial, he was acquitted of two charges and convicted of evidence tampering. We reverse the tampering conviction because the State failed to establish a violation of section 918.13, Florida Statutes (2013).

The evidence tampering charge arose from appellant's deletion of a video from his work cellular phone. On January 20, 2012, a suspect in a case made statements about an unrelated criminal case where the defendants were two other officers, Koepke and Dodge, friends of appellant.

Appellant made a video of these statements with his phone. He then texted the video to Koepke, showed the video to his supervisor, and used his work e-mail account to send the video to the general counsel for the Police Benevolent Association. Ten days later, appellant's cell phone was seized by an investigator with the State Attorney's Office. The January 20 video could not be located on appellant's phone and an expert concluded that the video had been deleted.

The January 20 video was ultimately recovered from two locations—Koepke's Sprint/Nextel account and the e-mail servers at the Broward Sheriff's Office. Both versions of the video were played for the jury.

Both at the conclusion of the State's case and after the defense rested, appellant moved for a judgment of acquittal on the evidence tampering count. After the jury verdict, he filed post-trial motions directed at the evidence tampering conviction.

[1]   [2]   Section 918.13, Florida Statutes (2013), provides in pertinent part:

> (1) No person, knowing that a criminal trial or proceeding or an investigation by a duly constituted prosecuting authority, law enforcement agency, grand jury or legislative committee of this state is pending or is about to be instituted, shall:
>
> > (a) Alter, destroy, conceal, or remove any record, document, or thing with the purpose to impair its verity or availability in such proceeding or investigation....

To establish a violation of the statute, "the State must prove a defendant 'had knowledge of an impending investigation and destroyed evidence in order to impair its availability for the investigation.' " *State v. Major*, 30 So.3d 608, 609 (Fla. 4th DCA 2010) (quoting *C.K. v. State*, 753 So.2d 617, 618 (Fla. 4th DCA 2000)). Appellant admitted he was "buddies" with Koepke, so he knew that there was a pending investigation into the matter; that was why he recorded the conversation in the first place. There is thus no issue with the "knowledge" element of the crime. Appellant takes issue with the second element—that he intentionally deleted the video from his phone with the purpose to impair its availability for the investigation.

[3]   [4]   We have held that a defendant's equivocal conduct toward evidence is insufficient to demonstrate the intent necessary for a section 918.13 violation; merely discarding

evidence from one's person, without more, does not amount to a violation of the statute. "[T]he offense of tampering is committed only when the defendant takes some action that is designed to actually alter or destroy the evidence rather than just removing it from his or her person." *E.I. v. State,* 25 So.3d 625, 627 (Fla. 2d DCA 2009).

In *Obas v. State,* 935 So.2d 38, 38 (Fla. 4th DCA 2006), for example, the defendant emptied a pill container of crack cocaine rocks as police approached. He tossed the container five feet away after police ordered him to stop. *Id.* This Court reversed *739 the defendant's conviction for tampering with evidence, stating:

> We are unable, on these facts, to accept the state's argument that defendant violated the statute. If defendant had dropped or thrown the items so that they could not have been retrieved, it would be another matter, like swallowing. In this case, however, where he merely dropped the cocaine rocks and tossed the container on the ground, and both were easily found, the evidence was insufficient. Otherwise a tampering conviction could be obtained whenever a suspect merely drops drugs on the ground.

*Id.* at 39.

Similarly, in *Evans v. State,* 997 So.2d 1281 (Fla. 4th DCA 2009), we held that the trial court erred in denying a motion for judgment of acquittal on a charge of tampering with evidence where the defendant threw a crack cocaine rock onto sandy ground as officers approached for a stop. We held that the fact the officers were unable to find the drugs due to

the nature of the surface of the ground did not demonstrate the necessary specific intent to tamper with or conceal the evidence. *Id.* at 1284.

Such equivocal conduct differs from that conduct that completely destroys potential evidence, such as swallowing an object. *See State v. Jennings,* 666 So.2d 131, 133 (Fla.1995); *McKenzie v. State,* 632 So.2d 276, 277 (Fla. 4th DCA 1994) (holding that "swallowing a substance" demonstrates the necessary intent to amount to a violation of section 918.13, just like "flushing it down a toilet").

[5]  In this case, after appellant recorded the video on his cell phone, he showed it to his supervisor, texted it to Koepke, and e-mailed it to an attorney for the Police Benevolent Association. As we know from videos that have gone viral, texting or e-mailing a video is the antithesis of trying to destroy it. In fact, with the assistance of technology, the video was recovered from two separate locations. There was insufficient evidence of appellant's intent to violate the tampering statute. In addition, there was insufficient evidence that the video was "destroy[ed]" within the meaning of the statute; the statute does not criminalize deleting evidence existing in the memory of a particular electronic device, particularly where such evidence resides elsewhere in the electronic ether. The trial court's denial of appellant's motion for judgment of acquittal was therefore erroneous.

We reverse the conviction and remand to the circuit court with direction to grant the motion for judgment of acquittal.

DAMOORGIAN, C.J., and MAY, J., concur.

**All Citations**

152 So.3d 737, 39 Fla. L. Weekly D2498

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.